```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3     UNITED STATES OF AMERICA         )   Docket No. 13 CR 00726
                                        )
 4                    Plaintiff,        )   Chicago, Illinois
                                        )   October 6, 2015
 5            v.                        )   10:04 a.m.
                                        )
 6     DaJUAN KEY,                      )
                                        )
 7                    Defendant.        )

 8                                VOLUME 1-A
 9           TRANSCRIPT OF PROCEEDINGS - SUPPRESSION HEARING
               BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11     APPEARANCES:

12     For the Government:     UNITED STATES ATTORNEY'S OFFICE by
                               MS. KATHERINE SAWYER
13                             MR. JEFFREY D. PERCONTE
                               Assistant United States Attorneys
14                             219 South Dearborn Street
                               5th Floor
15                             Chicago, Illinois 60604

16     For the DEFENDANT:      MS. HEATHER L. WINSLOW
                               53 West Jackson Boulevard
17                             Suite 1560
                               Chicago,Illinois  60604
18

19

20

21

22     Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                               Federal Official Court Reporter
23                             219 South Dearborn, Room 2318-A
                               Chicago, Illinois 60604
24                             (312) 435-6047
                               Gayle_McGuigan@ilnd.uscourts.gov
25
```

1                          I N D E X

2    WITNESS                                              PAGE

3    DUSTIN LEGNER
          Direct By Ms. Sawyer ....................... 9
4         Cross By Ms. Winslow ...................... 24
          Redirect By Ms. Sawyer .................... 36
5         Recross By Ms. Winslow ....................39

6    BRIAN L. TRUHLAR
          Direct By Ms. Sawyer ...................... 40
7         Cross By Ms. Winslow ...................... 51
          Redirect By Ms. Sawyer .................... 74
8         Recross By Ms. Winslow ....................79

9    CHRISTINE MASTERSON
          Direct By Mr. Parente ..................... 81
10        Cross By Ms. Winslow ...................... 92
          Redirect By Mr. Parente .................. 110
11
     DACHE CRAYTON
12        Direct By Ms. Winslow .................... 118
          Cross By Mr. Parente ..................... 121
13        Redirect By Ms. Winslow .................. 128

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Proceedings heard in open court:)

 2               THE CLERK:  13 CR 726-1, USA versus DaJuan Key.

 3               MS. SAWYER:  Good morning, your Honor.  Katherine

 4     Sawyer on behalf of the United States.

 5               THE COURT:  Good morning.

 6               MS. WINSLOW:  Good morning, your Honor.  Heather

 7     Winslow on behalf of DaJuan Key, who is present and on his way

 8     into the courtroom.

 9               THE COURT:  Okay.  Good morning.

10          (Defendant enters courtroom.)

11               THE COURT:  Good morning, Mr. Key.

12               THE DEFENDANT:  Good morning.

13               THE COURT:  Okay.  So the way I usually do this is I

14     permit a short opening statement from both sides, and then --

15     have you discussed the presentation of evidence, the two of

16     you?

17               MS. WINSLOW:  We have.  We've been discussing it on

18     and off, and I think that the government is prepared to call

19     the officers who were present at the time of the initial

20     contact.  We will have a witness, one witness, to follow, I

21     believe.

