IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES | ) |
| | ) |
| | ) No. 13 CR 726 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| DAJUAN KEY | ) |

## MEMORANDUM OPINION AND ORDER

On October 8, 2013, a federal grand jury charged Defendant DaJuan Key with transporting a minor in interstate commerce with the intent that the minor engage in prostitution in violation of 18 U.S.C. § 2423(a). Key moved to suppress the evidence acquired from warrantless searches of his motel room and rental car, claiming that the searches violated his right to be free from unreasonable searches and seizures under the Fourth Amendment. To support his position, Key filed a sworn affidavit stating that he never provided law enforcement consent to search his motel room or his rental car. As a result of the conflicting evidence, this Court held an evidentiary hearing on Key's motions on October 6, 2015. For the following reasons, Key's motion to suppress evidence recovered from his motel room [47] is granted in part. His motion to suppress evidence recovered from his rental car [48] is denied.

## BACKGROUND[1]

On the evening of September 10, 2013, Detective Sergeant Christine Masterson of the Romeoville Police Department was informed by her commander that a Wisconsin mother had

---

[1] These facts are drawn from the testimony of Romeoville Police Officer Dustin Legner, Sergeant Brian Truhlar, and Detective Sergeant Christine Masterson from the suppression hearing on October 6, 2015; the testimony of Dache Crayton, a young woman who was prostituted by Key and was present during portions of the subject searches, from that same hearing; the audio recordings and rental car agreement presented at the hearing; and Key's affidavit. The Court also considers the six police reports offered by Key in support of his pretrial motions and referenced by both parties in their papers. (*See* Dkt. No. 48, at 3, 4, 8, 10; Dkt. No. 47, at 3); *see also, e.g., United States v. Simmons*, 771 F.Supp.2d 908, 912 n. 1 (N.D. Ill. 2011) (Castillo, J.) (citing *United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996) ("a judge presiding at a suppression hearing may receive and consider any relevant evidence" and the "judge here properly relied on facts set out in police report ... where defendant made no motion to strike and adduced no evidence that impeached or contradicted the account in the report")).

1

called the Department inquiring about the Romeoville Super 8 Motel. (Tr. 83). The woman's 15-year-old daughter had left Wisconsin with an unknown black male and had called from the motel asking to come home. (*Id*.) The mother asked the commander whether the motel was in a good or bad area and informed the commander that she was on her way to the motel from Wisconsin. (Tr. 82).

Masterson testified that she was also told by her commander that the girl was "crying and very upset" and "wanted to come home." (Tr. 83). Masterson and the other testifying officers agreed that the motel had a reputation for prostitution and drug problems. (Tr. 13; 42-43). Thinking the girl was in danger, Masterson called Officers Dustin Legner and Brian Truhlar and told them to report to the motel. (Tr. 84). Legner and Truhlar did not have a clear understanding at this point of what the mother had said, but they testified that they were treating this as an urgent situation and were considering possible kidnapping and prostitution. (Tr. 13; 42-43).

Legner and Truhlar arrived at the motel before Masterson and checked the parking lot for vehicles with Wisconsin license plates. (Tr. 13, 44). There was only one car in the lot with Wisconsin plates and, when they ran the plate, it came back as a rental vehicle. (Tr. 13-14, 44). The officers testified that rental vehicles are commonly used in prostitution and drug trafficking. (*See* Tr. 14). Legner and Truhlar then entered the motel lobby where they met Masterson. The clerk informed the officers that there was one motel guest from Wisconsin and she showed the officers a photocopy of his identification. (Tr. 14, 44-45, 84). The guest was Defendant DaJuan Key. (Tr. 14, 45).

At this point, Legner, Truhlar, and Masterson went to the room registered to Key. (Tr. 15, 45). Legner and Truhlar testified that when they arrived at the room, the upper latch on the door was pushed to the outside so that the door was held open about an inch. (Tr. 15, 45; *see also* Tr.

