IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES | ) |
| | ) |
| | )  No. 13 CR 726 |
| v. | ) |
| | )  Judge Virginia M. Kendall |
| DAJUAN KEY | ) |

**MEMORANDUM OPINION AND ORDER**

On September 10, 2014, Defendant DaJuan Key moved to suppress the evidence acquired from warrantless searches of his motel room and rental car, claiming that the searches violated his right to be free from unreasonable searches and seizures under the Fourth Amendment. The Court held a suppression hearing to resolve these issues and entered an order granting his motion in part and denying it in part on December 30, 2015.

In granting the motion in part, this Court suppressed Key's cellphone, finding the plain-view doctrine inapplicable because there was no evidence from the hearing as to where the phone was discovered, how it was seized, or whether the incriminating nature of the phone was immediately apparent to the officers. The government, acknowledging its errors, moved this Court to reconsider its suppression of Key's cellphone and reopen the hearing for supplemental testimony and evidence. Key, meanwhile, moved to suppress his post-arrest statements despite having missed the deadline for filing of pretrial motions by nearly a year. In the interest of justice, the Court exercised its discretion and ordered a hearing on both issues on January 26, 2016. (Dkt. No. 120). Pending before the Court are the two suppression issues:  1) whether the Government has laid a sufficient basis to permit the cell phone seized in the hotel room to be admitted into evidence based on the new testimony offered in the second hearing that it was

retrieved in plain view; and 2) whether the Defendant's post-arrest statements should be suppressed due to an alleged violation of his Constitutional right to counsel.

## I. Key's Cellphone

### A. Factual Background

The following facts are drawn from the testimony from the suppression hearing held on January 26, 2016 of Romeoville Police Officers Dustin Legner and Brian Truhlar, and Special Agent Carrie Landau from the Chicago Division of the Federal Bureau of Investigation; two video recordings, consent forms, the phone presented at the hearing; and Key's affidavit. Though they are not set forth herein, the Court also adopts the facts set forth in its ruling from December 30, 2015 regarding Key's initial motions to suppress.[1] (Dkt. No. 99). On the evening of September 10, 2013, three officers from the Romeoville Police Department entered Key's motel room at the Romeoville Super 8 Motel. Upon entering the motel room, officers observed a tablet open to backpage.com, used and unused condoms, prepaid credit cards, and two cellphones in plain view. Eventually, after placing Key under arrest and having him transported by a fourth officer to the Romeoville Police Department, officers seized a number of items from the motel room, including multiple cellphones. Officer Legner did not testify during the initial suppression hearing to having observed or seized any cellphones, though his report from that day clearly indicates that the officers seized multiple cellphones from Key's motel room. At the subsequent

---

[1] The facts set forth in the Court's original suppression order were drawn from the testimony of Romeoville Police Officer Dustin Legner, Sergeant Brian Truhlar, and Detective Sergeant Christine Masterson from the suppression hearing on October 6, 2015; the testimony of Dache Crayton, a young woman who was prostituted by Key and was present during portions of the subject searches, from that same hearing; the audio recordings and rental car agreement presented at the hearing; and Key's affidavit. The Court also considered the six police reports offered by Key in support of his pretrial motions and referenced by both parties in their papers. (*See* Dkt. No. 48, at 3, 4, 8, 10; Dkt. No. 47, at 3); *see also, e.g., United States v. Simmons*, 771 F. Supp. 2d 908, 912 n. 1 (N.D. Ill. 2011) (Castillo, J.) (citing *United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996) ("a judge presiding at a suppression hearing may receive and consider any relevant evidence" and the "judge here properly relied on facts set out in police report ... where defendant made no motion to strike and adduced no evidence that impeached or contradicted the account in the report")).

hearing on January 26, 2016, Officer Legner stated that his failure to mention the observation and seizure of cellphones at the previous hearing was merely an oversight because it had been approximately two years since the incident.

Officer Legner further testified that in his ten years of working for the Romeoville Police Department, he has worked on approximately fifty prostitution investigations, all of which involved backpage.com. In his experience, individuals posting prostitution advertisements on backpage.com use their cellphone numbers as contact information and he commonly seized cellphones during raids of hotel rooms related to these investigations.

### B. Analysis

At the initial suppression hearing in this case, Key sought to suppress a number of items, including those seized from his motel room by the Romeoville Police Department: his cell phone, $323 in cash, prepaid credit cards, a notebook, a Samsung flip phone, and a Samsung tablet computer. (*See* Dkt. No. 47, 1; Dkt. No. 88, 6-7). The government, however, elicited absolutely no testimony regarding the two cellphones that Key sought to suppress—apparently relying exclusively on the officers' police reports. One of the government's theories of seizure of the cellphones was the plain-view doctrine, which allows for the seizure of items of obvious evidentiary value in the officers' plain-view. Because the government failed to present sufficient evidence of where the cellphones were found or whether the evidentiary value of the cellphones was immediately apparent to officers, the Court refused to admit the cellphones under this theory. In the most recent suppression hearing, the government provided additional information regarding the seizure of Key's cellphone, including testimony from Officer Dustin Legner and the phone itself.

Based on the evidence presented at the most recent hearing, as well as the evidence presented at the prior hearing, the Court now finds Key's cellphone admissible under the plain-view doctrine. The plain-view doctrine "allows for seizure of material if: (1) a law-enforcement officer is lawfully present;[2] (2) an item not named in the warrant (or, likewise, outside the scope of consent[3]) is in the plain view of the officer; and (3) the incriminating nature of the item is immediately apparent." *United States v. Raney*, 342 F.3d 551, 558–59 (7th Cir. 2003). In this case, the first two elements are readily satisfied because Key consented to the officers' entry into his motel room (*see* Dkt. No. 99, 6) and his cellphone was in the plain view of the officers upon entry. The issue is whether the incriminating nature of the cellphone was "immediately apparent."

