```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                              EASTERN DIVISION

3   UNITED STATES OF AMERICA          )   Docket No. 13 CR 00726
                                      )
4                    Plaintiff,       )   Chicago, Illinois
                                      )   February 4, 2016
5             v.                      )   10:07 a.m.
                                      )
6   DaJUAN KEY,                       )
                                      )
7                    Defendant.       )

8
          TRANSCRIPT OF PROCEEDINGS - FINAL PRETRIAL CONFERENCE
9         BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a jury

10
    APPEARANCES:
11
    For the Government:       UNITED STATES ATTORNEY'S OFFICE by
12                            MS. KATHERINE SAWYER
                              MR. CHRISTOPHER PARENTE
13                            Assistant United States Attorneys
                              219 South Dearborn Street, 5th Floor
14                            Chicago, Illinois 60604

15  For the Defendant:        MS. HEATHER L. WINSLOW
                              53 West Jackson Boulevard, Suite 1560
16                            Chicago,Illinois  60604

17                            HART & MILLER LLC by
                              MR. JAMES LEIGHTON O'CONNELL-MILLER
18                            150 North Michigan, Suite 2800
                              Chicago, Illinois  60601
19

20

21

22  Court Reporter:           GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Federal Official Court Reporter
23                            219 South Dearborn, Room 2318-A
                              Chicago, Illinois 60604
24                            (312) 435-6047
                              Gayle_McGuigan@ilnd.uscourts.gov
25
```

1     (Proceedings heard in open court:)

2          THE CLERK:  13 CR 726-1, USA versus DaJuan Key.

3     (Defendant enters courtroom.)

4          THE COURT:  Good morning.

5          MS. WINSLOW:  Good morning, your Honor.  Heather

6  Winslow on behalf of DaJuan Key.

7          MR. O'CONNELL-MILLER:  Good morning, your Honor.

8  Leighton O'Connell-Miller, also on behalf of DaJuan Key.

9          THE COURT:  Good morning.

10         Good morning, Mr. Key.

11         MS. SAWYER:  Good morning, your Honor.  Katherine

12 Sawyer and Christopher Parente on behalf of the United States.

13         THE COURT:  Okay.  Good morning.

14         We have a number of things to wrap up here.  I have

15 some rulings -- some more rulings for you.  And then I don't

16 think I got anything from you on one of the things that I was

17 waiting on.

18         MS. WINSLOW:  Which was -- what's that, your Honor?

19         THE COURT:  I thought I gave you more time to file a

20 supplement to admit the charges against Agent Landau as

21 evidence of bias.

22         MS. WINSLOW:  Oh, I thought you determined that they

23 were not admissible.

24         THE COURT:  Oh, okay.

25         MS. WINSLOW:  And we don't object to that.  That's

1    fine.

2              THE COURT:  Okay.  All right.

3              MR. O'CONNELL-MILLER:  The only thing, I think there's

4    the --

5              COURT REPORTER:  I'm sorry, I can't hear you.

6              MR. O'CONNELL-MILLER:  I'm sorry.  The April testimony

7    was the only thing.  There was a motion to extend time until

8    today, and that's something we do want to discuss, a phone

9    message we had from April's attorney indicating that she was

10   going to assert her Fifth Amendment rights, but we don't know

11   the scope of that.  And I played the voice-mail message for the

12   government.  We're going to try to all get in touch with her

13   later today.

14             THE COURT:  Okay.  Because we'll need to know that

15   before trial.

16             All right.  So let me address one outstanding motion,

17   which is the motion to strike the testimony in the original

18   suppression hearing based upon the fact that the government did

19   not turn over the grand jury testimony of that witness that was

20   within its possession.

21             And we start with the understanding that that is the

22   factual basis -- hang on a second -- the factual basis that it

23   was in the government's possession isn't in dispute.  But what

24   happened was that one of the issues at the suppression hearing

25   was that the defendant had consented to the police's entry into

1    his hotel room that day, and the three law enforcement officers

2    who testified that the defendant responded to their knock at

3    the hotel room door and then voluntarily allowed them into

4    their room.

5            So this witness Crayton, which is the subject of this

6    particular motion, she testified that they entered the room

7    without knocking or being invited.

8            So at issue is this transcript of Crayton's testimony

9    that was before the grand jury in October of 2013, which is two

10   years -- almost two full years prior to her testimony on the

11   witness stand.

12           And she testified before the grand jury:  After

13   talking to Marie, I left the McDonald's and I went back to our

14   hotel room at Super 8 where Amillie was waiting, we were each

15   laying on one of the beds when the police arrived at the room,

16   they placed Amillie under arrest, and I went with another

17   police officer.

18           Now, oddly -- or should I say uniquely -- the

19   defendant is arguing that this testimony is consistent with her

20   testimony before the Court at the suppression hearing.  And

21   since she called the witness, she wanted to use that as a prior

22   consistent statement to rehabilitate Crayton.

23           And the government's position is, well, we had no

24   obligation to turn that over to her because she wasn't our

25   witness, and there was no material difference between the

1   testimony before the grand jury and her testimony in court and,

2   therefore, it can't be a *Brady* violation.

3         So I think we have to look at it from a couple of

4   different perspectives.

5         Of course, the defense proposal is that it's a *Brady*

6   violation and, therefore, her testimony should be stricken.  So

7   *Brady* occurs when the evidence is favorable to the accused, and

8   it's either exculpatory or impeaching, and it must have been

9   suppressed by the government either willfully or inadvertently

10  and there's a reasonable probability that prejudice ensued.

11  So, in other words, that's the materiality component that I

12  just mentioned to you a moment ago.

13        So, first, the evidence was suppressed.  It's

14  suppressed for purposes of *Brady* where they failed to disclose

15  it in time for the defendant to make use of it and the evidence

16  was not otherwise available to the defendant through the

17  exercise of reasonable diligence.  They did have the same

18  information with the defendant's summary of her interview.

19        This is where the issue is unique in that the

20  information that was provided to the defense was not

21  inconsistent with the information that was in the grand jury.

22        Under the Rule 3500, once the government calls a

23  witness, the government must turn over whatever statements it

24  has within its possession.  That evidence has to be turned over

25  under 35, and then you would have the ability -- and that's the

1  old way of -- that's what the rule states, but of course I have

2  discretion to order it earlier than that.

3  　　　　So here government says, "Well, I didn't call this

4  witness," even though this witness is someone that they have on

5  their witness list, that they're relying on as someone to give

6  key testimony to -- or for, for their 404(b) motion and some

7  other motions, but they didn't call her.  So I grappled for a

8  while with this concept of at the moment that she finished her

9  testimony, why the government didn't reach into its bag and say

10  here is the grand jury testimony from two years earlier that

11  we've had, and they didn't do that.  Because even though they

12  didn't call her, there would have been the ability for the

13  defense to judge whether or not this witness had something

14  inconsistent.  And that's just not right that you didn't turn

15  over the grand jury testimony after she testified, under 3500.

16  And you made the call as to whether it was inconsistent or

17  material.  And in a situation where we're already in court and

18  she's on the stand, it behooves any prosecutor to turn over a

19  prior statement.

20  　　　　Fortunately for the prosecutors, they're saved by the

21  fact that the statement is consistent.  And I think that makes

22  this a different call, even though I don't think it was the

23  right call to have been made by the government.

24  　　　　Prior consistent statements do have the potential to

25  effect the fact-finder's view of a witness's credibility.  And

1   under *Brady*, the prosecutor isn't required to deliver his

2   entire file, but to disclose evidence favorable to the accused

3   if suppressed would deprive the defendant a fair trial.

4          So Ms. Winslow's position is, well, I would have liked

5   to have rehabilitated her to say she's not lying today, this is

6   exactly what she said before.

7          I was the fact-finder in this situation.  I was the

8   person that had all the information now at my disposal.  And

9   this issue of materiality and the reasonable probability that

10  it would have, had it been disclosed to the defense, the result

11  of the proceeding would have been different is where the

12  government's action is protected.

13         In this case, there's no reasonable probability that

14  the suppression hearing would have turned out differently if

15  the defendant had had the grand jury testimony.

16         The three officers were consistent with their

17  statements, and her grand jury and statement to the FBI was

18  consistent.  And for that reason, that consistency makes it not

19  a material issue that would have affected the outcome of the

20  suppression hearing.

21         So Crayton didn't testify before the grand jury that

22  the officers entered without knocking or announcing.  She

23  didn't provide any information regarding how they came inside

24  the room.  It's possible that Crayton and Key were each laying

25  on one of the beds when the police arrived, as she testified

1    before the grand jury, and that Key answered the door and

2    consented, as the Court found after the first hearing.

3         So given the facts of the case and the substantial

4    evidence undermining her testimony at the suppression hearing

5    that the officers entered the room without consent, I think the

6    government's failure to disclose this grand jury testimony did

7    not undermine the confidence in my initial order.

8         And I'll put this up online.

9         I don't think it was the right practice.  I think that

10   if you have a statement of a witness, even if called by the

11   defense, especially in light of the way you have embraced her

12   testimony to be part of the motions that you filed as a

13   government witness to support her, that you should have given

14   the grand jury testimony to Ms. Winslow when she finished

15   testifying, at the latest.  So that is, in my mind, probably

16   negligence.  Fortunately for you, I'm not finding it to be a

17   *Brady* violation because I don't think it's materially

18   inconsistent, and it wouldn't have affected the outcome of my

19   decision.

20        So that is for the outstanding issue on the motion to

21   strike.