22               THE COURT:  You're going to go first?

23               MS. SAWYER:  Well, I'll defer to the Court for how the

24     Court takes evidence in a motion to suppress.  I've seen it

25     done both ways, so I'll defer to the Court.
```

Opening Statement - Ms. Sawyer

1          THE COURT:  What's your position?

2          MS. WINSLOW:  It's warrantless, which means the burden

3     is on the government, so I anticipated that the government --

4          THE COURT:  Yeah.

5          MS. WINSLOW:  -- would go first, without the warrant.

6          THE COURT:  All right.  We'll do it that way.  And

7     let's get started.  Okay?

8          MS. SAWYER:  If I may, your Honor -- I'm happy to get

9     started.  Christopher Parente is handling the motion with me,

10    and he is in --

11         (Mr. Parente enters courtroom.)

12         MS. SAWYER:  -- a status I believe next door -- here

13    he is.  I take that back, your Honor.

14         MR. PARENTE:  Good morning, your Honor.  Chris Parente

15    for the United States.

16         THE COURT:  Good morning.

17         All right.  Let's get started.  You can have a seat,

18    Mr. Key.

19         And I'll hear first from the government for an opening

20    statement.

21    OPENING STATEMENT BY MS. SAWYER:

22         MS. SAWYER:  Your Honor, particularly as I don't have

23    anything specific prepared for an opening statement, I'll keep

24    this brief.  And I don't want to repeat what's in our papers.

25         I do think that what the Court is going to hear is not

Opening Statement - Ms.  Sawyer

1   one basis for admission of the evidence, but three.

2       The Court will hear testimony from three Romeoville

3   police officers that establish that Mr. Key allowed the

4   officers into the room where this evidence was found.

5       Subsequent to that, items were found in plain view in

6   the room, which were incriminating on their face, that being

7   the tablet displaying a backpage.com ad that this Court will

8   hear more about, condoms, prepared credit cards, all of which

9   to those officers at the time were evidence on their face of

10  prostitution and human trafficking.

11      Beyond that, I suggest the evidence will show that if

12  the Court were not inclined to find that there was consent in

13  this case, that the Court could find that there were also

14  exigent circumstances for the officers to enter that room with

15  the information that they possessed at the time in order to

16  ensure the safety of this 15-year-old girl.

17      And then, third, that there is an inevitable discovery

18  situation in which this evidence nevertheless would have been

19  discovered upon those officers later seeking a search warrant

20  were that to become the case.

21      And then with respect to the vehicle, the Court will

22  hear evidence that consent was provided, if not by Mr. Key,

23  then certainly by Miss Crayton, who was the other individual

24  who was in the hotel room at the time the officers entered.

25  She accompanied Sergeant Masterson downstairs to the vehicle,

Opening Statement - Ms. Winslow

1   opened the vehicle herself, and provided consent for

2   officers -- I'm sorry, Sergeant Masterson, to search that

3   vehicle.

4          Similarly, I think the Court could also find that,

5   regardless of the consent issue, there is an inevitable

6   discovery argument to be made with respect to the vehicle,

7   which would have been impounded and searched later, and, in

8   fact, was searched again pursuant to a federal search warrant

9   in this case.

10         There is yet another argument that Mr. Key -- and this

11  is less clear in the Seventh Circuit -- but that Mr. Key was

12  driving a rental car that he was not on the rental agreement

13  for, so we would potentially make also a standing argument that

14  Mr. Key shouldn't have been driving that vehicle in the first

15  place and doesn't have the standing to contest its search.

16         But our position is going to be that the Court doesn't

17  need to even reach that point because there was consent and

18  also the inevitable discovery issue with respect to the car.

19         So, again, I will keep it short, but the Court will

20  hear evidence I think that will support all of the government's

21  arguments.

22         THE COURT:  Okay.  Thank you.

23  OPENING STATEMENT BY MS. WINSLOW:

24         MS. WINSLOW:  In addition to what the government has

25  just indicated and contrary to what the government has

Opening Statement - Ms. Winslow

1  indicated, we believe that the evidence will show that on the

2  night in question, September 10th, the Romeoville Police

3  Department received a call from -- I think we're calling her

4  AD -- AD's mother, who indicated that her daughter wanted to

5  come home and she was on her way down to pick her up.  She was

6  on her way from Wisconsin to pick her daughter up.  Nothing in

7  that call indicated that she was in danger.  Nothing in that

8  call indicated that she was being held against her will.  In

9  fact, just simply that she wanted to come home, during that

10  call.  She was told to leave the hotel room and to go to the

11  police department where she could be safely picked up by her

12  mother.

13          Nonetheless, Romeoville police officers went to

14  Room 206 in the Super 8 Motel.  And without being given

15  consent, without a warrant, they entered the room, encountered

16  Mr. Key, where they then -- then they then proceeded to search

17  the room without probable cause and without a warrant.

18          We believe that the evidence will show that they never

19  had consent to search the room.  They most certainly did not

20  have consent to enter the hotel room to begin with.  And,

21  moreover, they did not have consent to search the vehicle.

22  Mr. Key was -- the vehicle was registered through the hotel to

23  Mr. Key.  The other individual in the room had no legal or

24  apparent authority to give consent.  In fact, the officers --

25  we anticipate the officers' testimony will be inconsistent as

Legner - Direct by Sawyer

1    to when and who gave consent to begin with.

2            In addition, we believe that the evidence will not

3    support the government's argument for inevitable discovery.  In

4    fact, the officers never did seek a search warrant.  And it's

5    far from clear, based on what we anticipate their testimony

6    will be, that they would certainly have sought this search

7    warrant, which is necessary under the law.

8            In the end, we believe that there will be a witness

9    who will testify and corroborate Mr. Key's own statement in

10   his -- in his affidavit that he was laying in the hotel room

11   when the officers burst into the room without, again, probable

12   cause or a warrant.

13           When all the evidence is heard, we believe that your

14   Honor will find that the evidence was unlawfully seized and

15   should grant the motion to suppress.

16           THE COURT:  Okay.  Thank you, folks.

17           All right.  Then let's have the government call your

18   first witness, please.

19       (Witness enters courtroom.)

20           THE COURT:  Up here, sir.  Raise your right hand.

21       (Witness duly sworn and takes the stand.)

22           THE COURT:  You can proceed.  You may proceed when

23   you're ready.

24           MS. SAWYER:  Thank you, your Honor.

25             DUSTIN LEGNER, GOVERNMENT'S WITNESS, SWORN

Legner - Direct by Sawyer

DIRECT EXAMINATION

BY MS. SAWYER:

Q   Officer, could I have you state and spell your name for the record, please?

A   Dustin Legner.  L-E-G-N-E-R.

Q   And Officer Legner, where do you work?

A   The Romeoville Police Department.

Q   And what is your current rank and duty assignment there?

A   Patrol officer.

Q   And how long have you been with the Romeoville Police Department?

A   9 1/2 years.

Q   All right.  And you said that your current rank and duty assignment is police officer.

     Have you held any other positions with the Romeoville Police Department?

A   Yes.  I worked in the ComStat unit as well as the tactical unit.

Q   What is the ComStat unit?

A   It's a problem-oriented policing unit.

Q   What does that mean?

A   They'll take statistics for different crime trends within the town, and they will decide a specific area.  And we had a unit that would focus on that crime in that area.

Q   All right.  And how long were you with ComStat?

Legner - Direct by Sawyer

1    A    Approximately two years.

2    Q    And during that time, was prostitution an area -- a

3    problem-based issue that you all addressed during your time at

4    ComStat?

5    A    At times, yes.

6    Q    And you mentioned a tac. unit.  Can you describe what that

7    consists of?

8    A    The tactical unit at our department is -- we focus on

9    gangs, guns, and narcotics.

10   Q    How long were you in the tac. unit?

11   A    Approximately four years.

12   Q    During your time at the tac. unit, did you also have

13   experience with prostitution investigations and cases?

14   A    Yes.

15   Q    And what -- can you describe, just briefly, describe that

16   experience.

17   A    Throughout the years that I was with the tactical unit,

18   occasionally we would do prostitution stings -- reverse stings,

19   actually -- where we would take an undercover female officer

20   and post her as a possible prostitute on backpage.com.

21   Q    And what's backpage.com?

22   A    It's similar to Craigslist.  It's a site where you can buy

23   and sell, post ads, personal ads, things of that nature.

24   Q    And what kinds of things are generally posted on

25   backpage.com?

Legner - Direct by Sawyer

A    Everything from items that are for sale, to dating, to
personals, to escorts, exotic dancers, things of that nature.

Q    And what was it about backpage.com that caused you as the
Romeoville Police Department to use that website as opposed to
others in your reverse sting cases?

A    It's the most commonly used website for posting
prostitution ads.

Q    All right.  And were you working as an officer in the
tactical unit on September 10th, 2013?

A    Yes.

Q    And what shift were you working that day?

A    7:00 p.m. to 3:00 a.m.

Q    All right.  And at some point, did a radio call take you to
the Super 8 Motel located at 1301 Marquette Drive in
Romeoville?

A    Yes.

Q    Now, prior to that date, September 10th, 2013, were you,
based on your training and experience as a police officer in
Romeoville, already familiar with that Super Motel location --
that Super 8 Motel location?

A    Yes, I was.

Q    How were you familiar with it?

A    Quite often, we have a lot of issues there with
prostitution and drug use.

Q    And were you specifically also familiar with that hotel

Legner - Direct by Sawyer

1    because of a particular investigation that you knew about?

2    A    Yes.  I wasn't directly involved, but I was aware of a

3    situation where they were surveilling the hotel and looking at

4    the owner of the hotel for supporting prostitution and allowing

5    people to come in and use cash under the table and rent rooms

6    without record.

7    Q    Okay.  All right.  And when the call came through on

8    September 10th, 2013 directing you to that location, were you

9    alone or were you with someone else?

10   A    I was with my partner.

11   Q    Who was your partner that night?

12   A    Officer Brian Truhlar.

13   Q    And what do you recall that dispatch being about?

14   A    It was reference a female white subject from Wisconsin.

15   She was 15 years old.  Her mother had contacted the police

16   department, alleged that she was possibly being held against

17   her will.  She was at the Super 8 Motel in Romeoville with two

18   male blacks.

19   Q    All right.  And at this point, based on the information

20   available to you, what are your biggest concerns?

21   A    The safety of the female.

22   Q    And is that based upon what?

23   A    The possibility that she could have been kidnapped.  We

24   weren't totally clear as to what the mother had said.  She was

25   either being held against her will, she had been kidnapped, or

Legner - Direct by Sawyer

1    she was there on her own.  We weren't sure.

2    Q    All right.  And because of the location and what you knew

3    about it, were you also concerned about prostitution?

4    A    Yes.

5    Q    And are you treating this at this point as an urgent

6    situation?

7    A    Yes.

8    Q    Are you treating it as a possible kidnapping situation?

9    A    Yes.

10   Q    And what do you and Officer Truhlar do in response to

11   getting that call?

12   A    We drive to the Super 8 Motel.  Knowing that the subjects

13   were allegedly from Wisconsin, we checked the parking lot for

14   any vehicles that may have Wisconsin plates, and we located

15   one.

16   Q    You located one.  Where was that?

17   A    It was at the rear of the hotel.  That would be the south

18   side.

19   Q    And aside from that vehicle, do you recall seeing any other

20   vehicles in the parking lot with Wisconsin plates?

21   A    No.

22   Q    And after locating those Wisconsin plates, what did you do?

23   A    We entered the hotel and spoke with the clerk.

24   Q    Did you make any follow-up inquiries with respect to those

25   license plates?

Legner - Direct by Sawyer

1   A   Yes.  We asked if they had anyone registered at the hotel

2   from Wisconsin who had rented a room.

3   Q   Did you run the license plate themselves?

4   A   Yes.

5   Q   And what, if anything, did you find out once you did that?

6   A   Came back out of Wisconsin to a rental company.  I believe

7   it was Enterprise.

8   Q   All right.  And based on your training and experience as a

9   police officer, did the fact that that was a rental car mean

10   anything to you or suggest anything to you?

11   A   Yes.  Rental cars are very commonly used in prostitution

12   and/or drug trafficking.

13   Q   All right.  And so once you gain this information about the

14   license plate, you've alluded to this already, but what did you

15   do next?

16   A   We went in and spoke with the clerk.  Requested information

17   about anyone who -- from Wisconsin that may have been staying

18   in the hotel.

19   Q   What, if any, information did the clerk provide you?

20   A   She advised there was one subject in Room 206 from

21   Wisconsin.

22   Q   All right.  And what information did she provide you about

23   that particular person?

24   A   She showed us a photocopy of his ID.  It was DaJuan Key.

25   And his driver's license number.

Legner - Direct by Sawyer

1    Q    All right.  And was DaJuan Key that you -- when you saw the

2    license plate, did he fit the description, at least insofar as

3    he was a black male?

4    A    Yes.

5    Q    Of the individual who this young girl was with.

6    A    Right.

7    Q    Okay.  So at this point, all of the information that you've

8    gathered at the hotel, would you say it was consistent with the

9    information provided to you in the dispatch?

10   A    Yes, up to that point.

11   Q    With this information, what did you do next?

12   A    Once we located what room it was, myself, Officer Truhlar,

13   and Sergeant Masterson went up to the room.

14   Q    All right.  And what happened when you got to the room?

15   A    When we walked into the room -- walked up to the room,

16   the -- the door was open.  The latch that would be the -- the

17   upper latch on the door that you would lock from the inside was

18   pushed to the outside, so that was holding the door open about

19   an inch.

20   Q    All right.  And what did you do when you got to the door

21   and saw this?

22   A    We knocked on the door.

23   Q    Did you identify yourself as RPD or as police in any way?

24   A    Once the door was opened, yes, we identified ourselves.  We

25   were also wearing vest carriers that said "Romeoville Police"

Legner - Direct by Sawyer

1     on the front and "Police" on the back.

2     Q    All right.  And did anyone come to the door?

3     A    Yes.  One male black.

4     Q    And was it the same individual that you had seen in the

5     driver's license photo?

6     A    Yes.

7     Q    And do you see that individual in the courtroom here today?

8     A    Yes.

9     Q    Would you please identify him by an article of clothing and

10    where he is seated?

11    A    The black male at the table over there, wearing the orange

12    shirt.

13          MS. SAWYER:  Your Honor, at this time I would request

14    that the record reflect an in-court identification of the

15    defendant.

16          THE COURT:  It will.

17    BY MS. SAWYER:

18    Q    And when the defendant came to the door, Officer Legner,

19    what happened next?

20    A    We began to speak with him.  Asked him about a 15-year-old

21    white female.

22    Q    All right.  And as you're standing at the door when the

23    defendant first comes to the door, are you able to see in the

24    room?

25    A    Yes.

Legner - Direct by Sawyer

1  Q    And are you able to see whether or not there is anyone else

2  in the room with the defendant?

3  A    Yes.  There's a black female towards the back rear corner

4  of the room sitting on the bed.

5  Q    Could you see whether there was anyone else in the room?

6  A    Not at that time, no.

7  Q    All right.  And when Mr. -- when the defendant came to the

8  door, what exchange did you all have with him?

9  A    We asked him about the 15-year-old white female.  He told

10  us that he didn't know where she was.  He thought she had gone

11  to the McDonald's across the street.

12  Q    All right.  And at some point, did you and other

13  officers -- at some point during this exchange, did you and

14  other officers have occasion to enter the hotel room?

15  A    Yes.

16  Q    Can you explain to the Court, please, how that happened?

17  A    Through our conversation with him, he explained that he

18  thought she was across the street at the McDonald's, wearing a

19  black and white dress.  We started to -- throughout our

20  conversation, we asked if he'd mind if we check -- if we check

21  the room.  He advised that that was no problem, come on in.

22        And then at that point, we entered the room -- myself,

23  Sergeant Masterson, and Officer Truhlar -- and continued our

24  conversation.

25  Q    Could you describe the defendant's demeanor at the point

Legner - Direct by Sawyer

1   that you're having this exchange with him?

2   A   Pleasant at this time.  Cooperative.

3   Q   At any point while you were outside or entering the room,

4   did he ever ask you to leave?

5   A   No.

6   Q   Did he ever indicate in any way to you that he did not want

7   you in the room?

8   A   No.

9   Q   And so the defendant ultimately told you that he thought

10  that she was across the street at the McDonald's; is that

11  correct?

12  A   Yes.

13  Q   And once you were inside the room, was there anything

14  located inside the room that caught your attention?

15  A   Yes.

16  Q   What was that?

17  A   I observed on -- to my left on the dresser near the

18  television, I observed a tablet.

19  Q   And what do you mean when you say "tablet"?

20  A   Like an iPad, iPad-type device.

21  Q   So a tablet computer?

22  A   Yeah, tablet computer.

23  Q   All right.  And what about the tablet computer drew your

24  attention?

25  A   It was open to backpage.com.

Legner - Direct by Sawyer

1   Q   And is that the same website that we discussed earlier?

2   A   Yes.

3   Q   And so in your training and experience, what did that lead

4   you to believe or what did that tell you?

5   A   That's an instant clue that it's possible that there could

6   be prostitution going on.

7   Q   And what, if anything else, did you observe around the

8   room?

9   A   I noticed a large amount of prepaid credit cards.

10  Q   And what significance did that have to you?

11  A   Throughout our prostitution details and stings, we found

12  that most of the time they used the prepaid credit cards to pay

13  for their hotel rooms as well as their backpage ads.

14  Q   All right.  And were you also -- were you also able to

15  observe condoms?

16  A   Yes.

17  Q   All right.  And it seems like a silly question, but what,

18  if anything, did that tell you?

19  A   There was used and unused condoms spread throughout the

20  room.  And that's also another, obviously, sign of sexual

21  activity.

22  Q   Now, at this point in the conversation, to your knowledge,

23  had this missing 15-year-old girl yet been located?

24  A   No, she had not.

25  Q   Okay.  What, if anything else -- what, if other -- any

Legner - Direct by Sawyer

1    other conversation at this point did you have with Mr. -- with
2    the defendant?
3    A    The female that was in the room was taken out in the
4    hallway by Sergeant Masterson.  She was attempting -- she
5    wanted to locate her identification.  She had told Sergeant
6    Masterson that it was -- she believed it was in the car.
7    Q    Let me just parse through this a little bit.
8         You said "she" a couple of times.
9         Who was attempting to locate whose identification?
10   A    Dache Crayton was attempting to locate her own
11   identification.
12   Q    All right.  And then Miss Crayton stated that she thought
13   it was potentially in the car; is that correct?
14   A    Yes.
15   Q    Okay.  And as a result of that, was there a conversation
16   with the defendant about the car?
17   A    Yes.
18   Q    And what was that conversation?
19   A    I asked permission for the officers to search the vehicle.
20   He gave verbal consent at that time.  The keys were sitting on
21   the bed.  I gave the keys to Sergeant Masterson.  Her and
22   Miss Crayton then went downstairs to the vehicle.
23   Q    All right.  And did the defendant tell you anything about
24   who the car belonged to?
25   A    He said it was rented for him by another party up in

Legner - Direct by Sawyer

1    Wisconsin a few days prior.

2    Q    Did he also tell you that he had, in fact, driven it to

3    Chicago from Wisconsin?

4    A    Yes.

5    Q    All right.  And once Sergeant Masterson left the room with

6    Miss Crayton, do you know where they went?

7    A    I believe they went downstairs to the vehicle.  I did not

8    go with them.

9    Q    Okay.  So you weren't personally with them once they left

10   the room.

11   A    No, I was not.

12   Q    All right.  Now, once -- once that happened, what, if

13   anything, happened next with the defendant?

14   A    Once Miss Crayton and Sergeant Masterson walked away, he

15   started to get fidgety.  He was reaching in his pockets, in his

16   waistband, putting his hands under his shirt.  I asked him to

17   stop multiple times, he wouldn't, at which point he was placed

18   in handcuffs just for his safety and ours.

19   Q    All right.  What was it in particular that was concerning

20   you about his actions?

21   A    He hadn't been patted down for weapons or anything at this

22   point.  I'm not -- wasn't familiar with him.  The fact that he

23   kept reaching into his waistband and into his pockets, he could

24   have had a weapon.

25   Q    All right.  In a short time -- or at least at some point

Legner - Direct by Sawyer

1    after placing handcuffs on the defendant, did you subsequently

2    receive another communication from Sergeant Masterson?

3    A    Yes.

4    Q    And what was that communication?

5    A    At that point, she had told us that he was to be

6    transported to the station for questioning.

7    Q    So in your mind, until that point he was not under arrest?

8    A    No.  He was just being detained because he wasn't -- he

9    wasn't being cooperative and a lot of furtive movements with

10   his hands.

11   Q    In that communication from Sergeant Masterson to you all

12   to -- that -- that the defendant should be transported to the

13   station, was the defendant able to hear that?

14   A    I believe so, yes.

15   Q    All right.  And what was his response to that, if you can

16   recall?

17   A    He instantly asked for an attorney.  Didn't want to be

18   asked any questions.

19   Q    All right.  And did you all honor that?  Did you have any

20   further interaction with him?

21   A    No, I didn't.

22   Q    And after you received that communication from Sergeant

23   Masterson that the defendant should be transported, did you

24   conduct -- did you then conduct a search incident to his

25   arrest?

Legner - Direct by Sawyer

1    A    Yes.

2    Q    And what, if anything, did you recover from him?

3    A    I believe we located $323 in U.S. currency, as well as the

4    hotel room key.

5    Q    All right.  And following that arrest, did you -- were you

6    then the person responsible for seizing those items from the

7    hotel room?

8    A    Yes.

9    Q    And specifically with reference to the tablet, the condoms,

10   and the prepaid credit cards, just to make clear, were those

11   all in plain view at all times when you were in the room?

12   A    Yes, they were.

13   Q    And after the -- were you personally responsible for

14   transporting the defendant?

15   A    No, I was not.

16   Q    After he was transported, did you have any further

17   interaction with him?

18   A    No, I did not.

19   Q    Did you have any further involvement in this case at all

20   until -- until this came about?

21   A    No.

22   Q    Officer Legner, if Mr. Key -- if the defendant had not come

23   to the door, if it hadn't been open and he hadn't come to the

24   door, if it had been locked, you knocked, and no one answered,

25   what would your next steps have been?

Legner - Cross by Winslow

1   A    We would have knocked on the doors of the surrounding rooms

2   to see if they had observed any white female matching the

3   description of who we were looking for.  We probably would have

4   surveilled the room, contacted a supervisor, and then

5   eventually probably contacted the Will County State's

6   Attorney's Office about a search warrant.

7   Q    All right.  And is this a circumstance, given all of the

8   facts that you knew at the time you went to that room, is this

9   a circumstance where in your training and experience as a

10  police officer you would have felt comfortable walking away

11  from that door and taking no further action?

12  A    No.

13  Q    Why is that?

14  A    There's a possibility of an underage female being held

15  against her will, out of state from where she's originally

16  living.  It's not a situation that we can ignore.

17  Q    Thank you.

18          MS. SAWYER:  I have no further questions, your Honor.

19          THE COURT:  All right.

20                          CROSS-EXAMINATION

21  BY MS. WINSLOW:

22  Q    Do you recall the specific dispatch phone call that alerted

23  you to the situation?

24  A    The phone call or the dispatch?

25  Q    The dispatch.

Legner - Cross by Winslow

1    A    Specific words that were used?  No, I don't.

2    Q    All right.  Do you recall whether during that call there

3    was any indication that this white female was being held

4    against her will?

5    A    The information that we received from Sergeant Masterson, I

6    believe via the phone, elated -- elaborated more on that.

7    Q    During this call, there was no statement about an

8    individual being subjected to any violence, was there?

9    A    Violence?  No.

10   Q    And there was no specific indication that she had been

11   kidnapped; is that right?

12   A    Specific?  No.

13   Q    And, in fact, what the call said was that a 15-year-old

14   girl -- that they received a call from her mother, and she

15   wanted to go home; is that right?

16   A    Yes.

17   Q    And so nothing in that call indicated she had been taken

18   against her will, did it?

19   A    Not in the dispatch call, no.

20   Q    And nothing in that -- in that dispatch call that sent you

21   to the Super 8 Motel indicated that she was being prostituted,

22   did it?

23   A    Not at that time, no.

24   Q    All right.  I'm just asking you about this original call

25   when you first received the alert.

Legner - Cross by Winslow

1    A    Uh-hum.

2    Q    And so when you went to the Super 8 Motel, you didn't have

3    any knowledge, any information, that this individual had been

4    kidnapped, did you?

5    A    By the time we arrived at the hotel, yes, we had received a

6    phone call from Sergeant Masterson.

7    Q    And -- you received a phone call from Sergeant Masterson,

8    and she was already at the hotel; is that right?

9    A    No.  She was on her way from the station.  I believe one of

10   the commanders at the department had spoken further with the

11   mother on the phone.  She contacted us with more information.

12   Q    And during that phone call between the commander, if you're

13   aware, the mother never said she had been kidnapped.

14   A    I wasn't on the phone with her.

15   Q    Did anybody say that the mother said she had been

16   kidnapped?

17   A    Yes.  We were told she's being held against her will.

18   Q    That's the information you received about this phone call.

19   A    That's the information that I received, yes.

20   Q    Okay.  And when you arrived at the Super 8 Hotel, you

21   indicated that the door was open; is that right?

22   A    Yes.

23   Q    Do you recall meeting with the United States Attorney's

24   Office or a representative of the United States Attorney's

25   Office around October of 2014?

Legner - Cross by Winslow

1   A   Yes, I believe so.

2   Q   And do you recall them asking you about the circumstances

3   of this case?

4   A   I don't recall the specifics of what we talked about at

5   that time, no.

6   Q   Do you recall telling representatives of the United States

7   Attorney's Office that your recollection was that the door was

8   shut?

9   A   No, I don't.

10  Q   You don't recall that?

11  A   Not at that time, no.

12  Q   Okay.  You've indicated that the latch to the door was

13  holding the hotel door slightly ajar; is that correct?

14  A   Yes.

15  Q   And you knocked on the door?

16  A   Yes.

17  Q   And you didn't announce your office at the time, right?

18  A   Not until the door was opened, no.

19  Q   And the door was open -- the door opened because you

20  knocked on it, right?

21  A   No, the door opened because he opened it.

22  Q   So it's your testimony that he got up and he opened the

23  door?

24  A   Yes.

25  Q   All right.  And he stood there --

Legner - Cross by Winslow

1   A   Yes.

2   Q   -- is that right?

3       And did he ask you to come into the room?

4   A   We asked permission to come in the room.

5   Q   And he said, "Please come in"?

6   A   Yes.

7   Q   All right.  You said that he was cooperative at this point.

8   A   Yes, he was.

9   Q   That's your testimony.

10      All right.  And once you entered the room, you saw

11  another individual there; is that right?

12  A   Yes.

13  Q   And what was she doing?

14  A   Female black sitting on the bed.

15  Q   She was sitting on the bed.

16      This bed, was it the one closest to the door or

17  furthest from the door?

18  A   I believe it was the furthest from the door.

19  Q   All right.  And the other bed was empty?

20  A   To my knowledge, yes.

21  Q   All right.  You indicated that when you entered the room,

22  you saw a tablet; is that right?

23  A   Yes.

24  Q   And the tablet was on a dresser?

25  A   Yes.

Legner - Cross by Winslow

1  Q   And where was that dresser with respect to the door?

2  A   As you walked in, it would have been to your left, probably

3  about 5 feet into the room.

4  Q   All right.  How far away from the dresser were you?

5  A   Maybe 18 inches, at the most.

6  Q   And how tall is this dresser?

7  A   Approximately 3, 3 1/2 feet, I'd imagine.

8  Q   All right.  So it was below you; is that right?

9  A   About waist height, yes.

10 Q   About waist height.  Okay.

11      And so you were standing close to it, but you said

12 that you could see this tablet; is that right?

13 A   Yes.

14 Q   And you -- your testimony is that you -- you saw that it

15 was open to backpage; is that right?

16 A   Yes.

17 Q   Did you swipe the tablet in order to open it to backpage?

18 A   No, I did not.

19 Q   You indicated that one of -- one of the considerations that

20 was in your mind when you went in is that this was a rental

21 car -- there was a rental car registered to the room; is that

22 right?

23 A   Yes.

24 Q   And you said rental cars are commonly used in prostitution;

25 is that right?

Legner - Cross by Winslow

1   A    Yes.

2   Q    Are they also commonly used in legal travel?

3   A    I'm not aware of that.

4   Q    You don't know whether rental cars are used for legitimate

5   travel?

6   A    Oh, I thought you were referring to, like, legal as in,

7   like, lawyers -- okay.

8   Q    Although sometimes but --

9   A    Do normal folks?  Yes, they do rent rental cars.

10  Q    So there's nothing inherently suspicious about renting a

11  car, is there?

12  A    Not necessarily, no.

13  Q    And there's nothing inherently reflective of prostitution

14  in renting a car from Wisconsin and driving to Illinois; is

15  that right?

16  A    No.

17  Q    And this Super 8 Motel that you were talking about, you

18  indicated that it was the subject of some prostitution

19  investigation; is that right?

20  A    One that I wasn't involved in, but yes.

21  Q    But it's not solely used for prostitution, is it?

22  A    Not -- I'm sure it's not.

23  Q    All right.  And so it's -- people stay there legitimately

24  without any connection to prostitution.

25  A    I would imagine so.

Legner - Cross by Winslow

1    Q    Or any connection to drugs.

2    A    Yes.

3    Q    So, again, there's nothing inherently suspicious about

4    checking in to the Super 8 Motel, nothing inherent about that;

5    is that right?

6    A    No.

7    Q    For the court reporter.

8    A    Oh.  No.

9    Q    Okay.  I want to talk to you a little bit about the vehicle

10   keys.

11              You indicated that the keys were on the bed; is that

12   right?

13   A    Yes.

14   Q    And which bed were the keys on?

15   A    That would have been the bed closest to me, so the closest

16   to the door.

17   Q    So they were not on the bed that was -- where the other

18   individual was sitting; is that right?

19   A    Right.

20   Q    And did you ever see Miss Crayton take those keys?

21   A    No.

22   Q    Did you see her in possession of those keys?

23   A    No.

24   Q    Did Miss Crayton ever indicate to you that she had a car

25   that was parked in the parking lot?

Legner - Cross by Winslow

1   A   I did not speak with her.

2   Q   All right.  Did you hear her indicate to anyone that she

3   had a car parked in the parking lot?

4   A   No.

5   Q   All right.  In fact, she said she was looking for her ID;

6   is that right?

7   A   Yes.

8   Q   And she didn't have the keys, again, correct?

9   A   (Nods head.)

10  Q   So --

11  A   Yes.

12  Q   For the court reporter.  Yes.

13          So you had to retrieve the keys from the bed -- from

14  the bed closest to the door; is that right?

15  A   Yes.

16  Q   And at that point, the keys were given to Sergeant

17  Masterson; is that right?

18  A   Yes.

19  Q   All right.  And Sergeant Masterson took Ms. Crayton

20  downstairs; is that right?

21  A   Yes.

22  Q   And after Sergeant Masterson took Miss Crayton downstairs,

23  they were going to look in the car for her identification; is

24  that right?

25  A   Yes.

Legner - Cross by Winslow

1   Q    That car was registered to the room -- to Room 206; is that

2   right?

3   A    Yes.

4   Q    And it was registered to Room 206 under Mr. Key's name; is

5   that correct?

6   A    Yes.

7   Q    And Mr. Key is the one who registered that car to the room;

8   is that correct?

9   A    I would assume so.  I wasn't there.

10  Q    All right.  From your discussion with the desk clerk, would

11  it seem reasonable that Mr. Key was the one who registered the

12  car?

13  A    Yes.

14  Q    Because he's the one who registered the room.

15  A    Yes.

16  Q    And he indicated that the car was his to the clerk; is that

17  right?

18  A    Yes.

19  Q    All right.  And after Sergeant Masterson took Miss Crayton

20  downstairs to look for her ID, did you get a call from Sergeant

21  Masterson to look around the room for the identification?

22  A    Not to my knowledge, no.

23  Q    You don't recall that?

24  A    No.

25  Q    All right.  During this period of time when you encountered

Legner - Cross by Winslow

1    Mr. Key, you indicated you hadn't patted him down; is that
2    right?
3    A   No, I had not.
4    Q   Had you spoken to your -- to your commander about getting a
5    search warrant for the room?
6    A   No.
7    Q   Did you ever speak to your commander about getting a search
8    warrant to the -- for the room?
9    A   No.  There was a supervisor on scene.  I had no reason to
10   contact a commander.
11   Q   All right.  And you had no reason to get a search warrant
12   for the room; is that right?
13   A   Wasn't needed.
14   Q   It wasn't needed, and you never did; isn't that correct?
15   A   That's correct.
16   Q   You indicated that had Mr. Key not opened the door, you
17   would have surveilled the room; is that correct?
18   A   Yes.
19   Q   All right.  And by surveil, you mean sit outside and watch
20   for comings and goings?
21   A   Yes.
22   Q   How long would you have surveilled this room?
23   A   That would have been determined by the supervisor.
24   Q   Okay.  But you wouldn't have received a search warrant to
25   go into the room; is that right?

Legner - Cross by Winslow

1    A    That's a decision that would be made by the Will County

2    State's Attorney's Office.

3    Q    Well, at that point did you feel you had enough information

4    to get a search warrant to go into that room?

5                MS. SAWYER:  Objection.

6                THE COURT:  Overruled.

7    BY THE WITNESS:

8    A    It was unknown.  There was a lot of unknowns in this case

9    up to that point.  The safety of the girl was paramount.

10   BY MS. WINSLOW:

11   Q    Well, you keep saying that the safety of the girl was

12   paramount, but you still at this point hadn't received any

13   information that she had been kidnapped; is that right?

14   A    I told you I was contacted via the telephone and told she

15   was being held against her will.

16   Q    And you --

17   A    The information from the mother.

18   Q    Okay.  It's your testimony that you were told that the

19   mother contacted the commander and told her she was being held

20   against her will; is that correct?

21   A    Yes.

22   Q    All right.  But still at this point, you did not wish to

23   seek a search warrant; is that correct?

24   A    It wasn't needed at that time.

25   Q    Thank you.

Legner - Redirect by Sawyer

1        MS. WINSLOW:  Nothing further.

2        THE COURT:  Okay.  Any redirect?

3        MS. SAWYER:  Briefly, your Honor.

4        THE COURT:  Okay.

5                    REDIRECT EXAMINATION

6    BY MS. SAWYER:

7    Q    Officer Legner, among the things that you knew at the time

8    that you arrived at the room, is one that this 15-year-old girl

9    had called crying?

10   A    Yes.

11   Q    And that she wanted to go home.

12   A    Yes.

13   Q    She was 15 years old, correct?

14   A    Yes.

15   Q    And you were also informed that she had been taken from

16   Madison, Wisconsin to Chicago.

17   A    Yes.

18   Q    All right.  And you also testified that you're aware that

19   this particular hotel is used for narcotics and prostitution,

20   correct?

21   A    Yes.

22   Q    And so when you say that the safety of the girl was

23   paramount, she may not have been -- let me ask you this:

24        When we use the word "kidnapping," does that

25   necessarily mean to you in your mind as a police officer that

Legner - Redirect by Sawyer

1    she was blindfolded and thrown into --

2           MS. WINSLOW:  Objection, your Honor.

3    BY MS. SAWYER:

4    Q    -- a windowless van?

5           THE COURT:  All right.  Because you objected while she

6    was talking, I have to re-read this question.

7           (Pause in proceedings.)

8           THE COURT:  Okay.  I'm going to sustain the objection

9    because, first of all, you're supposed to not be leading and

10   so -- if you want to have him define what "kidnapping" is, you

11   can do that.

12   BY MS. SAWYER:

13   Q    Officer, let me ask you this a different -- a different

14   way.

15          In your training and experience, is it possible for

16   someone to go with a person initially voluntarily and for it to

17   evolve into a kidnapping?

18   A    Yes.

19   Q    And what is -- what is kidnapping?  When you as a police

20   officer think about a kidnapping, what circumstances can that

21   encompass?

22   A    That could encompass anything from, like you said, leaving

23   with someone voluntarily and then realizing that you're not

24   allowed to leave when you choose.  It could be anything from

25   that to an actual, you know, blindfold and gagged, throw them

Legner - Redirect by Sawyer

1    in the trunk kind of a thing.  There's a -- there's a wide

2    variety of things that -- it could have all been a kidnap.

3    Q    And in your mind, once you knew that there was a

4    15-year-old girl that had been taken across state lines to a

5    hotel that was renown in the area to police officers for

6    narcotics and prostitution, what are some of the things going

7    through your mind that could have been happening to that girl

8    in that room?

9    A    It could have been anything from prostitution, to drug use,

10   to she could have been legitimately held against her will, and

11   she could have been kidnapped.  Until we had further

12   information and we were able to say for sure what had happened

13   to her, we had to continue our investigation.

14   Q    All right.  And you were asked a few questions about

15   Miss Crayton's ID.

16          It was Miss Crayton's ID that they were referring to

17   that was in the rental car, correct?  Or that she thought was

18   in the rental car.

19   A    Yes.

20   Q    And was that conversation had in the presence of the

21   defendant?  Was he there when that conversation was had?

22   A    At that point we were all still in the room, yes.

23   Q    And did Miss Crayton ever ask the defendant permission to

24   go into the car?

25   A    Not that I heard.

Legner - Recross by Winslow

1   Q   And did he ever voice an objection to Miss Crayton going

2   into the car?

3   A   No.

4          THE COURT:  Anything on that?

5          MS. WINSLOW:  Just very briefly.

6          THE COURT:  Sure.

7                    RECROSS-EXAMINATION

8   BY MS. WINSLOW:

9   Q   You testified that when we were talk -- when Miss Sawyer

10  was asking you about the universe of potential kidnapping

11  scenarios; is that right?  And you testified that you could not

12  say for sure what was happening in this case; is that right?

13  A   No, I wasn't there.

14  Q   So you, when you entered the room, did not have information

15  that this individual had been kidnapped; is that correct?

16  A   We were unsure at that time.

17  Q   Thank you.

18         THE COURT:  Okay.  You can step down then --

19         THE WITNESS:  Thank you.

20         THE COURT:  -- and be excused.

21     (Witness excused.)

22         THE COURT:  And you can call your next witness.

23         MS. SAWYER:  At this time, your Honor, the government

24  calls Officer Brian Truhlar.

25         THE COURT:  Okay.