85 (Masterson testified that the door was slightly ajar)). The officers then knocked on the door and Key came to the door. (Tr. 15-16; 45-46; 85). The officers identified themselves as police and were wearing vest carriers that said "Romeoville Police" on the front and "Police" on the back. (Tr. 15-16). The officers asked Key about the 15-year old white female from Wisconsin. (Tr. 16). Key told the officers that he did not know where the girl was and that he thought she had gone to the McDonald's across the street. (Tr. 17; 46). The officers asked Key if they could check the room and he advised that was "no problem, come on in." (Tr. 17; *See also* Tr. 46; 85; 99-100 (Masterson could not recall what Key said, but was certain that Key moved out of the way to let them in)). Throughout this early exchange, Legner and Truhlar described Key as pleasant, cooperative, and relaxed. (Tr. 18; 47-48). Crayton corroborated that Key was cooperative when the officer first entered the room. (Tr. 126). Key never asked the officers to leave and he never indicated that he did not want the officers in the room. (Tr. 18; 47).

Inside the room, the officers saw a tablet on the dresser to the left of the door open to the website www.backpage.com. (Tr. 18; 48). The officers all testified that they knew this website was commonly used to post prostitution advertisements. (Tr. 18-19; 48; *see also* Dkt. No. 49, Ex. D). The officers also noticed a large number of prepaid credit cards, as well as a number of used and unused condoms throughout the room. (Tr. 19; *see also* 48).

Inside the room was a black female, later identified as Dache Crayton, toward the rear corner of the room sitting on a bed. (Tr. 17; 47; 86). Once inside the room, Masterson began speaking with Crayton. (Tr. 85-86). During their conversation, Masterson asked for Crayton's identification, but Crayton could not find it. (Tr. 86-87). She suggested it might be in their car. (Tr. 20, 102).

According to Legner, he then asked Key for permission to search the rental car and Key gave verbal consent. (Tr. 20; *see also* Dkt. No. 49, Ex. B). Masterson did not recall this conversation and did not recall Key ever giving consent to search the car. (Tr. 105). Regardless, Legner (or someone else) then gave the car keys to Masterson. (Tr. 20; *see also* Tr. 86-87 (Masterson recalled being handed the keys, but could not recall by whom)). Masterson and Crayton left the room and went to the vehicle. (Tr. 20; 86-87).

After Crayton and Masterson left the room, Key began reaching in his pockets and waistband and generally becoming fidgety. (Tr. 21; 49). Because he had not been patted down, the officers were concerned for their safety and his and placed Key in handcuffs. (Tr. 21; 49). He was not, however, placed under arrest at this time. (Tr. 22).

Meanwhile, Masterson and Crayton were in the parking lot near the rental car. In the parking lot, Crayton told Masterson that she and the 15-year-old girl were prostituting and that Key was their pimp. (Tr. 87). Masterson gave Crayton the keys to the car and Crayton began dumping bags in the trunk of the car to look for her identification. (*Id.*) Masterson assumed the bags belonged to Crayton. (*Id.*) Masterson asked whether she could search the car and Crayton said yes. (Tr. 88). Masterson did not, however, search the car at that point. (*Id.*) Instead, Masterson took Crayton to McDonald's to find the girl. (Tr. 88-89). Masterson also radioed Officer Swiatek, who was en route to the motel, and advised him to meet them at McDonald's. (Tr. 88).

At the McDonald's, Swiatek entered the establishment and took the girl into protective custody. (Tr. 90). While he was in the McDonald's, Masterson continued speaking with Crayton to gather details about the underlying prostitution scheme. (*Id.*) She then called Legner and Truhlar and advised them to take Key into custody. (*Id.*)

4

Key immediately asked for an attorney and neither Legner nor Truhlar had any additional contact with him. (Tr. 22; 50). Prior to Key being transported to the station by Officer Augustine, Key was searched. (*See* Dkt. No. 49, Ex. B). After Key was transported, the officers searched the motel room and the rental vehicle. At some point during the course of searching Key and the motel room, the officers recovered prepaid Visa cards, a room key, cash, Key's Wisconsin state identification card, the tablet, condoms, a notebook, and at least two cellphones. Upon searching the rental vehicle, Masterson recovered approximately $20, a global positioning system, and some prepaid credit cards. (Tr. 91; Dkt. No. 49, Ex. C).