For the incriminating nature of the seized item to be immediately apparent, the officers "must have probable cause to believe that the item is contraband or otherwise linked to criminal activity." *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004). A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal quotation marks and citations omitted). In this case, the officers reasonably believed that Key's cellphone was linked to criminal conduct.

As set forth in this Court's previous order, officers arrived at Key's motel room having received information that a 15-year-old girl had been transported from Wisconsin to the subject motel by a black male subject. They had information that the girl may have been at the motel

---

[2] The Court finds for the reasons stated in its first order that Key consented to the officers' entry into his motel room. (*See* Dkt. No. 99, 6).

[3] The Court once again notes (as it did in its previous order) that Key did provide limited consent to search his room, but that consent was limited to a search for the 15-year-old girl. The officers' asking whether they could "check" the room is sufficient to seek consent to search. *See United States v. Jackson*, 54 F. App'x 870, 873 (defendant consented to officers having a "look around") (citing *United States v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000) (officers asked to "take a look" inside the room); *United States v. Rice*, 995 F.2d 719, 720 (7th Cir. 1993) (officers asked to "look around"); *United States v. Berke*, 930 F.2d 1219, 1222 n. 7 (7th Cir. 1991) (officers asked to "look" in a home); *United States v. Montilla*, 928 F.2d 583, 587 (7th Cir. 1991) (officers asked to take a "quick look")).

voluntarily or may have been there against her will. The officers knew this motel to be a common place for prostitution. When they arrived at the motel, they found one car in the parking lot with Wisconsin plates. The car was a rental vehicle and the officers all stated that rental cars are commonly used in prostitution. The clerk confirmed that there was only one Wisconsin guest at the hotel and that he was a black male. Inside the room, the officers found Key and another young female—both of whom indicated knowledge of the 15-year-old girl. In a quick scan of the room for the girl, the officers observed used and unused condoms, prepaid credit cards, a tablet open to backpage.com, and cellphones.

All of the officers testified that, through their training and experience, they knew backpage.com to be commonly used for prostitution and pimping of young females. *See United States v. Canty*, 617 F. App'x 630, 631 n.1 (8th Cir. 2015) ("Backpage.com is a website known for posting disguised advertisements for prostitution services."); *United States v. Winbush*, 524 F. App'x 914, 915 (4th Cir. 2013) (per curiam) (unpublished) (concluding the defendant's "prostitutes advertised their services" on Backpage.com); *but see, Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (stating there is "no estimate of how many ads in Backpage's adult section promote illegal activity"). Officer Legner also testified that, in his experience, individuals posting prostitution advertisements on backpage.com use their cellphone numbers as contact information and he commonly seized cellphones in raiding hotel rooms related to these investigations. Though cash and phones are not "inherently incriminating and cannot alone supply probable cause to search," their presence is "relevant to the question of probable cause." *Spencer v. Pistorius*, 605 F. App'x 559, 566 (7th Cir. 2015) (internal citations omitted). And, in this case, the officers reasonably believed Key's cellphone to be linked to criminal conduct based on the totality of the circumstances. *See Cellitti*, 387 F.3d at 624 (officers "may have probable

cause to seize an ordinarily innocuous object when the context of an investigation casts that item in a suspicious light") (citing *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) (guns and ammunition found during investigation of illegal hunting; *see also, e.g., Pistorius*, 605 F. App'x at 566 (noting three cellphones, just one of which was linked specifically to defendant suspected of promoting prostitution by phone number, were lawfully seized in search of defendant's car incident to arrest); *United States v. Brinson*, 772 F.3d 1314, 1319 (10th Cir. 2014) (allowing expert to explain to jury how cellphones are used as tools of the prostitution trade); *United States v. Nyuon*, No. CR. 12-40017-01-KES, 2013 WL 1338192, *3-4 (D.S.D. Mar. 29, 2013) (officers reasonably believed cellphone contained evidence of prostitution-related offense where, among other things, officer testified that cellphone are "commonly used for pimping" and text message discussing condoms appeared on phone); *United States v. Warren*, 2010 WL 5330566, *2 (D. Minn. Dec. 1, 2010) (probable cause existed to search cellphone where affiant stated, in part, that "in his experience cell phones are often used to promote prostitution, and that such cell phones can contain evidence in the form of voice mail, e-mail, text messages and photographs, as well as contact information regarding co-participants in the crime of prostitution").

The flaw in Officer Legner's testimony is that he merely concluded that the phones were relevant because they were relevant in previous investigations of prostitution. He did not, for example, testify that the victim had contacted her mother by telephone, that a phone number was listed on the backpage ad that he saw in plain view, or that prostitutes use cell phones to communicate with their pimps and their johns. However inartful his testimony, it was sufficient to show a link between the illegal activity of prostitution and telephones when he stated that he had seized them in previous prostitution investigations as evidence based on the backpage ads.

That statement and the fact that he stated he was seizing evidence of prostitution allows the factfinder to make the reasonable inferences necessary to link the phones to prostitution and to the specific prostitution of this victim. Therefore the phone will not be suppressed.