22        I still am working on the law, and I will have a

23   ruling for you today on his statement.  I'm not completed with

24   my opinion on whether or not his statement should be

25   suppressed.

1    I've given you my ruling on the 404(b), and I am

2    excluding it.

3    I do find that under *Gomez* and its progeny that it is

4    propensity evidence.  And I think the charge is narrow enough

5    that we should only be admitting evidence that goes directly to

6    the intent to have this particular victim engage in

7    prostitution.  And I personally think that will protect you if

8    you get a conviction anyway because the case law is clear that

9    it's prejudicial to have these other acts by other victims and

10   other prostitutes, I think would fall right into the *Gomez* new

11   direction from the Seventh Circuit, and that it's very likely

12   that the admissibility if upon conviction, if you get a

13   conviction, would be a reversal.

14   So I'm not going to admit the 404(b), as you saw in my

15   ruling yesterday.

16   Did you turn over your summary chart as directed?

17   MS. SAWYER:  We don't have any, your Honor.

18   THE COURT:  Oh, okay.  And what about -- so there was

19   a motion to admit summary charts.  That's withdrawn, I assume,

20   then?

21   MS. SAWYER:  It is, your Honor.

22   THE COURT:  Okay.  And then the motion to admit the

23   exhibits filed in support of the government's reply, is there

24   any objection to that one?  I think that was taken under

25   advisement.

1          MS. WINSLOW:  Are we referring to the backpage ads?

2          THE COURT:  Yeah.

3          MS. WINSLOW:  The backpage ads that involve the --

4     involve April, that's not at issue.  The other backpage ads --

5          THE COURT:  It's been stricken under the 404(b) now.

6     There won't be evidence about the other -- other victims.

7          MS. WINSLOW:  Precisely.

8          THE COURT:  I do have your agreed protective order,

9     which is spartan, but at least covers one aspect of 3509, but

10    it's not signed, so I'm going to pass that forward and have all

11    of you sign it so we get it on the record, please.

12         And then, most importantly, I have received in the

13    last 24 hours two filings from Mr. Key himself.  And I'm going

14    to start by addressing those in the way that I always address

15    those, and then we'll get to the substance.

16         First and foremost, Mr. Key, you are represented by

17    counsel.  When you are represented by counsel, I do not take

18    any of the motions as motions filed in your case because she's

19    the one that files on your behalf.  So these will not be

20    addressed by me unless -- and this is the second part of the

21    analysis -- unless you have reached a point with your defense

22    counsel where you believe that you should not have her

23    represent you anymore because of a significant divergence of

24    opinion on how your case should be handled.

25         She has been vigorously defending your case, as has

1    the attorney before you.

2        I will say if your issue is ineffectiveness, I do not

3    see it at all.  If your issue is something else, I'm going to

4    ask your attorney and not you first as to whether this has been

5    resolved.

6        MS. WINSLOW:  In my opinion, based on our recent

7    communications, this has been resolved.  This motion before you

8    was a point of disagreement.  It does not in my opinion amount

9    to a total breakdown or even a partial breakdown of

10    communications.  Our communication has been really actually

11    exceptional the last few days, last week.  I did not see it as

12    a -- as a non-frivolous motion.  Therefore, I did not file it.

13    Mr. Key disagreed, and he filed it with the understanding that

14    your Honor would not consider it.

15        THE COURT:  Okay.  So I need to ask you directly,

16    because you did give me these filings, whether you are

17    satisfied with Ms. Winslow and that you're working together

18    with her to prepare your defense for this trial.  Are you?

19        THE DEFENDANT:  Well, I'm working together with her.

20        THE COURT:  Come on over here, please.

21        THE DEFENDANT:  I'm working together with her to get

22    me prepared for trial.  I thought -- well, from my

23    understanding, I want to be able to explain well to get all my

24    things that I feel like are issues in front of the Court,

25    because I know on appeal, if I do get found guilty, I would

1    like these things I have to appeal.  So anything I file and I

2    file for record is based on appeal rights, because I don't want

3    to give any of my appeal rights up, so I want to make sure that

4    I get everything out in the open that I feel that I have some

5    type of concern about from my point of standing, where I look

6    at the law and see things that she might don't see.  You know

7    what I'm saying?  So I try to get everything out there on

8    docket for if I have to I can bring it back up.

9            THE COURT:  Okay.  That's exactly what you can't do,

10   you cannot do that, because what I'm telling you now is this is

11   the person trained in the law, this is the person who knows the

12   law.  If you have some issue that you want to preserve for

13   appeal, the way it works is you say:  Here's my issue,

14   Attorney.  She says:  That issue is not one that I can present

15   under the law and the facts, so I can't file it under my

16   obligations of Rule 11 as a lawyer.  Or she says:  This is one

17   that I can file.  And she uses her legal judgment to file it,

18   and she works out an agreement with you as to which ones will

19   be filed.

20           If she's not filing it, my -- what I'm hearing is

21   there is not a legal basis for this to be presented to me based

22   upon my obligations to you, Judge, as an officer of the court.

23           And so these are not preserving your record because

24   they won't be considered because I'm only considering things

25   filed by her.

1          So if you think that there is something that she is

2     not doing and you're reaching some point of irreconcilable

3     presentation, that's when we decide about whether or not this

4     is a significant enough conflict.

5          But this is exactly what you can't do.  (Indicating.)

6     She's the one trained in the law.  She's presenting the motions

7     to me after discussing with you what can be presented.

8          I'm not going to consider them.

9          THE DEFENDANT:  Can I speak?

10         THE COURT:  Absolutely.

11         THE DEFENDANT:  Every single motion, every single

12    hearing that I had inside this court is me.  I looked up every

13    single case.  I found everything on my own.  Everything.

14    Every -- Candace Jackson, I filed on.  I had to give her the

15    paperwork.  I had to tell her.  She didn't want to do nothing

16    for me.  I had to do it myself.  So every time I bring

17    something to this Court, it's from me.

18         THE COURT:  Okay.  If it's from you and you're

19    presenting it to her and she's presenting what you want

20    presented to the Court, then you're represented appropriately,

21    and she's using her legal expertise to raise the issues to the

22    Court.

23         THE DEFENDANT:  Uh-hum.

24         THE COURT:  Is that what's going on?

25         THE DEFENDANT:  Yes.  Yes.  It been going on for a

1    while.  But at the same time, like I told you, I protect myself

2    because when I was telling my old lawyer about the hotel and

3    she saying I ain't -- it ain't -- I ain't have arguments and

4    stuff like that, that it wasn't a law and everything, so it was

5    like a back-to-back thing where going back and forth.  So now

6    I'm at the point where I have to look it up for myself because

7    I feel if I don't, then ...

8         THE COURT:  Is there something in these two motions

9    that you believe that she is not presenting to you --

10   presenting to me?

11        THE DEFENDANT:  Well, I think we just had a

12   disagreement on the motions itself because I felt like that she

13   was coerced to say me because the police threaten her.

14        MS. WINSLOW:  By she, he means April.

15        THE DEFENDANT:  April.  They threatened her.  They hit

16   her with the paper.  They pulled her desk from under her.  She

17   kept telling them, no, it wasn't -- I ain't do nothing.  And

18   they forced her to say.  And it's in the video.

19        THE COURT:  Then when she testifies, you will have the

20   opportunity to cross -- your attorney will have the opportunity

21   to cross-examine her --

22        THE DEFENDANT:  Yes.

23        THE COURT:  -- and challenge whether it was the truth

24   that she said to them.  So that's preserved for trial.

25   Ms. Winslow has had many trials in this building.  She'll be

1    able to cross-examine using her skills.  So that's preserved

2    for you.

3              And so you moved to exclude her, but you can't move to

4    exclude the victim of the case that has provided a statement to

5    the government that says that she's been victimized by you.

6    You don't have the right to exclude her just because you don't

7    think she's telling the truth.

8              You do have a confrontation clause right to confront

9    her when she's on the witness stand, challenge her with that

10   statement, and attempt to disprove that statement to the jury.

11   And that's your constitutional right, and you're going to

12   exercise it.  And Ms. Winslow is going to cross-examine her.

13             THE DEFENDANT:  Okay.  Thank you.

14             THE COURT:  Okay.  So are you satisfied that you're

15   going to have that proper representation at trial then?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Okay.  And that you're satisfied that

18   Ms. Winslow is going to continue to represent you.

19             THE DEFENDANT:  Yes.

20             THE COURT:  Okay.  All right.  So what else do we need

21   to address?  We've got some jury instructions, I think.

22             MS. WINSLOW:  Jury instructions.  And also both

23   parties filed some brief *voir dire*.

24             THE COURT:  Oh, okay.

25             MS. WINSLOW:  I filed mine relatively early this

 1    morning, so if your Honor doesn't have a copy, I have an extra

 2    copy.

 3            THE COURT:  Although Docket 128 and 129 from the

 4    government came up identical as both proposed jury

 5    instructions.  All the ones titled *voir dire*, it's jury

 6    instructions, so I think there was a filing problem -- did they

 7    fix it?

 8            LAW CLERK:  They fixed it this morning.

 9            THE COURT:  Oh, they fixed it this morning?  Oh, good.

10    Thanks.  I guess you fixed it this morning.  I didn't see it

11    yet.

12            MS. SAWYER:  Your Honor, we also have a copy we can

13    hand up --

14            THE COURT:  Okay.  Why don't you grab that.

15        (Tendered.)