```
 1        (Witness enters courtroom.)

 2             THE COURT:  Please raise your right hand.

 3        (Witness duly sworn and takes the stand.)

 4             THE COURT:  Okay.  Have a seat.

 5             BRIAN L. TRUHLAR, GOVERNMENT'S WITNESS, SWORN

 6                          DIRECT EXAMINATION

 7   BY MS. SAWYER:

 8   Q    Good morning, Sergeant.

 9   A    Good morning.

10   Q    Could I have you state and spell your name for the record,

11   please?

12   A    Brian L. Truhlar.  T-R-U-H-L-A-R.

13   Q    And Sergeant Truhlar, where do you work?

14   A    Romeoville Police Department.

15   Q    What's your current rank and duty assignment?

16   A    Patrol duty sergeant.

17   Q    How long have you been with Romeoville -- with the

18   Romeoville Police Department?

19   A    Almost 14 years.

20   Q    And how long have you been a duty sergeant?

21   A    Almost a year.

22   Q    And before that, what was your rank and duty assignment?

23   A    I was a tactical officer.

24   Q    Did you -- how long were you a tactical officer for?

25   A    Almost eight years.
```

Truhlar - Direct by Sawyer

1    Q    Prior to that, did you hold any other offices within the
2    Romeoville Police Department?
3    A    Field training officer, firearms instructor, and several
4    other instructor training applications.
5    Q    All right.  And could you just summarize briefly for the
6    Court some of your duties and responsibilities as a tactical
7    officer?
8    A    To investigate known gang members, any drug activity,
9    prostitution, anything gun-related.
10   Q    All right.  In your time as a tactical officer, did you, in
11   fact, have occasion to investigate and work on prostitution
12   cases?
13   A    I did.
14   Q    Over the course of your career, approximately how many
15   prostitution cases would you say that you worked on?
16   A    Probably over 100.
17   Q    And were you working on the evening of September 10th, 2013
18   as a tactical officer?
19   A    I was.
20   Q    And were you working alone or with someone else?
21   A    With Officer Legner.
22   Q    At some point that evening, did you receive a dispatch that
23   took you to the Super 8 Motel located in Romeoville at 1301
24   Marquette Drive?
25   A    I did.

Truhlar - Direct by Sawyer

1  Q   What, if anything, do you recall about the dispatch that
2  you received or the instructions that took you there?
3  A   The information that we received was a young 15-year-old
4  female white girl was being held against her will at the
5  Super 8 Motel.
6  Q   Did you have information about where that young girl was
7  from?
8  A   Wisconsin.
9  Q   And at that time, based on your training and experience as
10 a police officer, were you familiar with that specific Super 8
11 Motel?
12 A   I am.
13 Q   And what, if anything, did you know about that motel?
14 A   That hotel has a lot of -- is known for a lot of drug
15 activity, prostitution, things of that nature.
16 Q   All right.  And so taking all of the information that you
17 had as a whole, that being that there was a 15-year-old girl,
18 against her will, with an individual that had taken her from
19 Wisconsin to Romeoville to this specific location, what is your
20 first thought when you hear that that's where she is?
21         MS. WINSLOW:  Objection.
22         THE COURT:  First thought?  Well, it is mushy, isn't
23 it?
24    (Laughter.)
25         THE COURT:  I'll sustain on the grounds of mushiness.

Truhlar - Direct by Sawyer

1    What his reason was for acting in a certain way is

2    fine; but what his first thoughts are, maybe he was thinking

3    about what he's having for dinner tonight.  I mean, I don't

4    know.  Have him --

5    BY MS. SAWYER:

6    Q   At this --

7         THE COURT:  -- be a law enforcement officer.

8         MS. SAWYER:  Understood, your Honor.

9    BY MS. SAWYER:

10   Q   At this point, Sergeant Truhlar, given all of this

11   information, what are your concerns with respect to the girl's

12   situation?

13   A   That her well-being might -- is probably in jeopardy.  She

14   could be, you know, being tied up.  I mean, I'm thinking

15   worst-case scenario.

16   Q   And are you treating this as an emergency situation, as an

17   urgent situation?

18   A   Yes.

19   Q   And what are some of the crimes that you were concerned

20   could be -- could be being committed at this time?

21         MS. WINSLOW:  Objection as to relevance, Judge.

22         THE COURT:  I think at this point it is, so sustained.

23   BY MS. SAWYER:

24   Q   All right.  In response to the calls -- and let me just ask

25   you, you received a dispatch, correct?

Truhlar - Direct by Sawyer

1    A    Yes.

2    Q    All right.  And were there any other communications that

3    you recall receiving with respect to what was happening?

4    A    Yes.  I was in communication through cell phone with

5    Sergeant Masterson.

6    Q    All right.  And in response to either or both the dispatch

7    and/or the cell phone communications, did you respond to the

8    Super 8 --

9    A    Yes.

10   Q    -- on Marquette Drive?

11   A    Yes.

12   Q    And what did you do when you got there?

13   A    We checked the parking lot to see if we could locate any

14   vehicles with Wisconsin plates on them.

15   Q    Were you able to do so?

16   A    We did.

17   Q    And did you locate one vehicle or more than one vehicle?

18   A    Just one vehicle.

19   Q    And what, if anything, did you do once you located that

20   vehicle?

21   A    We ran the license plate through our dispatch and then

22   proceeded to go inside to make contact with the clerk.

23   Q    And why did you do that?

24   A    To see if anybody was staying in the hotel from Wisconsin.

25   Q    All right.  And would you describe the conversation that

Truhlar - Direct by Sawyer

1  you had with the clerk?

2  A   We had asked the clerk if anybody had that vehicle

3  registered that had checked into the hotel or if they had

4  anybody with Wisconsin identification that had checked in, and

5  they went through their list of check-ins and located a male

6  black that had checked in to Room 206 from Wisconsin.

7  Q   All right.  And so up until this point, did all of the

8  information that you learned from your review of the parking

9  lot and your discussion with the clerk corroborate the

10  information you had received from dispatch and from Sergeant

11  Masterson?

12  A   Yes.

13  Q   And so what additional information did the clerk give you

14  about the particular room that they were in?

15  A   She was able to show a copy of the identification card he

16  provided when he checked into the hotel room.

17  Q   And did she tell you what room he had checked into?

18  A   Yes.

19  Q   Did you go to the room?

20  A   We did.

21  Q   What happened when you got to the room?

22  A   When we got to the room, the door was propped open by the

23  security lock inside the latch, and then we knocked on the

24  door.

25  Q   And once you knocked on the door -- now, did you -- when

Truhlar - Direct by Sawyer

1    you're -- as you're knocking on the door, do you identify

2    yourself in any way?  Police?  RPD?  Anything like that?

3    A    Not at that point, no.

4    Q    And did someone eventually come to the door?

5    A    Yes.

6    Q    And who was that?

7    A    DaJuan Key.

8    Q    And the individual who came to the door that you referred

9    to as Mr. Key, do you see him in the courtroom here today?

10   A    I do.

11   Q    And would you identify that individual by an article of

12   clothing and where he's seated?

13   A    The orange shirt to your left, my right.

14          MS. SAWYER:  Could the record reflect an in-court

15   identification of the defendant?

16          THE COURT:  It will.

17   BY MS. SAWYER:

18   Q    And what happened when the defendant came to the door?

19   A    The door opened.  We had asked him where the young female

20   white girl was at.  He stated she wasn't in the room.  We asked

21   him if we could come in and check to verify if she was in the

22   room.  He invited us in.  He said he thought that she was at

23   McDonald's across the street.

24   Q    Just before I get too far ahead, when the defendant got to

25   the door, could you see into the room?

Truhlar - Direct by Sawyer

1    A    After he opened it?

2    Q    Yes.

3    A    Yes.

4    Q    And could you see whether there was anyone else in the room

5    with the defendant?

6    A    There was a female black in the room with him.

7    Q    Did you see -- and were you able to see if there was anyone

8    else in the room at that time?

9    A    Not at that point, no.

10   Q    And did it seem to you -- I guess I just want to clarify.

11        When you asked if the defendant knew where the

12   15-year-old white girl was, what was his demeanor at this point

13   in the conversation?

14   A    Relaxed.

15   Q    Did he let you in as if to say, "See, she's not here"?

16   A    Yes.

17   Q    At any point during this exchange, either at the door or

18   once you're in the room, did he ever ask you to leave?

19   A    No.

20   Q    Did he ever ask -- did he ever indicate to you that he

21   didn't want you in the room?

22   A    No.

23   Q    All right.  And was there anything inside the room once you

24   walked in that caught your attention?

25   A    There was a computer tablet sitting on the dresser.

Truhlar - Direct by Sawyer

1   Q   Was there anything that called your attention specifically

2   to that computer tablet?

3   A   The computer tablet was on and was displayed to backpage.

4   Q   And what is backpage?

5   A   Backpage is a website that is typically used to put up

6   females for the purposes of prostitution.

7   Q   And how do you know that?

8   A   Through my training and experience.

9   Q   Have you encountered it during the course of your

10  experience in prostitution cases?

11  A   I'm sorry?

12  Q   Have you encountered that website during your experience

13  personally on prostitution cases?

14  A   Many times.

15  Q   What, if anything else, did you notice about what was in

16  the room?

17  A   There were condoms laying on the floor.  There were

18  clothes, you know, throughout the room on the floor, on the

19  bed.

20  Q   And were all of those things in plain view or did you have

21  to look around to find them?

22  A   They were in plain view.

23  Q   Now, at some point -- you've just testified that Mr. Key

24  was calm and cooperative.

25          At some point, did that demeanor change?

Truhlar - Direct by Sawyer

1    A    It did.

2    Q    And could you describe that, please?

3    A    When we started to ask him about the computer tablet where

4    it displayed the backpage, he became -- his posture became

5    defensive.  His responses became loud.  He started putting his

6    hands in his pockets and under his shirt.

7    Q    And did you instruct -- what, if anything, did you and/or

8    Officer Legner do in response to those gestures?

9    A    We told him to keep his hands out of his pockets and out

10   from underneath his shirt.  And Officer Legner placed him into

11   handcuffs for our safety.

12   Q    And what was it about those gestures that made you

13   concerned for your safety?

14   A    We didn't know if he had a weapon on him or if he was

15   reaching for any kind of a weapon.

16   Q    And did that -- had you searched or patted down Mr. -- the

17   defendant at any point prior to this?

18   A    No.

19   Q    And do you recall where Sergeant Masterson and the other

20   girl are when this is occurring?

21   A    When he's handcuffed?

22   Q    Yes.

23   A    They were not in the room at that time.

24   Q    And so do you know where they went?

25   A    I believe out in the hallway.

Truhlar - Direct by Sawyer

Q    All right.  At any point did you join them or did you stay in the room?

A    I stayed in the room.

Q    At any point while you were interacting with the defendant in the room, did Sergeant Masterson or the other girl come back to the room?

A    Not that I recall.

Q    So once they left, they never came back; is that right?

A    I believe so.

Q    Okay.  And at some point while you're in the room with the defendant after Sergeant Masterson left, did you ultimately receive another communication from Sergeant Masterson with respect to the defendant?

A    We did.

Q    What was that communication?

A    That Mr. Key was to be transported to the police department to be interviewed.

Q    And was Mr. Key able to hear that transmission?

A    He did.

Q    What do you recall his response being?

A    He immediately said he wasn't going to talk to us and that he wanted to speak to an attorney.

Q    And because of that, did you have any further interaction with Mr. Key?

A    No.

Truhlar - Cross by Winslow

1  Q    And were you personally the one that transported him?

2  A    No.

3  Q    Now, you testified that the door was propped ajar by

4  that -- by that lock.  But if it had been closed and Mr. Key

5  had never come to the door the way he did, what steps would you

6  have taken?

7  A    We would have checked with the adjoining rooms across the

8  hall and next to it to see if we could make contact with

9  anybody staying in those rooms, if they heard anything out of

10 the ordinary.  If we wouldn't have been able to make contact

11 with them, then we would have called the on-call Assistant

12 State's Attorney from Will County to obtain a search warrant.

13 Q    And why would you have done that?

14 A    Because of the seriousness of the call that came in.  We

15 have an obligation and duty to follow through to make sure that

16 the 15-year-old girl is found safe.

17 Q    Given the information in its totality that you had at that

18 time, would you have felt comfortable walking away from that

19 door?

20 A    Absolutely not.

21      MS. SAWYER:  No further questions, your Honor.

22                   CROSS-EXAMINATION

23 BY MS. WINSLOW:

24 Q    Your first communication regarding this situation was a

25 dispatch call; is that correct.  A communication --

Truhlar - Cross by Winslow

1    A    I don't -- I'm sorry?

2    Q    A communication from dispatch, that's what sent you to the

3    Super 8 Motel?

4    A    I don't know if that was the first communication or whether

5    it was through cell phone contact with Sergeant Masterson.

6    Q    Okay.  Do you recall receiving a dispatch communication to

7    send you to the Super 8 Motel?

8    A    I do.

9    Q    And do you recall -- do you recall specifically what was

10   said during that conversation?

11   A    Not -- not off the top of my head, not at all.

12   Q    Do you recall generally what was said?

13   A    Other than a young girl was -- from Wisconsin had been

14   picked up, and that she had wanted to go home was what came

15   across from dispatch.

16   Q    All right.  So the -- the dispatch that you got indicated

17   that -- do you recall whether it indicated that she had called

18   her mother?

19   A    I don't recall.

20   Q    All right.

21        MS. WINSLOW:  I don't know if we have the technology

22   to do this, Judge, but I have the call.  I have the dispatch.

23   BY MS. WINSLOW:

24   Q    If it would refresh your recollection --

25        THE COURT:  We have the technology.  I think it's

Truhlar - Cross by Winslow

1    right there.

2            MS. WINSLOW:  Okay.

3            THE COURT:  So, what, do you have it in a CD?

4            MS. WINSLOW:  I have it in a CD.

5    BY MS. WINSLOW:

6    Q    Would it refresh your recollection of what was in the

7    content of that --

8            THE COURT:  Maybe -- we can get them to -- we can

9    always ask Nate, right?  Yeah.  Yeah, I'll call and see --

10           MS. WINSLOW:  Since there's no jury, I don't know if

11   we can play it on your computer.

12           THE COURT:  Yeah.  I mean, I don't have the -- I don't

13   have a CD drive on my brand new, amazing computer here.

14           THE CLERK:  It's on the side.

15           THE COURT:  Oh, do I?

16           THE CLERK:  It's on the side.

17           THE COURT:  Wait just a minute here.

18           MS. SAWYER:  Your Honor, I do also have a laptop and

19   speakers, if that's easier to do.

20           THE COURT:  Look at that, I do.  I have one.

21           MS. WINSLOW:  You learn something new every day.

22           THE COURT:  I had no idea.  I just got it.  I didn't

23   think I had one.

24           MS. WINSLOW:  I can move on for a little bit.

25           THE COURT:  Yeah.  I don't want to do it on mine

Truhlar - Cross by Winslow

1   because you want to queue it up to where you want to do it.

2             MS. WINSLOW:  It's really easy.  It's set up in items.

3             THE CLERK:  Nate is coming up.

4             MS. WINSLOW:  Why don't I move on for a minute and

5   then we can come back to this.

6             THE COURT:  Move on.

7             Thanks for seeing my CD drive, Tresa.  Didn't know it

8   existed.

9         (Counsel confering.)

10  BY MS. WINSLOW:

11  Q   Okay.  Moving on from that for just a moment, you indicated

12  that you had cell phone contact with Sergeant Masterson; is

13  that right?

14  A   Yes.

15  Q   Is it Sergeant Masterson?

16  A   I'm sorry?

17  Q   Am I right that it's Sergeant Masterson?

18  A   Detective sergeant now, yes.

19  Q   Oh, okay.  But it was sergeant at the time.

20  A   Yes.

21  Q   All right.  And that cell phone, was that your personal

22  cell phone?

23  A   No.

24  Q   It's a department-issued cell phone?

25  A   Yes.

Truhlar - Cross by Winslow

1    Q    Are your conversations recorded?

2    A    No.

3    Q    So you were having conversations via cell phone with

4    Sergeant Mas -- then Sergeant Masterson regarding an ongoing

5    situation; is that correct?

6    A    Yes.

7    Q    And those calls are not being recorded.

8    A    Correct.

9    Q    And so there's no record of those calls.

10   A    Correct.

11   Q    And there's no record of anything that was said during

12   those calls.

13   A    Correct.

14   Q    And were you reporting the conversation back to dispatch or

15   anyone else while it was happening?

16   A    No.

17   Q    So those calls, those conversations between the two of you,

18   there's no record of those; is that right?  I mean no record of

19   the content.

20   A    There's -- correct.

21   Q    Right.  Okay.

22        But it's your testimony that you learned significant

23   additional information about this ongoing situation during

24   those unrecorded cell phone calls; is that right?

25   A    When you mean "significant," can you be specific?

Truhlar - Cross by Winslow

1    Q    Well, you testified that you -- many of the details that

2    you learned about this situation you got from Sergeant

3    Masterson in the cell phone calls; is that right?

4    A    That would be correct.

5    Q    And did you think that those details that you were

6    receiving were significant?

7    A    I did.

8    Q    Okay.  You testified that when you arrived at Room 206, the

9    door was ajar; is that right?

10   A    It was propped open by the door latch.

11   Q    To the best of your recollection, is this a heavy hotel

12   room type door or --

13   A    It's a hollow-core wooden door.

14   Q    So is it a light door?

15   A    Heavier than normal, but not as heavy as you would expect

16   it to be.

17   Q    When you knocked -- did you knock on the door?

18   A    I don't recall knocking on the door, no.

19   Q    Okay.  Do you recall anyone knocking on the door?

20   A    I don't know who knocked on the door.

21   Q    That wasn't my question.

22            Do you recall anyone knocking on the door?

23   A    I don't know.

24   Q    So as you testify today, you don't have a specific

25   recollection of announcing yourself when you got to Room 206?

Truhlar - Cross by Winslow

1    A    Announcing that the police were at the door?

2    Q    That's correct.

3    A    No, that we did not do.

4    Q    All right.  So you do recall that you did not announce your

5    office and that you were present, but you don't recall if

6    anyone knocked on the door.

7    A    I don't recall who knocked on the door.

8    Q    Let's be clear.

9         Your testimony was you don't remember if anyone

10   knocked on the door.

11   A    I don't believe that was what my testimony was.

12   Q    I thought that was your answer, but let's be clear.

13        Do you recall someone knocking on the door?

14   A    I would believe that somebody knocked on the door.  I don't

15   recall who knocked on the door.

16   Q    All right.  I want to be clear about this because it's

17   important.

18        Do you have a specific recollection of anyone knocking

19   on the door?

20   A    No, I do not.

21   Q    Okay.  But you indicated that at some point someone

22   eventually came to the door; is that right?

23   A    Yes.

24   Q    What's "eventually"?  How long is "eventually"?

25   A    I don't recall.

Truhlar - Cross by Winslow

1    Q   Minutes?

2    A   No, it wouldn't have been minutes.  But I don't -- I -- I

3    would say within probably 15 to 20 seconds.  It wasn't very

4    long.

5    Q   All right.  And, again, you don't recall anyone knocking on

6    the door, so you don't recall whether or not you had to

7    repeat -- repeatedly try to get someone's attention from inside

8    the room; is that right?

9    A   (Indicating.)

10   Q   But --

11        COURT REPORTER:  I didn't hear your answer.

12   BY THE WITNESS:

13   A   I said correct.

14   Q   All right.  And -- but you indicated that at some point you

15   interact -- you encountered Mr. Key; is that right?

16   A   Yes.

17   Q   And where -- when -- when you were at the door, if you

18   recall, how far away were you from the threshold of the room?

19   Were you right in front of the door or were you back into the

20   hallway a little?

21   A   Well, the hallway is not very wide.

22   Q   Well, how wide is the hallway?

23   A   Probably 3 1/2 to 4 feet.

24   Q   Okay.  And there are three of you present; is that right?

25   A   Yes.

Truhlar - Cross by Winslow

1          THE COURT:  Can I interrupt you for a minute?

2          MS. WINSLOW:  You may.

3          THE COURT:  Your client is making a lot of gesturing

4   and talking to the marshal, and I just need to know what the

5   crisis is.

6          Would you find out for me?

7          MS. WINSLOW:  I will.

8      (Defendant confers with defense attorney.)

9          MS. WINSLOW:  My client is concerned that there's some

10  gesticulation coming from the government's table that he feels

11  may be coaching the witness, so -- I can't see them because

12  they're behind me, but I would just ask that if there's some

13  unspoken communication going on between Mr. Parente and the

14  witness that it stop.  I can't see them.

15         THE COURT:  I'm watching everybody.  That's how I knew

16  that he was talking to the marshal.

17         They're permitted to talk to each other.  I can see

18  their faces directly.  I don't see that.

19         MS. WINSLOW:  All right.

20         THE COURT:  I will look for --

21         THE DEFENDANT:  He shook his head.  He shook his head

22  to the witness, like this.  (Shaking head.)

23         THE COURT:  I didn't observe that.

24         Okay.  Go ahead.

25         MS. WINSLOW:  I do -- I don't have an issue with them

Truhlar - Cross by Winslow

1    talking to one another.  If there's signals being sent, if

2    there are, I would ask --

3        (Brief interruption of the proceedings.)

4            THE COURT:  Nate, do you mind coming up and seeing if

5    we can play a CD for a second, sir?

6            And for the future, if you're going to have a hearing

7    and you have evidence, the equipment is here for you to learn

8    in advance of the hearing.

9            Thanks so much.

10       (Off-the-record discussion.)

11       (Pause in proceedings.)

12   BY MS. WINSLOW:

13   Q   So we're going to go back a little bit.

14           And I asked you previously whether it would refresh

15   your recollection as to the content of the original dispatch if

16   you heard it.  Would it?

17   A   Yes.

18           MS. WINSLOW:  May I, your Honor?

19           THE COURT:  You may.

20           MS. WINSLOW:  Do you have volume?  Best laid plans.

21       (Off-the-record discussion.)

22       (Pause in proceedings.)

23       (Tape played.)

24   BY MS. WINSLOW:

25   Q   Do you recall that dispatch, that communication?

Truhlar - Cross by Winslow

1    A    I do.

2    Q    And so does that refresh your recollection as to what you

3    knew at the time you receive -- you headed out -- why can't I

4    speak -- when you headed out to the Super 8 Motel?

5    A    Based on the dispatch, yes.

6    Q    All right.  And during that dispatch, you learned that this

7    15-year-old girl had called her mother; is that correct?

8    A    Correct.

9    Q    And that she had her cell phone; is that correct?

10   A    That's correct.

11   Q    And that this girl went from Wisconsin to Chicago, is that

12   correct -- or to Romeoville; is that right?

13   A    Correct.

14   Q    And during that dispatch, nothing -- there was no

15   indication she was taken against her will; is that right?

16   A    Within that dispatch, that's correct.

17   Q    And what you did learn from that dispatch is that the

18   mother had spoken to the 15-year-old, correct?

19   A    That's correct.

20   Q    And that the mother was on her way from Wisconsin to

21   Romeoville to pick up her daughter; is that correct?

22   A    That's correct.  Yes.

23   Q    And she didn't indicate during that conversation that her

24   daughter had been the victim of a crime?

25   A    I'm sorry?

Truhlar - Cross by Winslow

1    Q    She did not, from what you learned, you did not understand

2    that the daughter had been the victim of a crime; is that

3    correct?

4    A    On that dispatch, that's correct.

5    Q    All right.  And so the government asked you what you

6    were -- what you were thinking, what your first thought is.

7    Over objection.

8         You said you were just thinking about worst-case

9    scenarios; is that right?

10   A    That's correct.

11   Q    You were guessing?  Is that correct?

12   A    That's part of police work, yes.

13   Q    Okay.  But you were guessing.

14   A    Yes.

15   Q    Because the information you received from dispatch didn't

16   support a finding that she had been taken against her will; is

17   that correct?

18   A    From dispatch, correct.

19   Q    Just that she wanted to go home.  Just that --

20   A     Correct.

21   Q    -- she wanted to go home?

22        Okay.  You indicated -- let's go back to when you

23   entered Room 206.

24        You entered Room 206.  And you indicate that you at

25   some point made contact with DaJuan Key; is that correct?

Truhlar - Cross by Winslow

1    A    Yes.

2    Q    And you -- according to your testimony, the first thing he

3    said is he thought the 15-year-old was at McDonald's; is that

4    correct?

5    A    That's correct.

6    Q    Let's talk about this hotel room a little.

7         Is there a bathroom?

8    A    There is.

9    Q    And we're talking about a relatively small hotel room?

10   A    Yes.

11   Q    How many beds?

12   A    Two.

13   Q    All right.  And there was another person in this room; is

14   that correct?

15   A    Yes.

16   Q    Is there a closet?

17   A    I don't recall if there's a closet or not.

18   Q    Did you search the room?

19   A    Not at this point, no.

20   Q    Did you search the bathroom at this point?

21   A    The bathroom door was open.

22   Q    All right.  Did you look in the bathroom?

23   A    When we walked by it.

24   Q    Did you look in the shower?

25   A    It was open.

Truhlar - Cross by Winslow

1    Q    All right.  So you could see that there wasn't anyone in

2    there.

3                 Did you look under the beds?

4    A    No.

5    Q    Did you look anywhere else in this room for this -- for

6    this missing 15-year-old girl?

7    A    No.

8    Q    All right.  But you spoke to Mr. Key, correct?

9    A    Yes.

10   Q    And he said she -- thought she was at McDonald's; is that

11   right?

12   A    Yes.

13   Q    So she wasn't in the room anymore; is that correct?

14   A    That's correct.

15   Q    And this is the girl whose welfare you're so concerned

16   about; is that right?

17   A    That's correct.