## **DISCUSSION**

Key now moves to suppress the evidence recovered during the search of his motel room because the officers' entry into his room was unlawful and he did not consent to the search. Key similarly moves to suppress evidence recovered during the search of his rental car on the grounds that he did not consent to the search of the vehicle and Crayton did not have authority to provide consent.

**I. Motel Room**

Key first moves to suppress the following items seized from his motel room by the Romeoville Police Department: his cell phone, $323 in cash,[2] prepaid credit cards, a notebook, a Samsung flip phone, and a Samsung tablet computer. (*See* Dkt. No. 47, 1; Dkt. No. 88, 6-7).

---

[2] The Court notes briefly that the approximately $323 in U.S. currency that Key seeks to suppress was found in a wallet in his pants pocket during a lawful search incident of his person incident to arrest. Legner testified, consistent with his report, that the cash was found on Key when he was searched by Officer Augustine prior to being transported to the Romeoville Police Department. (*See* Dkt. No. 49, Ex. B; Tr. 22-23). The parties have provided the Court little briefing or argument regarding this search, though the government did mention it in its opening brief and did ask one of the officers about such a search on direct examination. The Court notes that "it is not our responsibility to make the parties' arguments for them," *see United States v. Leo*, 792 F.3d 742, 749 (7th Cir. 2015), but in this case Key does not appear to contest the search of his person incident to arrest and, from the record now before the Court, the Court finds the search was obviously lawful and the evidence was lawfully seized. *See United States v. Gary*, 790 F.3d 704, 709 (7th Cir. 2015) (A search of an arrestee's person and personal effects on his person is "*per se* reasonable under the Fourth Amendment.") (citing *United States v. Robinson*, 414 U.S. 218, 251 (1973)).

Preliminarily, the Court finds that Key consented to the officers' entry into his motel room. *See United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996) (recognizing that person can consent to entry of his motel room, but not to its search). "The Fourth Amendment prohibits the police from making warrantless nonconsensual entry into a suspect's home in order to make a routine felony arrest or to conduct a search. This protection of the home against warrantless entries has been extended to hotel rooms." *Id.* (internal citations omitted). A person may, however, consent to the entry of their hotel room by officers and this consent need not be express or verbal. *Id.*

In this case, Key consented to the officers' entry into his motel room by both his words and actions. Legner and Truhlar testified that they asked Key if they could check the room and he advised that was "no problem, come on in." Masterson could not recall precisely what Key said, but she similarly stated that Key was very cooperative during their initial encounter at the door and—at the very least—moved out of the doorway to let the officers into the room. *See United States v. Taylor*, 549 F. App'x 562, 565 (7th Cir. 2013) (officers uncertainties regarding conversation about consent were "not fundamental inconsistencies or conflicts that invalidate the court's choice to believe the officers). There is no evidence that Key expressed any opposition to the officers' presence during this initial encounter. On the contrary, Key was pleasant, cooperative, and relaxed this initial exchange as testified to by the officers as well as Crayton. Key never asked the officers to leave and he never indicated that he did not want the officers in the room. Based on the totality of these circumstances, the Court finds that Key consented to the officers' entry into his motel room.

### A. Plain-View Doctrine

Once lawfully inside the room, the officers were entitled to seize the tablet and prepaid credit cards under the plain-view doctrine. The plain-view doctrine "allows for seizure of

6

material if: (1) a law-enforcement officer is lawfully present; (2) an item not named in the warrant (or, likewise, outside the scope of consent[3]) is in the plain view of the officer; and (3) the incriminating nature of the item is immediately apparent." *United States v. Raney*, 342 F.3d 551, 558–59 (7th Cir. 2003). In this case, the first two elements are readily satisfied because Key consented to the officers' entry into his motel room (*see supra*) and the prepaid credit cards and tablet were in the plain view of the officers upon entry. The only issue is whether the incriminating nature of the items was "immediately apparent."