**II. Motion to Suppress the Post-Arrest Statements**

The Defendant moves to suppress both of his post-arrest statements: the first given in the early morning hours of the day after he was arrested, and the second, given while he was driven to the federal building from the Romeoville Police Department for his initial appearance on this case. The Defendant set forth his position in an affidavit as required and stated that he was never warned of his *Miranda* rights at the motel or in the vehicle transporting him to the Romeoville Police Station. The Defendant maintains, however, that as soon as he was placed in handcuffs, he asked to speak with his lawyer. He says that while he was being transported to the Romeoville Police Station, he told the transporting officer that he needed to get his lawyer's phone number out of his cellphone so that he could call him. At the Romeoville Police Station, the Defendant was placed in a room where he says that he once again asked to get his lawyer's number from his cellphone. He says that several hours after being placed in the room, he was awakened and asked whether he needed to use the bathroom. He informed the officer that he did not need to use the bathroom and the officer told the Defendant that some people wanted to speak with him and asked whether he wanted to speak with them. The Defendant says he told the officer that he wanted to talk with them because he believed it was the only way that he would be allowed to get his lawyer's phone number and call him. The Defendant also says that he did, in fact, speak with two FBI agents dressed in plain clothes, but that he only did so because he believed it was the only way that he would be allowed to call his lawyer. The Defendant does not mention the second post-arrest statement in his affidavit.

The Government does not dispute that the Defendant invoked his right to counsel at the motel and that he was then transported to the Romeoville Police Department and placed in a holding cell. The Government asserts that the Defendant sought to speak with them first and therefore even though they knew he had invoked, he reinitiated contact with the law enforcement officers. The Government asserts that when Officer Truhlar asked the Defendant whether he needed to use the bathroom just after 5:30 a.m., the Defendant saw the FBI agents in the booking area and said that *he* wanted to speak with them. The Government does not contest that the agents who interviewed the Defendant knew that he had invoked his right to counsel but they re-read the Defendant his rights, and although he refused to sign the waiver form, he agreed to speak with them, he spoke to them, and as soon as he mentioned that he wanted an attorney they stopped talking to him. With respect to the second post-arrest statement, made on the morning of September 14, 2013, the Government maintains that, around 9:00 a.m., SA Landau arrived with another agent to transport the Defendant to his court date from the Romeoville Police Department. Upon SA Landau's arrival, the Defendant said that he wanted to have a two-way conversation. In the transport vehicle, SA Landau advised the Defendant of his Miranda Rights and the Defendant proceeded to waive his rights and speak with SA Landau, telling her that he wanted to cooperate with the Government.

### A. Factual Background

The following facts are drawn from the testimony from the suppression hearing held on January 26, 2016 of Romeoville Police Officers Dustin Legner and Brian Truhlar, and Special Agent Carrie Landau from the Chicago Division of the Federal Bureau of Investigation; the video recordings, consent forms, phone presented at the hearing; and Key's affidavit. Though

they are not set forth herein, the Court also adopts the facts set forth in its ruling from December 30, 2015 regarding Key's initial motions to suppress.[4] (Dkt. No. 99).

When the Defendant was first placed under arrest by police officers of the Romeoville Police Department at the Romeoville Super 8 Motel on September 10, 2013, he invoked his Constitutional right to remain silent and requested a lawyer. He told the officers that he did not want to talk to them. The Romeoville officers immediately ceased their questioning of the Defendant. This occurred sometime between 8:30 and 9:30 pm on September 10, 2013. The Defendant was then transported to the Romeoville Police Station where he arrived at approximately 9:05 p.m. and was eventually placed in a holding cell at approximately 11:00 p.m. where he was handcuffed by one wrist to the bench of the cell and the cell door was locked. The Defendant repeatedly asked for a lawyer while in the Romeoville Police Station. The defendant was not provided with access to his attorney via of a phone call or other means while housed at the Romeoville Police Department lock-up.

According to the surveillance video of the booking area at the Romeoville Police Department provided as *Government Exhibit 1*, the Defendant is first seen in the booking area at 9:05 p.m. He was placed in a holding cell at 11:24 p.m. No one is seen in the booking area again until around 3:18 a.m. when an officer enters the area with what appears to be another suspect. During that time period, an unidentified police officer entered the Defendant's cell. He appears

---

[4] The facts set forth in the Court's original suppression order were drawn from the testimony of Romeoville Police Officer Dustin Legner, Sergeant Brian Truhlar, and Detective Sergeant Christine Masterson from the suppression hearing on October 6, 2015; the testimony of Dache Crayton, a young woman who was prostituted by Key and was present during portions of the subject searches, from that same hearing; the audio recordings and rental car agreement presented at the hearing; and Key's affidavit. The Court also considered the six police reports offered by Key in support of his pretrial motions and referenced by both parties in their papers. (*See* Dkt. No. 48, at 3, 4, 8, 10; Dkt. No. 47, at 3); *see also, e.g., United States v. Simmons*, 771 F. Supp. 2d 908, 912 n. 1 (N.D. Ill. 2011) (Castillo, J.) (citing *United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996) ("a judge presiding at a suppression hearing may receive and consider any relevant evidence" and the "judge here properly relied on facts set out in police report ... where defendant made no motion to strike and adduced no evidence that impeached or contradicted the account in the report")).