16            THE COURT:  All right.  So we're going to go through

17    some jury instructions.  We're going to go through some

18    *voir dire*.  And you're waiting on the motion to suppress the

19    statement from me.  And that should be the end result.  Right?

20            MR. PARENTE:  Yes, your Honor.

21            The one time-sensitive issue that -- and the motion to

22    suppress the telephone as well.

23            The one time-sensitive issue for this morning -- and

24    it's only because we have grand jury time scheduled for later

25    this morning -- is the government's filing on the proposed

1    language of the indictment, and it kind of loops into the jury

2    instructions.

3            So I think the Court saw the filing of the government

4    that understanding the position --

5            THE COURT:  You have grand jury time on this case?

6            MR. PARENTE:  If it's the Court's position that as

7    currently charged --

8            THE COURT:  Oh, I see.  That you'd go back into the

9    grand jury --

10           MR. PARENTE:  And supersede --

11           THE COURT:  Okay.

12           MR. PARENTE:  -- with a second --

13           THE COURT:  Okay.

14           MR. PARENTE:  -- second part of that statute.

15           THE COURT:  All right.  So let's take -- you can take

16   the tables where you can spread out your work and we'll take a

17   look.

18           So let's first look at the *voir dire* that was filed I

19   guess this morning correctly.

20           Let's see.  All right.  So the first one that's

21   proposed is that the testimony will involve sexually suggestive

22   or explicit conduct, including prostitution.

23           I think we should ask that.  We give them a head's up

24   that they're going to hear it, and then ask them at sidebar as

25   to why it would bother them, if it does.

1       Do you have an objection?

2       MS. WINSLOW:  I do, Judge.  And I actually proposed

3   what I think is a simpler version of that same question as my

4   *Voir Dire* 1.

5       THE COURT:  All right.  Let me see.

6       Yeah, sexual conduct can be like, you know, a romance,

7   a rom-com, or it can be prostitution.  I think we really want

8   to ask them whether they have issues regarding prostitution.

9       MS. WINSLOW:  I believe they will be asked that with

10  the last question of your Honor's standard *voir dire*.  It

11  already asks them -- they will be advised of the nature of the

12  case, and then they're asked whether or not that's an issue

13  that they can judge fairly, so I think it's repetitive.

14      THE COURT:  The last question on mine says solely is

15  there anything about the facts of the case that you've heard.

16  Right?

17      MS. WINSLOW:  Yes.

18      THE COURT:  All right.  Yeah, I think that we should

19  do Number 1.  I think it will be beneficial to you.  This will

20  be one of those that they respond to at sidebar if they have

21  strong feelings.  And so it's going to be worded the way I

22  usually word these.

23      Do any of you have strong feelings with the prospect

24  of hearing such evidence?

25      And that will be, when they give us the sidebar,

1    you'll be able to cross, rehabilitate, whatever you want to do,

2    and so will you.  So that way I think you can find out whether

3    there's issues.

4            I'm not going to ask the entire group about

5    legalization of prostitution.  I don't need to get into

6    anybody's legislative opinions.

7            But if we do get a strong feeling on prostitution

8    issue, you go ahead on the sidebar and inquire about that.  So

9    I think that will be appropriate for you.

10           And the third one is really a follow-up to the first,

11   which at sidebar you can inquire about.  If they do say that

12   they think that prostitution is fine and it shouldn't be

13   illegal, then go ahead and ask them, would you feel differently

14   if it was someone under 18.  But that will be outside of the

15   presence of the jury.

16           So what I'm saying is Number 1 will be asked with an

17   altered version of the wording.  2 and 3 is permissible to be

18   asked at sidebar.  And then I think that 4 would be whether you

19   or a close friend or family member has had any -- I think maybe

20   it is as broadly worded as we can get it -- experiences that

21   would make it difficult for you to be impartial in judging a

22   case involving prostitution.  I think that's helpful.  I think

23   you want to know that, and so that that one will be asked.

24           And I'm not going to ask the question about whether

25   you disbelieve a person just because it's involving

1    prostitution.

2            Again, if they have strong feelings, you can follow

3    up.

4            So 2, 3, and 5 are available to you for sidebar

5    discussion on your own.

6            1 and 4 will be given.  4 will be given as is.  1 will

7    be modified by me.

8            MS. WINSLOW:  Actually, Judge, *Voir Dire* 2 that I

9    presented was really in rebuttal to *Voir Dire* 3 from the

10   government.

11           THE COURT:  Right, which is why I don't want to do it

12   to the whole group --

13           MS. WINSLOW:  That's fine.

14           THE COURT:  -- so we're not going to -- I don't want

15   to instruct that on the whole group.  The whole group is going

16   to get that instruction, their jury instructions, at the end,

17   and I don't like to prepare them one way or the other.

18           Okay.  So -- during *voir dire*, that is, not during

19   their case.

20           All right.  So that's for *voir dire*.

21           Now let's look at those jury instructions.

22           Did you separate out for me the ones that are objected

23   to that I was dealing with, Colette?  Or did you leave them all

24   together?

25           LAW CLERK:  I did not.

```
 1              THE COURT:  All right.  Well, I don't have them in the
 2   order that I want them in.
 3              Can you direct me to which ones we were in dispute,
 4   please?
 5              MS. SAWYER:  I can, your Honor.
 6              Starting with Government's, in the old version,
 7   Instruction Number 4 --
 8              THE COURT:  Okay.
 9              MS. SAWYER:  -- we agreed to strike the stipulation
10   language, which we've done.
11              THE COURT:  Okay.  Hang on.  Let me just get -- so do
12   you want me to follow with what was filed on the 29th?  Or do
13   you want me to -- is that the latest one?
14              MS. SAWYER:  The latest one, your Honor, I believe was
15   filed on the 29th, yes.  That was the date of the pretrial
16   conference.
17              The only thing is the numbers have shifted because we
18   took one out.
19              THE COURT:  Right.  You took some out.  Okay.  So --
20              MS. SAWYER:  I believe Number 4 is still Number 4,
21   though.
22              THE COURT:  Okay.  And you removed stipulation.  And
23   you don't have any problem with that?
24              MS. WINSLOW:  No.  No, your Honor.
25              THE COURT:  Okay.  All right.  That's fine.
```

1        MS. SAWYER:  The next one was Government Instruction

2    19 from the old version, which is now omitted from this

3    version, was about summary charts.  We took that out.

4        THE COURT:  Okay.  And there's no objection to that?

5        MS. WINSLOW:  No, your Honor.

6        THE COURT:  Okay.

7        MS. SAWYER:  Just for the Court's information, your

8    Honor, I think that now, given the Court's 404(b) ruling, there

9    need to be some additional amendments here, which I can make

10   today to reflect the Court's ruling.  And there were a couple

11   that the Court took under advisement.  I haven't addressed

12   those because obviously we're not there yet, but I just wanted

13   to draw the Court's attention to those.

14       THE COURT:  Okay.

15       MS. SAWYER:  And then I think the main subject of our

16   discussion --

17       THE COURT:  Is what's on 22.

18       MS. SAWYER:  Correct, is what's on I believe now

19   Government's 21 through -- sorry, it's going to be Government

20   Exhibit -- I'm sorry, Government Instruction 22, correct, 22-A,

21   and then 25, 26, and 27 on the new version.

22       THE COURT:  Okay.  So the -- let's start with 22, the

23   elements instruction.

24       So Element Number 1:  Knowingly transported Victim 1

25   in interstate commerce.  Victim 1 was less than 18.  And the

1  defendant intended that Victim 1 engage in prostitution.  And

2  then bracketed you have, "Which, if it had occurred, the

3  defendant would have committed the criminal offense of

4  prostitution."

5       I'm not sure why you have that bracketed like that.

6  Because you don't need that bracketed, right?

7       MS. SAWYER:  I think if we are exactly where we were

8  with the indictment as it stands, I think that's correct, that

9  we don't need the --

10      THE COURT:  You make the indictment.  You're the

11 executive branch.

12      What I was telling you last week, and I said to you

13 before, is that 2423(a) has two components.  It's either for

14 prostitution or it's for a sex act that anyone could be charged

15 with.  And it's and/or.  You could charge all of them if you

16 wanted.  That's your decision.  It's your choice.  And then I

17 said to you that, of course, 2423(a), the Mann Act is an old

18 statute.  It's a very old statute that Congress hasn't fixed to

19 the extent of comporting with laws nationwide that prostitution

20 can't be for a child.  That's all I said.  But you can stick

21 with it.  It's your choice.  You make your decision.

22      So you can charge prostitution or you can charge a sex

23 act.  And obviously you're sticking with prostitution, from

24 what you've got here.

25      MS. SAWYER:  Yes.  Yes, your Honor.  But I guess we

1    were seeking clarification from the Court because we wanted to

2    be certain that the Court's -- that we understood the Court's

3    position and that we weren't misunderstanding it.  We wanted to

4    make sure that it was not the Court's position that because a

5    juvenile cannot be prosecuted for prostitution in the State of

6    Illinois, that somehow the indictment was defective because it

7    relied on the prostitution prong.

8         THE COURT:  I am not making that -- that would make me

9    have to be in the legislative branch or to rule on a motion to

10   dismiss the indictment, which is not before me.  I don't have a

11   motion to dismiss the indictment.

12        MS. WINSLOW:  You don't, although I have one in my

13   computer that will be filed, depending on the outcome of this.