18   Q    Did you head straight to McDonald's?

19   A    No.  There was another officer that was en route there.

20   Q    How do you know?

21   A    I'm sorry?

22   Q    How do you know?

23   A    How do I know?

24   Q    That there was another officer en route.

25   A    We had another -- Officer Swiatek was also coming up to the

Truhlar - Cross by Winslow

1    hotel.

2    Q    And you told Swiatek to go to McDonald's?

3    A    I did not.

4    Q    Who told Swiatek to go to McDonald's?

5    A    I believe Sergeant Masterson did.

6    Q    Well, according to your testimony, Sergeant Masterson was

7    in the hallway with Miss Crayton; is that correct?

8    A    That's correct.

9    Q    And so did you hear Miss Crayton say that the 15-year-old

10   was at McDonald's?

11   A    I don't know.  I wasn't out there with her.

12   Q    All right.  But you got that information from Mr. Key,

13   according to your testimony.

14   A    That's correct.

15   Q    And you didn't communicate that to another officer.

16   A    Not at this time, no.

17   Q    Did you communicate it to Sergeant Masterson?

18   A    I don't recall.

19   Q    You don't recall?

20   A    I don't recall.

21   Q    And yet was it Swiatek -- is that how you say the name?

22   A    Yes.

23   Q    Officer Swiatek was on his way to McDonald's; is that

24   right?

25   A    He was on his way to Super 8.  That's where he was

Truhlar - Cross by Winslow

1    dispatched.

2    Q    But you just testified he was on his way to McDonald's.

3    A    No, I said at some point he went to McDonald's.  He was --

4    he was told to go to McDonald's.

5    Q    What point was that?

6    A    I don't recall.

7    Q    All right.  So you're in this room, and the 15-year-old

8    you're looking for is not there; is that right?

9    A    That's correct.

10   Q    Or at least you've decided she's not there.  Correct?

11   A    She's not in plain view, no.

12   Q    She's not in plain view, but you didn't look for her.

13   A    I would say doing a cursory look around the room, and the

14   motel room is very small, if she's not in plain view, she's

15   probably not there.

16   Q    All right.  At this point are you still concerned for her

17   welfare?

18   A    I am.

19   Q    And yet you didn't radio any other officers to go to

20   McDonald's; is that right?

21   A    I don't recall doing so.

22   Q    Instead, you stayed there and looked around the hotel room;

23   is that right?

24   A    No.

25   Q    Well, how long did you remain in the hotel room with

Truhlar - Cross by Winslow

1      Mr. Key?

2      A      From the time that we entered until the time that he was

3      taken into handcuffs.

4      Q      How long was that?

5      A      I don't recall.

6      Q      But you do recall that when you came in, there was a

7      computer tablet sitting on the dresser; is that right?

8      A      Yes.

9      Q      How far away from the door is the dresser?

10     A      Approximately maybe 8 feet.  7, 8 feet.

11     Q      So it's about 7, 8 feet away from the door; is that right?

12     A      Yes.

13     Q      And during the period of time that you're conversing with

14     Mr. Key, where are you in the hotel room?

15     A      Standing in between the two beds.

16     Q      So you've moved from the doorway, the threshold, all the

17     way into between the two beds; is that right?

18     A      Yes.

19     Q      And how far away are you from this computer tablet?

20     A      Right next to it.

21     Q      What do you mean by right next to it?

22     A      Standing right next to it.

23     Q      18 inches?

24     A      Probably closer.

25     Q      Okay.  Who was standing -- who else is still in the room at

Truhlar - Cross by Winslow

1    this point when you see the tablet?

2    A    Officer Legner.

3    Q    Officer Legner.

4              Where was he with respect to this tablet?

5    A    I don't know.

6    Q    So you recall coming into the room and seeing the tablet;

7    is that right?

8    A    Yes.

9    Q    And you recall where the tablet was located within the

10   room, correct?

11   A    Yes.

12   Q    And you recall that you testified that there was --

13   backpage.com was on the tablet, correct?

14   A    Yes.

15   Q    But you don't recall where your partner was in this room?

16   A    That's correct.

17   Q    And when you looked at -- when you looked at the tablet,

18   was it face-up at that point?

19   A    Yes.

20   Q    And did you swipe your finger across it to open it?

21   A    No.

22   Q    So your testimony is that you could see that backpage was

23   open; is that right?

24   A    Yes.

25   Q    And what specifically could you see on the screen?

Truhlar - Cross by Winslow

1   A    I'm sorry?

2   Q    What specifically could you see on the screen?

3   A    That it was on backpage.com.

4   Q    Okay.  But how did you know it was backpage.com?

5   A    Because it said backpage on it.

6   Q    And what else was on the screen?  Did it just say

7   backpage.com?

8   A    I don't recall what specifically was on the screen.

9   Q    You just recall that it was backpage.com.

10  A    Correct.

11  Q    But you don't recall whether there was an advertisement

12  showing?

13  A    I don't recall that.

14  Q    All right.  And are you aware that backpage.com also is

15  used for legitimate purposes, such as personal ads?

16  A    Yes.

17  Q    And selling property --

18  A    Yes.

19  Q    -- legitimate property; is that right?

20  A    Yes.

21  Q    And so all you saw when you're standing right above this

22  tablet is the fact that it was on backpage; is that right?

23  A    Yes.

24  Q    So you couldn't -- you don't -- you don't recall whether or

25  not there was any indication that it was open to an ad for an

Truhlar - Cross by Winslow

1  escort; is that right?

2  A    I don't recall.

3  Q    So you just simply recall that backpage -- I'll withdraw

4  that.

5        And you also indicated that when you were in the room,

6  you saw condoms; is that correct?

7  A    Yes.

8  Q    Where were the condoms?

9  A    On the floor.

10 Q    Where on the floor?

11 A    Throughout the hotel room, in between the beds.

12 Q    In between the beds.

13 A    Yes.

14 Q    How many condoms were there?

15 A    I don't recall how many.

16 Q    Did you -- do you recall -- do you recall seeing unopened

17 condoms?

18 A    Yes.

19 Q    And where were those?

20 A    In the same area, on the --

21 Q    So they were all between the two beds.

22 A    Yes.

23 Q    And you could see that because when you came into the room,

24 you moved in between the two beds, right?

25 A    Yes.

Truhlar - Cross by Winslow

1   Q   And that was right next to the tablet?

2   A   Yes.

3   Q   That was about 7 or 8 feet from the door --

4   A   Yes.

5   Q   -- is that correct?

6           All right.  When you -- when you saw that the tablet

7   was opened to backpage, at least opened to that site, did you

8   ask Mr. Key about the backpage ad?

9   A   I did.

10  Q   And what did he say?

11  A   He just said that that was his tablet and -- he didn't

12  really -- he started getting defensive, he started getting

13  loud, and his body -- body language changed, his posture

14  changed.

15  Q   While you were in this room, did you see any indication

16  that anybody had been held there against their will?

17  A   No.

18  Q   Any indication that there had been a struggle?

19  A   No.

20  Q   And, in fact, the other young woman who was in the room,

21  did she appear to be in distress?

22  A   No.

23  Q   Where was she when you first entered the room?

24  A   I believe she was sitting back on one of the beds.

25  Q   Do you remember which bed?

Truhlar - Cross by Winslow

1   A    No, I don't.

2   Q    Do you remember if there -- well, how many beds were there,

3   to be clear?

4   A    Two.

5   Q    And do you remember if anyone was on the bed that was

6   closest to the door?

7   A    I don't recall.

8   Q    So you don't recall where she was.

9           Do you recall seeing car keys during the period of

10  time that you were in the room?

11  A    No, I don't.

12  Q    And do you recall -- so you don't recall Miss Crayton, the

13  other woman in the room, you don't recall her get -- having

14  keys in her hand?

15  A    No, I don't.

16  Q    Do you recall Mr. Key having keys?

17  A    No.

18  Q    So you don't recall anything about the transfer of these

19  keys; is that right?

20  A    No.

21  Q    And do you -- did you ever ask Mr. Key for permission to

22  search the car?

23  A    No, I did not.

24  Q    Did you ever ask Mr. Key for permission to search the room?

25  A    I'm sorry?

Truhlar - Cross by Winslow

1    Q    Did you ever ask Mr. Key for permission to search the room?

2    A    No.

3    Q    After you took Mr. Key into custody, did you -- did you

4    seek a search warrant for Room 206?

5    A    No, I did not.

6    Q    Are you aware whether any other officers ever sought a

7    search warrant for Room 206?

8    A    No.

9    Q    They didn't or you're not aware?

10   A    I'm not aware.

11   Q    Okay.  Are you aware whether Room 206 was ever searched?

12   A    Yes.

13   Q    Okay.  Was it searched?

14   A    Yes.

15   Q    But it wasn't searched pursuant to a search warrant; is

16   that correct?

17   A    I'm sorry?

18   Q    It wasn't searched pursuant to a search warrant; is that

19   correct?

20   A    That's correct.

21   Q    And when you say it was searched, did -- who did the

22   searching?

23   A    Officer Legner and I.

24   Q    So you did ultimately search the room; is that correct?

25   A    At some point, after Mr. Keys was transported.

Truhlar - Redirect by Sawyer

1    Q    Did you search under the beds?

2    A    I'm sorry?

3    Q    Did you search under the beds?

4    A    We did.

5    Q    Did you look into the drawers?

6    A    We did.

7    Q    Did you look -- we still think there wasn't a closet?

8    A    I'm sorry?

9    Q    We still think there wasn't a closet?

10   A    I don't recall if there was a closet in there or not.

11   Q    Did you search the bathroom?

12   A    We did.

13   Q    And all of this was without a search warrant; is that

14   correct?

15   A    That's correct.

16            MS. WINSLOW:  I have nothing further at this time.

17            THE COURT:  Okay.

18            MS. WINSLOW:  Do you need the computer?  Do you want

19   the disk still in there?

20            MS. SAWYER:  Yes.  Thanks.

21            THE COURT:  Whenever you're ready.

22            MS. SAWYER:  Thank you, your Honor.

23                      REDIRECT EXAMINATION

24   BY MS. SAWYER:

25   Q    Sergeant Truhlar, is it routine as a tac. sergeant or

Truhlar - Redirect by Sawyer

1    officer to use unrecorded cell phones to communicate during the

2    course of an operation?

3    A    It is.

4    Q    Now, there was some back-and-forth with defense counsel

5    about knocking and who knocked.

6            I want to pose the question specifically.

7            Even if you don't recall who did the knocking, do you

8    recall someone that -- the fact that a knock was conducted?

9    A    Yes.

10   Q    All right.  Now, defense counsel played the dispatch for

11   you regarding the 15-year-old girl.

12           In that dispatch, did you learn, A, that there was a

13   15-year-old girl who had been transported by potentially two

14   black males from Wisconsin to Chicago?

15   A    Yes.

16   Q    Did you learn the location where they believed her to be?

17   A    Yes.

18   Q    And did you have previous knowledge about that location?

19   A    I did.

20   Q    Did you also learn that they had tried to contact her, but

21   that they couldn't get her to answer?

22   A    Yes.

23   Q    And did you also, aside from that dispatch, receive a

24   separate communication regarding the girl?

25   A    I did.

Truhlar - Redirect by Sawyer

1   Q    And do you recall what, if any, detail you learned during

2   that conversation?

3   A    That the 15-year-old girl wanted to go home, and that the

4   people she was with would not let her leave.

5   Q    Now, you were asked some questions about Sergeant Masterson

6   being in the hallway with Miss Crayton.

7        Do you personally have any idea, based on your own

8   personal information, do you know where Sergeant Masterson and

9   Miss Crayton went once they went into the hallway?

10  A    No, I do not.

11  Q    So could they have gone elsewhere?

12  A    They could have.

13  Q    Were you personally present for any conversations that took

14  place between Miss Crayton and Sergeant Masterson once they

15  left the room?

16  A    I was not.

17  Q    Defense counsel asked you whether any transmissions were

18  made to Officer Swiatek instructing him to go to the

19  McDonald's.

20       Would the dispatch reflect -- and I think you

21  indicated that you didn't know or you didn't recall.

22       Would the dispatch refresh your recollection as to

23  that issue?

24  A    It would.

25       MS. SAWYER:  For the record, I'm playing item number

Truhlar - Redirect by Sawyer

1    14 on defense counsel's exhibit.

2          (Tape played.)

3    BY MS. SAWYER:

4    Q    Whose voice was that?

5    A    That would be mine.

6    Q    What did you just say there on the recording?

7    A    To please check the McDonald's across the street for the

8    female.

9    Q    Who were you instructing to check the McDonald's across the

10   street?

11   A    I believe that would have been Officer Swiatek.

12         (Tape played.)

13   Q    The individual who just said, "I'm walking in right now,"

14   do you recognize that voice?

15   A    I do.

16   Q    And who is that?

17   A    Officer Swiatek.

18         (Tape played.)

19   Q    And that individual, the female voice, who -- do you

20   recognize that voice?

21   A    Sergeant Masterson.

22   Q    What did she relay over the air?

23   A    Can you replay it?  I couldn't understand.

24         (Tape played.)

25   A    I believe she asked if there were any keys up there.

Truhlar - Redirect by Sawyer

1    Q    Let me play that one more time.

2         (Tape played.)

3              MS. SAWYER:   Sorry, your Honor.   Now I'm having

4    trouble with the sound.

5         (Tape played.)

6    BY THE WITNESS:

7    A    She asked if her ID was up there, saying that Mr. Key might

8    have her ID.

9         (Tape played.)

10   BY MS. SAWYER:

11   Q    So does that call refresh your recollection first as to

12   whether or not you instructed Officer Swiatek to respond to the

13   McDonald's?

14   A    It does.

15   Q    And did you, in fact, do that?

16   A    I did.

17   Q    And why did you do that?

18   A    To look for the 15-year-old girl at the McDonald's.

19   Q    And at the time that you made that broadcast, where were

20   you located?

21   A    I was inside Room 206.

22   Q    With the defendant.

23   A    I was.

24             MS. SAWYER:   I have no further questions, your Honor.

25             THE COURT:   Okay.   Anything on that?

Truhlar - Recross by Winslow

1          MS. WINSLOW:  I do, your Honor.

2                    RECROSS-EXAMINATION

3     BY MS. WINSLOW:

4     Q    How long was it between the time that you were told that

5     the 15-year-old girl was at McDonald's and the time that you --

6     can we call it radioed? -- radioed Officer Swiatek?

7     A    I don't recall.

8     Q    Was -- would it have been immediate?

9     A    I believe it would have, but I don't recall.

10    Q    All right.  Would it have been your normal procedure to

11    pass that information on as quickly as possible --

12    A    Yes.

13    Q    -- to another -- is that a yes?

14    A    Yes.

15    Q    And that is because you are concerned about this

16    15-year-old, correct?

17    A    Yes.

18    Q    And you would like to have her found as soon as possible.

19    A    Yes.

20    Q    So would it seem reasonable to you that you would have

21    radioed -- if that's the right term -- that you would have

22    radioed this information pretty quickly?

23    A    Yes.

24    Q    And at the time that you radioed this information, you

25    indicate you told Officer Swiatek to go to McDonald's, correct?

Truhlar - Recross by Winslow

1    A    That's correct.

2    Q    And he responded, according to what we just listened to,

3    that he was already walking in the door; is that right?

4    A    That's what he said.

5    Q    All right.  And do you have any reason to doubt that he was

6    walking in the door?

7    A    No.

8    Q    So it was your testimony earlier that he had been

9    dispatched to Super 8; is that right?

10   A    That's correct.

11   Q    And yet he was walking into McDonald's; is that correct?

12   A    That's correct.

13   Q    So it's reasonable to believe that he had found out she

14   wasn't in the room and was at McDonald's before you radioed

15   him?

16   A    I'm sorry?

17   Q    Would it be reasonable to believe that he had learned that

18   she was in McDonald's before you radioed him?

19          MS. SAWYER:  Objection.

20          THE COURT:  It's sustained.

21          MS. WINSLOW:  Nothing further.

22          THE COURT:  You can argue that if you want.

23          MS. WINSLOW:  I will.

24          THE COURT:  Anything else?

25          MS. SAWYER:  Court's indulgence, your Honor.

Masterson - Direct by Parente

1          THE COURT:  I didn't hear what you said.

2          MS. SAWYER:  I'm sorry.  Court's indulgence for just a

3     moment, your Honor.

4          THE COURT:  Oh.

5       (Counsel conferring.)

6          MS. SAWYER:  No, your Honor.  Thank you.

7          THE COURT:  Okay.  You can step down then.

8          THE WITNESS:  Thank you.

9       (Witness excused.)

10         THE COURT:  And you can call your next witness.

11         MR. PARENTE:  Thank you.

12         The United States calls Sergeant Masterson.

13         THE COURT:  Okay.

14      (Witness enters courtroom.)

15         THE COURT:  Right here.  Please raise your right hand.

16      (Witness duly sworn and takes the stand.)

17         THE COURT:  Okay.  Have a seat.

18         CHRISTINE MASTERSON, GOVERNMENT'S WITNESS, SWORN

19                      DIRECT EXAMINATION

20    BY MR. PARENTE:

21    Q    Good morning, Sergeant.

22    A    Good morning.

23    Q    Can you please state your name and spell your last name for

24    the record?

25    A    Christine Masterson.  M-A-S-T-E-R-S-O-N.

Masterson - Direct by Parente

1  Q    And how are you currently employed?

2  A    I'm a detective sergeant with the Romeoville Police

3  Department.

4  Q    And how long have you worked for the police department in

5  Romeoville?

6  A    It will be 19 years, total, in January.

7  Q    And you said your current position is detective sergeant?

8  A    Yes.

9  Q    Were you working for the police department in Romeoville on

10 September 10th, 2013?

11 A    Yes.

12 Q    Were you involved in the investigation of a missing

13 15-year-old Wisconsin girl?

14 A    Yes.

15 Q    Can you please tell the Court how you first became involved

16 in this investigation?

17 A    My commander called me on the telephone and advised me of

18 the missing 15-year-old girl.

19 Q    And if you can just speak up and stay close to the

20 microphone.

21        Can you tell me what you recall from that conversation

22 with your commander about the details of the missing girl?

23 A    My commander advised me that he received a phone call from

24 a mother from Wisconsin inquiring about our Super 8 Motel and

25 what kind of -- if it was a good area or bad area.

Masterson - Direct by Parente

1          I was advised from my commander that the mom said her

2     daughter left with an unknown male black subject, and they

3     wound up in Romeoville, Illinois from Wisconsin.

4     Q    Do you recall any information or details about the call

5     from the girl to her mother?

6     A    I was told that the mom stated that the girl wanted to come

7     home, she was crying and was very upset.

8     Q    And then the mom called police?

9     A    Correct.

10    Q    Why did the commander call you to respond to this

11    investigation?

12    A    Typically, my unit investigates drugs, gangs, prostitution

13    cases.

14    Q    Were you familiar with this Super 8 Motel?

15    A    Yes.

16    Q    What did you know about it?

17    A    The Super 8 Motel is known for drug and prostitution

18    problems.

19    Q    Did you believe, knowing that the missing 15-year-old girl

20    was housed at that location, that she might be in danger?

21    A    Yes.  That was my belief.

22    Q    So after receiving this information from your commander --

23    was that by cell phone?

24    A    Yes.

25    Q    After receiving that information by cell phone, what did

Masterson - Direct by Parente

1    you do next?

2    A    I then called Officer Truhlar and Officer Legner and

3    advised them of the situation and told them to respond to the

4    Super 8.

5    Q    And you advised them of what -- the information that was

6    passed to you from the commander?

7    A    Yes.

8    Q    And you did this by cell phone as well?

9    A    Yes.

10   Q    After calling Officers Truhlar and Legner to advise them of

11   that situation, what did you do?

12   A    I then responded to the Super 8.

13   Q    So what happened once you arrived at the Super 8?

14   A    When I arrived at the Super 8, I met Officer Truhlar and

15   Legner in the lobby of the Super 8.

16   Q    And what happened in the lobby?

17   A    It was determined that a subject from Wisconsin rented a

18   room at the Super 8.

19   Q    And after that was determined, what did you do?

20   A    We then went to Room 206 in the Super 8.

21   Q    In Room 206, is that the room that the clerk identified?

22   A    Yes.

23   Q    What happened as you approached Room 206?

24   A    We walked up to Room 206.  We noticed the door was cracked

25   open, and we knocked on the door.

Masterson - Direct by Parente

1  Q    And after knocking on the door, what happened?

2  A    We were met at the door by a male black subject.

3  Q    And the male black subject that met you at the door, do you

4  see him in the courtroom today?

5  A    Yes, I do.

6  Q    Can you identify him by where he is located in the

7  courtroom and an article of clothing that he's wearing?

8  A    He's located to my right with an orange shirt on.

9          MR. PARENTE:  I would ask the Court to let the record

10  reflect that she's identified the defendant.

11          THE COURT:  It will.

12  BY MR. PARENTE:

13  Q    So after the defendant meets you at the door, what happens?

14  A    He's asked where the white girl is and if we could come in

15  and talk to him about it.

16  Q    And what does he say?

17  A    He invited us in the room.

18  Q    Now, once you are inside the room, can you describe the

19  defendant's demeanor during this initial conversation?

20  A    From what I remember, he was fine.

21  Q    And what happened when you were inside the room?

22  A    We went inside the room.  I asked him where the white girl

23  was.  He told me he didn't know.  I noticed a female black

24  subject sitting on the bed, and I started to talk to her.

25  Q    So once you're in the room, is it fair to say your

Masterson - Direct by Parente

1   attention is focused on the black female?

2   A    Yes.

3   Q    And then are the other officers interacting with Mr. Key?

4   A    I don't recall.

5   Q    So once you -- do you approach the black female?

6   A    Yes.

7   Q    And what happens then?

8   A    I ask her for her name.  She identifies herself.  I ask her

9   for her ID.  And she told me her ID is in their vehicle, which

10  was down in the parking lot.

11  Q    So first you said you asked her for her name.  What did she

12  tell you, if you recall, what her name was?

13  A    She told me her name was Artie Ross.

14  Q    Did you believe that?

15  A    I wasn't sure at the time if that's who she was or not.

16  Q    Is that why you asked for her ID?

17  A    Yes.

18  Q    And when you asked for her ID, what did she say?

19  A    She told me her ID was in their vehicle in the parking lot.

20  Q    So what did you do next?

21  A    I asked her to take me down to her car to get her ID out,

22  which she agreed to do so.

23  Q    So then did you leave the room with her?

24  A    I did.

25  Q    Do you recall how you obtained the keys to the car?

Masterson - Direct by Parente

1    A    I was handed the keys.

2    Q    Do you recall who handed them to you?

3    A    I do not.

4    Q    So you then leave the room with who you later learned to be

5    Dache?

6    A    Yes.

7    Q    And what happens when you get out to the parking lot?

8    A    We have a conversation.  As she's looking for her ID, I ask

9    her if she and the 15-year-old are prostituting, and she tells

10   me they are.  I ask if the male black subject is their pimp,

11   and she tells me that he is.

12   Q    And when you said she's looking for her ID, where is she

13   looking for the ID?

14   A    In the trunk of the vehicle.

15   Q    And how did the trunk to the vehicle get opened?

16   A    I gave her the keys, and she opened the trunk of the

17   vehicle.

18   Q    And when she opened the trunk, what did she do?  Did she

19   take items out?

20   A    There was bags in there, and she turned over and started

21   dumping them out in the trunk.

22   Q    And were these her bags?

23   A    I would assume so.

24   Q    Did you see what items came out of the bag?

25   A    There was -- I remember shoes.  That's all I remember.

Masterson - Direct by Parente

1   There was a bunch of -- a bunch of stuff.

2   Q   Would it be fair to describe it as female shoes?

3   A   Yes.

4   Q   Okay.  So you give her the keys.  She opens the trunk and

5   removes bags of female clothing.

6   A   Yes.

7   Q   Is she able to find her ID?

8   A   No.

9   Q   So what happens next?

10  A   I ask her where the female -- the 15-year-old female was,

11  and she told me she was at McDonald's, which was directly

12  across the street from the hotel.

13  Q   So once she told you that the 15-year-old victim is at

14  McDonald's, what did you do?

15  A   I advised Officer Swiatek to go to the McDonald's, and then

16  Dache and I proceed over to the McDonald's.

17  Q   And while Dache was searching for her ID in the parking

18  lot, did you ask if you could search the car?

19  A   I did.

20  Q   Can you tell us about that conversation?

21  A   I asked Dache if I could search her car.  She advised I

22  could.

23  Q   And did you end up searching her car at that point?

24  A   Not at that point, no.

25  Q   And why not?

Masterson - Direct by Parente

1    A    'Cuz I needed to get to the 15-year-old girl at McDonald's.

2    Q    So you left the car with Dache -- I'm sorry, you and Dache

3    left to go to the McDonald's.

4    A    Yes.

5    Q    And what happens when you and Dache go over to the

6    McDonald's?

7    A    When we get to the McDonald's, Dache points out the

8    15-year-old girl, and I advise Officer Swiatek to go talk to

9    the girl and take her into protective custody.

10   Q    And while you're at the McDonald's, are you still -- where

11   are you located?

12   A    In the vehicle with Dache.

13   Q    And is your conversation with Dache continuing?

14   A    Yes.

15   Q    And are you still gathering facts about I guess what we'll

16   call the prostitution investigation?

17   A    Yes.

18   Q    And is Dache cooperating with you?

19   A    Yes.

20   Q    What else does Dache tell you about the defendant, Mr. Key,

21   in particular?

22        MS. WINSLOW:  Objection as to relevance for these

23   proceedings, Judge.

24        THE COURT:  I don't know what the answer is, so I

25   can't -- so I can't say.

Masterson - Direct by Parente

1          Go ahead and -- it's overruled for now, and you can

2    argue it later, please.

3    BY THE WITNESS:

4    A    I'm sorry, can you repeat it?

5    BY MR. PARENTE:

6    Q    What else, in this conversation outside of McDonald's with

7    Dache, what else does she tell you about the defendant, in

8    particular?

9    A    She advised me he was posting them up on backpage for

10   prostitution, meaning making ads for them.

11   Q    And so after learning all of this information about the

12   defendant from Dache, what do you do?

13   A    Once we have -- once Officer Swiatek has the 15-year-old