For the incriminating nature of the seized item to be immediately apparent, the officers "must have probable cause to believe that the item is contraband or otherwise linked to criminal activity." *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004). A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal quotation marks and citations omitted). In this case, the officers reasonably believed that the prepaid credit cards and tablet opened to backpage.com were linked to criminal conduct.

Earlier that evening, the officers received information that a 15-year-old girl had been transported from Wisconsin to the subject motel by a black male subject. They had information that the girl may have been at the motel voluntarily or may have been there against her will. The officers knew this motel to be a common place for prostitution. When they arrived at the motel, they found one car in the parking lot with Wisconsin plates. The car was a rental vehicle and the officers all stated that rental cars are commonly used in prostitution. The clerk confirmed that

---

[3] The Court notes briefly that Key did provide limited consent to search his room, but that consent was limited to a search for the 15-year-old girl. The officers' asking whether they could "check" the room, *see* Tr. 17, 46, 99, 101, is sufficient to seek consent to search. *See United States v. Jackson*, 54 F. App'x 870, 873 (defendant consented to officers having a "look around") (citing *United States v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000) (officers asked to "take a look" inside the room); *United States v. Rice*, 995 F.2d 719, 720 (7th Cir. 1993) (officers asked to "look around"); *United States v. Berke*, 930 F.2d 1219, 1222 n. 7 (7th Cir. 1991) (officers asked to "look" in a home); *United States v. Montilla*, 928 F.2d 583, 587 (7th Cir. 1991) (officers asked to take a "quick look")).

7

there was only one Wisconsin guest at the hotel and that he was a black male. Inside the room, the officers found Key and another young female—both of whom indicated knowledge of the 15-year-old girl. In a quick scan of the room for the girl, the officers observed used and unused condoms, prepaid credit cards, and a tablet open to backpage.com. All of the officers testified that through their training and experience, they knew backpage.com to be commonly used for prostitution and pimping of young females. They also testified that the use of prepaid credit cards is common when posting internet ads for prostitution. Though these items may ordinarily be innocuous, the officers reasonably believed them to be linked to criminal conduct given the totality of the circumstances. *See Cellitti*, 387 F.3d at 624 (officers "may have probable cause to seize an ordinarily innocuous object when the context of an investigation casts that item in a suspicious light") (citing *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) (guns and ammunition found during investigation of illegal hunting); *United States v. Bruce*, 109 F.3d 323, 328–29 (7th Cir. 1997) (shotgun shells found while officers were investigating armed bank robberies); *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (empty ammunition box found in suspected drug dealer's apartment); *United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994) (large amount of cash found on man who had recently sold illegal drugs to an undercover officer)). Given the circumstances under which the officers found the prepaid credit cards and tablet in this case, they had probable cause to seize both items. *See, e.g., United States v. Oates*, No. 14-15397, 2015 WL 5438221, at *3 (11th Cir. Sep. 16, 2015) (agent allowed to seize computer where he was lawfully in apartment and computer screen displaying download was in plain view and easily recognized by agent as possible child pornography); *United States v. Messino*, 871 F. Supp. 1035, 1041 (N.D. Ill. 1995) (rubber-banded business cards and Rolodex not suppressed where they were in plain view and were likely to yield incriminating evidence

regarding tax crimes and narcotics investigation); *but see United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085, 1145 (9th Cir. 2008) (suppressing computer because "no incriminating photo or similar evidence" could be viewed on the screen).

In addition to the prepaid credit cards, tablet, and cash already discussed, the government also seeks to admit Key's cellphone, a notebook, and a Samsung flip phone under the plain-view doctrine. These items must be suppressed because the government has failed to provide sufficient evidence of where these items were discovered and how they were seized. Despite being discovered in the exact location as the tablet and prepaid credit cards, there is no testimony or other evidence indicating that these items were observed by the officers in their initial scan of Key's room. On the contrary, the evidence before the Court indicates that the cellphones and notebook were only discovered and seized when the officers searched the room after Key was arrested and transported. Moreover, there is not testimony or evidence indicating that the incriminating nature of these items was immediately apparent to the officers. The government has provided no briefing on the cellphones and its limited argument regarding the notebook is unsupported by the testimony of the officers or the police reports. The Court cannot find on the stark record before it that these remaining items were found during a lawful search of the room. The question, therefore, now becomes whether these items would have inevitably have been discovered.