to say something to the Defendant and then leaves the cell. Officers come and go from the holding area from that point forward. At approximately 11:30 p.m. the Defendant lied down on the bench that he was cuffed to and fell asleep.  He slept continuously until 5:34:31 a.m., when Officer Truhlar of the Romeoville Police Department entered the holding area. Officer Truhlar appears to retrieve the key to the holding cell, walks to the holding cell where Defendant is sleeping  and  bangs on the cell cage at 5:35:09 a.m. Defendant is seen moving slightly from the noise and looks at the officer.  Officer Truhlar opens the cell and walks back to the desk in the booking area and looks out the door to the hallway at 5:35:35. He lingers a few seconds as if waiting for someone, and then pulls out his cellphone at 5:35:50. There are two other Romeoville officers in the holding area at this time who are not interacting with Officer Truhlar or the Defendant. Less than a minute after Officer Truhlar is seen texting or emailing on his cell phone, Officer Masterson of the Romeoville Police Department walks into the booking area followed closely by two agents from the Federal Bureau of Investigation:  SA Carrie Landau and SA Michael Barker at 5:36:29. The two agents stand at the desk in the holding area for 7 seconds, without doing anything.  SA Landau is holding a pad of paper and a pen. At 5:36:52, while Officer Truhlar enters the cell to remove the bench handcuff, the two FBI agents move to the front of the desk and watch the cell continuously.

Officer Truhlar and Officer Masterson, meanwhile, walk directly to the Defendant's cell. The Defendant, during this less than two minute period is seen slowly stretching and gradually waking up.  At 5:36:47, Officer Truhlar walks into the cell and uncuffs the Defendant from the cell bench.  Officer Truhlar is observed speaking for a few seconds with the Defendant while the Defendant rises from the bench and then does not speak again while the Defendant shuffles slowly and groggily out of the cell towards Officer Masterson who is standing blocking the door

of the cell with her back to the surveillance camera.  It appears that Defendant is listening to Officer Masterson.   When the Defendant walks out of the cell at 5:37:07, Officer Truhlar stays a few paces behind him and is not speaking.   At the cell door, Officer Masterson speaks to the Defendant for a few seconds and gestures toward the two FBI agents (5:37:20) who have now positioned themselves on the outside of the desk area and remain looking in the direction of the cell at all times.  Officer Masterson is observed speaking and gesturing for a total of 15 seconds. Defendant is then escorted directly to the two waiting FBI agents and is escorted to the interview room.  Officer Truhlar is inside the cell at this point, several steps behind the Defendant. Officer Masterson is seen pointing toward the agents and saying something. Officer Masterson begins walking toward the agents and the Defendant follows slowly behind. The first time that the agents are in the line of site of the Defendant is at 5:37:22. Officers Truhlar and Masterson direct the Defendant toward the two waiting FBI agents and the entire group escorts the Defendant out of the booking area at 5:37:48.  The Defendant is next observed on video in the interview room sitting alone at 5:43:00 a.m.

At 5:43:16 a.m., the agents enter the interview room and begin speaking with the Defendant. SA Landau opens the session, saying: "We will cut to the chase. I know you're tired. Have you slept much?"[5] The Defendant responds that he was sleeping until they came in and woke him up. Almost immediately thereafter, SA Landau says: "We would like to talk to you. We would like to hear your side of things." SA Landau advises the Defendant of his rights and asks him to sign a waiver of rights form, which he refuses. At 5:47:52, SA Barker tells the

---

[5] The Court reviewed Government Exhibits 1 and 2 from the second suppression hearing in their entirety. These exhibits are videos of the holding area and the Defendant's first post-arrest statement respectively. The Court also reviewed the transcript provided as a demonstrative aid. The Court reviewed the portions of the video that are quoted in this opinion, as well as several other portions of the video, countless times. As the fact-finder, the Court did not rely on the inaccurate transcript provided by the Government, but made its own factual determinations as to what was said and shown on the videos.

Defendant that he looks "petrified." The Defendant responds, "I know, I just been sitting here so long."

After over one hour of interviewing the Defendant, at approximately 6:46:38:21, the agents appear to finish their interview, SA Landau sighs, signs the bottom of the page she is writing on, passes the paper and pen to SA Barker, who signs the paper. SA Landau says, "Alright, let me go figure out what the skinny is, okay?" SA Landau then asks the Defendant if his mom works and she says, "Cuz, I wanted to call her but. . . ." Defendant then interrupts her and says in response: "Yeah, cuz, I asked them, I asked them, I asked them, when I first got here, I wanted to speak to a lawyer, right? or to make me a phone call. I wasn't given never the opportunity to do none of the above. I have been here over 8 hours." When asked whether he agreed to talk to the agents, the Defendant responded: "Under the circumstances, that I ain't got no choice to. I don't…I've been sitting right here." (6:46:56). SA Landau challenges the Defendant and says, "What do you mean you don't have a choice. They asked you if you wanted to talk to us. You said yes, we heard you say that." The Defendant retorts: "They told me, do you want to talk to you lawyer, I'm like yeah, and they like well, in order to talk to your lawyer you have to talk to these people first." (6:47:10). The Defendant attempted to explain, starting to say "He came to me and said," (6:47:26) but he was interrupted by SA Barker. The agents continued to question the Defendant about his wanting to talk to an attorney and the Defendant continued to assert his right to speak to a lawyer: "I've been telling them I want a lawyer" (6:47:34); "No I told you. I just told you. That I been telling them I want to talk to a lawyer" (6:47:52). SA Barker continues to tell the Defendant if he wants to talk to a lawyer then "we're done" and the Defendant continues to assert "I been asking for a lawyer for a long time." (6:48:37). SA Barker says "OK, so we're done." The Defendant responds: "I mean, if we were

done we would have been done a long time ago" and further "Listen, you are going too fast. I told you before I even got to this police station I wanted to talk to a lawyer. I asked for a lawyer several times. You disregarded that." SA Barker says, "We heard the opposite." The Defendant responds: "Regardless of that, I asked for a lawyer several times before I ever even stepped foot in this police station. I was denied a lawyer. I have been denied a lawyer just . . .I had my lawyer's number in my phone. My lawyer's number is actually in my phone. I said can you get my lawyer number. . ." (6:49:01). SA Barker says, "You need to stop talking now." Again the Defendant says: "If we would have been done a long time ago." The questioning did not stop and the agents proceeded to question the Defendant about his criminal history. The interview ended at 7:03:14 a.m.