14        Judge, it's our understanding that -- and we agree

15   with your understanding of the law -- that a minor cannot

16   engage in prostitution in the State of Illinois.  That may be

17   different in other states.  Because this is a federal law, it

18   makes sense that the law is written as it is.  If there are

19   other states that still consider a minor able to engage in

20   prostitution, then it makes sense that this applies to all 50

21   states.  The government could have charged the second prong,

22   but it didn't.

23        THE COURT:  Right.  But you have to be able to say in

24   your motion to dismiss the indictment, if you can, that because

25   all of the 50 states now say that that is a commercial sex act

1    of a minor or exploitation of a minor or sexual abuse of a

2    minor, however it's defined, that it doesn't define the

3    activity that is defined in the statute.  It criminalizes

4    prostitution.  And it criminalizes it for someone under 18.

5         MS. WINSLOW:  But the State of Illinois doesn't

6    recognize the crime of prostitution for someone under 18, which

7    is why the government could have, but didn't, charge under the

8    second prong of that statute.

9         THE COURT:  Oh, no.  They could have charged under the

10   second prong.

11        MS. WINSLOW:  They absolutely could have, but they

12   didn't.

13        THE COURT:  No, I actually think that -- what I was

14   trying to say to you last time -- and I'm saying again -- is

15   the alternative is that you're charged for the purposes of

16   prostitution or any criminal act for which he can be charged.

17   And he certainly can be charged, as I said in my 404(b).  He

18   can be charged with recruiting a minor for a commercial sex act

19   under the federal statute of human trafficking.  He can be

20   charged with aiding and abetting the, you know, the sexual

21   abuse of a minor if he put her into prostitution under state

22   laws.  And under the old -- under this old statute, that would

23   be defined by whatever happened to her.  You know?

24        MS. WINSLOW:  But he wasn't charged.

25        THE COURT:  No, no, he is charged with it.

1    MS. WINSLOW:  He's --

2    THE COURT:  He's charged with -- oh, you're saying

3    because he wasn't charged with another sexual act.

4    MS. WINSLOW:  Yes.  Precisely.  He was simply -- he

5    was only charged under the prostitution portion of that

6    statute.  There is an "or."  But the government only charged

7    with committing an act of prostitution.

8    (Counsel conferring.)

9    THE COURT:  Okay.  So then if that's your theory and

10   that because they didn't say any sexual activity for which any

11   person can be charged, you have to be able to say that the

12   statute is somehow unconstitutional because since 2010 all of

13   the states have said that it's not -- the act is not

14   prostitution, the act is sexual abuse.  So it's really the

15   definition of prostitution.  And it doesn't constitutionally

16   negate the statute.  It's just that the language is old, and

17   they haven't touched it.

18   MS. WINSLOW:  The language is old, but it's also that

19   the government has failed to -- and it's literally already

20   drafted, it was just based on your Honor's ruling.  The

21   government has failed to charge a crime in this case because

22   the minor cannot commit an act of prostitution.  It's a legal

23   impossibility.  And the government could never present the

24   evidence necessary to prove beyond a reasonable doubt.  It's a

25   legal impossibility.  There's no evidence that it could present

1    that would show that April committed an act of prostitution

2    because prostitution, as it pertains to minors, does not exist

3    in the State of Illinois.

4            THE COURT:  Okay.  Go ahead.

5            MR. PARENTE:  Judge, it's the government's position,

6    just so we're clear, that we don't -- the statute doesn't

7    require the government to prove that the minor could be charged

8    in the state for committing the crime of prostitution.

9            THE COURT:  I get that.

10           MR. PARENTE:  Okay.  So the statute criminalizes the

11   defendant's intent that she engage.  As the Court knows, it

12   doesn't even matter if she actually does engage --

13           THE COURT:  Exactly.

14           MR. PARENTE:  -- in an act --

15           THE COURT:  Yeah.

16           MR. PARENTE:  -- of prostitution.  So it's our

17   position that the indictment as charged is correct.

18           We could have charged a whole bunch of different ways

19   and other things, we didn't, and that's why we're going forward

20   on this.  But it's our position that there's no defect in the

21   indictment.  And the Illinois legislature's decision to

22   immunize a minor from being prosecuted has nothing to do with

23   this federal statute which criminalizes his intent that the

24   minor engage in the act of prostitution.

25           THE COURT:  Right.  I just don't think that the

1    State's defining the act differently negates also the intent of

2    this original statute, which was to transport a minor to have

3    her engage in -- they could have said a commercial sex act.  I

4    mean, that's really the difference.  Right?

5            MS. WINSLOW:  It is.

6            THE COURT:  It's prostitution or a commercial sex act.

7    And they're the same thing.

8            MS. WINSLOW:  I suppose they are the same thing,

9    except when your -- when the interest is a minor in this case,

10   and Illinois has taken the extra steps to make it the law of

11   the state that a minor cannot engage in, and I think -- I guess

12   I would disagree with your Honor --

13           THE COURT:  Okay.

14           MS. WINSLOW:  -- with all due respect, that a

15   commercial sex act is not prostitution.

16           THE COURT:  What's the difference to you?

17           MS. WINSLOW:  I don't -- I don't think that there's a

18   difference, and I think both of them are not a crime under

19   Illinois law.  They don't exist.

20           THE COURT:  Well, no, I --

21           MS. WINSLOW:  As to a minor.

22           THE COURT:  But that's the problem, see?  Because the

23   criminal activity is against your client, not against the

24   minor.

25           So the problem with the statute is just the old

1    language of calling it prostitution that -- you know, to engage

2    in prostitution.

3         It would have been more enlightened and advanced in

4    this day and age that the language be changed to say "engaged

5    in a commercial sex act."

6         MS. WINSLOW:  Except the statute, as it reads now,

7    says "prostitution."  It hasn't been changed.

8         THE COURT:  But you don't think there's a difference

9    between the two.

10        MS. WINSLOW:  It says "prostitution."  And under

11   Illinois law, a minor cannot commit an act of prostitution.

12        THE COURT:  But it doesn't matter if the minor can't

13   commit it.  Right?

14        MS. WINSLOW:  Except I think under the statute, and I

15   don't have --

16        THE COURT:  It matters whether what he does is

17   criminal, not what she does.  It's just the language of how

18   they've charged it --

19        MS. WINSLOW:  It is.

20        THE COURT:  I mean, the language of the old Mann Act,

21   which goes all the way back to, like, when the mafia was

22   bringing, you know, prostitutes across state lines, that was

23   the whole concept when it was first enacted.  And it's been a

24   solid statute in that regard forever.  It's just that it's

25   inconsistent now with our enlightened view that children are

1    not prostitutes, they're child abuse victims.

2          MS. WINSLOW:  All of this is true, but if I could just

3    indulge -- if you would --

4          THE COURT:  Sure.

5          MS. WINSLOW:  -- just indulge me a minute, if I could

6    read you the indictment as it's charged.

7          THE COURT:  Go right ahead.

8          MS. WINSLOW:  And I'm sure -- I know you've read it.

9          "In or around September of 2013, in the Northern

10   District of Illinois, Eastern Division, and elsewhere, DaJuan

11   Key, a/k/a Amillie, defendant herein, knowingly transported

12   Victim 1, an individual who had not attained the age of 18

13   years, in interstate commerce from the State of Wisconsin to

14   the State of Illinois with the intent that Victim 1 engage in

15   prostitution."

16         THE COURT:  Uh-hum.

17         MS. WINSLOW:  So as it's charged, it's the intent that

18   April engage in prostitution.  It's not charging Mr. -- it's

19   charging Mr. Key's intent with transporting her, but her act of

20   prostitution.

21         THE COURT:  Okay.  So here -- no.  You're wrong.  And

22   I'll tell you why.  I disagree, and I'll tell you why.

23      (Laughter.)

24         MS. WINSLOW:  That's fine, Judge.

25         THE COURT:  Believe me, they will tell me whether I'm

1    wrong.  And they do plenty.

2          So the -- it is not her intent to engage in the

3    activity or that she actually engage in the activity.  As

4    Mr. Parente said first, she doesn't even have to engage in the

5    activity.  But, remember, if you looked at the second prong, it

6    enlightens you on this.

7          "Or any sexual activity for which any person can be

8    charged with a criminal offense."  And usually that "any

9    person" is the defendant, not the victim, but the defendant,

10   and whether the defendant could be charged.

11         So like in a situation where you're transporting a

12   minor and engaged in a sex act, that it would be intercourse

13   with a child or sexual abuse of a child, and that would be the

14   definition.  It would say transported from Illinois to Indiana.

15   In Indiana law, it's illegal for an adult to have sex with a

16   child.  You know, that would be the "or" prong.

17         So the focus is on the illegal activity for the

18   defendant, not on the illegal act of the prostitution.  The

19   focus is on the intent and the act of your client, not on the

20   victim.

21         MS. WINSLOW:  I don't disagree with anything your

22   Honor said, respectfully, except the fact that the government

23   didn't charge the last part of the statute.  They didn't charge

24   that second -- that second prong.  And I think if that's the

25   theory under which the government is going to proceed, then it

1    needed to charge that.

2          THE COURT:  It's not -- I'm hearing they're going to

3    proceed under prostitution, and I just addressed what I think

4    is an archaic term for the Mann Act, but it's not illegal and

5    it's not unconstitutional.  Prostitution -- do you have a

6    definition for prostitution?

7          MR. PARENTE:  We do, your Honor.

8          THE COURT:  Does it say commercial sex act or

9    something like it?