14   girl, I call Officer Legner and Truhlar and advise them to take

15   Mr. Key into custody.

16   Q    And to your understanding, they're still at the hotel room

17   with him.

18   A    Yes.

19   Q    And you've authorized the arrest.

20   A    Yes.

21   Q    Now, after you leave -- at some point you leave the

22   McDonald's?

23   A    Yes.

24   Q    And where do you go?

25   A    I go back to the Super 8 to the vehicle.

Masterson - Direct by Parente

1    Q    And what do you do at the vehicle?

2    A    I search the vehicle.

3    Q    And do you recall what is found in the vehicle?

4    A    I located approximately $20, a GPS, and some prepaid credit

5    cards.

6    Q    And why did you seize prepaid credit cards?

7    A    Prepaid credit cards are typically used in prostitution to

8    purchase their hotel room and also place the ad on the sites

9    they're using, such as backpage.

10   Q    And then why did you seize the GPS?

11   A    For locations that they could have traveled possibly from

12   Wisconsin to Romeoville.

13   Q    Now, after receiving -- going back.

14        After you received a call about the missing

15   15-year-old and you responded to the hotel, if you had knocked

16   on the door of that hotel room and no one had answered, what

17   would you have ended up doing?

18   A    We would have talked to the other adjoining hotel rooms to

19   see if they had seen her or heard anything in that room.

20        I would then, depending on the information I obtained,

21   I would have probably then called the -- our State's Attorney

22   to get their opinion.

23        MR. PARENTE:  Your Honor, may I have one moment,

24   please?

25        THE COURT:  Sure.

Masterson - Cross by Winslow

1      (Counsel conferring.)

2   BY MR. PARENTE:

3   Q   When you said you would have called the State's Attorney,

4   that was to seek a possible search warrant?

5   A   Correct.

6          MR. PARENTE:  Nothing further, your Honor.

7          THE COURT:  Okay.  Cross?

8                     CROSS-EXAMINATION

9   BY MS. WINSLOW:

10  Q   You indicated you first learned about this situation when

11  the commander called you on your cell phone; is that correct?

12  A   Yes.

13  Q   And during that call, the commander told you that he

14  received a phone call from a concerned mother?

15  A   Yes.

16  Q   And the purpose of the call was to find out whether or not

17  the Super 8 Motel was located in a good or bad area; is that

18  right?

19         MR. PARENTE:  Objection, your Honor.  Calls for

20  speculation.

21         MS. WINSLOW:  Well, she --

22         THE COURT:  Wait, wait.  I get to rule.  So overruled.

23  BY THE WITNESS:

24  A   I'm sorry, can you ask me again?

25  Q   Certainly.

Masterson - Cross by Winslow

1          The purpose of this call was to determine whether the
2     Super 8 Motel was in a good or bad area; is that right?
3     A    One of the reasons, from my understanding.  I didn't talk
4     to her.
5     Q    Right.  So this is what you learned from your commander; is
6     that right?
7     A    Yes.
8     Q    And you also learned from the commander that her daughter
9     had left Wisconsin?
10    A    Yes.
11    Q    And she had left with an unknown individual?
12    A    Yes.
13    Q    And that she had called her -- the daughter had called her
14    mother to come pick her up; is that right?
15    A    Yes.
16    Q    And so the mother was on her way from Wisconsin to come
17    pick her up; is that correct?
18    A    Yes.
19    Q    And the mother hadn't called the police specifically for
20    the purpose of having them go get the daughter, had she?
21         MR. PARENTE:  Objection, your Honor.  Calls for
22    speculation.
23         How does she know what the mother --
24         THE COURT:  Listen, when you object in my courtroom --
25    and all of you know this -- you stand so I can hear you.  So

Masterson - Cross by Winslow

1    first stand.

2         (No response.)

3              THE COURT:  Stand.  And make your objection.

4              MR. PARENTE:  Objection, your Honor.  Calls for

5    speculation.

6              THE COURT:  Okay.  And your response?

7              MS. WINSLOW:  My response is she testified to what her

8    understanding of this phone call was on direct, and I just want

9    to flesh out a little bit more about her understanding from her

10   conversation with the commander.

11             THE COURT:  And her understanding is relevant.

12   Overruled.

13   BY THE WITNESS:

14   A   I'm sorry, can you ask the question again?

15   BY MS. WINSLOW:

16   Q   I can try to say it the same way I said it.

17             From your understanding of your -- of the commander's

18   conversation with her mother, she was calling not for the

19   purpose of having the police go get the daughter, is that

20   right, but to find out whether it was in a good or bad area?

21   A   From my understanding, the mom was concerned because her

22   daughter was crying and wanting to come home, and she was

23   checking on what type of area her daughter was brought to.

24   Q   Okay.  But her -- it's your understanding from this whole

25   conversation that she was able to call her mother; is that

Masterson - Cross by Winslow

1    right?

2    A    Yes.

3    Q    And that when her mother arrived, was this your

4    understanding, that when her mother arrived, she would be

5    allowed to leave with her mother?  If you know.

6    A    Leave my custody to her mother or just in general coming to

7    pick her up?

8    Q    Coming to pick her up.

9    A    Yes.

10   Q    Because that was the purpose of her mother coming to [sic.]

11   Wisconsin, correct?

12   A    I believe so.

13   Q    You indicated -- well, during this initial phone call

14   between you and the commander -- not between the commander and

15   mom, but between you and the commander -- did he -- did your

16   commander -- it's a he, right?

17   A    Yes.

18   Q    Did -- and what's his name?

19   A    Ferdinardo.

20   Q    We'll try to keep that right.  Both of us have been

21   mispronouncing it.

22          Did Commander Ferdinardo indicate that this individual

23   was -- had been the subject -- had been prostituting herself?

24   A    No.

25   Q    Did he indicate that she had been the victim of a violent

Masterson - Cross by Winslow

1   act?

2   A    Not that -- no.

3   Q    No.  Okay.

4        And he -- I'll leave that.

5        So you indicated then that you subsequently called two

6   other officers to go to the Super 8 Motel, is that -- do you

7   recall?

8   A    Yes.

9   Q    And were those officers also directed to go to the Super 8

10  Motel by a dispatch communication, radio communication?

11  A    I do not remember.

12  Q    Would it be normal to have a dispatch send officers to a

13  location they had already been sent to by cell phone?

14  A    I don't understand what you're asking.

15  Q    I'll try to ask it a little differently.

16       If you had already -- if you had already sent these

17  two officers to the Super 8 Motel, would there be any reason to

18  have dispatch repeat those orders?

19  A    I'm going to assume that Commander Ferdinardo advised

20  dispatch of the call and dispatch re-dispatched them.

21  Q    But you indicated that the commander -- because I can't say

22  his name -- because the commander told you about the situation,

23  is that right, by cell phone?

24  A    Correct.

25  Q    He didn't have dispatch reach out to you.  Correct?

Masterson - Cross by Winslow

1    A    Correct.

2    Q    And so did you tell him during your conversation that you

3    would be responding to the Super 8 Motel?

4    A    I did.  And I also told him to send a zone car.

5    Q    All right.  So knowing -- knowing all of these facts, would

6    it be normal to have dispatch re -- re-send these same orders?

7    A    Yes.

8    Q    It would be?

9    A    Yes.  Because I had told him to send a zone car, so he

10   would have called up to dispatch and told them to dispatch

11   officers to the Super 8 Hotel.

12   Q    Would you -- or do you recall whether you told him during

13   your phone conversation with the commander that you were

14   sending officers to the hotel?

15   A    I don't recall.

16   Q    Would it have been normal for him to reach out to you with

17   this situation and have you not send other officers to this

18   hotel -- motel?

19   A    Well, I sent the other officers there because I'm their

20   supervisor.

21   Q    So it's your job, in fact, to send these other officers out

22   to the hotel, correct?

23   A    Yes.

24   Q    And you wouldn't respond it by yourself, would you?

25   A    No.

Masterson - Cross by Winslow

1    Q    All right.  There would always be other officers sent out.

2    A    Yes.

3    Q    All right.  Let's talk about Room 206, shall we?

4         You indicated that when you arrived at Room 206, the

5    door was slightly ajar; is that correct?

6    A    Yes.

7    Q    And at that point, did you knock on the door?

8    A    One of us knocked on the door.

9    Q    Do you recall who?

10   A    No.

11   Q    All right.  And at that point, did you indicate that you

12   were police or Romeoville Police Department, anything of the

13   kind?

14   A    We said, "Police."

15   Q    All right.  You said, "Police."

16        And when you knocked on the door, did the door open?

17   A    Yes.

18   Q    All right.  Did it open because -- because of the pounding

19   or did someone open it from the inside?

20   A    Someone opened it.

21   Q    Okay.  And when the door opened, you could see into the

22   room; is that right?

23   A    Yes.

24   Q    Could you see that there were two beds?

25   A    Yes.

Masterson - Cross by Winslow

1    Q    And could you immediately see that there was another

2    individual in the room?

3    A    I don't remember.

4    Q    Okay.  But you eventually entered the room; is that right?

5    A    Yes.

6    Q    And you indicated that Mr. Key, in fact, allowed you into

7    the room; is that correct?

8    A    Yes.

9    Q    And did he do that verbally?

10   A    Yes.

11   Q    He said, "Come in," or -- specific -- what did he say?

12   A    We asked him if we could come in and talk about the white

13   girl, and he said -- he let us in.

14   Q    Okay.  But you indicated just a minute ago -- and I want to

15   make sure this is clear -- that he verbally allowed you access

16   to the room, correct?  Was that your testimony?

17   A    I don't recall what he exactly said.

18   Q    Okay.  Do you recall what he exactly did at that moment?

19   A    He opened the door and let us in.

20   Q    And by letting you in, can you explain what you mean by

21   letting you in?  I mean, he opened the door, so you had -- you

22   could physically move into the room, but did he gesture in any

23   way that you were welcome to enter the room?

24   A    The doorway is so small, he moved to the side so we could

25   come in and talk to him.  If he didn't move to the side, no one

Masterson - Cross by Winslow

1   would have been able to walk through the doorway.

2   Q   Did you move him to the side?

3   A   No.

4   Q   Did any of the other officers move him to the side?

5   A   No.

6   Q   How far away from him were you standing when you were at

7   the threshold of the door?  Inches?

8   A   I was standing in the door, the ... at the door.

9   Q   So you were standing right in the threshold of the door; is

10  that correct?

11  A   Yes.

12  Q   And all three of you were standing right in the threshold

13  of the door?

14  A   I don't recall.

15  Q   Do you recall whether when the door opened you moved

16  forward into the room?

17  A   After he stepped out of the way so we could come in and

18  talk to him.

19  Q   All right.  When he stepped out of the way, is that because

20  he was pulling the door back?

21  A   No.  The door was open.  When he opened the door, he's in

22  the doorway.

23  Q   And then you indicated that he did what?  Specifically.

24  A   We asked him where the white girl was.

25  Q   And what did he say?

Masterson - Cross by Winslow

1   A    He said he didn't know.  And we asked if we could come in

2   and talk to him about her.  And he let us in.

3   Q    And did he tell you at that point he didn't know what you

4   were talking about?

5   A    What I remember him telling me is he didn't know where she

6   was at.

7   Q    Okay.  At some point then, you noticed that there was

8   another individual in the room; is that right?

9   A    Yes.

10  Q    And you went over to talk to her, correct?

11  A    Yes.

12  Q    At this point were you -- were you further involved in the

13  conversation with Mr. Key?

14  A    I was more involved with the conversation with Dache.

15  Q    Do you -- could you hear the conversation with Mr. Key?

16  A    I don't remember.

17  Q    All right.  But in any case, you asked Miss Crayton whether

18  or not she had an ID; is that right?

19  A    I asked her what her name was.  She told me a name.  And

20  then I asked her if she had an ID.

21  Q    And she said what?

22  A    It was in their car.

23  Q    Okay.  Now, you testified earlier that she indicated it was

24  in her car.  Do you recall that testimony?

25  A    Not offhand.

Masterson - Cross by Winslow

1   Q    Okay.  Do you -- do you recall specifically what she said

2   about the car?

3   A    It was their car.

4   Q    So it's your testimony now that she said it was their car?

5   A    Yes.

6   Q    All right.  And did she have keys to their car?

7   A    I am unsure if she had the keys or if he had the keys.

8   Q    At some point you got the keys; is that correct?

9   A    I gave her the keys.

10  Q    Okay.  Who gave you the keys?

11  A    I do not recall.

12  Q    Do you recall whether you picked up the keys off the bed?

13  A    I don't remember.

14  Q    So you have, as you testify today, no recollection about

15  how you came to have the keys to that car; is that right?

16  A    That's correct.

17  Q    Were you involved in the conversation with the hotel clerk

18  about the Wisconsin license plates and which room it was

19  registered to?

20  A    That was Officer Legner and Officer Truhlar.

21  Q    So you weren't present during that conversation.

22  A    I was present.  I wasn't the one speaking to the clerk.

23  Q    Did you hear what was said?

24  A    I don't recall.

25  Q    Do you recall whether or not the clerk indicated that the

Masterson - Cross by Winslow

1    car and the room are registered to DaJuan Key?

2    A    I recall that the car was registered to Room 206.

3    Q    And do you recall that Room 206 was registered to DaJuan

4    Key?

5    A    Yes, I do.

6    Q    Do you recall whether or not the clerk told you that

7    Room 206 was registered to Dache Crayton?

8    A    I do not recall.

9    Q    All right.  But before she told you her ID, had you heard

10   the name Dache Crayton before?

11   A    No.

12   Q    All right.  Thank you.

13        Did you ask Mr. Key for consent to search the vehicle?

14   A    I do not remember.

15   Q    You do not recall?

16   A    Correct.

17   Q    Did you ask Dache Crayton for consent to search the car?

18   A    At one point, yes.

19   Q    At what point?

20   A    When we were down by the car.

21   Q    Had you asked Mr. Key whether you had consent to search the

22   car, would you have then later asked Miss Crayton as well?

23   A    Sure.

24   Q    Why?

25   A    Just to confirm it was okay that I search the car.

Masterson - Cross by Winslow

1    Q    Well, if you've gotten consent from one individual to

2    search the car, do you need consent from the other?

3    A    Not necessarily.

4         MS. WINSLOW:  Just one second, Judge.

5         (Pause in proceedings.)

6    BY MS. WINSLOW:

7    Q    Do you recall meeting with representatives of the

8    United States Attorney's Office about this case in

9    approximately October of 2014, about a year ago?

10   A    Yes.

11   Q    And do you recall recounting those -- the circumstances of

12   September 10th?

13   A    I recall talking to them, yes.

14   Q    Okay.  Do you recall telling the representatives of the

15   United States Attorney's Office that you recalled Mr. Key

16   giving Dache Crayton the keys to the car while the other two

17   officers were present?

18   A    No, I don't recall.

19   Q    You don't recall that?  Okay.

20        I might have asked you this.  If I did, if I'm

21   repeating myself, I do apologize.

22        While you were in the room, do you recall the other

23   officers asking Mr. Key for consent to search the car?

24   A    I do not remember.

25   Q    You do not remember.

Masterson - Cross by Winslow

1    A    No.

2    Q    All right.  Is it your recollection at any point that

3    Mr. Key gave consent to search the car?

4    A    I do not remember.

5    Q    Okay.  When -- after you left the room with Ms. Crayton,

6    you went down to the car; is that right?

7    A    Yes.

8    Q    And at some point while you were at the car, you learned

9    that the person you were looking for, the 15-year-old, was at

10   McDonald's.  Do you recall that?

11   A    Yes.

12   Q    How did you learn that?

13   A    I asked Dache where the 15-year-old was, and she told me

14   she was at the McDonald's.

15   Q    So that was the first time you learned that she was at

16   McDonald's?

17   A    Yes.

18   Q    And then did you proceed directly to McDonald's?

19   A    Yes.

20   Q    How far away is the McDonald's from the Super 8 Motel?

21   A    Right across the street.

22   Q    100 feet, 200 feet?

23   A    Probably to the other side of the hallway from here.

24   Q    Let me ask the question a different way, a more relevant

25   way, as a matter of fact.

Masterson - Cross by Winslow

1      How long did it take you to get from the Super 8 Motel
2 to the McDonald's?

3 A    Less than a minute.

4 Q    Okay.  And when you got to the Super 8 Motel -- pardon me,
5 when you got to the McDonald's, was Officer Swiatek there at
6 the McDonald's?

7 A    I don't know if he arrived before me or at the same time.
8 We kind of got there around the same time.

9 Q    Okay.  So basically about one minute after you learned that
10 the individual you were looking for was at McDonald's, Swiatek
11 was present at McDonald's; is that right?

12 A    Yes.

13 Q    And Swiatek was present at McDonald's because he was going
14 to get the 15-year-old; is that right?

15 A    Going to look for the 15-year-old, yes.

16 Q    Did you tell Swiatek to go to McDonald's to look for the
17 15-year-old?

18 A    I did.

19 Q    And when did you tell him to go look for the -- for the
20 15-year-old at McDonald's?

21 A    After I found out that she was at the McDonald's.

22 Q    And at the time you told him, was he already on his way to
23 the McDonald's?

24 A    He was probably on his way to Super 8.

25 Q    So you don't know where he was going at that point.

Masterson - Cross by Winslow

1  A    He would have been coming to Super 8, because he was the

2  zone car at the time.

3  Q    So he was in a zone car, but he arrived at the Super 8

4  Motel at the same time -- pardon me, at the McDonald's at the

5  same time that you did; is that right?

6  A    Approximately, yes.

7  Q    All right.  During your conversation with Ms. Crayton, did

8  you learn her age?

9  A    She told me she was 38, and I told her she pretty much was

10  lying to me.  I don't remember offhand what her real birthday

11  is.

12  Q    Did you ever learn her age?

13  A    Her real age?

14  Q    Her real age.

15  A    I eventually learned her real age, yes.

16  Q    And you learned that she was of the legal age of consent;

17  is that right?  She was over 18?

18  A    Yes.

19  Q    During your conversation with Dache Crayton, did she

20  indicate that Mr. -- pardon me, I'll withdraw that.

21         All right.  Let's talk about the vehicle for a little

22  bit.

23         During the time that you were at the Super 8 Motel,

24  did you ever see Mr. Key in the vehicle?

25  A    No.

Masterson - Cross by Winslow

1    Q    Did you ever see him near the vehicle?

2    A    No.

3    Q    When you pulled up at the hotel, did you see him leaving

4    the vehicle?

5    A    No.

6    Q    In fact, he was in his room; is that correct?

7    A    Yes.

8    Q    And during the time that you, you personally, were present

9    in the hotel room, was he free to leave?

10   A    Yes.  He wasn't under arrest at that time.

11   Q    Okay.  And if he had gone to get in -- into the vehicle,

12   would you have let him drive away?

13   A    No.

14   Q    All right.  Would you have -- if he had done so, would you

15   have stopped the vehicle?

16   A    Yes.  He's part of my investigation.

17   Q    Okay.  When you stop a vehicle -- in your experience, when

18   you stop a vehicle, are you aware that you have the authority

19   to impound that vehicle?

20   A    It depends on what crime or what policy I have to follow.

21   Q    If you -- if you believe that the vehicle contains evidence

22   of a crime, are you aware that you have the authority to

23   impound the vehicle?

24   A    Yes.

25   Q    And are you aware that once the vehicle is impounded, you

Masterson - Cross by Winslow

1   could apply for a search warrant?

2   A   Yes.

3   Q   And do you know in this case whether a search warrant for

4   the vehicle was ever applied for?

5   A   There was, yes.

6   Q   And when was that?

7   A   The next day maybe, maybe two days later.  I think it was

8   the next morning, if I remember right.

9   Q   And was the vehicle subsequently searched?

10  A   Yes.

11  Q   All right.  With respect to the hotel room, do you know

12  whether or not a search warrant was ever sought for the room?

13  A   No.

14  Q   Do you know whether the room was ever fully searched?

15  A   From my understanding, Officer Truhlar and Officer Legner

16  might have searched it.

17  Q   So you don't really know.  They might have searched it?

18  A   I know they obtained evidence from that room.  I don't know

19  how they searched the room or if they searched every drawer or

20  under the bed, I don't know that.

21  Q   All right.  But you do know that they -- that they never

22  sought or received a search warrant; is that right?

23  A   That's correct.

24  Q   Sergeant, you were reprimanded, is that correct, for your

25  conduct as a police officer?

Masterson - Redirect by Parente

1    A    Yes.

2    Q    And that was in August of 2011; is that correct?

3    A    Yes.

4    Q    And there was a finding from the Romeoville Police

5    Department that you obstructed a criminal investigation?

6    A    It was a hit-and-run accident.

7    Q    It was a hit-and-run accident, but it was being

8    investigated as a possible DUI; is that correct?

9    A    Correct.

10   Q    And as a result of your obstruction, the individual who

11   they were investigating was not charged with DUI because they

12   were not located until the next day; is that correct?

13   A    That's correct.

14   Q    And there was a finding of sustained for this particular

15   violation on your part?

16   A    Correct.

17   Q    And what was the sanction for that?

18   A    I took a five-day suspension.

19   Q    All right.

20           MS. WINSLOW:  I have nothing further.  Thank you.

21           THE COURT:  Okay.  Redirect.

22           MR. PARENTE:  Just very briefly, your Honor.

23                    REDIRECT EXAMINATION

24   BY MR. PARENTE:

25   Q    Sergeant, you were asked about what the victim's mother's

Masterson - Redirect by Parente

1   purpose was in calling the Romeoville Police Department.

2           Do you recall those questions?

3   A   Yes.

4   Q   Do you have any idea what the victim's mother was thinking

5   when she called the police department?

6   A   No.

7   Q   Do you know that you were sent out by the person who took

8   that call to investigate this case?

9   A   Yes.

10  Q   And can you remind us one more time the facts that you were

11  told by the commander that were relayed by the victim's mother?

12  A   That her 15-year-old daughter left Wisconsin with an

13  unknown male black subject.  They were supposed to be going to

14  another town in Wisconsin, but wound up in Romeoville,

15  Illinois.

16  Q   And what was the victim's condition when she called her

17  mother?

18  A   Crying.  Upset.  She wanted to go home.

19          MR. PARENTE:  Nothing further, your Honor.

20          THE COURT:  Okay.  Anything on that?

21          MS. WINSLOW:  No, your Honor.

22          THE COURT:  All right.  You can step down then and be

23  excused.

24          THE WITNESS:  Thank you.

25      (Witness excused.)

1          THE COURT:  How many more witnesses does the

2   government have?

3          MR. PARENTE:  Judge, that's our final witness.

4          We do have one exhibit to introduce.  I don't believe

5   there's an objection.

6          MS. WINSLOW:  No.

7          MR. PARENTE:  Judge, it's Government Exhibit 1.  It's

8   just a copy of the Enterprise rental agreements.

9          THE COURT:  Okay.  I'll take it.

10         MR. PARENTE:  Permission to approach.

11         THE COURT:  Uh-hum.

12      (Tendered.)

13         THE COURT:  How many witnesses does the defense have?

14         MS. WINSLOW:  We have one.  And then there's an issue

15  that's arisen from a lot of the testimony.  We have a recording

16  of this phone call between mom and the commander.  I believe

17  that we don't have the commander to introduce the -- to

18  introduce it, so I don't know whether the government has an

19  objection to presenting that as an exhibit based on -- because

20  it is impeaching.  It also rounds out the testimony we've heard

21  a lot about.

22         MR. PARENTE:  No objection to the admission, Judge.

23         THE COURT:  Okay.

24         MS. WINSLOW:  I can play it first or --

25         THE COURT:  No, that's fine.  We'll take a lunch

1    break.

2            Why would you ever tell me that it's going to take two

3    full trial days for this suppression hearing?

4            I had my courtroom deputy ask you twice because I

5    didn't believe it could possibly take two days, and I scheduled

6    all around it.  And there's no way you're going two full trial

7    days.

8            MS. WINSLOW:  I would anticipate, at best, another

9    hour -- at worst, I'll say another hour.

10           THE COURT:  I worked my entire travel schedule for a

11   meeting in New York City around the two-day trial schedule.

12           I wish trial lawyers would learn how long they really

13   need for trial and hearings.

14           We'll take an hour lunch break.

15           THE CLERK:  All rise.  This court is in recess until

16   1:00.

17       (Recess taken from 12:01 p.m. to 1:05 p.m.)

18

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3     UNITED STATES OF AMERICA        )   Docket No. 13 CR 00726
                                       )
 4                    Plaintiff,       )   Chicago, Illinois
                                       )   October 6, 2015
 5              v.                     )   1:05 p.m.
                                       )
 6     DaJUAN KEY,                     )
                                       )
 7                    Defendant.       )

 8
                                VOLUME 1-B
 9          TRANSCRIPT OF PROCEEDINGS - SUPPRESSION HEARING
               BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

11     APPEARANCES:

12     For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                                MS. KATHERINE SAWYER
13                              MR. JEFFREY D. PERCONTE
                                Assistant United States Attorneys
14                              219 South Dearborn Street
                                5th Floor
15                              Chicago, Illinois 60604

16     For the DEFENDANT:       MS. HEATHER L. WINSLOW
                                53 West Jackson Boulevard
17                              Suite 1560
                                Chicago,Illinois  60604
18

19

20

21

22     Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                                Federal Official Court Reporter
23                              219 South Dearborn, Room 2318-A
                                Chicago, Illinois 60604
24                              (312) 435-6047
                                Gayle_McGuigan@ilnd.uscourts.gov
25
```