### B. Inevitable Discovery

Under the doctrine of inevitable discovery, illegally obtained evidence will not be excluded if the government proves by a preponderance of the evidence "that the officers 'ultimately or inevitably would have … discovered [the challenged evidence] by lawful means.'" *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009) (quoting *Nix v. Williams*, 467 U.S.

431, 444 (1984)). To satisfy its burden, the government must show: (1) "that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence;" and (2) "that it would have conducted a lawful search absent the challenged conduct." *See id*. (citing *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir.1995) ("[W]hat makes a discovery 'inevitable' is not probable cause alone ... but probable cause plus a chain of events that would have led to a warrant ... independent of the search.")). The government "is not required to show that investigators *in fact* obtained or sought a warrant in order to prove that they *inevitably would have* done so." *Marrocco*, 578 F.3d at 640 n.21. Instead, the government only needs to show that "[i]t would be unreasonable to conclude that, after discovering all of [the] information, the officers would have failed to seek a warrant." *Id.* at 640; *see also United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990) (holding that police inevitably would have sought a warrant to search defendant's hotel room because "it would have been foolish not to want to look for the gun there").

In this case, there is insufficient evidence for the Court to conclude that the police would inevitably have sought a warrant to search the defendant's motel room. The parties argue about whether the officers would have sought a search warrant had Key not answered the door, but this inquiry misses the point. The issue is not whether the officers would have sought a search warrant had Key not answered the door; Key answered the door and consented to the officers entering his room. The question is whether the officers would have sought a search warrant after Key was arrested and brought to the station.

This is not a case where it would be unreasonable to think that the officers would have failed to follow up and obtain a search warrant for the motel room. *See, e.g., United States v. Pelletier*, 700 F.3d 1109, 1117 (7th Cir. 2012) ("unreasonable to think that, after [Defendant]

10

admitted to two FBI agents that he had pornography, the FBI would have failed to follow up and obtain a search warrant. That fact alone is enough for the inevitable discovery doctrine to apply."); *United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990) (holding that police inevitably would have sought a warrant to search defendant's hotel room because "it would have been foolish not to want to look for the gun there"). At the time the officers searched Key's room and seized the subject evidence, they knew that the girl they had been looking for had been taken into protective custody and that Key had already been transported to the police station. It may be that the officers would have wanted to continue searching the room for additional evidence of prostitution or trafficking or kidnapping or other criminal activity, but that is simply not clear from the record now before the Court. For the foregoing reasons, the cellphones and notebook are suppressed. The prepaid credit cards, tablet, and cash are admitted.

**II. Rental Car**

Key next moves to suppress the following items seized during the search of his rental car: a Global Positioning System (GPS), prepaid credit cards, and $20.72 in cash. (*See* Dkt. No. 48, 1; Dkt. No. 88, 7). As set forth above, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Warrantless searches are "per se unreasonable" under the Fourth Amendment unless one of a few exceptions is satisfied. *United States v. Edwards*, 769 F.3d 509, 513-14 (7th Cir. 2014) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal quotation marks omitted)). If law enforcement agents conduct a warrantless search, "the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *Gant*, 129 S. Ct. at 1716).

Preliminarily, the Court questions whether Key has standing to challenge a search of this rental car. This Circuit has expressly left the question of whether an "unauthorized, properly licensed driver" of a rental car has standing to challenge the search of the vehicle. *United States v. Walton*, 763 F.3d 655, 662 (7th Cir. 2014). Though Key had clearly been driving the car, the rental agreement shows that Key's mother, Angela Williams, rented the car and that Key was not named as an authorized driver of the vehicle. The parties presented no evidence on whether Key was a properly licensed driver, but the government does not dispute the issue. Indeed, the only mention of this salient standing issue is in one footnote of the parties' briefing and one brief statement by the government at the suppression hearing. The sparse briefing is of no consequence, however, because even assuming Key does have standing to contest the search, its fruits are saved under the inevitable discovery doctrine.