On September 13, 2013, a federal complaint was filed against the Defendant and a federal arrest warrant was issued. On September 14, 2013, three days after his arrest by the Romeoville Police Department and three days after being held in custody in the Romeoville Police Department, the Defendant was officially arrested and taken into federal custody. SA Landau and another agent arrived at the Romeoville Police Department early on September 14, 2013 to transport the Defendant to his initial court appearance based on an arrest warrant obtained through the United States Attorney's Office. Inside the Romeoville Police Department, the Defendant told that he wanted to have a "two-way conversation." Once the Defendant was in the transport vehicle, SA Landau advised him of his rights verbally and from memory and the Defendant agreed to speak with her. This second interview between SA Landau and the Defendant was one-sided, with the Defendant doing the majority of the talking. The Defendant said that he would cooperate with the government and would wear a wire for the government. When asked whether her impression was that the Defendant wanted to speak to law enforcement,

SA Landau said "very much so." On September 14, 2013, the Defendant appeared for his initial appearance on the federal complaint in front of the duty Magistrate Judge. A Federal Defender was appointed to him at that time.

**B. Analysis**

A suspect subject to custodial interrogation has the right to remain silent and the right to consult with an attorney and have counsel present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 468-73 (1966); *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011). "To protect a suspect's Fifth Amendment right against compelled self-incrimination, custodial interrogations must be preceded by the familiar Miranda warnings, including a warning that the suspect has a right to an attorney at state expense during questioning; if the suspect invokes the right to counsel, he 'is not subject to further interrogation ... until counsel has been made available to him, unless [he] himself initiates further communication, exchanges, or conversations with the police.'" *United States v. Hampton*, 675 F.3d 720, 727 (7th Cir. 2012) (quoting *United States v. Edwards*, 451 U.S. 477, 484-85 (1981)).

In this case, the parties do not dispute that the Defendant invoked his right to counsel after being placed under arrest at the motel. The parties do not dispute that the Defendant ultimately spoke with agents at the Romeoville Police Department and that, prior to his speaking with them, they read him his rights. At issue is whether, after invoking his right to counsel, Key "(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *See Smith v. Illinois*, 469 U.S. 91, 95 (1984). "A suspect initiates conversation if he makes a statement that 'evince[s] a willingness and a desire for a generalized discussion about the investigation.'" *United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)). Initiation alone, however,

does not necessarily constitute a waiver of the suspect's right to counsel. *Robinson*, 586 F.3d at 545. The suspect's waiver "must also be knowingly and voluntary, under the totality of the circumstances, before law enforcement agents engage in any interrogation." *Id*. (citing *Edwards v. Arizona*, 451 U.S. 477, 486 n.9 (1981).

### 1. Initiation

The Government takes the position that the Defendant initiated further discussions with authorities when he was at the Romeoville Police Department. The evidence, primarily in the form of two videotapes, one silent overview of the booking and cell areas, and a second video and audio tape of the interview, do not support that position. The video of the holding cell shows Officer Truhlar waking the Defendant from a sound sleep at 5:35:09. At that point, the Defendant had been in the cell alone in the custody of the police for at least six hours, has been sleeping for approximately six hours, and had not had access to an attorney. At the suppression hearing, Officer Truhlar stated that he awoke the Defendant to see if he needed to go to the bathroom. The Defendant had not asked to go to the bathroom and was in fact in a deep sleep. Officer Truhlar is seen banging on the cell to wake the Defendant. When the Defendant responds by moving and looking toward him, Officer Truhlar walks away rather than asking through the cell bars whether the Defendant needs to go to the bathroom. Officer Truhlar testified that he waited to ask the Defendant whether he needed to use the bathroom until Officer Masterson was in the area so she could assist him. Officer Truhlar also stated that he told the Defendant he should use the bathroom because it might be some time before he would be able to use it again.

There is no explanation for this in the record. The Defendant had not been charged, was not being transported to court, had not been given access to an attorney to be escorted to an

attorney room, and had not asked to go the bathroom. The oddity of the awakening becomes clear when Officer Truhlar is seen looking out into the hallway as if anticipating that someone will be there. When no one arrives immediately, he takes out his cellphone as if to notify someone that the Defendant is now awake. Within 54 seconds, the two FBI agents arrive with notepads in hand to interview the Defendant.

The arrival of the agents with notepads at the ready to interview the Defendant is also inconsistent with SA Landau's testimony that she went to the booking area to find a piece of evidence. The video shows no such actions on her part, but rather, that she is simply waiting to interview the Defendant. As the Defendant was walking out of the cell, at approximately 5:36:57, Officer Truhlar testified that the Defendant indicated he wanted to speak to the FBI agents that had entered the booking area along with Officer Masterson. Specifically, Officer Truhlar testified that the Defendant said he "wanted to talk to his people." Officer Masterson asked whether the Defendant was referring to the two plain-clothes FBI agents that had just walked into the booking area.