10         MS. SAWYER:  I can find --

11         MS. WINSLOW:  Instruction 25, Judge, in the new

12    instructions.

13         THE COURT:  Yeah.  So it's true that he -- if the

14    allegations are true that that was the intent, to engage in a

15    sexual act in exchange for money or other valuable

16    consideration.

17         MR. PARENTE:  Judge --

18         MS. WINSLOW:  Except that --

19         THE COURT:  So I don't really sit as, like, a super

20    legislator, like, redrafting.  I sit only to see whether the

21    issue is -- if the indictment is unconstitutional.  I don't

22    have a motion challenging it as such.  And I raised the issue

23    primarily about language and the language you were going to

24    continually use to the jury regarding the abuse of a minor.

25    And I think that we should be enlightened when we have your

1    Department of Justice issuing every year missives regarding how

2    prosecutors should be aware of these -- the language in the

3    statutes and how they should be treating victims, et cetera, so

4    I think that we're going to have a jury here, we should do it

5    the right way.  That doesn't mean that I'm going to negate a

6    statute because it is unconstitutional to say that a minor

7    engaging in prostitution can no longer be a minor engaged in

8    prostitution.  It's more of a semantic -- it's more of

9    semantics, you know, that -- whether prostitution is a

10   commercial sex act.  I think.  It's more of the diction of the

11   statute.

12            MR. PARENTE:  Judge, just to I guess come full circle,

13   what I think, what I at least am hearing, is when defense

14   counsel continues to say that the Illinois legislature is

15   saying that a minor can't engage in prostitution, that's not

16   what they're saying.

17            The Illinois legislature is saying a minor cannot be

18   prosecuted for engaging in prostitution.

19            And the best evidence of that is that Illinois, in the

20   State of Illinois, you can still be prosecuted for the crime of

21   promoting the prostitution of a minor, so they still -- even

22   the State itself recognizes this.

23            THE COURT:  Right.  Right.  And my description and my

24   presentation to you regarding this issue was really to make

25   sure that as we are talking and discussing the evidence in

1    front of this jury, that we're not doing so in such a way that

2    we are misunderstanding what is the enlightened view of child

3    exploitation.  And I don't think the statute is

4    unconstitutional.  And if they want to stick with prostitution,

5    they can stick with prostitution.

6         MS. WINSLOW:  I will file the motion today.  I

7    basically just outlined the argument in the motion.

8         THE COURT:  Now, remember, under the new rules of

9    criminal procedure, you had an obligation to attack an

10   indictment at the earliest stages, which is now two years ago.

11        MS. WINSLOW:  It is two years ago, although under Rule

12   12, I just need to bring this motion before trial.

13        THE COURT:  I'll take a look.

14        MS. WINSLOW:  That's fine.

15        Also with respect to the Government's Instruction 22,

16   the government repeatedly refers to April as Victim 1.

17        As your Honor said, there is no Victim 2.  The

18   second --

19        THE COURT:  I think you agreed in your protective

20   order to call her by her first name, so you need -- didn't you?

21        MR. PARENTE:  We did, Judge.  I think the only issue

22   there is the actual indictment referred to her as Victim 1 --

23        THE COURT:  Oh.

24        MR. PARENTE:  -- and that's why we kept it.  We've

25   changed it in every other demonstrative exhibit that we're

1     using, but the indictment does say Victim 1.

2            MS. WINSLOW:  And I obviously didn't have any control

3     over what the indictment said when it was brought.  But

4     "victim," it leads to a legal conclusion, Judge.  And I think

5     that it needs to be -- indictments are redacted or changed all

6     the time for the purposes of trial.  And when you're presenting

7     April as victim, it very, very strongly suggests to the jury

8     that, particularly in jury instructions, very, very strongly

9     suggests to the jury that you're endorsing the government's

10    position that she is, in fact, a victim, and I think it needs

11    to be changed to "April."

12           THE COURT:  Well, she is charged as the victim.  I

13    mean, if you're -- I thought -- I thought you were going down a

14    completely different path.

15           I mean, if you're going down the path that there's

16    multiple victims and this is prejudicial in the sense that

17    she's labeled 1 and there might be 2, 3, or 4, I thought that's

18    where you were going.  But the fact that she's labeled "the

19    victim" by them, that's who she is, according to their

20    evidence.

21           MS. WINSLOW:  According to their evidence, but these

22    are the jury instructions.  The government -- or -- it's the

23    jury's job to decide whether she's a victim.

24           THE COURT:  Right.  But they have to charge -- they

25    have to give her some name, and they're not permitted to give

1    her name name in the 3509 section.

2            MS. WINSLOW:  They're not, but we can change it to

3    April.  I mean, that's the agreement, that she would be

4    referred to by her first name and not by this legally

5    conclusive term of "victim."  That's for the jury to decide.

6            THE COURT:  What's your position on that?

7            MR. PARENTE:  Judge, we believe that it should stay

8    with what was found by the grand jury in the indictment.  I

9    don't think at the end of this it's a game changer.

10           Obviously, I can look into this issue.  I don't know

11   what the case law says on changing --

12           THE COURT:  I -- well, I don't either, but I -- you

13   know, you can always change things like, you know, VIN numbers

14   on guns or serial numbers -- I mean, VINs on cars or serial

15   numbers on guns and titles of, you know, weapons that are

16   possessed in statutes without going back to the grand jury, but

17   I don't know if it's -- I don't know if it's necessarily

18   prejudicial if the charge says that he transported this

19   individual and if convicted he would -- she definitely would be

20   a victim.  So you're saying the term "victim" is what's

21   prejudicial.

22           MS. WINSLOW:  I am.

23           MR. PARENTE:  I mean --

24           THE COURT:  Go ahead.

25           MR. PARENTE:  Would the word "minor" --

1        MS. WINSLOW:  "Minor" is fine.

2        MR. PARENTE:  Maybe that solves it.

3        THE COURT:  Let me see what that indictment looks like

4    again.

5        Transported a minor, an individual who had not

6    attained the age of 18, from the State of Wisconsin to the

7    State of Illinois with the intent that the minor engage in

8    prostitution.

9        MR. PARENTE:  The government would accept that.

10       THE COURT:  Yeah.  I don't think you need to fix that

11   in the grand jury.  I think by agreement you can make that

12   clerical change.

13       Do you agree?

14       MS. WINSLOW:  I do.

15       THE COURT:  I think that's fine, if it's overly

16   prejudicial.

17       And then it would be -- you could either say "April"

18   or "the minor" for your elements instruction then, whichever

19   one you think is cleaner for you.  I mean, or you could say the

20   defendant knowingly transported April, comma, a minor -- oh,

21   no, they have to find that she's a minor, right?

22       MS. WINSLOW:  That's true.

23       THE COURT:  In interstate commerce and April was less

24   than 18 and the defendant intended that April engage in

25   prostitution.

```
1              All right.  So we can make those changes.

2              So, no, I am not directing the government to do

3    anything in the grand jury.  That's your choice.  But they are

4    sticking with prostitution, and I don't think it's

5    unconstitutional, and I really am not happy that you're going

6    to give me a motion on it now after we've discussed it for so

7    long.

8              MS. WINSLOW:  Judge, having discussed it, and I

9    understand your Honor's ruling, there's no need for me to file

10   the motion.  I think it's properly preserved at this juncture.

11   I won't file it.

12             THE COURT:  Okay.  Fair enough.

13             All right.  So Number 22-A.

14             MS. WINSLOW:  One, there's a typo.

15             THE COURT:  Okay.

16             MS. WINSLOW:  Five lines down.  Transported Victim 1,

17   obviously change to "minor" or "April," from the State of -- it

18   should be Wisconsin to the State of Illinois.

19             THE COURT:  Yeah.  That's for sure.

20             MS. WINSLOW:  Secondly, it strikes me this morning

21   that this probably calls for a special jury verdict, just so

22   that we can assure that the jury has agreed on the particular

23   transportation.

24             The government -- to find that the government has

25   proven this, you must agree unanimously on which particular
```

1    occasion the defendant transported April, as well as all of the

2    other elements.

3              And I think it would better protect the record if we

4    had a special verdict and indicated which transportation they

5    agreed upon.

6              THE COURT:  What is the evidence that you have two

7    transports?

8              MS. SAWYER:  Your Honor, I don't even think we have an

9    objection to this.  We just didn't reflect it in the verdict

10   form.  There is an instruction regarding unanimity.

11             What happens is he brings April down on September 8th,

12   and then there's a subsequent trip back up to Wisconsin with

13   both young women, and then back into Illinois on the 9th.  And

14   so presumably on that evidence, they could find either on the

15   8th or the 9th that he brought her into the State of Illinois

16   for that purpose.

17             THE COURT:  Okay.  So then we do need the special

18   verdict form to make sure that they have unanimity on which

19   transport.

20             MS. SAWYER:  I think that's appropriate, your Honor,

21   yes.

22             THE COURT:  All right.  So other than that and the

23   state being wrong, have we fixed that jury instruction?

24             MS. WINSLOW:  Yes, your Honor.

25             THE COURT:  Okay.  What was the next one, Ms. Sawyer,

 1    since I'm not working with the disputed ones?

 2            MS. SAWYER:  25, 26, and 27, though those might be

 3    resolved now following your discussion.

 4            THE COURT:  So is there an objection -- well, and I'm

 5    looking at your new ones, so let's just make sure.

 6            25 now is the prostitution definition.  Is there an

 7    objection to the prostitution definition?