 1          (Proceedings heard in open court:)

 2          THE COURT:  Okay.  Good afternoon.  Is everyone ready

 3   to proceed?

 4          MS. WINSLOW:  We are, your Honor.  We're hooking up

 5   the computer.

 6          Our witness is Dache Crayton, and I understand she

 7   might -- they're looking for her right now?

 8          MR. PARENTE:  (Nods head.)

 9          MS. WINSLOW:  She's disappeared over lunch.

10          MS. SAWYER:  Your Honor, I'm told that she's on her

11   way back.  I'm very sorry.  I'm not entirely certain.  I'm told

12   she's close and on her way back --

13          THE COURT:  She was here and she went to lunch or

14   something?

15          MS. SAWYER:  She was here.  Yes, your Honor.

16          MS. WINSLOW:  I did see her, so I do know she was

17   here.

18          I have the recording to play --

19          THE COURT:  Okay.  We can do that first then.

20          MS. SAWYER:  I'm hoping I can recreate the setup from

21   earlier.

22          (Pause in proceedings.)

23          MS. WINSLOW:  All right.  Your Honor, this is the

24   recording of a telephone call between the mother of the

25   15-year-old girl and Commander Ferdinardo.

 1          THE COURT:  Ferdinardo.

 2          MS. WINSLOW:  Ferdinardo, Ferdinardo, recorded on

 3   September 10th, 2013.

 4          THE COURT:  Okay.

 5       (Tape played.)

 6          MS. WINSLOW:  That's the conclusion of that recording.

 7          THE COURT:  Okay.

 8          MS. WINSLOW:  Just need a witness.

 9       (Pause in proceedings.)

10          THE COURT:  Did you subpoena her?

11          MS. WINSLOW:  Judge, the government made her available

12   by -- by agreement yesterday.

13          THE COURT:  Okay.

14          MS. WINSLOW:  So I did see her in the lobby when I

15   left.  Hopefully she's not gone.

16          THE COURT:  Okay.

17       (Pause in proceedings.)

18          MS. SAWYER:  In answer to the Court's question, she

19   has been served with a subpoena.

20          MS. WINSLOW:  In terms of these exhibits, Judge, I

21   would be happy to make a copy for the Court or give the Court

22   my copies that we've actually played in court for the record.

23          THE COURT:  Either way, doesn't matter, but I'll need

24   them.

25          MS. WINSLOW:  I will absolutely do that.

1    The first recording that we play -- I played one and

2    the government played one.  Actually, I think we have -- I

3    think, because I'm technically impaired, I would have to copy

4    the whole disk, and we'll just indicate that 1 and 14 were --

5         THE COURT:  Okay.

6    (Pause in proceedings.)

7    (Counsel conferring.)

8         MS. SAWYER:  Your Honor, it sounds, based on the

9    conversation that Mr. Parente just had with the agents, that we

10   may want to take a break.  She's on her way back, but it could

11   be five to ten minutes.  And so to not have the Court sitting

12   here waiting, maybe a break makes more sense.

13        THE COURT:  All right.

14        MS. SAWYER:  I apologize.

15        THE CLERK:  All rise.  This Court is in recess.

16   (Recess taken from 1:18 p.m. to 1:54 p.m.)

17        THE COURT:  Call your witness.

18        MS. WINSLOW:  Mr. Key calls Dache Crayton.

19   (Approaching.)

20        MS. WINSLOW:  Go up and around that way.

21        THE COURT:  Raise your right hand.

22   (Witness duly sworn and takes the stand.)

23        THE COURT:  Okay.

24        DACHE CRAYTON, DEFENDANT'S WITNESS, SWORN

25                  DIRECT EXAMINATION

Crayton - Direct by Winslow

1    BY MS. WINSLOW:

2    Q    Good afternoon.

3         Could you state your name and spell your name for the

4    record?