As discussed above with respect to the search of the motel room, one exception to warrantless search rule is the doctrine of inevitable discovery. Under this doctrine, "even an illegally seized item need not be suppressed if the government can prove by a preponderance of the evidence that the officers would discovered it by lawful means." *United States v. Stotler*, 591 F.3d 935, 940 (7th Cir. 2010). "To obtain the benefit of the doctrine, the government must show a chain of events that would have led to a warrant or some other justification independent of the unlawful search." *United States v. Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010). The government insists that, even if the evidence from the car were not lawfully obtained, a search warrant or inventory search of the vehicle would have inevitably led to its discovery. The Court agrees.

If Masterson had not searched the car, the evidence would have been discovered shortly thereafter. At the time the car was searched, the officers had knowledge that Key had transported

a 15-year-old girl from Wisconsin to Romeoville, Illinois in the rental car. They knew that the motel where they found the vehicle and its occupants had a history of prostitution issues and they had also found a number of condoms, prepaid credit cards, and a tablet open to backpage.com—all of which indicated to the officers sexual activity and possible prostitution. The fact that the car was a rental vehicle was also significant to the officers, who testified that rental vehicles are commonly used for prostitution. By the time the car was searched, Masterson had also been told by Crayton that Crayton and the 15-year-old girl were being prostituted by Key and that Key was posting advertisements for them on backpage.com. Masterson testified she would not have allowed Key to drive away even before he was arrested because he was part of her investigation and she also asked Crayton for permission to search the car. While the Court need not resolve the issue of consent in this case, the fact that Masterson did seek consent to search the vehicle is evidence of her intention to have the car searched. Masterson clearly believed that there was evidence of a crime in the vehicle and the circumstances leading up to the search support such belief as reasonable.

Additionally, Masterson testified that she had the authority to have the car impounded if she believed (as she did) that it contained evidence of a crime. With Key in custody on his way to the police station, he was not going to be driving his car away and the officers would not have allowed the car to just sit in the motel parking lot—especially given the officers' belief that the car contained evidence of a crime. Instead of allowing the car to sit in the parking lot, the officers would inevitably have impounded the car and had it towed; an inventory search would have followed and the challenged items would inevitably have been discovered. *See, e.g., United States v. Bennett*, 491 F. App'x 760, 762 (7th Cir. 2012) (holding evidence of gun admissible under inevitable discovery doctrine where officer "could have, and testified that he would have,

obtained a search warrant to recover the gun had he not thought that [defendant's] mother validly consented to the search"); *Stotler*, 591 F.3d at 940-41 (observing, despite government not developing record for inevitable discovery, that evidence from defendant's truck would have "undoubtedly" been discovered shortly after his arrest because, with the defendant in custody, officers would have impounded the truck, had it towed away, and completed an inventory search); *United States v. Simms*, 626 F. App'x 966, 971 (7th Cir. 2010) ("Moreover, he was about to be arrested, and jailed indefinitely. His car could not be left unattended indefinitely. Eventually it would have been impounded by the police and subjected to an inventory search. The discovery of the gun was thus inevitable."). Based on the officers' testimony and the totality of the circumstances in this case, the Court finds that the evidence recovered in the rental vehicle would inevitably have been discovered during a routine inventory search. The Court need not resolve the issue of consent. *See, e.g., United States v. Bennett*, 491 F. App'x 760, 761 (7th Cir. 2012) (resolving motion to suppress under doctrine of inevitable discovery, without analyzing consent); *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (refusing to determine whether consent was voluntary because inevitable doctrine theory clearly applied). The motion to suppress items recovered from Key's rental car is denied under the doctrine of inevitable discovery.

## CONCLUSION

For the reasons stated, Key's motion to suppress evidence recovered from his motel room [47] is granted in part. His motion to suppress evidence recovered from his rental car [48] is denied.

Date: 12/30/2015

Virginia M. Kendall
United States District Judge