There are several problems with this exchange. First, Officer Truhlar testified that this exchange was taking place at around 5:36:57 on the video, as the Defendant is seen walking out of his cell. However, at that time on the video, Officer Truhlar is seen inside the cell and several steps behind the Defendant, with the Defendant's back squarely toward him and the Defendant and he are not seen speaking. To the extent any discussion was taking place at this time, it was while the Defendant was still inside the solid-walled cell and the plain-clothed agents were out of his view. Second, the only statements that the Defendant has made to the Officers prior to this moment were pleas to speak to his lawyer or to use his cellphone to retrieve the number for his

lawyer. Officer Truhlar oddly interpets "my people" as being the FBI agents who the Defendant has never met rather than his attorney or family members.

Law enforcement are required to verify whether an individual has invoked his right to an attorney where the invocation is ambiguous. *See United States v. Hunter*, 708 F.3d 938, 942 (7th Cir. 2013) (strongly encouraging officers to clarify whether a suspect wants an attorney once the suspect makes an ambiguous statement). Here, Officer Truhlar knew that the Defendant had already invoked his right to an attorney, and rather than clarify whether "my people" meant the same invocation, consistent with his prior statements for the past 8 hours, or whether it meant something entirely different, such as the reinitiation of contact with law enforcement, he immediately interpreted it as the latter and directed the groggy Defendant to the waiting agents. Officer Truhlar states that the Defendant was seeking to speak with them some 20 seconds after waking up from a deep sleep. Officer Truhlar says that it was Officer Masterson that spoke at this time and asked the Defendant for clarification as to whether "his people" were the FBI agents. That is possible—Officer Masterson is seen speaking on the video—but she did not testify and the video had no audio. Regardless of who may have spoken it, the exchange occurred between 15-20 seconds after entering his cell to uncuff him from the bench where he was asleep.

The evidence of the video clearly shows that it was the officers who initiated contact with the Defendant and the officers who initiated discussion with him about an interview. It is undisputed that at this point the Defendant had invoked his right to an attorney and had not been given access to one. Officer Truhlar made no effort to clarify the ambiguous request and instead directed the Defendant to the agents.

More concerning, is that the video clearly shows the agents enter the booking area with Officer Masterson and waiting for the Defendant to be delivered to them. SA Landau testified

that she entered the booking area to look for identification or other evidence related to this incident, but that is not reflected in the video. The video shows Officer Truhlar wake the Defendant and then go stand by the desk in the holding area. It shows Officer Truhlar take out his cellphone and fixate on it—a reasonable inference that he was texting the agents to come to the room. Shortly thereafter, Officer Masterson arrives in the booking area with the agents in tow. The video then shows the agents waiting at the counter looking toward the Defendant's cell while Officer Masterson and Officer Truhlar go to the cell. The video does not show the agents looking for any evidence, reading anything, talking about anything. They were not working in the booking area prior to Officer Truhlar waking the Defendant. They are not working in the area when Officer Truhlar is in the cell. They are merely waiting for the Defendant with pen and paper in hand. There was no reason to wake the sleeping Defendant who had invoked his Constitutional right to counsel other than to orchestrate his contact with FBI agents for an interview. There is nothing coincidental about the scene on the video; it is planned contact with a criminal defendant who has invoked his right to counsel.

It is further not plausible that Key would seek to initiate contact with the two FBI agents when he had never met them before and did not know them. Further corroboration for the fact that law enforcement initiated this contact is SA Landau's own words on the video of the interview when she first brings the Defendant into the interview room. SA Landau testified at the suppression hearing that she was fully aware that the Defendant had invoked his right to an attorney, but her first exchange with him does not reflect that. Rather than begin, as one would think she would have if she knew he had invoked, by saying words to the effect that we understand you wanted an attorney earlier, and now you want to talk to us, what do you want to say? Instead, she says: "*We* would like to talk to you. *We* would like to hear your side of

things…" Having known that the Defendant had invoked previously, the agent's first obligation was to clarify whether he had in fact asked for a lawyer. *See Arizona v. Roberson*, 486 U.S. 675, 687 (1988) (the reinitiation protections set forth in *Edwards* focus on the state of mind of the suspect and require police procedures to "enable an officer who proposed to initiate an interrogation to determine whether the suspect has previously requested counsel.") These first words of introduction reflect what is displayed on the videotape. The agents wanted to talk to the Defendant, they made no effort to determine whether he had invoked in the past, and the Officers created the opportunity for them to interview and they made no effort to determine whether he had invoked in the past. The Officers woke him for the purpose of the interview and directed him to pass by the agents on the alleged bathroom trip so that he would have contact with them. Law enforcement clearly orchestrated this opportunity and clearly initiated contact with a Defendant who had invoked his Constitutional right not to speak to them.

By orchestrating Defendant's movement out of the cell to the agents and by asking whether the Defendant wanted to speak, the law enforcement officers violated his Constitutional rights not to speak to them after he had invoked it. *See, e.g., United States v. Johnson*, 400 F.3d 187, 194 (4th Cir. 2005), *cert. denied,* 546 U.S. 886 (2005) (holding that police violated Edwards where officer re-entered the interrogation room forty minutes after the suspect requested a lawyer to see whether the suspect would waive his rights); *United States v. Rodriguez*, 993 F.2d 1170, 1174 (5th Cir. 1993) (finding police initiated contact with suspect where law enforcement went to suspect in jail not because suspect wanted to speak with him, but because he received a call from a co-defendant saying "they" wanted to talk to him); *Desire v. Attorney Gen. of Cal.*, 969 F.2d 802, 804–05 (9th Cir. 1992) (holding that police improperly initiated contact with

suspect where the officer overheard a conversation between the suspect and his co-defendant and in response, asked the suspect whether he "wanted to talk about anything").