 8            MS. WINSLOW:  No, your Honor.

 9            THE COURT:  And then 26, which is it is not necessary

10    for the government to prove that a criminal sexual act was the

11    sole purpose.

12            MS. WINSLOW:  No objection to that.

13            THE COURT:  Okay.  And then whether the victim

14    consented to being transported or to traveling is irrelevant.

15            MS. WINSLOW:  Is irrelevant, and as is the jury

16    instruction.

17            I don't think this is a proper instruction.  The

18    government can certainly argue, I suppose, if it wants to, or

19    the Court can take judicial notice of the fact of consent, but

20    this is not -- this is in addition to the pattern instructions.

21    It provides the jury with, again, the government's theory of

22    the case through the instructions from the Court, which I

23    always think is inappropriate.  There's not going to be an

24    argument in this case, I understand -- I don't understand that

25    there will be -- from the government that she was coerced or

1    forced.

2         THE COURT:  Well, I'm going to reserve this one.  And

3    the reason I'm going to reserve it is I want to see how it

4    plays out with the evidence at trial.  But if there is

5    cross-examination that discusses that she knowingly wanted to

6    go down for the purposes of prostitution, that would be a legal

7    mistake not to tell them that she has -- she has no ability to

8    consent to being engaged in a commercial sex act.

9         MS. WINSLOW:  I can tell you right now that there

10   won't be argument, cross-examination, or any other presentation

11   that she wanted to come down here for the purpose of

12   prostitution, as it is and always has been our position that

13   neither Mr. Key nor at the time April came down for the purpose

14   of prostitution at all.  That's not going to be our

15   presentation.

16        THE COURT:  Okay.  I'm still going to hold it in

17   abeyance --

18        MS. WINSLOW:  That's fine.

19        THE COURT:  -- until I hear the evidence.  Okay?

20        MS. SAWYER:  Thank you, your Honor.

21        THE COURT:  All right.  And then I've got the -- do I

22   have a verdict form that has that breakout now?

23        MS. SAWYER:  You don't, your Honor.  The only

24   amendment I made to the verdict form was the defense's request

25   that we put "not guilty" first.

1          THE COURT:  So we need that breakout with the travel.

2          MS. SAWYER:  Yes.

3          THE COURT:  Well, I'll see what you do, if you can run

4    that up today so I can see how you do it, and I'll let you know

5    whether or not it's the way I think it should be done.  Okay?

6          MS. SAWYER:  Yes, your Honor.

7          THE COURT:  All right.  Anything else on your side

8    from the jury instructions?

9          MS. SAWYER:  No, except that I do think that I'll have

10   to make some revisions now, in light of the Court's ruling on

11   the 404(b) evidence.  There are one or two that address how the

12   jury is to take that evidence, so I'll have to take those out,

13   but I think that's it.

14         THE COURT:  And then what about you, Ms. Winslow?

15   What --

16         MS. WINSLOW:  That --

17         THE COURT:  -- do you have?

18         MS. WINSLOW:  Pardon me.  That was my additional

19   thought.  I think Instruction 15 will have to be removed.

20   That's the enlarged part.  The government agrees that it's 15?

21         THE COURT:  Yeah.  That's the 404(b) instruction.

22         MS. SAWYER:  Yes, that's correct.

23         MS. WINSLOW:  Okay.

24         THE COURT:  Anything else?

25         MS. WINSLOW:  No, your Honor.

1        THE COURT:  All right.  Do you have a theory of the

2  case instruction or something like that?

3        MS. WINSLOW:  I do not, your Honor.  We'll be

4  proceeding on the elements.

5        THE COURT:  Okay.  Very well.  Did you give me a

6  statement of the case?  A joint statement of the case?

7        MS. WINSLOW:  I filed one.

8        MS. SAWYER:  We have no objection to the one that

9  defense filed.

10       THE COURT:  Got it.  That's the one that simply says

11  the government has charged DaJuan -- is that how you say it?

12  DaJuan?

13       MS. WINSLOW:  DaJuan.

14       THE COURT:  -- DaJuan Key with in or around

15  September 10th, 2013, transporting an individual who had not

16  obtained the age of 18 from the State of Wisconsin to the State

17  of Illinois intending for that individual to engage in

18  prostitution.  Mr. Key has pleaded not guilty and is presumed

19  innocent of the charge.

20       And you're fine with that.

21       All right.  Do I have a witness list?

22       MS. SAWYER:  I do have a revised witness list, your

23  Honor.

24       THE COURT:  Okay.  So I can read their names.

25       Do you have any names you need me to read?

 1          MS. WINSLOW:  No, your Honor.  Our only potential

 2     witness would be Mr. Key.  I will be happy to provide your

 3     Honor with a list of names of the individuals at the table if

 4     that would be helpful.

 5          THE COURT:  Sure.  That would be helpful.  And so

 6     remind me as we go forward in the trial about -- discuss with

 7     your attorney over this weekend whether you want to testify in

 8     the case or not.  And please know, Mr. Key, that you have a

 9     right not to incriminate yourself, so you don't have to

10     testify.  And, in fact, you don't have to put on any evidence

11     at all.  The government carries the burden in this case.

12          If you choose not to testify, I will instruct the jury

13     that they make -- may make no assumption of guilt based upon

14     your refusal to testify.  But next week I will be asking you

15     this again, and I will be asking you whether you've had a

16     chance to discuss with your attorney the costs and benefits of

17     you taking the witness stand.  And when I do that, I will put

18     you under oath, and I will ask you for your answer as to which

19     way you want to go so that you understand that's a

20     constitutional right, and it's one that I need to protect next

21     week when we talk.  So discuss this in the coming days as to

22     how you want to proceed.  Okay?

23          THE DEFENDANT:  (Nods head.)

24          THE COURT:  All right.  Anything else from the

25     government?

1        MR. PARENTE:  Yes, your Honor.  If the Court would be

2   willing to listen to some questions regarding the Court's

3   404(b) ruling in how we present Ms. Crayton's testimony.

4        THE COURT:  Okay.  Please, so we make sure we don't

5   step in any areas.

6        MS. SAWYER:  Your Honor, may I hand up the witness

7   list?

8        THE COURT:  Please.  Go ahead.

9      (Tendered.)

10        MR. PARENTE:  So we've read the Court's order, and it

11   essentially allows four areas:  What the defendant said to

12   April; what the defendant said to Dache about April; what Dache

13   observed the defendant doing to prepare for his travel to

14   Wisconsin to pick up the victim; and what Dache observed April

15   doing while she was with the defendant.

16        THE COURT:  Oh.  Well, of course, if April is

17   testifying, April can testify about what was said to her and

18   what was -- what she observed --

19        MR. PARENTE:  Oh, correct.

20        THE COURT:  -- if I didn't include that.

21        MR. PARENTE:  That is -- I'm sorry, this is just in

22   the context of Ms. Crayton's testimony.

23        THE COURT:  Oh, okay.  Sorry.

24        MR. PARENTE:  So the first issue where this would come

25   up would be Ms. Crayton is anticipated to testify that the

1    defendant told her, "I am now," after this other prostitute

2    left who we're not going to talk about, he then says, "I'm on

3    my computer looking for new girls to recruit to help us out,"

4    and shows her the ad of the girl in Wisconsin and then picks up

5    the phone and starts calling --

6            THE COURT:  Right.  That's permissible because that's

7    him making a statement against interest to her regarding his

8    intent to have someone engage in prostitution.  That's covered

9    in what defendant said to Crayton.

10           MR. PARENTE:  And then there's going -- there will be

11   testimony from Ms. Crayton about when April is with them, that,

12   you know, they return from Wisconsin and the defendant got them

13   a hotel room at the -- at the hotel, and that's where things

14   happened.  Does the Court want me to sanitize that to say -- to

15   have the witness say he paid for just April's hotel room and

16   not Ms. Crayton's hotel room?

17           THE COURT:  No, I don't think that -- I don't think

18   you need to clean it that -- like that.

19           The risk in the 404(b) is that everything he did prior

20   to this date that you've charged is prejudicial to say that he

21   was doing this all before.

22           What he did for this victim and during this trip is

23   all relevant for the jury to understand what the relationship

24   was between the two of them.

25           So his act of paying for the room for both is a factor

1      to be weighed in the totality of the circumstances

2      understanding his intent at the time, so that's not excluded.

3                MR. PARENTE:  And then I guess, big picture, for the

4      context of Mrs. Crayton to give these statements to the jury,

5      how would the Court like me to describe her relationship to the

6      defendant?

7                THE COURT:  So from what I've read and what I've

8      heard, she was -- she was -- she met him a few weeks

9      beforehand?

10               MR. PARENTE:  Two weeks prior.

11               THE COURT:  And that she was being prostituted by

12     him --

13               MR. PARENTE:  Correct.

14               THE COURT:  -- right?

15               Are they in a relationship?

16               MR. PARENTE:  They had a -- somewhat of a

17     relationship.

18               THE COURT:  So what would she testify if she didn't

19     say -- if I didn't narrow her at all?  Tell me what she would

20     say.

21               MR. PARENTE:  I would say:  How did you meet the

22     defendant?  She would say:  Two weeks ago, I got into a fight

23     with the man I was staying with, I ran into the defendant in

24     the parking lot, he said come work for me, I had nowhere else

25     to go, I began working for him.

1          THE COURT:  But working for him, she's going to have

2    to describe that -- that makes no sense, right?  She's going to

3    have to say what her work was.