5    A    Dache Crayton.  D-A-C-H-E.  C-R-A-Y-T-O-N.

6    Q    And what city -- in what city do you live?

7    A    Rockford.

8    Q    How old are you?

9    A    23.

10   Q    Okay.  I'm going to ask you some questions about

11   September 10th, 2013.  Okay?

12   A    Yes.

13   Q    Do you remember that day?

14   A    Yes.

15   Q    Do you remember where you were about 8:00 o'clock that

16   evening?

17   A    I was in a hotel.

18   Q    Do you remember what hotel?

19   A    No.

20   Q    All right.  Were you alone in the hotel?

21   A    No.

22   Q    Okay.  Who were you with?

23   A    I was with Amillie.

24   Q    Amillie?  Is that what you said?

25   A    Uh-hum.

Crayton - Direct by Winslow

1   Q    Okay.  And at some point during the evening of

2   September 10th, 2013, did the police come into that room?

3   A    Yes.

4   Q    All right.  I want to ask you some questions about what

5   happened when the police came in the room.  Okay?

6   A    Uh-hum.

7   Q    Where were you when the police came in the room?

8   A    I was on the bed, laying down.

9   Q    And where was Amillie?

10  A    He was on a different bed on the side of me, on the -- the

11  next bed.

12  Q    And you said he was on the bed.

13       Was he on the bed when the police entered into the

14  room?

15  A    Yes.

16  Q    Do you know how the police got into the room?

17  A    They came in the room on they own.

18  Q    Do you remember Mr. -- first of all, do you see the person

19  that you know as Amillie in this courtroom?

20  A    Yes.

21  Q    Okay.  Can you just tell us what he's wearing, where he's

22  located?

23  A    He's over there.  (Indicating.)

24  Q    It's just for the record.

25       THE COURT:  That's not sufficient.

Crayton - Direct by Winslow

1   BY MS. WINSLOW:

2   Q    Can you identify an item of clothing that he's wearing?

3   A    Orange.  Orange jumpsuit.

4            THE COURT:  Okay.

5   BY MS. WINSLOW:

6   Q    Do you remember what happened after the police came in the

7   room?

8   A    No, I don't.

9   Q    Do you know whether or not the police had a key to the

10  room?

11  A    I think they did have a key, because we didn't let them in.

12  They just came in the room on they own, so ...

13  Q    All right.  Did you have -- did you personally have a

14  vehicle on September 10th, 2013?

15  A    No.

16  Q    And had you been driving a vehicle?

17  A    No.

18  Q    Did you arrive at the hotel with Amillie?

19  A    Yes.

20  Q    And did he have a vehicle?

21  A    Yes.

22  Q    Did he ever allow you to drive that vehicle?

23  A    No.

24  Q    Did he ever give you the keys to that vehicle?

25  A    Probably to get something out of the car, but not to drive,

Crayton - Cross by Parente

1    no.

2    Q    At no -- at no time -- would it be true to say that at no

3    time did he give you permission to drive the car?

4    A    He never gave me permission to drive the car.

5    Q    All right.

6          MS. WINSLOW:  I have nothing further, Judge.

7                        CROSS-EXAMINATION

8    BY MR. PARENTE:

9    Q    Good afternoon, ma'am.

10   A    Hi.

11   Q    The defendant who you identified earlier, would it be fair

12   to classify him as your pimp?

13         MS. WINSLOW:  Objection, your Honor.  Beyond the scope

14   and irrelevant at this time.

15         THE COURT:  Overruled.  It goes to bias.  It goes to

16   motivation to testify.

17   BY MR. PARENTE:

18   Q    Would that be a fair assessment?

19   A    I wouldn't say pimp.  I would just ...

20   Q    Let me ask you this:

21         At the time of September of 2013, were you working for

22   the defendant?

23   A    I don't want to answer that question.

24   Q    Ma'am, you have to answer the question.

25         In September of 2013, were you working as a

Crayton - Cross by Parente

1    prostitute?

2    A    Yes.

3    Q    Did you turn over all of the money that you made from your

4    dates to the defendant?

5    A    Yes.

6    Q    Did the defendant, while you were with him at that time,

7    have other women working for him?

8    A    Yes.

9    Q    And are you afraid of the defendant?

10   A    Sort of, a little bit.

11   Q    Did you hear the defendant threaten the children of one of

12   the other women that were working for him in September of 2013?

13   A    He didn't threaten the children.  He -- he was talking to

14   Nicki about something, about the kids, about something.

15   Something like that.  He wasn't talking directly to the kids,

16   though.

17   Q    Did he -- Nicki was another prostitute that worked for the

18   defendant?

19   A    Yes.

20   Q    And did he threaten her kids -- did he tell her that her

21   kids would be in danger if she left him?

22   A    Yes.

23   Q    I'm sorry?

24   A    Do I have to answer that -- do I have to answer that

25   question?

Crayton - Cross by Parente

1  Q    Yes, ma'am.

2  A    Yes.  Yes.

3  Q    While you were working for the defendant, did he tell you

4  that he, quote, owned you?

5  A    (Nods head.)

6  Q    You have to answer out loud.

7  A    Yes.  Yes.

8  Q    One day when you did not make enough money for the

9  defendant, did he tell you that he was going to hit you?

10  A    No.

11  Q    He never said that?

12        (No response.)

13  Q    Ma'am, did he ever tell you that?

14  A    (Shaking head.)

15  Q    Is your answer no?

16  A    (Nods head.)

17  Q    You have to answer out loud.

18  A    No.

19  Q    When you were working for the defendant in September of

20  2013, do you recall him bringing a girl from Wisconsin who you

21  knew as Marie to work for him?

22  A    Yes.

23        MS. WINSLOW:  Objection, your Honor.  This is beyond

24  the scope, and it does not go to the bias.

25        MR. PARENTE:  Judge, if I may respond.

Crayton - Cross by Parente

1          THE COURT:  Yes, go ahead.

2          Do we need to be outside of the presence of the

3     witness?

4          MR. PARENTE:  I can come sidebar if that's --

5          THE COURT:  I think maybe, thinking of how it may go.

6        (Proceedings at sidebar:)

7          THE COURT:  Your objection?

8          MS. WINSLOW:  It's beyond the scope, and it does not

9     go to bias.  It's irrelevant.

10         MR. PARENTE:  First of all, the defense asked her

11    about generally what happened that day, September 12 [sic.],

12    2013.  This is what we're talking about.

13         Second, we've heard a lot about the call from the girl

14    to the mom.  This woman was there and observed a lot of the

15    interactions between the defendant and the girl which will give

16    the Court context of the demeanor of the girl when she called

17    her mom, was she really scared, how this man treated her, did

18    she really want to come home.

19         THE COURT:  Well, none of that is going to be relevant

20    to whether your officers treated it as exigent circumstances,

21    so if there's a part of what she's going to testify to that

22    pertained to calls to the police or how the police responded to

23    it, that would be relevant.  But -- just going to how she was

24    feeling might be helpful at trial, but not through the

25    perspective of whether they had probable cause to search and

Crayton - Cross by Parente

1  arrest.  So if you've got that from her, you can go there.  But

2  it would have to be in this police context.

3          MR. PARENTE:  Okay.

4          THE COURT:  Okay?

5          MR. PARENTE:  Thank you.

6     (Sidebar proceedings concluded.)

7  BY MR. PARENTE:

8  Q   Now, ma'am, at some point you testified that you, after the

9  police came into the hotel room, that you went outside to the

10 parking lot with one of the officers, correct?

11 A   Yes.

12 Q   And you told that officer that you were looking for your

13 ID?

14 A   Yes.

15 Q   And you opened the trunk of the car?

16 A   Yes.

17 Q   And you pulled out your bags?

18 A   Uh-hum.

19 Q   And your bags were in the car?

20 A   Yes.

21 Q   And you said that the defendant let you go use the car at

22 times to get -- to put stuff in?

23 A   Yeah.

24 Q   And the officer asked you if she could search the car?

25 A   Yes.

Crayton - Cross by Parente

1   Q   And you said it was okay?

2   A   Yes.

3   Q   Did you ever tell -- you never told the officer that it

4   wasn't your car?

5   A   No, but I thought she already knew that it wasn't my car

6   because, I mean ... (Indicating.)  I never told her that it was

7   my car.

8   Q   You never told her that it wasn't your car.

9   A   Right.  That it wasn't my car.  Right.

10  Q   And you never said it was your car.

11  A   Right.

12  Q   But she asked you if she can search it.

13  A   Yeah.

14  Q   And you said yes.

15  A   Yes.

16  Q   Now, when the officers were in the hotel room that day, was

17  the defendant cooperative with them at first?

18  A   Yes.

19  Q   Was it a cordial conversation between them?

20  A   Yes.

21  Q   When you were in the room with the officers, was the

22  defendant handcuffed?

23  A   Yes.

24  Q   And you're sure he was handcuffed while you were in the

25  room?

Crayton - Cross by Parente

1   A   Yes, but I don't know what happened after I left the hotel.

2   Q   But you're sure that he was handcuffed while you were in

3   the room.

4   A   I believe I seen them put handcuffs on him when I was in

5   the room.

6   Q   And you said you were on the bed.  Which bed when you walk

7   into the hotel room were you on?

8   A   I was on the one closest to the door.

9   Q   Okay.  And are you sure you were on the one closest to the

10  door?

11  A   Yes.

12  Q   Positive.

13  A   Yes.

14  Q   And the defendant was on which bed?

15  A   The one to the -- by the window.

16  Q   The farthest from the door.

17  A   Right.

18  Q   And you're positive of that as well.

19  A   Yes.

20  Q   The tablet computer in the hotel room, whose computer was

21  that?

22  A   What is his name?  DaJuan?  DaJuan?

23  Q   The defendant?

24  A   Uh-hum.

25  Q   That was his computer.

Crayton - Redirect by Winslow

1    A    Yes.

2    Q    Did he use that computer to post backpage ads?

3    A    Yes.

4    Q    And was he doing that on the day that the police entered

5    the room?

6    A    Yes.

7    Q    And, ma'am, the day in question, it's correct that you had

8    drank a half pint of Hennessy prior to the police coming to the

9    room?

10   A    Yes.

11         MR. PARENTE:  Nothing further, your Honor.

12         MS. WINSLOW:  Very briefly.

13                     REDIRECT EXAMINATION

14   BY MS. WINSLOW:

15   Q    You testified that you believed that the female officer

16   knew that the car wasn't yours; is that right?

17   A    Yes.

18   Q    And how did you -- why did you think that she knew it

19   wasn't yours?

20   A    Because I thought she already spoke to him about it or she

21   already knew that the car was -- because I didn't even have a

22   license or nothing so ...

23   Q    And did you have the keys to the car while you were in the

24   hotel room?

25   A    No.  The car was already open so ...

Crayton - Redirect by Winslow

1   Q    All right.  When's the last time you spoke with the

2   defendant?

3   A    Like 2 1/2 years ago.

4   Q    Was it on September 10th, 2013?

5   A    Yes.

6   Q    Did he threaten you with respect to your testimony today?

7   A    No.

8           MS. WINSLOW:  I have nothing further, Judge.

9           THE COURT:  Anything else?

10          MR. PARENTE:  No, your Honor.

11          THE COURT:  Okay.  You can step down and be excused.

12      (Witness excused and exits courtroom.)

13          THE COURT:  Have you put that witness in contact with

14  the Victim Witness Coordinator from your office, as required by

15  the statute?

16          MS. SAWYER:  Our Victim Witness Representative has --

17  it's been a very long time.  Not since she has come back into

18  contact with the government for purposes of this hearing.

19          THE COURT:  I don't think that answered my question.

20          Is she -- does she have -- does she have the contact

21  information for your Victim Witness Coordinator --

22          MS. SAWYER:  I believe --

23          THE COURT:  -- Ms. Weiler?

24          MS. SAWYER:  I can't say for certain.  We discussed

25  that with her when she first came in in the context of the case

1  a couple of years ago.  It's been a very long time.  I can have

2  that conversation with her again, your Honor.

3          THE COURT:  Okay.  Read the statute.

4          MS. SAWYER:  Yes, your Honor.

5          MS. WINSLOW:  Your Honor, we have no additional

6  witnesses.

7          THE COURT:  Okay.  So do you have any rebuttal

8  witnesses?

9          MS. SAWYER:  No, your Honor.

10         THE COURT:  Okay.  Summary arguments then?

11         Do you want to go first?

12         MS. WINSLOW:  I'm happy to go first.

13         I would like the opportunity to brief this issue.  The

14  witnesses did not testify exactly as we thought --

15         THE COURT:  As you expected.

16         MS. WINSLOW:  -- as we expected.

17         And I think it would be useful to all of us to have a

18  copy of the transcript so that we're not speaking off of their

19  testimony but we can recall specifically --

20         THE COURT:  Well, that's fine, but I have questions,

21  and maybe that will help you with your briefing for me then,

22  okay?

23         MS. WINSLOW:  Absolutely, your Honor.

24         THE COURT:  All right.  So let's begin.

25         So as far as your first motion to suppress, the

1    government says that he -- your client consented originally,

2    and then even if he didn't consent, they had exigent

3    circumstances.  Right?

4            MS. WINSLOW:  That is correct, Your Honor.

5            THE COURT:  All right.  So your testimony from your

6    perspective -- and I won't hold you to this, but I'm trying to

7    get the arguments down -- your testimony is that the door was

8    either closed and they entered it somehow without knocking,

9    there's a disputed fact as -- from your perspective, or that

10   they had a key?  I mean, that was kind of new --

11           MS. WINSLOW:  That was news to me today, Judge.

12           THE COURT:  Oh, okay.  All right.

13           MS. WINSLOW:  But the argument there is that they did

14   not, in fact, have consent, either implied or express consent,

15   from Mr. Key or any person who was inhabiting the room --

16           THE COURT:  Okay.  So let me ask you this question:

17           Is it your question that his bodily gestures, if he

18   were to open the door and send a message that they could come

19   in, through his posture as opposed to his verbal consent, isn't

20   sufficient?

21           MS. WINSLOW:  I think that it is sufficient, but I

22   think that the facts do not support that.

23           THE COURT:  Got it.

24           MS. WINSLOW:  I think that the officers' testimony as

25   to what happened when he supposedly opened the door is

1    sufficiently inconsistent, even contradictory, that their

2    account of what happened is questionable.

3              In addition, Ms. Crayton's testimony is that he didn't

4    get up.  He did not rise from the bed until after they were

5    already in the room.

6              THE COURT:  Okay.  All right.  And then the second

7    part -- and then you're saying it can't be exigent

8    circumstances in that the officers were responding to kind of

9    locating this girl and returning her to her mother, but no one

10   was saying that she was in harm's way at that moment.

11             MS. WINSLOW:  The officers all seemed to testify that

12   they believed that there was a young woman or a girl --

13             THE COURT:  Girl.

14             MS. WINSLOW:  -- being held against her will, and that

15   they inferred all of this -- they were guessing about

16   prostitution, perhaps violence, all of these other parade of

17   horribles.  But the fact is we know from the recording that the

18   mother wasn't alarmed that she was in harm's way.  In fact,

19   that recording says -- I counted them and my colleagues in the

20   back counted them -- four times that she had been told to leave

21   the hotel room --

22             THE COURT:  And go to --

23             MS. WINSLOW:  -- and go to the police station --

24             THE COURT:  Okay.

25             MS. WINSLOW:  -- which seriously undermines the

1    credibility of the officers in saying that they believed that

2    there was somebody being held against her will.

3         They knew -- the Romeoville Police Department knew

4    that this was an individual who had been told to leave the

5    hotel and may be out wandering, finding her way to the police

6    department, which can be dangerous, too, but is not the same

7    danger as would allow them exigent circumstances to enter the

8    hotel room.

9         THE COURT:  Okay.

10        MS. WINSLOW:  May I add one thing?

11        THE COURT:  Oh, yes.  Sure.

12        MS. WINSLOW:  When Sergeant Masterson testified that

13   she received the information from Commander -- from --

14        THE COURT:  Ferdinardo, yes.

15        MS. WINSLOW:  -- from the commander, and she

16   testified, I think implausibly, that she received additional

17   information that this individual was being held against her

18   will and that there was potential prostitution.  Some of the

19   other officers echoed that -- which is the reason I would like

20   this transcript -- but we know that the commander then

21   contacted dispatch.  Dispatch first -- dispatch's first

22   communication was consistent with the conversation he had on

23   the tape with the mother.

24        The conversation that Masterson describes in her

25   testimony is inconsistent with that conversation -- with that

1    conversation.

2         I think it detracts from her -- seriously detracts

3    from her credibility.

4         THE COURT:  Got it.  Okay.  So then let's go back to

5    the alternating theories for admissibility of the evidence.

6         So then finally if the officers were in the room and

7    saw something in plain view, it's their theory they could have

8    seized it at that moment.

9         Do you contest that the objects that they seized were

10   objects that could be seized with the plain view doctrine?

11        MS. WINSLOW:  I question -- the condoms I think is

12   sort of off the scale, and I'm not sure that that's really

13   indicative --

14        THE COURT:  Okay.

15        MS. WINSLOW:  -- because it's not consistent with

16   prostitution to have the condoms in the room where they're

17   staying, to my mind, so I question the usefulness of that

18   particular bit of evidence.

19        The tablet, on the other hand, is a different issue.

20        If the officers -- if the officers were validly

21   within -- in the room and if they actually saw the tablet

22   opened to backpage suggesting prostitution, then I think yes.

23        But we haven't had any testimony from any of the

24   officers that the backpage -- the page of backpage to which the

25   tablet was opened was indicative of prostitution.

1          THE COURT:  Okay.

2          MS. WINSLOW:  And despite his very clear memory about

3     all kinds of other things, he couldn't remember anything that

4     was on that screen other than backpage.

5          THE COURT:  Okay.  And then what about the prepaid

6     credit cards?

7          MS. WINSLOW:  Again, I'm not -- I fail to see the

8     overwhelming evidentiary value of that.  The use of prepaid

9     cards is becoming really common in today's economy,

10    particularly with people who don't have regular and steady jobs

11    or the credit --

12         THE COURT:  So my point to the legal argument, because

13    I'm trying to break down the framework --

14         MS. WINSLOW:  Sure.

15         THE COURT:  -- are you saying then that your argument

16    will be that prepaid cards wouldn't be indicative of

17    criminality such that they would be plain view evidence to be

18    seized?

19         MS. WINSLOW:  It is -- that would be my argument.  To

20    be perfectly honest, Judge, if that particular evidence came in

21    at trial, it wouldn't cause me any heartburn.  I just don't

22    think that the connection between the prepaid cards and

23    prostitution is sufficiently made --

24         THE COURT:  Okay.

25         MS. WINSLOW:  -- and I don't think it could be made.

1          THE COURT:  Okay.  So now let's move out to the car.

2          So it's your position that, number one, she doesn't

3   have standing to offer consent for the car, right?

4          MS. WINSLOW:  Yes.

5          THE COURT:  Okay.  And you believe that there is a

6   fact dispute regarding the testimony as to whether she said

7   that the car was hers.

8          MS. WINSLOW:  Absolutely.

9          THE COURT:  Okay.  And then is it your -- is it

10  your -- is there a legal argument that you have regarding joint

11  possession of the car?  Or are you just going straight on the

12  issue of it's not her standing, it's not her car.

13         MS. WINSLOW:  It is not her -- it's not her standing,

14  it's not her car.

15         I think the facts, as they've developed -- and I don't

16  have the case at my fingertips --

17         THE COURT:  That's okay.

18         MS. WINSLOW:  -- but I will definitely have it when I

19  brief it for you.

20         There are -- there is case law that suggests that

21  people who are just simply passengers in a car but don't have

22  any co-rights to it don't have the ability to consent.  They

23  don't have the legal authority to consent.

24         And I will definitely provide those cases to your

25  Honor.

1        THE COURT:  And is it your theory of the facts that

2   were told that they had to get the keys from upstairs in order

3   to open the car in the first place or that they were actually

4   able to access the car when she was near the car?

5        MS. WINSLOW:  It is our position that the testimony --

6   the reliable testimony indicates that the keys were retrieved

7   from Mr. Key.

8        THE COURT:  Okay.  All right.  Is it -- is it your

9   position then that the retrieval of the keys is also a Fourth

10  Amendment violation?

11       MS. WINSLOW:  I don't think we have any testimony that

12  would suggest that he did not willingly give up the keys.  I

13  need to look at the transcript about that.

14       THE COURT:  All right.  And then the next thing is,

15  and final thing is, if the car were possessed by the police at

16  the time that he was taken under arrest, that the inventory

17  search would not lead to the materials?