The Defendant indisputably invoked his right to counsel. Law enforcement could not then hold Defendant without allowing him access to counsel and contrive circumstances to make him available for an interview. That is precisely what they did in this case. *See Haynes v. St. of Wash.*, 373 U.S. 503, 514 (1963) (noting in case of an involuntary statement that, "even apart from the express threat, the basic techniques presented here—the secret an incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects."). The Court finds by a preponderance of the evidence that law enforcement initiated contact and that suppression of the statements is therefore the appropriate remedy. *See McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)) (presumption that statement made upon initiation by police is involuntary is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.")

### 2. The statement was not made voluntarily

Even if this Court were to find that the interview was not initiated by law enforcement, the statements must still be suppressed because under all of the facts and circumstances, the Defendant's statement that he would talk to law enforcement was colored first by the orchestrated contact with law enforcement; and was second, coercive under all of the facts presented to the Court. Therefore, his statement could not be deemed voluntary. If the evidence shows that the Defendant's statement was not voluntary under all of the facts and circumstances, the *Miranda* waiver cannot stand and the statement must be suppressed. *See Robinson*, 586 F.3d at 545 ("By itself, a suspect's initiation of conversation does not necessarily constitute a waiver of his right to counsel; the suspect's waiver must also be knowing and voluntary, under the

totality of the circumstances, before law enforcement agents engage in any interrogation"). A statement is voluntary if, "in the totality of circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015) (quoting *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004)).

The Court finds by a preponderance of the evidence that Defendant's sworn statement in his affidavit supports the position that he was told that he would need to talk to the agents before he would get access to his attorney. First, the circumstances of the initial contact with the agents show that the Defendant was chained to a cot in a closed and locked cell for over six hours before the officers came to his cell. No other arrestees were in the lock-up nor in the cell where he was being held. There is no evidence that he had shown any aggression toward officers and the only evidence of his statements were those that he invoked his Constitutional rights. Yet, the officers kept him handcuffed to the bench in spite of having him in a locked cell. In spite of the handcuffed arm, the Defendant fell asleep at approximately 11:30 pm and was in a deep sleep when the officer came to wake him. The Defendant had been arrested some 8 hours earlier and was still not given access to his lawyer when he was brought out of his cell. After being restrained (first in handcuffs on the scene, then in transport, and finally even within a locked cell) for over eight hours, the Defendant clearly was being sent the message that he will not be released or given his attorney. The only time he was removed from the cell or uncuffed was to speak to the agents. At that time, he still had not been given access to his lawyer. The Defendant stated during his first post-arrest statement and in his affidavit that he believed that he needed to

speak with the agents to be allowed to speak with his attorney. This belief is corroborated by the videos. He is only uncuffed and allowed to leave the cell for the purpose of the interview.

The video of his statement shows a groggy Key mumbling to the agents that he will not sign the waiver form to be interviewed but he will talk to them verbally. Then the questioning begins. After over an hour of interviewing, SA Landau clearly ends the interview. She completes her writing and signs it and hands it to SA Barker and says that she will now go figure out "the skinny" on this. The interview is clearly over. SA Landau then references a possible call to someone in Key's outside world – his mother. This is the first time in his 8 hours of detention that anyone has offered to give him contact with *anyone* let alone his lawyer. The quid pro quo of interview for phone call is complete. Both SA Landau's statement to Key that she will now attempt to call his mom; and Key's immediate statement to her when the interview ends that: "Yeah, I told them when I first just got here then, I wanted to speak to a lawyer, right. Or maybe me- I wanted to make a phone call. I wasn't given an opportunity to do any of it. I have been here over 8 hours" supports his statement that he was led to believe that law enforcement was only going to grant him his phone call if he agreed to speak to them.

When asked whether he agreed to talk to the agents, the Defendant responded: "Under the circumstances, that ain't have no choice to. I don't…I've been sitting right here." (6:46:56). He went on, stating: "They told me, do you want to talk to your lawyer, I'm like yeah, and they like well, in order to talk to your lawyer you have to talk to these people first." (6:47:10). The Defendant attempted to explain, that a law enforcement officer told him that when he started to say "He came to me and said," (6:47:26) but he was interrupted by SA Barker before he could finish his sentence. The agents continued to question the Defendant about his wanting to talk to an attorney and the Defendant continues to say things like: "I've been telling them I want a

lawyer" (6:47:34); "No I told you. I just told you. That I been telling them I want to talk to a lawyer" (6:47:52); "I been asking for a lawyer" (6:48:37); "I asked for a lawyer several times before I ever set foot in this police station. I was denied a lawyer. I have been denied a lawyer. I been denied a lawyer just, I had my lawyer's number in my phone. My lawyer is actually in my phone. I asked them can you get my lawyer number" (6:49:01); "I've been asking to speak to a lawyer, but they denied it" (6:49:51). All of these statement were made immediately after the statement was complete. It is exactly at that point that Key believes it is time for him to get his right to access his counsel. Similarly persuasive is the fact that there is no statement made by the agents that the Defendant will be now charged based on the statement. If there had been, one might expect a "buyer's remorse" type of retort to the agents which would evidence his belief that he was now in trouble and therefore he might need a lawyer. Instead, Key is calm and waiting for the moment to complete the interview. In fact, he states twice that the interview would have been done a long time ago if they had given him a lawyer – once again showing that he believed that he would need to talk in order to get a lawyer.