4          MR. PARENTE:  Correct.  And I think to lay the

5    foundation for why, when she tells the jury what the defendant

6    was telling her, why it makes sense that he would have told her

7    that -- like she's in the room with a customer now, she had a

8    date right now -- because that's part of what was going on,

9    versus the jury might be thinking, well, why is he telling this

10   random person --

11         THE COURT:  Yeah.

12         MR. PARENTE:  -- these key details.

13         THE COURT:  I want to think about it.  I want to think

14   about what the best way -- I mean, we don't -- we're not going

15   to pull the wool over the eyes of the jury as to what her role

16   is with him; but, on the other hand, he's not charged with, you

17   know, trafficking her, and he's not -- and working for him in

18   the past, makes that relationship of prostitution in the past

19   that isn't charged, so let me think about that, see if I can

20   think of a way to make it more realistic without prejudicing

21   the defendant with propensity evidence.

22         What else?

23         MR. PARENTE:  And then -- and this might help the

24   Court make that decision.

25         When the victim actually testifies, she's going to

1  present testimony that when the defendant first brought her to

2  the hotel, he introduces her to Ms. Crayton.  She observes the

3  transactions going on between -- the money exchanged between

4  the defendant and Ms. Crayton, and then he takes her down to

5  the car and presuming in an attempt to groom her says:  You

6  know, she does the same thing you do, and I want you -- I post

7  her ads like I'm going to post your ads.

8         Obviously, that's critical evidence.  That's the

9  defendant's own statement.  That's an -- and should be

10 admissible.

11        THE COURT:  He's saying that to who?

12        MR. PARENTE:  He's saying that to the victim.

13        THE COURT:  The victim?  At the car says she's doing

14 what you're doing?  Or what -- that -- what you're going to do?

15        MR. PARENTE:  Correct.  I post her ads like I'm going

16 to post your ads.

17        I mean, so we believe that that's critical direct

18 evidence of this and that might be why in the beginning -- and

19 the Court will have this information.  April is going to

20 testify first, so the Court will see this information.  It will

21 be out there.  So maybe if that comes in, then it's not even a

22 big deal about Dache explaining what she was.

23        THE COURT:  Yeah.

24        MS. WINSLOW:  So I can be very clear, Judge, that the

25 testimony will not be -- at least that hasn't been her

1    testimony thus far -- she does what you are about to do, it's
2    she does what you do.  Not -- it's not a forward-looking --
3    it's a backward-looking.
4              THE COURT:  Oh, right, because I know what your theory
5    is.  Yeah.  Okay.
6              Well, I don't know what the evidence is.  It's going
7    to come out the way it comes out.  Yeah, it's probably going to
8    be less critical there.
9              His statements about that are going to come in.  They
10   have to come in.  So then when she comes on the stand and says
11   I met him two weeks earlier -- I guess, let's see if we -- see
12   if you can propose -- see if you can propose a line of
13   questions that would allow the jury to understand the
14   relationship without getting into a series of past commercial
15   sex acts that haven't been charged here.
16             Do you see the difference?
17             MR. PARENTE:  I do, Judge.  And to be clear, the
18   government in no way ever intends to argue that --
19             THE COURT:  Yeah.
20             MR. PARENTE:  -- because the defendant did this in the
21   past, that this is what he was doing.
22             THE COURT:  Well, that would not be --
23             MR. PARENTE:  Right.  This is just to lay the
24   foundation for her testimony --
25             THE COURT:  Good for you.

1     MR. PARENTE:  -- and I believe a lot of the cross of

2    Ms. Crayton is going to open up a lot of this as well.

3     THE COURT:  Yeah.  So see if you can propose a few

4    lines, and then we'll talk about them beforehand.  But I think

5    it's going to be less prejudicial after those statements,

6    admissions of his, if they come in first, if they come in

7    through April first.  Okay?

8     All right.  What else?

9     MS. SAWYER:  Your Honor, may I just clarify so I can

10   make sure that we don't make any missteps in eliciting certain

11   testimony?  That the Court has said that the defendant's direct

12   statements to April about "I want to introduce you to my

13   friend, she does what you do" would be admissible?

14    THE COURT:  I just said that.

15    MS. SAWYER:  Okay.  I just wanted to make sure that I

16   understood.  Thank you.

17    THE COURT:  Okay.  What else?

18    MR. PARENTE:  The next thing -- and, again, I don't

19   believe this is prohibited under the Court's order.  I just

20   wanted to run it by the Court.  It's proposed Government

21   Exhibit 44, which the Court doesn't have.  It's a text message

22   sent by the defendant to someone on the day that he, in fact,

23   goes and recruits the minor that reads, "I need you, I got too

24   many calls and only one girl."

25    The government's position is this is some of the best

1    direct evidence of the defendant's intent to pick up this minor

2    and have her engage in prostitution.

3              THE COURT:  Any objection to that?

4              MS. WINSLOW:  It's my understanding that this is a

5    text message that was not sent to April, it was sent to

6    somebody else, so I do object to it.

7              THE COURT:  Okay.  I think that statement, though, is

8    probably the clearest one that he intended to have her come up

9    to be a prostitute as opposed to something else.

10             I guess it does establish that he's in the business,

11   but it doesn't establish that he did so in the past.  It

12   doesn't exactly say I have been prostituting these people.  He

13   just says he needs one more.  I think that's admissible.  I

14   think that's direct evidence of intent.

15             MS. WINSLOW:  Judge, this is a text message that is

16   sent to another person, another person who he may or may not

17   have intended to recruit.  That doesn't -- that doesn't support

18   the government's case at all that he intended to recruit April.

19   In fact, he could have had -- undoubtedly encountered --

20             THE COURT:  But he's on the way up to get her, so it's

21   referring to getting another girl, and he's on his way to get

22   her.  Right?

23             MS. WINSLOW:  That's not --

24             THE COURT:  It's the same day.  Isn't that what you

25   said?

1          MR. PARENTE:  It's the same day he starts these

2    conversations with the -- it's the same day he reaches out to

3    April and tries to text her to get her to come to Illinois.

4    It's before he actually drives to Wisconsin.

5          MS. WINSLOW:  But this is another individual who he is

6    talking to.  And it's entirely conceivable that he's intending

7    to recruit another individual within the State of Illinois or

8    another individual who is an adult by this text message, but he

9    has an entirely different motivation for going up to Wisconsin

10   to meet April and --

11         THE COURT:  But doesn't that go to the weight of the

12   evidence as opposed to the admissibility of it?  Because it's

13   definitely an intent that he needs another girl.  Right?  On

14   that day at the time that he's communicating with the victim.

15         MS. WINSLOW:  Yes.  But then, again, we're opening up

16   all of this background, if you will, of his recruiting other

17   women to work for him.  And this text message was to another

18   individual, entirely unrelated to the crime that the government

19   has charged.  The government --

20         THE COURT:  Is it going to come in through an agent

21   that searched the phone?  Is that how it comes in?

22         MR. PARENTE:  Correct, your Honor.  And, again, it's

23   "I've got too many calls and only one girl."

24         Clearly, defense can argue that he collects girls or

25   does all kind -- it can mean all kinds of things.  But there's

1    a very fair inference that this is direct evidence that on the

2    same day he reaches out to our victim, that we have to prove

3    that what his intent was to do with her, that this is direct

4    evidence of that, and the jury should be allowed to consider

5    this for what it is.

6         MS. WINSLOW:  It may be direct evidence that he

7    engages in sex trafficking, and he's not -- which he's not

8    charged with, but it's not direct evidence that he recruited

9    April for the purpose of prostitution.

10        THE COURT:  Right.  But the difference with it and the

11   other ones, which are just what he did in the past, is that

12   this is during the same time frame that he's communicating with

13   this victim, and their theory of the case is that the intent

14   was to go get her to engage in prostitution.  Your theory is

15   that it wasn't.  This theory is a reasonable inference that

16   he's telling someone else, "I need another girl," and so as

17   he's linking up with or hooking up with her electronically,

18   that shows intent, and it has the ability to be challenged that

19   it was somebody else and it was never conveyed to her and she

20   never heard it and it wasn't conveyed to, you know, someone

21   else that was dealing with her, she never received it; but that

22   I think goes to weight and not to the fact that it is highly

23   relevant as to his state of mind at the time he's communicating

24   with the victim.  So that will come in.

25        MR. PARENTE:  Thank you, your Honor.

1    And then the last one is hopefully the easiest one.

2    It's just the testimony from the Bolingbrook -- Romeoville

3    police officer that when he goes into the room, he collects

4    the -- in his mind, what he thinks is going on is there's some

5    prostitution activity in the room.  I don't believe that is --

6    under the 404(b) order, I think that's just why he collected

7    the evidence and why he's here introducing prepaid --

8    THE COURT:  Well, no, that's -- he has to state that

9    when he went into the room -- the reason he seized all of those

10   things and the reason I've upheld them is because he identified

11   them as potential evidence of prostitution based upon his

12   experience of doing prostitution investigations.  So that can

13   come in.

14   MR. PARENTE:  Okay.  That's all that we have, your

15   Honor.

16   THE COURT:  I mean, you know, it's like splitting the

17   baby.  Believe me, if you were pre-*Gomez*, it would have been a

18   different ballgame; but now this kind of splitting of the hairs

19   of dividing the intent with one victim and trying to keep out

20   what was happening with potentially others and other crimes is

21   a challenge for all of us.  But in this situation, I think the

22   law is pretty clear that it's a safer route, even for them, to

23   not have it in, and it's a cleaner trial for the defendant to

24   just have what you've charged.  So it's -- that's what we're

25   going to try to walk the tightrope of.  And we'll do it at

1    sidebar if it turns out to be a problem.  Okay?