18       MS. WINSLOW:  The question there is inevitable

19  discovery and whether or not they actually would have sought a

20  warrant.  And I think that the testimony in this case about the

21  steps that would have been taken following the initial contact

22  and following the initial arrest, that testimony does not

23  support the government's argument that they absolutely would or

24  they -- the word is -- that they absolutely would have sought a

25  warrant.

1    Now, they ultimately did, but that was only after

2    statements were made by other individuals.

3    THE COURT:  Okay.  And then what was in the vehicle

4    that was seized that you're seeking to suppress?

5    MS. WINSLOW:  There was additional prepaid cards.

6    There was some -- I think some clothing that was in the --

7    and -- and there was some money.  It's -- I'll list it in the

8    motion.  I would be happy to pull it up.

9    THE COURT:  No, I have it in front of me.

10   MS. WINSLOW:  Okay.

11   THE COURT:  Okay.  So then my final question for you

12   then is would you say then that an independent subpoena, for

13   example, to backpage.com would not be -- which would lead to

14   more discoverable evidence would not be permitted because of

15   the fruit of the poisonous tree, even though another individual

16   might have said they were being prostituted by backpage.com?

17   MS. WINSLOW:  Yes, your Honor.  I believe that it

18   would be barred by fruit of the poisonous tree.

19   And if I could backtrack, I think probably the most

20   critical piece of evidence that was found in the car would be

21   the GPS.

22   THE COURT:  Got it.  Okay.  All right.  I think I've

23   got the branching arguments.

24   You're going to get time to brief it, but let me hear

25   from Miss Sawyer.

1          MS. WINSLOW:  Absolutely.

2          THE COURT:  Okay.  All right.  So you kind of saw all

3   of my -- let's walk through them with you then, too, unless you

4   have a closing you wanted to give.

5          MS. SAWYER:  No, your Honor.  And I'm happy to respond

6   more specifically to questions that the Court has.

7          There was one issue that we did want to address with

8   respect to the defendant's affidavit.

9          I would note obviously the defendant submitted that

10  affidavit and it was sufficient to put legal matters at issue

11  for purposes of getting a hearing, but I would note that he has

12  now declined to testify.  And so while the affidavit is what it

13  is, I would just suggest that the Court perhaps give that less

14  weight than if the defendant had submitted himself to

15  cross-examination.

16         THE COURT:  Hold on just a second while I pull it up

17  again.

18         MS. WINSLOW:  Your Honor, I have a paper copy.

19         THE COURT:  Do you?  Because I was just going to pull

20  it -- thanks.  I was just going to pull it off.  I think I

21  didn't bring a paper copy out.

22     (Tendered.)

23         THE COURT:  Thank you.

24     (Pause in proceedings.)

25         THE COURT:  Nobody addressed the issue of any

1    statement in his invocation of his right to a lawyer other than

2    that he said it.  Is there a statement that you're seeking to

3    suppress as well?

4            MS. WINSLOW:  No, your Honor.

5            THE COURT:  Okay.

6            MS. WINSLOW:  No.  I think everyone was clear that he

7    invoked and --

8            THE COURT:  And that was the end.  Okay.

9            Okay.  I've reviewed it again, so now you can start at

10   the beginning.

11           MS. SAWYER:  Thank you, your Honor.

12           And so the point simply being that he hasn't testified

13   under oath subject to cross-examination, and so our request is

14   that the Court treat the affidavit as such and not lend it the

15   weight that it would, you know, were the defendant to provide

16   live testimony.

17           So that being said -- essentially we'll start with the

18   consent issue.  And the Court is obviously being asked to

19   either credit the testimony of the officers or credit the

20   testimony of Dache Crayton.

21           Note that our position is that her recollection on the

22   circumstances surrounding the police officers' entry to the

23   room and what happened in the room is I think demonstrably

24   shaky and thus unreliable, particularly when contrasted with

25   the testimony of the police officers.

1       Each of the officers testified to the manner in which

2   they approached the door, how they found the door, how the

3   defendant came to the door, and how -- essentially how they

4   entered the room.

5       Miss Crayton's testimony was -- well, in and of itself

6   conflicts with the defendant's affidavit with respect to she

7   couldn't remember how the -- whether the door was open or

8   closed.  The defendant corroborates the police officers in that

9   he says the door was ajar.

10      The defendant also corroborates the police officers

11  when they say that he was on the bed -- I'm sorry, when the

12  defendant says he was on the bed closer to the door and

13  Miss Crayton was on the bed farther from the door, which is

14  what the police officers testified to.

15      And contrary to Miss Crayton's testimony herself, I

16  believe Miss Crayton testified that she did not hear the police

17  announce their presence, whereas Mr. Key is saying that they

18  shouted "RPD," they shouted, "Police."

19      And, finally, the defendant also corroborates the

20  police officers and his statement in the affidavit is contrary

21  to Miss Crayton's testimony with respect to the handcuffing and

22  when that took place.

23      She, again, was what I would submit is visibly un --

24  uncertain, but came to the conclusion that she thinks that

25  Mr. Key was handcuffed while she was still in the room.  The

1    officers' testimony was that she left the room with Sergeant

2    Masterson.  He then got visibly jittery, made movements to his

3    waistband, and then was subsequently handcuffed.

4           THE COURT:  He was arrested that day, right?

5           MS. SAWYER:  He was.  He was.

6           THE COURT:  And so he left -- did he go in the custody

7    of the officers that day?

8           MS. SAWYER:  He did.

9           THE COURT:  Immediately after this incident.

10          MS. SAWYER:  He -- yes, from -- his departure from

11   that motel room was in custody, yes.

12          THE COURT:  Okay.  So what's with the testimony about

13   him being just detained at that moment for purposes of his

14   safety -- of his and their safety if they were arresting him?

15          MS. SAWYER:  I'm just distinguishing between

16   Miss Crayton's recollection of the event.

17          THE COURT:  That's not my question, though.

18          The testimony was from the officers that they put him

19   in cuffs because of these furtive movements, so I wasn't

20   certain when he actually was arrested.

21          It's little -- it's of little consequence if we're not

22   suppressing a statement, but I don't understand what the point

23   of that was.

24          MS. SAWYER:  Well, no -- and I agree with the Court.

25   That's correct.  I think it was just the officers providing a

1    sequence of events as they happened.  They placed him into

2    handcuffs because of what was happening and then subsequently

3    got that order from Sergeant Masterson to take him to the

4    station.

5              THE COURT:  I see.

6              MS. SAWYER:  And in that sense, he was formally --

7              THE COURT:  Okay.

8              MS. SAWYER:  -- under arrest and taken to the station

9    at that point.

10             But for purposes of now, I guess I'm simply trying to

11   contrast Miss Crayton's recollection of events, which conflicts

12   with what the defendant has put in his affidavit.  And the

13   defendant's statement in his affidavit corroborates the

14   officers as to the timing of those events.

15             And so I suppose that simply what I'm -- the point

16   that I'm trying to make is that the officers' recollection is

17   consistent as between each other, and that Miss Crayton's

18   testimony on the matter of the initial entry into the room and

19   the way that events unfolded in the room is unreliable in the

20   sense that it conflicts with the officers' testimony and also

21   in several important ways conflicts with the defendant's own

22   affidavit.

23             THE COURT:  Okay.

24             MS. SAWYER:  I also think that the Court should credit

25   the testimony of the officers for one other reason, is that it

1    simply -- it's what makes more sense.  If the door was ajar,

2    they knocked on the door, Mr. Key came to the door.  Obviously,

3    the girl was not in the room.  And it makes sense that if he is

4    being -- if he is being cooperative with the officers in

5    answering questions, as even Miss Crayton testified that he

6    was, she wasn't in the room, it makes sense that he would say,

7    "Go ahead, there's no one here, I have nothing to hide," that

8    he would -- that he would do that.  And his demeanor at that

9    point was, according to everyone, cooperative and presumably in

10   his mind didn't have anything to hide.  And I think all of that

11   makes sense under the circumstances that the police officers

12   have provided with respect to the issue of consent.

13           Moving to the Court's next question and I think our

14   other basis, moving past consent, if the Court didn't want to

15   make its decision on the consent issue, is the exigent

16   circumstances issue.

17           And I understand why, but I think the defense

18   counsel's presentation of that issue is narrower than the one

19   that this Court should -- or her analysis of the issue is

20   narrower than the one that this Court should adopt and the one

21   that the facts support.

22           And so the mom's call is fine, and just because --

23   what I would argue is just because no one has said the girl was

24   taken at knifepoint or at gunpoint or is tied up in a hotel

25   room does not make this a situation that is not urgent or

1    exigent.

2         What's before the Court right now is a 15-year-old

3    girl who was, whether or not she left voluntarily with those

4    individuals, who was taken to a place that she was not supposed

5    to be taken, called her mother crying, was in a hotel that each

6    and every one of these police officers was extremely familiar

7    with for two reasons, either prostitution or narcotics, felt

8    that she couldn't get home and called crying and upset.

9         And I think Dache Crayton's testimony informs, if

10   nothing else, the environment of the circumstances under which

11   she made that call.  And that is, even Miss Crayton, who was on

12   her phone at the time the police came, felt captive in some

13   sense at least.  She was told by the defendant that he owned

14   her.  She was told by the defendant -- or she heard the

15   defendant threaten another prostitute's children.  She

16   testified reluctantly -- understandably, in the situation that

17   she's sitting in now -- that she was sort of afraid of him.

18   And so the notion that -- the notion that this 15-year-old

19   girl, in an unfamiliar city, driven there by a person who

20   wasn't letting -- wasn't taking her back where she should have

21   been, was just like any of us in this courtroom today, is

22   just -- I think that's an overly narrow construction of the

23   circumstances that these officers were confronting.

24        THE COURT:  I think the question is whether the

25   doctrine requires the subjective reaction of the officers to

1    those circumstances or the objective circumstances to be

2    exigent such that a reasonable officer under the circumstance

3    would respond with exigency, and so you'll have to put that in

4    your brief.

5              MS. SAWYER:  Certainly.  And I would direct the

6    Court -- it's cited not at length in our original brief, but

7    certainly I'll expound upon it.  There's a case, *United States*

8    *versus Brown* at 64 F.3d 1083, which says, "We do not think the

9    police must stand outside of a residence despite legitimate

10   concerns about the welfare of the occupant unless they hear

11   screams."

12             And this is a case where I suppose at the end of the

13   day the realistic and objective analysis of a police officer is

14   what would we have them do?  Walk away from that door?  Walk

15   away from that door, hoping that nothing is happening inside

16   while they go get a warrant?

17             If these aren't the kinds of exigent circumstances

18   that we want a police officer to act upon --

19             THE COURT:  I mean, it's not -- it's nice argument,

20   but the problem is that there's some inconsistent facts in the

21   sense that they didn't go -- if it was exigent, pound in and

22   grab the girl, right?  But they're knock, knock, knock,

23   according to them, wait to be invited in, and ask where she is,

24   and ask if they can see her, which is a little bit different

25   from we're in -- we're in tremendous knight-in-shining-armor

1  mode to rescue the 15-year-old.  There -- they don't have to

2  wait for screams.  So there's some inconsistencies, which is

3  why I asked about the subjective and objective analysis.  And I

4  don't know if that case is dead on point with that.

5          MS. SAWYER:  Well, and I'll say it is not on all fours

6  squarely on point with these circumstances, certainly; but what

7  it suggests is simply that we shouldn't expect our police

8  officers to stand outside and wait for someone to scream.

9          And I think that in this case, they didn't -- they

10 weren't confronted with that situation because the door was

11 ajar, they did knock, and he did come to the door, and it was a

12 small room, they could look inside, see that someone wasn't

13 tied up at that point.  But that's just -- that's not where we

14 are.

15         But I don't think that the mother's call to the police

16 renders this any less exigent than an objective case in which

17 police officers have information that a 15-year-old girl has

18 been taken by an unknown male to not only some location, but

19 another state and a hotel that these police officers know is

20 used routinely for narcotics and prostitution.

21         So I just -- I want to -- I guess I want to highlight

22 and I do believe that this creates an exigency that the

23 officers were entitled to act on regardless of the consent

24 issue.

25         Finally -- and, again, I would be happy to address

1    that in more -- in more detail to the extent that the Court

2    would like me to -- but, finally, obviously our last argument

3    would be that barring those other two arguments, that they

4    would have had grounds and would have gone and searched and

5    secured a search warrant.

6            And I think that this piece of the argument is a

7    little bit tied to the previous argument, and that is each of

8    those officers testified that this was not a circumstance under

9    which they would have felt comfortable walking away from that

10   room had they not been invited the way that they -- or had they

11   not -- had the facts not unfolded the way they did.  And if the

12   door had been closed and if they had knocked and no one

13   answered, this isn't a case where they would have just walked

14   away.  They would have followed up and talked to a State's

15   Attorney about getting a search warrant.

16           And our position is that for all of the reasons why we

17   think that there were exigent circumstances, we also think that

18   they would have been justified in getting that search warrant

19   for that room.

20           THE COURT:  So do you have records from backpage.com

21   that you've subpoenaed that you intend to use at trial?

22           MS. SAWYER:  We do.

23           THE COURT:  All right.  And is it your position that

24   you have an independent source for those records?  Or that

25   it's -- you know, she's arguing it's fruit from the poisonous

1    tree.  You knew about a backpage ad from the iPad.

2          MS. SAWYER:  Yes.  I mean, obviously they heard about

3    backpage both from Miss Crayton and then also from the victim,

4    where they learned that they were being posted on backpage.

5          I mean, I would argue that that would have been

6    inevitably discovered in any event because, as they testified,

7    they weren't walking away from that room.

8          They would have spoken to these people, and they would

9    have learned that the postings were being done on backpage.com.

10         THE COURT:  I think -- I think you're -- there's a

11   difference between independent source doctrine and inevitable

12   discovery, so you'll want to identify both of those.

13         All right.  Let's turn to the car.  And as far as you

14   are concerned, she has standing because she was accessing the

15   car?

16         MS. SAWYER:  I think that the officers got consent on

17   her apparent authority.

18         I don't think that there was anything that would have

19   suggested to the officers at that time that she didn't have the

20   authority, particularly when there's -- particularly when

21   there's testimony from multiple witnesses that in the

22   defendant's presence in the hotel room, the car was discussed

23   or keys were retrieved.  Nothing was said.  Nothing was

24   objected to.  She said that her ID was there.  There were

25   belongings in the car.

1      There was every indication that she had equal access

2  to that vehicle --

3      THE COURT:  Is he under arrest at the time of the

4  search of the car?

5      MS. SAWYER:  At the time it was physically conducted,

6  I believe that Sergeant Masterson had probably already made

7  that call to the officers, yes.

8      THE COURT:  Other than that she gave, in your opinion,

9  the apparent authority to consent, do you believe that the

10 inventory search that would have occurred subsequent to -- was

11 she arrested?

12     MS. SAWYER:  No, she was not.

13     THE COURT:  So the officers in the hotel room

14 determine it's his car, right?

15     MS. SAWYER:  Well, Sergeant Legner --

16     THE COURT:  I mean, he admits that actually.  He says

17 he told the officers it's his car, right?

18     MS. SAWYER:  He does say that in his affidavit --

19     THE COURT:  Right?

20     MS. SAWYER:  Yes.

21     THE COURT:  And that the keys, they are for his car?

22     MS. SAWYER:  I would have to refer back to the

23 affidavit, but I do believe his affidavit says that he told

24 them the car they were referring to was his and it had been

25 rented for him.

1     THE COURT:  So when is the subsequent search warrant

2 obtained?

3     MS. SAWYER:  I believe the federal search warrant was

4 obtained on the 13th of September, three days later.

5     THE COURT:  Was there a state search warrant?

6     MS. SAWYER:  No.

7     THE COURT:  Oh.  So why did you say that, federal

8 search -- is there a separate one?

9     MS. SAWYER:  No.

10     THE COURT:  Is there another search warrant?

11     MS. SAWYER:  No, no.  I'm sorry.  There was only -- I

12 was just trying to be clear.  There was one search warrant and

13 it's federal.

14     THE COURT:  Okay.  And when was it?

15     MS. SAWYER:  The 13th of September.

16     THE COURT:  And what is the date of the arrest?

17     MS. SAWYER:  The 10th of September.

18     THE COURT:  So was the car seized and brought into

19 custody and into the police department?

20     MS. SAWYER:  Yes, I believe -- yes, I believe it was.

21 And --

22     THE COURT:  But it had already been searched.

23     MS. SAWYER:  Well, procedurally -- Sergeant

24 Masterson's -- the Romeoville search was fairly cursory, and

25 agents subsequent to that wanted to be able to go back and make

1    sure that they hadn't missed anything in the vehicle.  And so

2    we got a federal search warrant for the car at that point.

3           THE COURT:  Okay.  Okay.  All right.  So can I get

4    briefs in two weeks from the two of you on this?

5           MS. WINSLOW:  I think, your Honor, I would be happy to

6    get this briefed in two weeks while it's fresher in our mind.

7    My question is whether or not we can have a transcript.

8           THE COURT:  Oh, yeah.  Sorry, April.  April, stay up

9    all night tonight.

10           MS. WINSLOW:  You can do it tonight, right?

11           THE COURT:  Here, let me talk to April privately.

12       (Judge Kendall confers with court reporter.)

13           THE COURT:  So she's going to give it to you a week

14    from today.

15           So you can have two weeks thereafter.  So whatever

16    that date would be, Tresa.

17           THE CLERK:  Okay.  A week from today is the 13th.

18           THE COURT:  And then two weeks thereafter.

19           THE CLERK:  The 27th.

20           THE COURT:  All right.  So your position papers based

21    upon the evidence that was presented are due on the 27th of

22    October, and then I'll give you a ruling.  Okay?

23           Let me see.  We really -- this has been going on way

24    too long, and I'd like to -- well, let me ask this very

25    important question:

 1          I mean, assuming -- let's assume the evidence was

 2   suppressed.  If it was suppressed, you would still go to trial,

 3   wouldn't you?

 4          MS. SAWYER:  Your Honor, please don't hold me to

 5   this --

 6          THE COURT:  Yes.

 7          MS. SAWYER:  -- but it is my expectation that

 8   regardless of the Court's ruling, we -- we would likely still

 9   be able to try the case.

10          THE COURT:  Right, because it's not like it's

11   suppressing everything --

12          MS. SAWYER:  Right.

13          THE COURT:  -- in the case.  And that's not a preview

14   of coming attractions.  That's a scheduling question.

15          And how long would it take if you were to go to trial?

16          MS. WINSLOW:  I don't think anybody wants to answer

17   that question right now.

18          THE COURT:  Mr. Parente should answer because he's the

19   only one that has credibility right now in the courtroom as far

20   as the timing of things.

21          A week?

22          MS. SAWYER:  I think the government's case would

23   probably be five to six witnesses.

24      (Counsel conferring.)

25          MS. WINSLOW:  I think a week -- my perspective, and I

1    obviously don't know how the government would put their case

2    on, but my perspective is a week might be longer than it would

3    take.

4              THE COURT:  All right.  How about February 8th?

5              MS. WINSLOW:  That's fine.

6              THE COURT:  That's good for you?

7              MS. WINSLOW:  Yes, your Honor.

8              THE COURT:  How about for you, Miss Sawyer?

9              MS. SAWYER:  I do have -- it should be fine, assuming

10   that's how long it takes.

11             THE COURT:  Okay.  February 8th will be the trial

12   date.

13             But, meanwhile, I'll get your briefs and try to rule

14   quickly thereafter so you can make strategic decisions about

15   how you want to move forward.  Okay?

16             Please cite to the transcripts since you'll have the

17   benefit of it, okay?

18             MS. WINSLOW:  Do you want to set pretrial motions and

19   all of that, or should we have a status after your Honor's

20   ruling?

21             THE COURT:  I think after the ruling, I think we'll

22   have a status and find out where we're headed.  And you'll

23   probably have a better sense then of what you're going to do.

24   Okay?

25             All right.  Thank you.

1          MS. WINSLOW:  Thank you, your Honor.

2          MS. SAWYER:  Thank you, your Honor.

3          THE CLERK:  All rise.  This court is adjourned.

4       (Proceedings concluded.)

5                    C E R T I F I C A T E

6       I certify that the foregoing is a correct transcript of the

7    record of proceedings in the above-entitled matter.

8

9
     /s/ GAYLE A. McGUIGAN                    October 12, 2015
10   Gayle A. McGuigan, CSR, RMR, CRR              Date
     Official Court Reporter
11
                                              October 12, 2015
12   _____               Date
     Gayle A. McGuigan, CSR, RMR, CRR
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25