That belief was reasonable under all of the circumstances. He had been held without the ability to make a phone call or access his attorney after repeated requests to do so; he had been chained to a bench in a locked cell; he had not been told that he was being charged; he was awakened in the middle of a deep sleep and shuffled into an interview at 5:40 a.m. in the morning; and he was interviewed within minutes of being awakened. Critical to understanding the coerciveness of the environment is to look at the timing of the entire exchange between law enforcement and the Defendant. The Defendant is supposedly asking to talk to the agents within 20 seconds of being awakened; he supposedly agrees to go with them within 30 seconds of being awakened, and he is being asked to waive his rights (rights he has invoked repeatedly for

hours) just 6 minutes after being escorted from his cell. That the Defendant could understand the circumstances within those first few minutes of consciousness is not reasonable. Although lack of sleep, or being awakened suddenly from sleep, would not be sufficient alone to demonstrate involuntariness, it is one factor of the many set forth above that shows the totality of circumstances reveal an orchestrated initiation by law enforcement of the interview within 30 seconds awakening the defendant after not being provided access to his attorney.

Further, the tape recording also shows the agent's reluctance to allow Defendant to ever invoke his right to counsel. After the interview pages are signed and Defendant repeatedly asserts that he has all along invoked his right to counsel, SA Barker tells him that if he truly wants to do that, he must stop talking. Rather than say, the interview is over, stand up, and leave the room, SA Barker and SA Landau continue ten minutes more of questioning, rejecting his assertion that he even *at that point* he was invoking his right to counsel. The questioning did not end until 7:03:14 a.m.

It is undisputed that that the Defendant had not been given an attorney or a phone call before he made this statement, despite his repeated requests for one. When asked during oral argument whether the Defendant was ever given a call during the time he was at the Romeoville Police Department, the prosecutor commented unhelpfully, "I don't have that information." The Court must assume that it does not exist because there is no evidence in the record that he received access to his attorney the entire time he was in custody at the Romeoville Police Department. Voluntariness must be judged by the totality of circumstances that led to the statement. If a Defendant is held in custody, cut off from access to his attorney, and brought in a sleeplike state to make a confession in the early hours of the morning, that lack of access certainly factors into whether the statement was made voluntarily. Being in custody cuffed for

hours and awakened suddenly without access to the attorney he repeatedly kept asking for, the Defendant's statement could not have been voluntary. *See Escobedo v. St. of Ill.*, 378 U.S. 478, 490-91 (1964) (finding suspect deprived of his Sixth Amendment right to counsel where, among other things, suspect had requested and been denied an opportunity to consult with his lawyer); *Haynes*, 373 U.S. at 514 (internal quotation marks and citation omitted) (finding petitioner's written statement involuntary where he "was alone in the hands of the police, with no one to advise or aid him, and he had no reason not to believe that the police had ample power to carry out their threats to continue, for a much longer period if need be, the incommunicado detention—as in fact was actually done."); *see also Tucker v. Randall*, 948 F.2d 388, 390-91 (7th Cir. 1991) (suggesting in dicta that "sixth Amendment right to counsel would be implicated if plaintiff was not allowed to talk to his lawyer" for the four days he was in custody following his arrest).

Following his first post-arrest statement, the Defendant was returned to his cell. Remarkably, the Defendant was held for another two days. On the second day in the Romeoville Police Station, he was charged in a federal criminal complaint. On the third day, September 14, 2013, he was transported to the federal building for his initial appearance. There is no evidence presented at the hearing that the Defendant was ever provided an attorney during that interim – a total of approximately 60 plus hours. The first record of anyone providing the Defendant with counsel is in the docket itself when the magistrate judge appointed a federal defender to represent him at the initial appearance. On the way to that court hearing, the Defendant was transported to the federal building by SA Landau and again he spoke to her. This time, SA Landau read him his rights orally and from memory. The Defendant expressed his desire to talk to her and to cooperate with the Government. The Court does not discredit SA Landau's

statement that she read him his *Miranda* rights or that he stated his desire to cooperate. But, there can be no question that after being held in custody without access to a lawyer for approximately 60 hours, after having invoked his right to an attorney and never having been provided an attorney, the Defendant was desperate to help himself out and could not possibly be determined to have been voluntarily waiving his rights. This was a desperate man with no lawyer and the overly coercive circumstances of being blocked access to an attorney for two and a half days render this statement also involuntary. *See Randall*, 948 F.2d at 391.

The statements must be suppressed in order to deter law enforcement officers from refusing to respect a defendant's exercise of his Constitutional rights. *See Colorado v. Connelly*, 479 U.S. 157, 166 (1986) ("The purpose of excluding evidence seized in violation of the Constitution is to substantially defer future violations of the Constitution."); *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) ("Rather, we have said time and again that the *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement.") (emphasis in original); *see also Breedlove v. Beto*, 404 F.2d 1019, 1023 (5th Cir. 1968) (Stating that the purpose of the exclusionary rule is "to deter police from obtaining involuntary confessions from accused persons in order to convict them.").

## CONCLUSION

For the reasons stated, the Court vacates in part its order from December 30, 2015 suppressing Key's cell phone [99] and grants Key's motion to suppress all of his post-arrest statements [104].

Date:   February 5, 2016

Virginia M. Kendall
United States District Judge