2         MS. WINSLOW:  Fine.

3         THE COURT:  And it's much better to raise it before at

4    sidebar than after and we have to do something to fix it.  So

5    if you think something is going to come out in a certain way,

6    raise it with me beforehand.  Okay?

7         MR. PARENTE:  And to that, in that regard, I would

8    proffer to the Court that Ms. Crayton is a reluctant government

9    witness, borderline probably hostile witness, so we will try to

10   prep her.  Again, that might not work.  But, if necessary,

11   we'll just ask the Court for time to admonish her before she

12   begins testimony.

13        THE COURT:  As in you want me to admonish her?

14        MR. PARENTE:  No, no.

15        THE COURT:  Oh.  I'm not going to do that.

16        MR. PARENTE:  Just once we propose the initial line of

17   questioning for her, just if the only time that we can actually

18   get her here is through some sort of compulsory process --

19        THE COURT:  Well, then you should just invoke the rule

20   by the rule number rather than by anything else.  Like I don't

21   want you to say, "We want to treat her as a hostile witness."

22   I think that's prejudicial.  I think you can -- they won't know

23   the rules.

24        MR. PARENTE:  Yes, your Honor.

25        THE COURT:  All right.  Anything else from you?

1          MS. WINSLOW:  The one remaining issue is this -- is

2     the question of April's exercise of Fifth Amendment, and we are

3     I think jointly frustrated by this process because we're having

4     a very, very difficult time getting an answer from her

5     attorney.

6          MR. O'CONNELL-MILLER:  Unfortunately, I also got a

7     message from her attorney during the course of the hearing, so

8     we may have some additional clarification.

9          THE COURT:  So the way this would work is that the --

10    we can do this -- where is she, by the way?  Is she in Madison?

11         MS. SAWYER:  She is, your Honor, yes.

12         THE COURT:  Physically in Madison, right?  So she's

13    coming down Monday or something like that for the trial?  Is

14    that how it --

15         MS. SAWYER:  In order to prepare for trial, yes.

16         THE COURT:  Okay.  So the way we should do it is have

17    her attorney and all of us here in the morning and address what

18    she believes -- her attorney believes is the Fifth Amendment

19    right.  He can proffer to me in chambers as to what the scope

20    of that is, and I can make a determination.

21         Or we can even go one step safer and bring her to the

22    chief judge for such an evaluation if you think that would be a

23    stronger record for each of you, where the attorney proffers

24    the scope of the testimony and why he believes it would

25    incriminate, because then we would need a compulsion order for

1    the case if it is not something that's protected.

2           So what is -- what does he or she think is the

3    incriminating nature?

4           MR. O'CONNELL-MILLER:  We don't know.  We have one

5    voice-mail that, in addition to the one I just got, which I

6    have not listened to yet, we have one voice-mail saying that

7    she's going to advise her client to invoke her Fifth Amendment

8    privileges.

9           THE COURT:  Do you think it's for prostitution?

10          MR. O'CONNELL-MILLER:  No.  She -- in the

11   voice-mail -- and, again, and I've called back repeatedly

12   trying to get the scope, so I'm hoping this new voice-mail has

13   some clarification.  I can run outside and listen to it real

14   quick, if you want.

15          THE COURT:  Why don't you go see if you can.

16          MR. O'CONNELL-MILLER:  Yes.

17          THE COURT:  Is there some evidence of drugs or

18   something that we have to be concerned about?

19          MS. SAWYER:  No, not to my knowledge, your Honor.  And

20   I spoke to -- well, I spoke to the defense attorney, and my

21   initial understanding was that when she says Fifth Amendment,

22   my understanding was to any questions that relate obviously to

23   that pending case and not to the questions she will be asked

24   regarding this case.

25          Now, these --

1          THE COURT:  What is her pending case?

2          MS. WINSLOW:  It's --

3          MS. SAWYER:  Attempted armed robbery and reckless

4     endangerment.

5          MS. WINSLOW:  Which your Honor has already excluded.

6          THE COURT:  I've already excluded it, so if it's

7     excluded and she can't testify regarding that, is there --

8     well, the only other thing would be that she's concerned by

9     testifying that she could be charged with something out of the

10    story that she's told you, and I only know what I know, and so

11    far -- is she thinking prostitution or -- is she thinking --

12         MS. SAWYER:  To be candid, your Honor, I don't know.

13    And I had a conversation that preceded obviously defense

14    counsel's conversation with her lawyer in Madison.  And if

15    given the information, now that questions about that pending

16    case will be excluded, I don't know if that will change her

17    analysis.

18         MS. WINSLOW:  Would it be helpful for your Honor to

19    listen to the voice-mail that was left?

20         THE COURT:  I don't know if I want to get into the --

21         MR. O'CONNELL-MILLER:  The new message doesn't get

22    into the Fifth Amendment issue at all.  It just was about

23    communications with the government.  Apparently, Miss Laitsch

24    has only met April once.  And then the first message, which I

25    got two days ago, it just says that she -- that Miss Laitsch,

1    who is the attorney, is going to advise April to assert her

2    Fifth Amendment rights as a witness, but it's unclear what

3    scope --

4            THE COURT:  Well, maybe she thinks that you're going

5    to talk to her about her pending case.  And if that's --

6            MR. O'CONNELL-MILLER:  That's possible.

7            THE COURT:  And so she very clearly is just telling

8    you, "I've told her to invoke her Fifth Amendment privilege if

9    that is what's going to happen," so is it possible we don't

10   just have miscommunication here?

11           MS. SAWYER:  If I may, your Honor, and hopefully what

12   we can do -- and I've proposed that the four of us get on a

13   conference call with the defense attorney, we all make sure

14   that we're all on the same page.  My conversation with her way

15   back when was I don't intend to ask her any questions about the

16   pending cases, nothing to do with the case in which she is a

17   testifying victim, and so I thought that was clear; but I think

18   that we can probably resolve this fairly simply if we all get

19   on the phone together.

20           If there's another issue, we can bring it to the

21   Court.

22           MR. O'CONNELL-MILLER:  I agree with that.

23           THE COURT:  We should raise it first thing in the

24   morning, so you should bring her and her attorney to the 9:30

25   criminal call on Monday.

 1          MR. O'CONNELL-MILLER:  I don't know that her

 2  attorney --

 3          MS. SAWYER:  Her attorney is a public defender in

 4  Madison, so it's not someone that I can necessarily get here.

 5          MS. WINSLOW:  She's actually privately retained.  She

 6  previously had a public defender, but she's a privately

 7  retained lawyer now.

 8          MR. O'CONNELL-MILLER:  The attorney is a private

 9  attorney in Madison --

10          THE COURT:  Okay, so here's --

11          MR. O'CONNELL-MILLER:  -- only for that case.

12          THE COURT:  Here's what we're going to do:  Find out

13  what you can find out.  And then if it is a situation where a

14  court hearing is necessary such that I need to discuss with her

15  and her attorney, I need notification of that, and we'll do it

16  tomorrow by telephone and get her on the phone.

17          We might even be able to set up a conference call by

18  video conference, if that's even better, depending on what

19  happens.

20          But I -- I'm going to be positive here and think that

21  maybe the only thing she's saying to you is "I don't want her

22  to incriminate herself on her pending case."  And if that's the

23  case, you're not going to be in a situation of trouble.

24          MR. O'CONNELL-MILLER:  Yeah, and, again, it's just

25  been a matter of getting clarification, because the scope of

1    what she said seemed awfully broad, so ...

2            THE COURT:  I don't know.  I don't know.  All right.

3    Anything else?

4            MS. SAWYER:  Your Honor, I think the only thing that

5    we have yet to address -- I know the Court is going to issue

6    the ruling on --

7            THE COURT:  Suppression.

8            MS. SAWYER:  -- the motion to suppress statements, and

9    so related to that is the cell phone --

10            THE COURT:  It's coming in the same opinion.

11            MS. SAWYER:  Understood.  I think that was the only

12    other thing.

13            THE COURT:  Okay.  When you give me last-minute

14    motion -- hearings, I have a few other cases to work on, too,

15    so --

16            MS. SAWYER:  Understood.

17            THE COURT:  -- it's coming.  It's going to be there

18    today for you, so you'll have it before the weekend.  Okay?

19            Did you sign the protective order?

20            MS. WINSLOW:  We did.

21            THE COURT:  And have it -- okay.  So I'll get my

22    courtroom deputy, if I can find one, to log that.  All right?

23            So, Mr. Key, stay in communication with your

24    attorneys.  And, remember, if you have something to address,

25    I'm not going to look at it if it comes just from you.  I want

1    to hear it from Ms. Winslow, unless there's a breakdown, okay?

2              THE DEFENDANT:  All right.

3              THE COURT:  Okay.  Thanks very much.

4              MS. SAWYER:  Thank you, your Honor.

5              THE COURT:  Thank you.

6              LAW CLERK:  All rise.  Court is adjourned.

7         (Proceedings concluded at 11:21 a.m.)

8                    C E R T I F I C A T E

9         I certify that the foregoing is a correct transcript of the

10   record of proceedings in the above-entitled matter.

11

12

     _/s/ GAYLE A. McGUIGAN_____          _July 1, 2016_
13   Gayle A. McGuigan, CSR, RMR, CRR                    Date
     Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25