<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   UNITED STATES OF AMERICA      )  Docket No. 13 CR 00726
                                   )
 4              Plaintiff,         )  Chicago, Illinois
                                   )  January 27, 2016
 5          v.                     )  10:08 a.m.
                                   )
 6   DaJUAN KEY,                   )
                                   )
 7              Defendant.         )

 8
             TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
 9            BEFORE THE HONORABLE VIRGINIA M. KENDALL


10
     APPEARANCES:
11
     For the Government:     UNITED STATES ATTORNEY'S OFFICE by
12                           MS. KATHERINE SAWYER
                             MR. CHRISTOPHER PARENTE
13                           Assistant United States Attorneys
                             219 South Dearborn Street, 5th Floor
14                           Chicago, Illinois 60604

15   For the Defendant:     MS. HEATHER L. WINSLOW
                            53 West Jackson Boulevard, Suite 1560
16                          Chicago,Illinois  60604

17                           HART & MILLER LLC by
                             MR. JAMES LEIGHTON O'CONNELL-MILLER
18                           150 North Michigan, Suite 2800
                             Chicago, Illinois  60601
19

20

21

22   Court Reporter:        GAYLE A. McGUIGAN, CSR, RMR, CRR
                            Federal Official Court Reporter
23                          219 South Dearborn, Room 2318-A
                            Chicago, Illinois 60604
24                          (312) 435-6047
                            Gayle_McGuigan@ilnd.uscourts.gov
25
</pre>

 1          (Proceedings heard in open court:)

 2              THE CLERK:  Case number 13 CR 726-1, USA versus DaJuan

 3   Key.

 4              MS. SAWYER:  Good morning, your Honor.  Katherine

 5   Sawyer and Christopher Parente on behalf of the United States.

 6              THE COURT:  Good morning.

 7              MS. WINSLOW:  Good morning, your Honor.  Heather

 8   Winslow on behalf of DaJuan Key.  Along with me is Leighton

 9   O'Connell-Miller, who made the mistake of joining me for a

10   status earlier today and got recruited to try this case with

11   me.

12              THE COURT:  I used to do that with my colleagues all

13   the time so ...

14          (Laughter.)

15              THE COURT:  That's great.

16          Wait, Leighton O'Connell-Lewis?

17              MS. WINSLOW:  Miller.

18              MR. O'CONNELL-MILLER:  Miller.

19              THE COURT:  Oh, Miller.  Miller.  So are you

20   Mr. Miller?

21              MR. O'CONNELL-MILLER:  I am Mr. O'Connell-Miller.

22              THE COURT:  O'Connell-Miller.  Is it hyphenated?

23              MR. O'CONNELL-MILLER:  It's hyphenated.

24              THE COURT:  Okay.  Good morning, Mr. O'Connell-Miller.

25   Welcome aboard.

1      Good morning, Mr. Key.

2      All right.  We're here for the final pretrial

3  conference, so we'll do that with you sitting at the table, so

4  get yourselves set up and the microphones where you can be

5  heard, and we'll get started.

6      MS. SAWYER:  Your Honor, to the extent that it's

7  helpful to the Court at all, we've prepared a somewhat

8  tentative pretrial conference agenda with just sort of

9  outstanding issues.

10      THE COURT:  Okay.

11      MS. SAWYER:  I don't know if that's helpful at all.

12      THE COURT:  That's fine.

13      (Tendered.)

14      THE COURT:  Oh, I know these, of course.

15      So let's get started with the trial and give you some

16  of the parameters and court rules for you to go forward with

17  how we'll proceed.

18      I'll start first with *voir dire*, okay?

19      It will be conducted by 14 prospective jurors being

20  placed in the jury box, and I will do the primary questioning

21  of the jurors.

22      Do you have a proposed *voir dire* to pass to them?

23      LAW CLERK:  Sure.

24      THE COURT:  Okay.  Just pass it to them.  I've got

25  one.

1          LAW CLERK:  Oh, you've got one.

2      (Tendered.)

3          THE COURT:  You'll see that my standard *voir dire*

4   includes the age, employment, marital status, educational

5   background, military service, whether they supervise anyone,

6   their organizations, clubs that they belong to, their outside

7   interests, where they get their news from, whether they're on

8   the internet.  And then the significant question is Number 15,

9   which involves their access to the civil and criminal justice

10  system.  It talks about whether they've been involved in a

11  civil lawsuit, a criminal action, or administrative hearing.  I

12  give them examples of what those are.

13         All of these questions are -- they include the

14  individual prospective juror, as well as a family member in the

15  immediate family, as well as a close friend.

16         There are some questions for law enforcement down at

17  18, for example, that say that the case was investigated by the

18  Romeoville Police Department and the Federal Bureau of

19  Investigation.

20         Are there any others?

21         MS. SAWYER:  No, your Honor.

22         THE COURT:  Okay.  And then whether they've had any

23  close work -- or relatives or themselves with law enforcement,

24  or lawyers and legal training, and those are the main

25  questions.

1        You will see that that gives you a tremendous amount

2   of information.

3        Then we go to sidebar with for cause strikes.

4        The for cause sidebars are, first and foremost, if a

5   prospective juror asks for one.  And I have learned over the

6   course of ten years that when I ask them a question and I ask

7   them if they have strong feelings about something and they say

8   yes, they're not allowed to say it in open court.  They have to

9   say it over at sidebar.  And the reason for that is because I

10  have had experiences where they say something that pollutes the

11  entire panel.

12       I always use the example and I'll use it again, which

13  was a bribery case with a City of Chicago Building Department,

14  and we were two and a half hours in, and I asked a prospective

15  juror if he had strong feelings about the City of Chicago

16  Building Department.  Who would think.  And he stood up and he

17  said, "All of them are dirty, all are on the take," and that

18  was the end of my day of work with them.

19       (Laughter.)

20       THE COURT:  So I let that panel go.  So now they're

21  allowed to say that at sidebar.

22       So at sidebar, that's where you do your lawyering.  So

23  don't just sit back.  It's not a Judge Kendall show.  That is

24  your show.  Rehabilitate a question that was given in open

25  court if you believe you can.  Cross and probe further if you

1   believe you can and it will help you.  That is where you do

2   your interrogation more than the open court questioning.  Okay?

3           And then after that sidebar, you can move to strike

4   based upon the answers.

5           So by the time you finish with the first 14 in the

6   box, you will know which of those 14 have been stricken for

7   cause, and then we move the next 14 in the box.

8           When I finish the sidebars, I will permit the

9   government and the defense to ask any *voir dire* questions to

10  the group that they may have.  I will tell you, it's rare that

11  they have them after they have thorough questioning at sidebar.

12  Or sometimes you might explore thorough questioning at sidebar

13  with a particular juror if you think it's appropriate.

14          So that will be the process.

15          We will do so until the defense has 10 peremptory

16  strikes, the government has 6 strikes under the rules, and the

17  for cause strikes reach the magic number of allowing you,

18  without cross-striking, to reach the number of jurors we're

19  going to have.

20          So that leads me to question how many alternates do

21  you want?

22          MS. SAWYER:  I think two would probably be sufficient,

23  your Honor.

24          MS. WINSLOW:  I don't disagree.  That's fine.

25          THE COURT:  Okay.  So it will be -- so just so you

1    understand the magic number, the magic number is 14 prospective

2    jurors, plus 10, plus 6, plus the number of cause strikes.

3    That's how many people we have to get through before you can do

4    that.

5            After we do the strikes for the 12 sitting jurors,

6    we'll call in the handful of prospective alternates if we need

7    to.  Maybe we'll have already questioned enough.  And at that

8    point, I'll give one strike to the government and one strike to

9    the defense for an alternate.  And we'll seat two alternate

10   jurors.  Okay?

11           Any question on the way that the *voir dire* works

12   technically?

13           MS. WINSLOW:  No, your Honor.

14           THE COURT:  Okay.  So then let's look to any questions

15   that you want to add to the jury questions that I have just

16   handed to you and have described for you that you think are

17   important for me to add.

18       (Counsel conferring.)

19           THE COURT:  I didn't get any from the government?  I

20   didn't get any from the defense.  Anybody?  Going once, going

21   twice.  Anything on prostitution?  Anything on human

22   trafficking?  Anything on the facts of your case?

23           These are the questions to help us get rid of

24   impartial jurors.

25           MS. WINSLOW:  Well, Judge, that is what we were just

1    discussing.

2         This case does present some of those very emotionally

3    charged issues, and I think the jury should be questioned as to

4    whether or not they -- although the last question somewhat

5    encompasses it, I think some specific questions about the

6    nature of the case, prostitution --

7         THE COURT:  So here's what you need to do is you need

8    to -- the way that I usually do that is if you have an agreed

9    statement of the case that describes certain facts about the

10   case, then they will hear what that case is about, and then

11   when I ask them is there anything that you've heard about the

12   case so far that you think would prevent you from being

13   impartial or sitting -- sitting through this trial, and that's

14   where you're going to hear someone say I don't want to listen

15   to whatever else, and then we'll talk to them at sidebar about

16   that, all right?

17        MS. WINSLOW:  That's acceptable to the defense.

18        Should we just stay sitting --

19        THE COURT:  That's the point, yeah.  That's the point.

20   Bring the -- the microphone is right there, right in front of

21   you.

22        MS. WINSLOW:  It's habit.

23        THE COURT:  Normally I do final pretrial conferences

24   in chambers, but not when we have someone in custody, so

25   that's -- get laid out.

1          There's another microphone behind you, if you move it

2     over to you, if you want to sit across the table.  Okay?

3          MR. O'CONNELL-MILLER:  Thank you, your Honor.

4          THE COURT:  All right.  So that's one way of doing it.

5          Any other specific questions?

6          MS. SAWYER:  Your Honor, that raises a point.  Now

7     that we're back to a jury trial, we brought a proposed

8     statement of the case.  I haven't obviously yet shared it with

9     Ms. Winslow, though it's fairly --

10         THE COURT:  Share it with her now, and I won't -- I

11    won't expect you to give it to me today.  Review it.  I will

12    give you a deadline for the proposed statement at the end of

13    this hearing.  Okay?

14         MS. SAWYER:  Again, your Honor, just for the Court's

15    information at this point, it just fairly mutually tracks the

16    language of the indictment and says the defendant has pled

17    not -- or Mr. Key has pled not guilty and denies the charge,

18    but it does at least set forth what he's been charged with.

19         THE COURT:  Okay.

20         MS. SAWYER:  But I think we're inclined to agree with

21    Ms. Winslow that some particularized question with respect to

22    prostitution and human trafficking is probably appropriate, and

23    that last question in the context of the statement of the case

24    might do that.

25         THE COURT:  You didn't charge human trafficking,

1     though.  You only charged a Mann Act count, right?

2              MS. SAWYER:  I'm sorry, it's -- it's the 2324 count.

3     Yes.

4              THE COURT:  2423.

5              MS. SAWYER:  2423.  I'm sorry.  Yes.

6              THE COURT:  Okay.  So just review that.  And when we

7     get an agreed statement, if you don't think that covers it, we

8     can add something else to the *voir dire*.  Okay?

9              MS. WINSLOW:  Should I have that to your Honor by

10    Friday?

11             THE COURT:  Sure.  I was going to give you a date, but

12    that's fine.

13             Okay.  All right.  So that will be the *voir dire*

14    process.

15             As far as trial process is concerned, there's no

16    limits on openings or closings, unless you tell me it's going

17    to be, you know, really long.  A one-week trial, it isn't

18    usually necessary for me to give you limitations.

19             You're permitted to use every space within the

20    courtroom except the jury box.  So don't ask me if you can

21    approach a witness.  It's your courtroom.  Go ahead, approach

22    your witness.

23             Make sure your exhibits are marked in advance.  I very

24    much appreciate exhibit lists from the government if you have

25    one rather than having me keep my own as it's ongoing.

1            I also have jury equipment that is very helpful, but

2     you need to know how to use it.  I'm not going to get down from

3     the bench and show you how.  There's people in the courthouse

4     that will show you how to use that.  If you're using anything

5     from your computer, I am the person -- I know there's

6     different -- if you've used the JERS system in other

7     courtrooms, I'm the person who will control the toggle between

8     whether the witness and you and I see the exhibit and until

9     it's published, and then I'm the one who publishes that it goes

10    to the jury.  So you should always say when you're presenting

11    an exhibit, I'm, you know, showing you what's marked as

12    Government Exhibit A, an unpublished exhibit.  Because if you,

13    later on, as the course of the trial goes on, have a published

14    exhibit, then I'll hit the display for them right away.  So

15    just refer to it that way until it's published -- I'm sorry,

16    admitted, an unadmitted exhibit or an admitted exhibit.

17            If it's admitted, I'll publish it as soon as you start

18    talking about it; if it's not admitted, it's not until you seek

19    to publish.  Okay?  So know how to do that.

20            And the only thing you have to do for me during the

21    course of the trial is sometimes if you switch to the Elmo, the

22    government has to ask me again to switch back to the PC,

23    because I have to hit a switch.  But I don't have to hit a

24    switch for you to use the Elmo.  I have no idea.

25            If you are going to show exhibits on this system, you

1    need to have them prepared in electronic format to be uploaded

2    to the courtroom deputy's computer at the end of the trial so

3    that they are then uploaded there so that the jury can see them

4    by their TV screen in the jury room.  So don't wait until the

5    end to upload your disks to electronic format.  You can talk to

6    Mr. Storino, who just finished a trial, if you want to know how

7    to do that, because we had complications, and so be prepared,

8    because they go and deliberate at the end of the trial and they

9    want their exhibits, okay?

10          All right.  As far as procedure for questioning, I

11   don't care where you question from.  That's your -- it's your

12   courtroom.  But objections, you must stand for your objections.

13   That is for your benefit so that I hear you and, more

14   importantly, Gayle, the court reporter, gets it on the record

15   for me.

16          And your objection should not be speaking and

17   argumentative.  They should be relevance, hearsay, whatever the

18   rule of evidence it is that you are objecting to, or if it is

19   to a pretrial ruling, it should say objection based upon this

20   Court's pretrial ruling, so that -- and then sometimes I think

21   which one are we talking about, and I might ask for more; but,

22   otherwise, that's the only speaking that you do.  The rest of

23   the speaking is done at sidebar so that we don't influence the

24   jury.

25          No objections to evidence not being turned over are

1    permitted in front of the jury.  It is permitted, of course,

2    but over at sidebar.  So if you have that, that's too

3    prejudicial in front of the jury.

4         No exhibits can be used in opening statement unless

5    the defense and the prosecution have agreement, so make sure

6    that if you want to use something in opening statement, you

7    have agreement.  If you believe that it would be beneficial and

8    the other side still objects, then you need to raise it for me.

9         Trial day is from 9:30 until 5:00 every day except

10   Monday and Wednesday.  Wednesday it will end at 4:00 and Monday

11   it will end at 3:40.  And those are your days as far as witness

12   scheduling.

13        I will have my witness room available for the

14   government, and I will see if I can get a witness room from

15   Judge Shadur or Judge Gottschall for the defense, so I'll check

16   in with them.  And just remind me, we'll get it opened up for

17   you, so that you'll each have one witness room available.  Make

18   sure your witnesses are here on time.  I'm not breaking a jury

19   for witnesses who are having a cup of coffee in the basement.

20   All right?

21        As far as breaks, you'll have 15 minutes in the

22   morning, 15 minutes in the afternoon, and one hour at lunch.

23        You will be required to appear every morning on my

24   morning call at 9:15.  You will be called to inform me as to

25   whether there are objections, issues regarding witnesses,

 1    before the trial day starts so that I can handle them and not

 2    waste the jury's time, and the jury can come at 9:30.

 3            If you're hearing what I'm saying, you know your trial

 4    is a full trial day.  Be prepared to fill it.  This isn't like

 5    half a day, easygoing trial.  This is move along, be prepared,

 6    and we'll get your trial done efficiently.  And you will have a

 7    happy jury, because jurors that don't waste their time return

 8    verdicts.  Okay?  And don't have frustration with parties or

 9    the Court.

10            All right.  Let's turn to the motions *in limine*.  I'm

11    going to start with the government's first.

12            I'll start with the first one, which is the 404(b)

13    motion.  And let me hear from the government as to your reasons

14    for admitting this other information.

15            MS. SAWYER:  It's probably just as easy for me to come

16    up here, your Honor.

17            With respect to -- and I guess for lack of a better

18    way to caption it, we called it 404(b), but I think there are a

19    couple of different categories, and our assertion about a

20    number of them is that they're, in fact, direct evidence.

21            THE COURT:  I don't know how his motive for traveling

22    to Wisconsin to meet the minor can possibly be deemed 404(b).

23    I mean, that's listed as one of them.  I mean, that's your

24    evidence of intent.  Right?

25            MS. SAWYER:  Well, that's correct, your Honor, and

1    that's why I think there are a number of categories of

2    testimony that fall under the umbrella of direct evidence of

3    the defendant's intent when he brought the victim from

4    Wisconsin to Chicago.

5            Obviously, anything relating -- anything involving

6    Victim 1 herself would go to that, but I think there's a

7    significant --

8            THE COURT:  Who is Victim 1?  AD?

9            MS. SAWYER:  AD -- or -- I'm sorry, yes, AD is

10   Victim 1.

11           There's a significant amount of testimony that is

12   expected to be offered then by DC, which is the other woman,

13   and she's not a minor, but she was also engaged in this conduct

14   during the course of the relevant time period.  And she would

15   testify --

16           THE COURT:  Well, unfortunately for you, because she's

17   not a minor, her name has to be in the record.

18           MS. SAWYER:  Understood.

19           THE COURT:  So you have to -- she has to say her name

20   when she takes the stand.  The law does not protect her unless

21   she's a minor.  So I think you should call her -- that's

22   Crayton?

23           MS. SAWYER:  Crayton.  Yes, your Honor.

24           THE COURT:  Okay.

25           MS. SAWYER:  Yes, your Honor.

1          Ms. Crayton would testify -- and this is all by way of

2     background, and it's in our pleadings, but just to make it

3     clear -- Ms. Crayton met the defendant a few weeks prior to the

4     events that we're going to be talking about.  She then

5     admittedly began engaging in prostitution, working for the

6     defendant.

7          What she would testify to, as we've laid out in our

8     papers, is that there was also another woman and another woman

9     of -- of over 18 by the nickname Nikki, who was also working

10    for the defendant prior to the victim's arrival.

11         Ms. Crayton would testify that shortly before the

12    defendant went to bring the victim from Wisconsin to Illinois,

13    Nikki essentially deserted the defendant, left, and the

14    defendant was left needing to replace her.

15         That's what motivated the defendant.  Then Ms. Crayton

16    will testify that he was on backpage.com, that he told

17    Ms. Crayton he was looking -- he was going to recruit a new

18    girl from backpage, this was to replace Nikki.  And then he

19    made some statements to her about finding the victim.  And then

20    she has information -- I'm sorry, Ms. Crayton has information

21    about the defendant communicating with the victim.  And then

22    Mr. Key tells Ms. Crayton that he is going to Wisconsin to get

23    her.

24         Our position is that all of that information is

25    directly relevant to the intent with which Mr. Key brought the

1      victim back to Illinois.

2              THE COURT:  Okay.

3              MS. SAWYER:  And for that reason should be admitted

4      and isn't subject to the 404(b) analysis.

5              MS. WINSLOW:  The defendant's motivation is obviously

6      something -- well, the motivation isn't anything the government

7      has to prove, but the intent is something the government has to

8      prove.

9              The background of the two women, Nikki and

10     Ms. Crayton, is irrelevant to the intent.

11             If the government -- if the government believes that

12     it will elicit the testimony from Ms. Crayton that his intent

13     was to go to Wisconsin to bring back a woman to work for him,

14     the fact that he had other prostitutes work for him in the past

15     really doesn't add to that.  And because he's not charged with

16     that, that -- the -- the scope of the government's case goes

17     far beyond the elements that are charged in this matter.

18             The question is whether or not he brought AD back for

19     the purpose of prostitution.  It's not the question of whether

20     or not he was running a pimping enterprise, as the government

21     wants -- wants to characterize it.

22             The further problem with bringing in the evidence

23     about Nikki is that I don't believe, and at least I haven't

24     heard, that Nikki will be testifying at all.  So --

25             THE COURT:  Is that Ms. Crayton?

1      MS. WINSLOW:  No.  Ms. Crayton I believe will be

2   testifying.  Nikki is the second woman, the woman the

3   government alleges left Mr. Key's employ and was intending to

4   be replaced by AD.  But it's not my understanding that she'll

5   be testifying at trial.

6      So unless Ms. Crayton is just going to testify to what

7   she observed, we're going to run into an area where she's

8   testifying to hearsay.  She's testifying to facts that are

9   not --

10      THE COURT:  Well, whose hearsay, though?  Because, of

11   course, if -- if during her time that she was with him he would

12   say things about his, you know, motivation -- I don't know if

13   that's what's in your record or not -- all of that is

14   admissible as admissions.

15      MS. WINSLOW:  That would be a statement by defendant,

16   but I don't have that information.  If it was conversations

17   between Nikki and Ms. Crayton, then those conversations would

18   be inadmissible.

19      If it's conversations that Ms. Crayton had with

20   Mr. Key, I haven't heard about them yet.

21      THE COURT:  Uh-hum.  Well, ironically, they've charged

22   an old statute and haven't charged any trafficking statute.  So

23   the old statute actually was designed -- the original Mann Act,

24   as you know, was to really criminalize the activity that was

25   prostituting -- transporting minors across state lines for

1    prostitution.  So even the old, old case law would say that

2    some evidence of what his role was as a pimp or as someone

3    running a prostitution group of individuals would be relevant

4    because that shows his intent to have them engage in a sexual

5    conduct that would be in violation of the law.

6            So what is going to be your law that you are going to

7    propose in your jury instructions as the violation?

8            The Mann Act violation requires that you know.

9            MS. SAWYER:  Right.  Well, your Honor, I think in --

10   the prostitution is the law that we would allege that he

11   transported her --

12           THE COURT:  She's a minor.  I said this to you

13   yesterday.  There is no such thing in Illinois law or federal

14   law, juvenile prostitution isn't a term.  It's sexual

15   molestation of a minor.  It's the sale of a minor for

16   commercial sex.

17           MS. SAWYER:  I apologize then, your Honor.  It would

18   be the sale of a minor for commercial sex.  It's exchanging sex

19   acts in exchange for --

20           THE COURT:  You have to have the law identified.

21           The way that the jury instruction has to go -- look at

22   your statute.

23           A person who knowingly transports an individual who

24   has not attained the age of 18 years in interstate or foreign

25   commerce or in any commonwealth, territory or possession of the

1    United States, with intent that the individual engage in

2    prostitution or in any sexual activity for which any person can

3    be charged with a criminal offense, shall be fined under this

4    title and imprisoned not less than ten years.

5            So you actually have to choose, under the case law --

6    I think the case is *McNeal* from the Seventh Circuit -- you have

7    to choose under the case law what is the criminal offense that

8    the individual could be charged with.  So it can be a bunch.

9    You know, you could say -- have they given you that as far as a

10   jury instruction proposal?

11           MS. WINSLOW:  I'm looking at the jury instructions

12   right now.  And, no, your Honor.

13           THE COURT:  I don't think that you can -- you have to

14   identify it.

15           MS. SAWYER:  And we'll provide something more

16   specific.  I apologize for that, your Honor.  In the jury

17   instruction currently, it just tracks the language of the

18   indictment, and in the statute that says prostitution --

19           THE COURT:  Oh, so you just did with the intent to

20   have the individual engage in prostitution.

21           MS. SAWYER:  That's correct, your Honor.

22           THE COURT:  Even though you have a minor.

23           MS. SAWYER:  I'll correct that and provide a new jury

24   instruction.

25           THE COURT:  Well, it will have to be proposed so that

1    Ms. Winslow can see it, because the way it works is whatever

2    sexual criminal violation it is would have to be defined, and

3    it's going to be defined then, if you look at the case law,

4    by -- it can be I think federal law or state law, it doesn't

5    matter, but you have to figure out what it's going to be, and

6    that defines what can come in.

7              MS. WINSLOW:  It does, Judge.

8              THE COURT:  And that defines what can come in.

9              So it's -- if it's the sexual abuse of a minor for

10   commercial sex activity, then I think 404(b) I have to look --

11   I guess what I'm going to need to do is look at the statements

12   by Ms. Crayton and what exactly you intend to submit, and maybe

13   that way I can make a determination.

14             So the two things that are going to help me in my

15   determination of what can be admissible is her statements, so

16   whatever 302 -- and I understand now grand jury is available --

17   plus whatever statutes you believe you'll be admitting for the

18   jury instruction.

19             And then maybe we'd have to reconvene and have you

20   argue for me as to what you think the scope is.

21             You have the statements, right?

22             MS. WINSLOW:  I absolutely have the statements.

23   There's actually a very lengthy videotaped statement --

24             THE COURT:  Can you help me then in seeing what would

25   be, knowing that it is a criminal activity to have a minor

1    engage in sexual commercial activity, is there -- what is in

2    there that you think is 403 prejudicial?

3              MS. WINSLOW:  I think it's -- it's 403 prejudicial

4    because it's essentially extraneous.  It's unnecessary.  It

5    presents a whole line of potential -- well, likely prejudicial

6    history that's irrelevant to the case as it's charged.

7              If the government is charging that Mr. Key went to

8    Madison, Wisconsin for the purpose of recruiting AD to bring

9    her back for the purpose of prostitution, then it is the fact

10   of the transportation of AD, not the history of Mr. Key and his

11   employment.

12             So if the government wants to argue that he's

13   attempting to exchange commercial sex acts with this

14   individual, that's the question that's relevant to the jury,

15   not whether he was involved in the ongoing practice of

16   exchanging sex acts, commercial sex acts.

17             THE COURT:  But if their evidence is that he was in

18   the business of putting these individuals into commercial

19   sexual activity, then some description of what he was doing on

20   a day-to-day basis would be relevant to his intent.  Right?

21             MS. WINSLOW:  Yeah, I don't think -- yes.  And I don't

22   believe that the statements, at least as I hear them, I don't

23   believe those statements would really support that finding.

24   We're talking about a very finite period of time that

25   Ms. Crayton even knew Mr. Key.  And her statements really don't

1    get into very much detail about the day-to-day activity as your

2    Honor presents it.  There's some -- there's some, but those are

3    mostly the statements of the agents, as a matter of fact, and

4    her responses.

5              But I don't believe -- and I think it would be useful

6    for your Honor to hear the recording.

7              THE COURT:  I think I better take a look at it.

8              So if I could please be provided with the -- I didn't

9    know there was a videotaped statement, and whatever statement

10   she has, I will take the 404(b) motion under advisement in

11   order to make a determination as to the scope of what she can

12   say.

13             I mean, I can see your fear that -- that because

14   they've only charged Mann Act and they haven't charged the

15   trafficking statute, that only the intent as to this victim is

16   relevant, and anything that implicates other victims in a

17   broader scheme would be 404(b) because it would be other

18   criminal act that he is alleged to have committed.

19             MS. WINSLOW:  That's precisely my position.

20             THE COURT:  So I need to hear it.

21             MS. SAWYER:  And, your Honor, for the Court's

22   information, there are two recorded interviews by -- of

23   Ms. Crayton:  One done by Romeoville, one done by the FBI.

24   There's also the 302 that was produced to Ms. Winslow in

25   addition to grand jury testimony.  And in our papers, we've

1    summarized a fair amount of what she has to say with respect to

2    both her interactions with Mr. Key and Nikki's and the

3    victim's.

4            THE COURT:  All right.  That will help.

5            MS. SAWYER:  And just for the Court's information, our

6    position is actually almost precisely what the Court

7    articulated originally for Ms. Winslow, and that is given that

8    the government does have to prove the defendant's intent --

9            THE COURT:  Right.

10           MS. SAWYER:  -- when he brought the victim across,

11   that those activities -- and we are amenable certainly to

12   narrowing the scope of what we're permitted to present, I don't

13   need to get into Ms. Crayton's entire history with the

14   defendant, but at least at a minimum what was happening that

15   informs the intent that he had while on that trip, I do think

16   that, as the Court has noted, that a lot of that information is

17   directly relevant to that intent.

18           THE COURT:  Yeah, I'm going to have to -- I think I'm

19   going to have to look at the evidence and see what the -- what

20   the worries are.  Certainly the statute charges it.  And so

21   there's -- you know, they have the -- they have the obligation

22   to prove their elements of the statute -- hang on just a

23   second.

24           You're restricted, though, in some ways.  I see -- I

25   see Ms. Winslow's concern, because, unlike a 1591 case where

1    you would be putting in the participation in a venture which

2    has engaged in the act, then -- then all of that prostitution

3    information comes in under 1591, which is the sex trafficking

4    of children.  You know, that comes in there because you have to

5    prove that.  But here you only prove this one finite -- one

6    finite travel and that we have to look at his intent for that

7    one piece of travel.

8            So, believe me, I'm very cognizant of the

9    Seventh Circuit's limitations on 404(b), having been the judge

10   that began the reversal process in narrowing of 404(b) by

11   admitting evidence that I believed was helpful for intent, and

12   so I'm very keenly aware of the restrictions now and the

13   Court's concern above me as well that this evidence can have

14   such a powerful impact on the jury.

15           So I'll need to look at it, and then we'll probably

16   revisit it.  If I can't do it on my own, I'll listen for

17   argument.

18           So Docket Number 102, which is the 404(b), is taken

19   under advisement.

20           And the government is directed to provide me with that

21   evidence.

22           All right.  The next one is the 413 motion.  I believe

23   it's the government wants to preclude the evidence of any

24   victim witnesses' sexual history before and after being

25   trafficked by Key.

1          MS. WINSLOW:  There is no objection to any --

2     excluding any evidence of any events after the trafficking.

3     That was not something that we would get into anyway.

4          This question is actually somewhat related to the

5     404(b) --

6          THE COURT:  It is.

7          MS. WINSLOW:  -- which is why --

8          THE COURT:  It is.

9          MS. WINSLOW:  -- I put them in the consolidated

10    response because the government is, on the one hand, seeking to

11    introduce evidence that AD was "posted up," is the phrase they

12    use, on backpage prior to meeting Mr. Key, and also seeking to

13    introduce evidence that Ms. Crayton was his prostitute, so the

14    government is actually seeking to admit this same evidence.

15         Beyond that evidence, I wouldn't be introducing it

16    anyway.  I'm certainly not going to try to --

17         THE COURT:  Right.  You realize that your 404(b)

18    motion is actually asking to talk about her sexual history in

19    the sense that she was prostituted, right?

20         MS. SAWYER:  Yes, your Honor.  I think what we wanted

21    to be careful of is that -- I don't think there's any

22    disagreement that both parties want to present evidence that

23    Mr. -- well, let me speak for the government -- that Mr. Key

24    located the victim on backpage.com, that there was an ad posted

25    for the victim on backpage.com, that's how the defendant found

1   her.  The government -- our request is that we narrowly

2   circumscribe the information that is admissible about the

3   victim's prior prostitution act -- I'm sorry, prior sexual

4   conduct before meeting the defendant because it's just not

5   relevant to the defendant's intent --

6           THE COURT:  Yeah.

7           MS. WINSLOW:  -- when he brings her, and so --

8           THE COURT:  Well, it's not just that it's not

9   relevant.  It's prohibited under the rule.  I mean, so what you

10  are allowed to do is you can cross the victim and the witness

11  about -- if they elicit that they were prostituted by the

12  defendant, you can cross them, of course, regarding how they

13  became involved in that as far as, like, you know, his role

14  versus their role during what they elicit, but not that prior

15  to meeting her -- or prior to meeting him she was in multiple

16  sexual relationships or was a prostitute before or was in an

17  early marriage or had a baby or all of the above, you know?

18          MS. WINSLOW:  Most of that I wouldn't touch anyway.

19  It would be inappropriate.  But the one factor that I do

20  believe is appropriate -- and it opens -- it potentially opens

21  the door to some other 404(b) or some other problems, so we'll

22  have to address this -- but the question of whether or not AD

23  had the knowledge and the ability to post herself up on

24  backpage becomes relevant in this case, because if she was

25  actually the person who posted herself on backpage as opposed

1    to Mr. Key, then that goes to his lack of intent.

2            THE COURT:  Oh, that's interesting.  That's very

3    different.  Yeah.  So how would you ever get that in without

4    getting in that she had -- was she a prostitute before?

5            MS. WINSLOW:  She was.  Not for long and --

6            THE COURT:  Was this the 16-year-old or Crayton?

7            MS. WINSLOW:  The 15-year-old.

8            MS. SAWYER:  15-year-old.

9            THE COURT:  The 15-year-old.

10           MS. WINSLOW:  Ms. Crayton, I will not get into any of

11   that because it's not relevant to the case, but it is relevant

12   to the question of intent.  And the government has responded

13   and suggested that that would open the door to some other

14   materials, and that's something I honestly have to consider.

15   I'll make that decision in conjunction with speaking with my

16   client.  But if we do decide that we're willing to take the

17   risk of opening up the door to potential other information, I

18   believe it's highly relevant.  It goes directly to his defense

19   that he did not have the intent to prostitute AD when she came

20   to Illinois.

21           THE COURT:  Well, the whole point of 413 is to exclude

22   any kind of trial on someone's previous sexual activity, but

23   it's never been to exclude a defense, which is why they have

24   carved out things such as, like, if the semen is from, you

25   know, the defendant versus someone else.  So that's an

1   interesting carve-out.

2           What's your response to that?

3           MS. SAWYER:  Your Honor, I think probably the easiest

4   way to address this is to give Ms. Winslow -- and I would

5   submit, it would probably take one question to the victim -- is

6   did you post the backpage ad that the defendant found you on?

7   And I expect her answer will be no.

8           THE COURT:  Yeah, but then she's going to go up and

9   her point is do you know how to post a backpage ad, and she's

10  going to say yes, according to Ms. Winslow, because she's done

11  so in the past.

12          That's what I'm hearing.  Am I hearing it wrong?

13          MS. WINSLOW:  You are correct.

14          THE COURT:  All right.

15      (Counsel conferring.)

16          MR. PARENTE:  Judge, and we've discussed this, the

17  issue isn't -- first of all, the witness would say she's never

18  posted a backpage.  She was the victim of another pimp

19  beforehand.  But I think what gets everyone -- what gets the

20  point across, and Ms. Winslow should be allowed to make, would

21  be did you ever post a backpage ad?  She'll say no.  Do you

22  know how to use the internet?  Do you know how to use

23  backpage --

24          THE COURT:  Did you ever post a backpage ad?  Why are

25  you saying she's going to say yes and you're saying she's going

1    to say no?

2              MR. PARENTE:  She'll say no.

3              MS. WINSLOW:  There are text messages on her phone

4    where she says that she's posting up.

5              MS. SAWYER:  Well --

6              THE COURT:  Prior to the incident or during this?

7              MS. WINSLOW:  Prior to the incident.

8              MS. SAWYER:  Your Honor, I suppose that we can clarify

9    this pretrial with the witness, but my interpretation of that

10   is that they use the word "posting up" to mean that they are

11   engaging in the conduct, and so "posting up" is that they're on

12   the internet.  And she knew she was -- she knew she had been

13   posted by another individual who she was working for.

14             THE COURT:  That's your interpretation.  I mean, she

15   would have the right to cross-examine the witness if there's an

16   interpretation dispute regarding what "post up" means.

17             If the -- if the defense is going to take the position

18   that she was an active participant in posting her own ad

19   voluntarily and that he was not the person who posted her for

20   commercial sex, how are you going to keep out the fact that she

21   had the ability to post before, knew how to do it, and had done

22   it, if there's some evidence or reasonable inference from the

23   evidence to say that she can.

24             MR. PARENTE:  Well, we would argue there is no

25   evidence, but she could ask the questions:  Do you know -- do

1    you know what backpage is, do you have -- did you have access

2    to the internet, do you know how to take photos of yourself.

3    To lay the groundwork to the jury, she can make that argument

4    that the woman could have done it.  And even if she did do it,

5    it wouldn't really -- it doesn't really negate the fact that

6    the defendant knew what was going on or --

7          THE COURT:  All she's got to do is just poke holes,

8    you know?  She doesn't have to --

9          MR. PARENTE:  Correct, but you don't --

10         THE COURT:  -- make him not guilty on that one

11   question, you know?  So you can't cut off her cross, though, if

12   that's a reasonable inference from the evidence.  What you can

13   cut off under 413 is the next line of questioning, which is,

14   you know, were you engaged in prostitution and posting, which

15   you're not allowed to do.

16         MS. WINSLOW:  Not going to do it.  I wouldn't do it

17   anyway, Judge.  I'm not going to ask any specific questions.

18   I'm not concerned about her prior sex acts.  I'm really more

19   concerned about her knowledge of backpage, her ability to post

20   up.  There are text messages that indicate she's asking for a

21   credit card to post on backpage.  That's where I'm going to

22   stop.  I'm not going to ask her what happened after that.

23         THE COURT:  All right.  You're going to need to

24   propose those questions with me so they don't interfere with my

25   413 ruling, okay?

1          MS. WINSLOW:  Yes.

2          THE COURT:  So that we're safe with that and that we

3     all know where we're headed with that so we don't have her open

4     up the door to something that she is protected under this rule

5     from opening.

6          But, otherwise, the 413 motion is granted in part in

7     that any of her sexual history prior to being trafficked by Key

8     is excluded.

9          So there's the motion to exclude mistake of fact

10    defense, which is the -- that the victim is -- the victim's age

11    is irrelevant under 2423 and should be precluded.

12          MS. WINSLOW:  I don't intend to offer the defense of

13    mistake of age; however, I do believe that the -- that AD's

14    statements, her lies about her age, are relevant for -- they're

15    relevant in the similar way, that AD knew that she had to

16    represent herself as being older and that she was -- she was

17    dishonest.  They're highly relevant to this case.  And her

18    statements about why she came to Illinois or her intention for

19    coming to Illinois along with Mr. Key, the misrepresentations

20    about her age are relevant to show that she -- the

21    misrepresentations about this whole finite period of her life,

22    that she was essentially lying about what she was doing.  And

23    she will -- I believe she will testify that she gave the

24    statement initially that she just came down to Illinois to hang

25    out with Mr. Key.

1    　　　　　Giving him a false age is -- would give him more

2    comfort in bringing her -- her to Illinois even not for the

3    purpose of prostitution.  They met in order to get to know one

4    another, if you will, for non-commercial sex purposes.  The

5    fact that she lied about her age is highly relevant, and it

6    also goes directly to her credibility.

7    　　　　　THE COURT:  Response?

8    　　　　　MS. SAWYER:  I think our position is that a limited

9    question about, you know, you told Mr. Key "X" but that's not

10   true, right?  I mean, to point out for credibility purposes but

11   for no other and --

12   　　　　　THE COURT:  Yeah, so we'll need a jury instruction.

13   And if it gets to -- if for credibility purposes any

14   misstatement, lies that she made, are available for cross, but

15   we need to make sure the jury understands that the law does not

16   require that, so you'll need to either do a limiting

17   instruction proposal directly after or a jury instruction or

18   both.  Okay?

19   　　　　　MS. WINSLOW:  That's fine, Judge.

20   　　　　　THE COURT:  All right.  So then the next motion is to

21   preclude evidence of the arrests, misdemeanors, convictions,

22   other bad acts involving dishonesty regarding specific

23   witnesses.

24   　　　　　This is relating -- are there specific criminal

25   histories that we need to be addressing one by one?

1          MS. SAWYER:  This is -- I'm going to defer to

2     Mr. Parente on Ms. Crayton's.  If there are any, I can't recall

3     off the top of my head.

4          MS. WINSLOW:  It's not -- Ms. Crayton has an armed

5     robbery or a residential burglary.

6          MR. PARENTE:  Two residential burglaries and

7     prostitution.

8          MS. WINSLOW:  The prostitution I will not inquire

9     about.  The residential burglaries, that is a theft.

10         THE COURT:  She has a residential burglary felony

11    conviction?

12         MR. PARENTE:  Yes, your Honor.

13         THE COURT:  She's a minor, though, right?

14         MS. WINSLOW:  No.

15         THE COURT:  Oh, she's an adult.  She's the adult.

16         MS. WINSLOW:  Ms. Crayton -- yes.

17         THE COURT:  And within the period of time?

18         MS. WINSLOW:  Yes.

19         THE COURT:  And what is your position?  That it's not

20    relevant?

21         MS. SAWYER:  No.  I'm sorry.  The -- well --

22         MR. PARENTE:  We have no objection.

23         MS. SAWYER:  Yeah, we have no objection to the

24    question.

25         THE COURT:  See, that's -- you know, these motions

1   that are just general, saying preclude evidence of witnesses'

2   arrest, misdemeanor convictions, and other bad acts are not

3   helpful to me.  What's helpful to me is saying this witness has

4   this conviction, we don't think it should be crossed on, and

5   you saying yes, we do.

6          So I think right now you just said to me that you

7   don't intend to cross on Crayton's prostitution conviction.

8   You will cross on her conviction for the residential burglary.

9   You're not objecting to that because you know the rule permits

10   it.

11          MS. SAWYER:  Correct.

12          THE COURT:  It doesn't permit collateral information,

13   just the cross.

14          Anything else on Crayton?

15          MS. WINSLOW:  No, your Honor.

16          MS. SAWYER:  Nothing.

17          THE COURT:  Anything else on any other witnesses?

18          MS. WINSLOW:  Yes.

19          MS. SAWYER:  There is an issue with respect to

20   Victim 1, and this has a couple of levels.  Victim 1

21   currently --

22          THE COURT:  Is this AD, the same person you're calling

23   AD?

24          MS. SAWYER:  This is AD.  Yes.  Sorry.

25          THE COURT:  Who was the other victim?

1        MS. SAWYER:  She's the only one, your Honor.  I'm

2   sorry.

3        THE COURT:  Okay.

4        MS. SAWYER:  She currently has a case pending in

5   Madison, Wisconsin for attempted armed robbery and --

6        MS. WINSLOW:  Reckless endangerment.

7        MS. SAWYER:  -- reckless endangerment.  I can't

8   remember exactly how Wisconsin puts it.

9        We've discussed this with Ms. Winslow.  We've also put

10  Ms. Winslow in touch with her defense witness -- the victim's

11  defense attorney in Wisconsin.  I think we are all in

12  agreement -- our position is that Ms. Winslow should be

13  entitled to ask her essentially one question:  That, you know,

14  you currently have a pending criminal case in the State of

15  Wisconsin, isn't that right?

16       I think it goes to bias.  I don't have an issue with

17  that.

18       We do want to be careful that it is, again, narrowly

19  circumscribed and limited to that one question for purposes of

20  bias.

21       THE COURT:  Why does the pending case become relevant

22  at all?

23       MS. WINSLOW:  It goes to her bias and her potential

24  motive for testifying.  I don't intend to go -- frankly, I

25  don't know that much about the case, so I couldn't get into too

1    much details, but I believe it does go to bias and motive for

2    testifying.

3              Again, I will not argue that the fact of a pending

4    case makes her a liar, but I will say that it does go to her

5    credibility and that she could have a motive for testifying.

6              THE COURT:  Do you have any case law to support that?

7    I mean, usually a pending case where we don't have a final

8    adjudication would be irrelevant because it's just so highly

9    prejudicial.

10             MS. WINSLOW:  Again, I'm not seeking to introduce it

11   for 608 purposes, but for bias purposes, just to show that she

12   could have a motive for testifying.  I don't --

13             THE COURT:  That wasn't my question, though.  Do you

14   have a case --

15             MS. WINSLOW:  I don't have it --

16             THE COURT:  Yeah.

17             MS. WINSLOW:  -- as I sit here right now, but I would

18   be happy to look.

19             THE COURT:  Yeah, I think you should look at that.  I

20   mean -- so your theory then is that because she has a pending

21   case in Wisconsin, she'll cooperate with the government here in

22   Illinois in order to be treated better by the authorities in

23   Wisconsin?

24             MS. WINSLOW:  Yes.

25             THE COURT:  So that's also tenuous in that unless

1      there's some kind of agreement, right?  Between the government

2      here and the government there?

3                MS. WINSLOW:  Correct.

4                THE COURT:  Yeah.  So, I mean, I'm inclined to keep it

5      out unless you can give me some more support.  Okay?

6                MS. WINSLOW:  Fine.

7                THE COURT:  All right.  Thanks.

8                MS. SAWYER:  Can I address one issue?  And I just want

9      to make sure this is vetted with the Court in the event that

10     the question is permitted.

11               THE COURT:  Yeah.

12               MS. SAWYER:  And I'm relaying this based on a

13     conversation with Ms. Winslow, so I'll defer to her.  It sounds

14     like defense counsel has represented to Ms. Winslow -- defense

15     counsel in Wisconsin has represented to Ms. Winslow that she

16     would be instructing her client not to answer any questions

17     regarding the pending case --

18               THE COURT:  Well, I hope so.

19               MS. SAWYER:  -- to include the fact of the case at

20     all.  Certainly not anything about the substance of it, but to

21     include simply refusing to answer a question about the

22     existence of a case.  And so I just wanted to flag that issue.

23               THE COURT:  Well, I'm not going to have her invoke her

24     Fifth Amendment right on the stand in front of the jury.

25               MS. WINSLOW:  Well, Judge, to the extent that your

1    Honor rules that I am allowed to ask this question and then she

2    refuses to submit to cross-examination, that presents a

3    confrontation problem for Mr. Key.  And I think this is

4    something we can probably deal with with the witness.  I'm not

5    sure she has a privilege to the question simply, "Is this case

6    pending," which is as far as we would go into it, but if she --

7    excuse me -- if she refuses to submit for cross-examination,

8    then I'm in a position of having to ask the Court to strike her

9    direct testimony.  So this --

10         THE COURT:  Hold on.  Hold on.  You've just said three

11   things that are really packed in there.

12         Number one, she has a Fifth Amendment right not to

13   incriminate herself.  So the existence of the charge, whether

14   that is a possibility for the invocation of the right, is one

15   question.

16         Secondly, whether she doesn't answer and the fact that

17   you would say he has a confrontation problem, I mean, she has

18   the same rights that your client has, right?  Right now both of

19   you are in the same position, and so she can't be forced to

20   testify, say statements under oath, nor can he.  So I don't

21   know how you can say that's a confrontation violation of his.

22         MS. WINSLOW:  Because if she refuses to submit to

23   cross-examination, then her direct --

24         THE COURT:  Solely on that question of the pending

25   case.

1    MS. WINSLOW:  Solely on that question.  But it's

2  highly, in my opinion, it's highly relevant to her motivation

3  bias and her reliability as a witness.

4    THE COURT:  Yeah, and my ruling is that I'll wait to

5  give you the final ruling on it, but that is not based in fact

6  without some more conclusion, fact, something that shows me

7  that the authorities in Illinois and in Wisconsin have agreed

8  to some kind of cooperation or benefit or something for her

9  that evidences that bias.  That simply having the pending case

10  is prejudicial, it doesn't fit with under 609, and her bias in

11  testifying with like just her belief that it would help her is

12  not sufficient to make it a potential for a benefit to her.

13    So if you want to give me case law on that, that's

14  what I'm asking for.

15    MS. WINSLOW:  Well, I'll do two things.  I will see

16  if -- I will talk to her attorney, see if there have been any

17  promises or expectations --

18    THE COURT:  Yes.

19    MS. WINSLOW:  -- of a benefit, and I will see if

20  there's case law on it.

21    THE COURT:  Yes.  And then when can you give me that?

22  How about Monday on that?

23    MS. WINSLOW:  Monday is fine.

24    THE COURT:  Okay?  Thank you.

25    Okay.  What about Agent Landau's federal case?

1      MS. SAWYER:  Your Honor, I guess if I can insert one

2 more issue -- and I know that this is tentative and dependent

3 on the Court's ultimate ruling -- but one of our issues also

4 was if Ms. Winslow asks that cross-examination question in

5 order to suggest some bias on the victim's part, then the

6 government's position is with respect to her prior recorded

7 statements to the FBI and to Romeoville, that those would

8 then -- that would then open the door under the hearsay rules,

9 now that she would have essentially alleged a recent motive to

10 fabricate then, to those statements coming in as prior

11 consistent statements.

12      THE COURT:  Okay.

13      MS. WINSLOW:  I guess I don't really understand the

14 government's argument, to be perfectly honest.

15      THE COURT:  So a recent fabrication can be rebutted

16 with prior consistent statement.

17      So she's saying that if she gets on the stand and she

18 is crossed about whether she has a bias to aid the government

19 based upon the fact that she has a pending state court case in

20 Wisconsin, that she could then say that you have attacked her

21 credibility and that recent allegation of fabrication permits

22 her to put in any prior consistent statement, which is her

23 complete statement to the government regarding whatever

24 happened.

25      Am I summarizing Ms. Sawyer for you better?

 1          MS. WINSLOW:  The government, I expect, to introduce

 2    that statement, although not in the form of a statement, in the

 3    form of her testimony, as the bulk of their case-in-chief.  So

 4    I think if the government wants to say, well, this is what you

 5    told us back on September 10th and 11th of 2013, you told us

 6    the same story, that would be one thing, except she told the

 7    government about four different things on that day.  So that's

 8    why I'm a little bit confused about just exactly which

 9    statement the government is referring to.

10          THE COURT:  Yeah, and I think that makes sense that

11    you're confused.  It has to go to the exact recent fabrication.

12          So here is my take on this, again, as I've said a

13    moment ago.

14          That bias has to be established by something.  It

15    can't be assumed just in her head that if she goes to Illinois

16    and is arrested by the FBI and the Romeoville Police

17    Department, that she believes cooperating with Romeoville is

18    going to get her a break up in Wisconsin.  There's got to be

19    some link to that, that, you know, the FBI said, well, we'll

20    let people know that you're helping us out down here, something

21    to make that bias reasonable, because just an average lay

22    person's belief that, hey, if I go help some local authority,

23    my case in another jurisdiction is going to be benefited by it,

24    is not realistic.

25          MS. WINSLOW:  As I said, I will speak with her

1    attorney and see if there's information that I can get that

2    would assist the Court in resolving that.

3              THE COURT:  Okay.  And I'll wait for that on Monday.

4              Now can we get to Agent Landau?

5              MS. SAWYER:  Yes, your Honor.  I apologize.

6              THE COURT:  Okay.  So the Indiana for conspiracy to

7    falsely prosecute defendants.  Is it a civil case?

8              MS. WINSLOW:  It is.

9              MS. SAWYER:  It is.

10             MS. WINSLOW:  I have a copy of the complaint, if your

11   Honor would like to see it.

12             THE COURT:  Okay.

13             MR. O'CONNELL-MILLER:  Your Honor, not to interrupt --

14   sorry, I did get willingly roped in earlier, but I have another

15   appointment at 11:00 --

16             THE COURT:  So do I, believe it or not, based upon

17   some scheduling glitch, so we're probably going to need to take

18   a break and reconvene in a little bit.

19             Let me take the complaint, please, that you have.

20             MS. WINSLOW:  Yes.

21             THE COURT:  And I'll take a look at that.

22             Unfortunately, due to a scheduling glitch, and we're

23   trying desperately to aid the marshals in clearing tomorrow and

24   Friday for your training, we have a sentencing that I have to

25   do at 11:00.  So I'm going to take a break now and reconvene in

1    an hour.  Okay?

2              MS. WINSLOW:  Judge, I know your Honor accommodated my

3    schedule yesterday, and I hate to do this to you again, and I'm

4    going to be perfectly honest with the Court about why I have a

5    conflict at 1:00 o'clock, but my -- my husband, because he's a

6    dear human being, has made me a very, very expensive and very,

7    very hard-to-get hair appointment at 1:00 o'clock, and I would

8    really like to make it.

9              THE COURT:  Okay.  All right.  Fair enough.

10             MS. WINSLOW:  I'm sorry.

11             THE COURT:  I appreciate the candor.

12             Where is my -- where is my defense attorney for my

13   sentencing who couldn't go later?

14             MR. GOODMAN:  Right here.

15             THE COURT:  Could you come up and tell me, please,

16   what your conflict is?  So you have to be in front of somebody

17   at 1:30.

18             MR. GOODMAN:  It was my co-counsel, Melissa Matuzak.

19   She has a bond hearing I believe at 1:00 o'clock.

20             THE COURT:  Okay.  And so you were capable of coming

21   back for sentencing at what time?

22             MR. GOODMAN:  I'm available all afternoon.  She has a

23   bond hearing.  I can't remember whether it was 1:00 or 1:30.

24             THE COURT:  Is it here in this building?

25             MR. GOODMAN:  Yes.

1           THE COURT:  Oh, that's very helpful.  Mr. Hogstrom,

2    are you available if we move you around a little bit?

3           MR. HOGSTROM:  Yes, Judge.  I'm available any time

4    this afternoon.

5           THE COURT:  Well, there's the kind of a prosecutor I

6    like to hear.  Okay.

7           All right.  So let's continue our final pretrial

8    conference.  And if I can please indulge upon you to move the

9    two of you to later when your co-counsel will be available and

10   when you will be -- so I may be able to finish you then.

11          So what do you think would be the earliest time for

12   that?

13          MR. GOODMAN:  I think 2:00 or 2:30 would be the

14   safest.

15          THE COURT:  How about we say 2:15?  We split the baby?

16          MR. GOODMAN:  Okay.

17          THE COURT:  Is that fine with you, Mr. Hogstrom?

18          MR. HOGSTROM:  Yes, Judge.

19          THE COURT:  Okay.  So then, Tresa, if you could call

20   the marshals and tell them that we will take Mr. Martin at 2:15

21   today and not now.  I know they didn't -- were you going to go

22   get him?

23          MR. GOODMAN:  Mr. Martin is not in custody.

24          THE CLERK:  I didn't have him in custody.

25          THE COURT:  Oh, he's not in custody.  Okay.  So that

1    helps.  Okay.  Oh, okay.  So I don't know how that got screwed

2    up then.  I thought it was due to the marshals.

3         All right.  So I'll see all of you at 2:15, and we'll

4    continue what we're doing.

5         MR. GOODMAN:  Thank you.

6         THE COURT:  Too bad.  I kind of wanted to see you come

7    back with your hair done.

8    (Laughter.)

9         MR. O'CONNELL-MILLER:  And I apologize for leaving.

10        THE COURT:  No, you're fine.

11   (Mr. O'Connell-Miller exits courtroom.)

12        MS. SAWYER:  Your Honor, may I inquire?  I believe

13   there's a fourth amended complaint, and I don't know what

14   Ms. Winslow has handed up.

15        THE COURT:  Oh, I have -- so -- oh, this is filed in

16   '08.

17        MS. SAWYER:  It is a very old case, but the fourth

18   amended complaint was filed in 2011.

19        THE COURT:  Okay.  I'll take a look at that then,

20   please.

21   (Tendered.)

22        THE COURT:  Well, this is in a different place.  Was

23   it moved?

24        MS. SAWYER:  Your Honor, and I'm sorry, I've done my

25   best to backtrack and to try to speak to the civil AUSA.  The

1    counts changed --

2          THE COURT:  Well, Judge Der-Yeghiayan has the -- this

3    case, which is an '08 case, 4752.

4          MS. SAWYER:  Right.  It's in Indiana, the case.  And

5    I'm not quite sure what the procedural history was, but this is

6    in Indiana.

7          THE COURT:  Why do I have this Illinois one from '08?

8    Is that --

9          MS. WINSLOW:  That was the original complaint.

10         THE COURT:  Was it then moved?

11         MS. WINSLOW:  It was then moved.  And I'm not exactly

12   sure why it was moved, to be honest.

13         THE COURT:  All right.

14         MS. SAWYER:  I believe Count 6 -- Count 1 and Count 6

15   pertain to the federal -- FBI defendants.

16         THE COURT:  Okay.  So you want to keep this out as a

17   pending action?

18         MS. SAWYER:  That's correct, your Honor.

19         THE COURT:  And there's no end to this, even though

20   it's an '09 case?

21         MS. SAWYER:  One would wonder, your Honor.  Summary

22   judgment motion was filed on January 16th, 2015 and apparently

23   has not yet been ruled on.

24         THE COURT:  That's not this court.

25         What's your position?

1          MS. WINSLOW:  My position is the fact of the

2     allegation go to the credibility.

3          The nature of this suit essentially is that the

4     federal agents conspired with local agents to generate false

5     evidence and to falsely accuse individuals of criminal conduct.

6          I think that that is relevant to her credibility.  It

7     has not been resolved, but it has been pending for six years.

8          THE COURT:  Yeah, I don't know what the pending nature

9     of it without any kind of adjudication.  What if he just grants

10    summary judgment for the defendants.  Then we've really

11    prejudiced the testimony by letting that come in.

12         MS. WINSLOW:  Well, certainly the witness could

13    certainly testify that she has denied all the allegations and

14    the case is pending and she expects it to be dismissed, but I

15    think the jury still should know that this is -- this is -- has

16    evidently survived years of litigation without being resolved,

17    and I think that fact is highly relevant.

18         THE COURT:  I don't know, because surviving years of

19    litigation in one courtroom can mean multiple filings and

20    challenges and in another courtroom can mean that it's sitting

21    at a slower pace.

22         I don't see that without any finding of lack of

23    credibility that I can admit that without having tremendous

24    prejudice against the witness, so I'm going to exclude the

25    pending case that she's in from cross-examination.

1          Let's turn to -- well, the motion to preclude argument

2     and evidence regarding jury nullification has to do with

3     outrageous government conduct or racially motivated, anything

4     like that.  Do you intend to do anything like that?

5          MS. WINSLOW:  I've tried a lot of cases in this

6     building, Judge, and I never have and I never will.

7          THE COURT:  Okay.  So that will be granted as no

8     objection to that.

9          Motion to exclude -- preclude comments about discovery

10    in front of the jury is granted.  That's my standard practice.

11         Motion to admit certain business records pursuant to

12    902(11).

13         Have you turned them over and are you objecting to any

14    of them?

15         MS. WINSLOW:  I'm not objecting in general to the

16    business records.  That's completely appropriate.

17         There is the question of the phones.  Your Honor has

18    not yet ruled, again, on the motion to suppress.

19         To the extent that the government has received

20    evidence -- to the extent first that your Honor sustains the

21    granting of the motion to suppress and the government wishes to

22    introduce evidence that it received from those phones, the

23    government is going to have to present the evidence of an

24    independent source, and it has not done that to this extent.

25         THE COURT:  Say that last line, to the extent that

1    they're going to do what?

2        MS. WINSLOW:  To the extent that they're going to

3    introduce evidence that arose from the seizure and search of

4    those phones, the government is going to be obligated to

5    present evidence of an independent source.

6        THE COURT:  If I suppress.

7        MS. WINSLOW:  If you suppress.

8        THE COURT:  Okay.  So I guess a preview of coming

9    attractions, if that occurs.

10       So the 902(11), though, you don't have any objection

11   to the ones you've received so far?

12       MS. WINSLOW:  No, your Honor.

13       THE COURT:  All right.  So that will be granted.

14       And of course you don't have a ruling on the phone

15   yet, so since it's not given, you can't know what that is going

16   to be yet.

17       MS. SAWYER:  Your Honor, if I could also make an

18   additional proffer -- and this would certainly come in -- our

19   position is this will certainly come in during trial, so I'll

20   just make this proffer to the Court and to defense counsel --

21   is that the defendant's phone number, the phone number that

22   attaches to the phone that's the subject of the motion to

23   suppress, now, was also extracted from -- the victim also had

24   that telephone number and Ms. Crayton also had that telephone

25   number.

1          THE COURT:  I think that's her point about independent

2     sources, so there you go.  I mean, I'm not keeping it out.

3          MS. SAWYER:  Okay.

4          THE COURT:  Has -- doesn't have anything to do with

5     the 902(11) issue.

6          All right.  Let's go to the summary chart under 1006.

7     Any objection to the telephone summary chart?

8          MS. WINSLOW:  Only to the extent that I don't have it

9     yet.  And the closer it gets to trial, the more problematic it

10    becomes.  I mean, I now have assistance, so I probably will put

11    him on that, but this happens in almost every single case where

12    I get these summaries of voluminous evidence right at the end

13    and -- when I'm not in a position to review the voluminous

14    evidence and compare it.  I do have assistance now, but the

15    sooner the better I would just ask.

16         THE COURT:  Do you have a date when you can get that

17    over?

18         MS. SAWYER:  And, your Honor, to be honest, I'm not

19    even 100 percent certain that we're going to be using one.  We

20    wanted to certainly raise the issue in the event that we

21    decided to.  We have provided a report created by a cell

22    phone -- cell site expert, an FBI cell site expert, that's

23    already been provided to Ms. Winslow.  And I think at this

24    point, it's unlikely that we'll have a summary chart.  We just

25    wanted to make sure to raise the issue.

1          THE COURT:  All right.  Any summary charts have to be

2     turned over by the end of business on Monday, the 1st of

3     February, so that they can review them.

4          MS. SAWYER:  Thank you, your Honor.

5          THE COURT:  All right.  So then the motion to admit

6     certain convictions.

7          So what are Mr. Key's convictions?

8          MS. SAWYER:  He has an armed robbery conviction.

9          THE COURT:  Is it Key or Keys?

10         MS. WINSLOW:  Key.

11         THE COURT:  Key.  Okay.  So what are Mr. Key's --

12     armed robbery?  From what year?

13         MS. SAWYER:  The conviction itself is from 2004,

14     September 2004.

15         THE COURT:  What was his sentence?

16         MS. SAWYER:  He was released from custody on May 13th,

17     2008.

18         THE COURT:  Okay.  Are you objecting to that being put

19     in?

20         MS. WINSLOW:  Not if he testifies, Judge.

21         THE COURT:  Okay.  All right.  So that -- that falls

22     within the rules, so if he testifies, you can cross with it.

23         All right.  Let's look to the defendant's motions *in*

24     *limine*.

25         The first one is the motion for disclosure of

```
 1    evidence.

 2              I know that I have at my desk here the one that I need

 3    to rely on -- I mean to rule on, which is the one regarding the

 4    Crayton grand jury testimony.  I'm working on that.

 5              But here you're asking for some other information

 6    about the Wisconsin charge?

 7              MS. WINSLOW:  Well, Judge, I think we've resolved that

 8    or it will be resolved when I present the evidence to your

 9    Honor.  If there's -- and I actually am not seeking any

10    additional information about that charge.  I wouldn't go into

11    the facts of the case anyway.

12              THE COURT:  Okay.

13              MS. WINSLOW:  The question -- pardon me.

14              THE COURT:  I'm just going to make sure that the

15    government acknowledges on the record its understanding that it

16    has the obligation to turn over on an ongoing basis any

17    impeachment evidence of a government witness.

18              MS. SAWYER:  Certainly, your Honor.

19              THE COURT:  Okay.  Go ahead.

20              MS. WINSLOW:  The second issue or the next issue was

21    the motion to bar post-arrest statements by Mr. Key.  That was

22    the issue we really addressed yesterday in the evidentiary

23    hearing.

24              THE COURT:  Yeah, right, which I have to deal with.

25              All right.  The motion to bar admissions of recorded
```

1    statement by AD.

2         MS. SAWYER:  I think we've addressed that in part,

3    your Honor.  That's the prior consistent statement issue or to

4    the extent that it's used for impeachment.

5         THE COURT:  So you don't want him to play it on the

6    case-in-chief.

7         MS. WINSLOW:  That's correct.

8         THE COURT:  So she has to testify.  If she's crossed,

9    you can use it to -- she can use it to rehabilitate under the

10   rule if she's crossed on a particular area, just the way you

11   would with a recorded statement.

12        MS. WINSLOW:  That's correct.

13        THE COURT:  Okay.

14        MS. SAWYER:  And we have no intent to offer it in our

15   case-in-chief, your Honor, aside obviously from refreshing

16   recollection or impeaching.

17        THE COURT:  All right.  So under those parameters, it

18   will be not admitted as a piece of evidence.

19         That's the end of my motions other than the ones that

20   I have pending, which is the motion to admit the cell phone,

21   which is kind of the flip-side of the motion to suppress all

22   the evidence from the room, and the newly obtained evidence

23   from yesterday regarding the cell phones, the motion for me to

24   withdraw my previous ruling based upon a violation of the

25   alleged *Brady* rule -- or the alleged violation of the *Brady*

1   rule, and then the motion to bar the statement.  And all of

2   those are pending with me.

3          Anything else as far as motions for the trial?

4          MS. SAWYER:  If I could just highlight, and this is

5   part and parcel probably of the Court's 404(b) analysis, but we

6   did submit that exhibit binder containing the backpage ads and

7   accompanying invoices that we would seek to admit.

8          It is now very clear, both based on defendant's

9   pleadings and statements of counsel and Court, that the

10  defendant is going to seek to argue at trial that he was not

11  the one that posted these ads, that either Ms. Crayton or the

12  victim herself posted these ads.  Those ads contain -- the

13  invoices and the ads taken collectively contain very compelling

14  identity evidence to show that it was, in fact, the defendant.

15  That is the common thread --

16         THE COURT:  Are you moving to keep it out?

17         MS. WINSLOW:  Here's the issue with that, Judge.  I

18  believe that the government intends to show that the e-mails of

19  the person who posted certain ads refer back to Mr. Key, the

20  telephone numbers or prepaid credit cards, but I think the

21  government has yet to complete that circle, if I may, that it

22  has yet to show that the e-mail address belongs to Mr. Key or

23  that he was the only person who accessed that.

24         So if the government wants to introduce that evidence,

25  I think that before it does that, it's going to have a burden

1    to prove that you can actually count those ads back to Mr. Key

2    and Mr. Key alone.

3              THE COURT:  Well, hold on a second.

4              So the evidence comprises the ads itself, which are

5    the ads that someone will lay the foundation, primarily the

6    victim, that he posted these of me.  Correct?

7              MS. WINSLOW:  If -- I think these are additional ads,

8    these are other ads that the government --

9              THE COURT:  Oh, I see.

10             MS. WINSLOW:  -- referring to other individuals.

11             If it's the person who is on the stand, that's one

12   issue.  I mean, that's direct evidence.  But if we're talking

13   about other people, historical evidence, then, again, we're

14   getting into this whole pattern question.  And, again, the

15   government is going to have to tie Mr. Key directly.

16             THE COURT:  Well, it comes into the 404(b) analysis.

17             MS. WINSLOW:  It does.

18             MS. SAWYER:  And I would submit, your Honor -- and we

19   can talk about sort of how this would work -- but it is very

20   clearly offered to rebut the defendant's assertion that he

21   didn't post these things.

22             And just to make this clear, there are I believe in

23   that binder a total of 14 ads, and behind each ad is the

24   invoice history for those ads, so each time it's posted -- I'm

25   sure the Court already knows this -- each time it's posted,

1    there's an invoice generated.

2            I think the first two are of the victim.  Then there

3    are a number that are of Ms. Crayton.  Then there are a couple

4    that are of Nikki.  And then there are two, 13 and 14, that are

5    of two other women.  And what is -- what -- what binds all of

6    them is that they've all got common characteristics.  The

7    customer -- the customer name is Juan King.  It's a slight

8    variation of the defendant's real address.  On one or two of

9    the invoices for earlier ads, the phone number is actually the

10   phone number of the defendant, a phone number that he provided

11   for a landline during an interview to FBI agents.  There's --

12   the name that's contained in the e-mail is a nickname that the

13   defendant went by.  And so all of these things show that the

14   same person is posting these things.  And so to the extent the

15   defendant is arguing it wasn't me, it was Victim 1 or it was

16   Ms. Crayton, well, there are ads that pre-date those people

17   that contain the same characteristics, which would directly

18   rebut that assertion, and that the victim wasn't with you when

19   these were posted and they contain the same characteristics.

20   And so that's the government's argument.

21           THE COURT:  And when -- and who is going to put them

22   in?  The agent who issued the subpoena?

23           MS. SAWYER:  We can do it that way.  We've got a

24   backpage custodian.  There's also a document certification

25   under 902(11) for the backpage ads.

1          THE COURT:  Okay.  So are you going to put the ads in

2     for the victim and for Ms. Crayton through those two

3     individuals?

4          MS. SAWYER:  Well, in theory, we can move them all in

5     under 902(11) with the certification, that's where we got them

6     from.  We can move them in through the agent.  Logistically, it

7     could be done a number of ways.  I think it's probably --

8          THE COURT:  I think it depends on a few things.  I

9     think it depends on my 404(b) ruling first, and then it also

10    depends upon what she does during trial, which would allow you

11    to put them in based upon the cross-examination of other

12    individuals, or if there's a defense case and we do a rebuttal.

13         So -- and it may be that part of them are and part of

14    them are not admitted in the case-in-chief, depending upon that

15    ruling, so I need to look at all of it together.

16         And you gave them to me in the binder?

17         MS. SAWYER:  There's a binder, yes, your Honor.

18         THE COURT:  All right.  I'll take a look at them then

19    and especially when I look at the 404(b).

20         I'm thinking we might need to have a reconvening of

21    this conference next week so that we can hammer out the

22    parameters of all of this evidence prior to trial the Monday

23    after, so let's -- I'll look at my calendar in a minute.

24         Other than that, as far as evidence, are there any

25    objections on witnesses?

1          MS. WINSLOW:  I don't have a witness list yet.

2          MS. SAWYER:  I do have a tentative witness list for

3     the Court and counsel.

4          MS. WINSLOW:  I doubt it, Judge.  We've had some

5     discussions, and I doubt there are.

6          THE COURT:  Okay.  And what about jury instructions?

7     Where are my jury instructions?  Did you propose them?

8          MS. SAWYER:  We did file proposed jury instructions,

9     your Honor.

10         THE COURT:  And did you file some?

11         MS. WINSLOW:  No, I haven't.  But your Honor earlier

12    suggested that the government's really substantive jury

13    instructions are going to need some adjustment, and so it

14    strikes me that perhaps that before we go through the jury

15    instructions specifically, that's something that should be

16    done.

17         In large part, the jury instructions are not

18    controversial.  They're mostly the pattern jury instructions.

19    But the significant jury instructions that we will have an

20    issue with will be the offense instruction, and I don't think

21    we really have that yet.

22         THE COURT:  Okay.  Where is your proposed jury

23    instructions?

24         MS. WINSLOW:  I -- as I said, they're largely pattern,

25    so -- and other than I may have a theory of the case

1    instruction, and if your Honor's practice is to have me submit

2    that prior to trial --

3            THE COURT:  Only if you have a proposed instruction

4    that is not one of theirs for me to review.

5            MS. WINSLOW:  I do not, Judge.

6            THE COURT:  Then let's go through these now.

7            MS. SAWYER:  Your Honor, if I may, I can hand up to

8    the Court a copy of our exhibit -- or, I'm sorry, our witness

9    list --

10           THE COURT:  Okay.

11           MS. SAWYER:  -- if that's helpful.

12       (Tendered.)

13           THE COURT:  All right.  So the first instruction is

14   the members of the jury instruction.

15           I assume there's no objection to that?

16           MS. WINSLOW:  None.

17           THE COURT:  And then the second is the document is

18   called an indictment.

19           No objection?

20           MS. WINSLOW:  No objection.

21           THE COURT:  Okay.  Presumed innocent.

22           I assume there's no objection.

23           MS. WINSLOW:  No, there is not.

24           THE COURT:  Okay.  And then Number 4 is based upon the

25   evidence, and there's a bracketed area for stipulations.

1          Will you have stipulations?

2          MS. WINSLOW:  It's my understanding Mr. Key does not

3     wish to stipulate to evidence.

4          THE COURT:  Okay.  So I'll remove the language

5     regarding stipulations.

6          Okay.  The next is the common sense instruction.

7          No objection?

8          MS. WINSLOW:  No objection.

9          THE COURT:  Direct and circumstantial is Number 6.

10         MS. WINSLOW:  No objection.

11         THE COURT:  Making your decision on the number of

12     witnesses.

13         MS. WINSLOW:  The bracketed information obviously will

14     be subject to what happens at trial, but no objection in

15     general.

16         THE COURT:  Okay.  And then do you have some sense of

17     whether your client intends to testify today?

18         MS. WINSLOW:  It's my sense that he will not, but I

19     cannot make that representation --

20         THE COURT:  Okay.  We'll keep it in for now and we'll

21     go from there.  Okay?

22         The factors that the jury can include regarding

23     credibility.

24         Any objection?

25         MS. WINSLOW:  No.

```
 1              THE COURT:  Okay.  And attorneys interviewing
 2   witnesses?
 3              MS. WINSLOW:  No.  No objection.
 4              THE COURT:  We don't know whether we'll have
 5   inconsistent statements, so we'll keep that in for now.
 6              Same with 12.  We'll keep those in until we hear what
 7   happens.
 8              But we are going to have someone who was convicted of
 9   a crime testify, so Number 13 should be in, right?
10              MS. WINSLOW:  Yes.
11              THE COURT:  Number 14 -- well, that depends on my
12   ruling.
13              15?
14              MS. WINSLOW:  I believe that also depends on your
15   ruling.
16              THE COURT:  Depends on the 404(b).
17              16.  Are we going to have 702 testimony?  Cell site
18   analysis.
19              MS. SAWYER:  We do expect at this point, your Honor,
20   yes.
21              MS. WINSLOW:  No objection.
22              THE COURT:  Okay.  16 is in.
23              Recorded conversations.
24              MS. WINSLOW:  I'm not sure there's a recorded
25   conversation.  If there is, it would probably be the
```

1    defendant's statement is my guess.  There may also be

2    impeachment or rehabilitation with, as we discussed earlier,

3    with the interviews between the FBI and the Romeoville Police

4    Department.

5           I do have a draft transcript of the interview of

6    Mr. Key.  I don't have any other draft transcripts.

7           THE COURT:  Okay.  So if we do use that, then you

8    probably don't object that what they hear is more important

9    than what the transcript says.

10           MS. WINSLOW:  Absolutely not.

11           THE COURT:  All right.  So let's keep that one under

12    advisement as well.

13           Same with the omitted non-pertinent conversations.

14    Let's just see what happens with what you put in.  Okay?

15           Summaries we intend to use, so do you have any

16    objection to that?

17           MS. WINSLOW:  No, I don't.

18           THE COURT:  Okay.  Note -- the note-taking?

19           MS. WINSLOW:  No objection.

20           THE COURT:  Okay.  The timing of events?

21           MS. WINSLOW:  No objection.

22           THE COURT:  The punishment of the defendant?

23           MS. WINSLOW:  No objection.

24           THE COURT:  Okay.  This is the elements?

25           MS. SAWYER:  This is the one that will need some

1    revision, your Honor.

2            THE COURT:  Right, because it's -- it can't be -- you

3    don't have a crime for prostitution in Illinois under -- since

4    2010, I'm pretty sure, so you have to make a call on that.  Go

5    back and rework that one.

6            MS. WINSLOW:  I think the same issue is presented in

7    25 -- or 23A.

8            THE COURT:  All right.  I'll let you guys look at

9    those.

10           The knowing instruction?

11           MS. WINSLOW:  No objection.

12           THE COURT:  Transportation in interstate commerce.

13   Objection?

14           MS. WINSLOW:  No objection.

15           THE COURT:  No objection?

16           Prostitution?

17           MS. WINSLOW:  Should that one be amended as well?

18           THE COURT:  Yes.  This to me is where you add the

19   subsets of what his crime is.

20           So, like, in a Mann Act case where you're moving --

21   or, like, in a trafficking case where you're moving an adult,

22   you might define "prostitution" or "commercial sex act."  I

23   think that needs to be cleaned up.

24           Okay.  The sole purpose of the travel?

25           MS. WINSLOW:  I don't have an objection to the sole

1    purpose, but I think this instruction should be amended so that

2    it's consistent with the other instructions that the government

3    is looking at so --

4              THE COURT:  Yeah, I think it's probably accurate, even

5    with whatever amendment they come with, but let's hold on to it

6    for you to object later.

7              Consent or voluntary participation not a defense?

8              MS. WINSLOW:  Again, I don't have an objection to it;

9    but at this point, it needs to be similarly modified --

10             THE COURT:  Okay.

11             MS. WINSLOW:  -- because it does discuss prostitution.

12             And I will say when the government is amending its

13   instructions, I am going to have an objection overall to having

14   AD referred to as Victim 1.  I think that language is

15   inappropriate in a jury instruction.

16             THE COURT:  Well, it suggests there's other victims,

17   so I agree with you on that.  So if you want to just say her

18   initials or you can say, you know -- whatever other moniker it

19   can be.  But Victim 1 suggests more than one victim, so it's

20   prejudicial.

21             MS. WINSLOW:  And I would just propose AD.

22             MS. SAWYER:  Your Honor, can I just ask one question

23   here --

24             THE COURT:  Sure.

25             MS. SAWYER:  -- that I think I forgot to ask the

1    Court.  And we wanted to seek defense counsel's agreement on

2    sort of a collective way to refer to the victim.  I don't know

3    what this Court's practice is, if it's to use just a first

4    name, which we're happy to do, and we can all agree on using --

5            THE COURT:  It doesn't matter to me.  I've used a

6    number of different ways, both in practice as a trial lawyer

7    and as a judge.  It doesn't matter to me.

8            MS. WINSLOW:  "April" is easier to say than "AD."

9            MS. SAWYER:  I think that's easier than the initials,

10   so if that's satisfactory to everyone --

11           THE COURT:  Fine with me.

12           So it raises the issue, I didn't receive a 3509

13   protective order I don't believe on the docket.  And you're

14   required to do so based upon the child's rights.

15           And so throughout the course of the trial, you need to

16   make sure that her name is not released on the public record.

17   And all of the court documents, if you do use her name, have to

18   be redacted.  So only those -- if they're with her name, they

19   have to be filed under seal, and then a redacted one should be

20   filed.

21           So usually you enter into just a protective order for

22   that purpose, and 18 U.S.C. 3509 are the requirements there for

23   you to do so.  And it also includes obligations by the

24   prosecutor's office, and actually everyone that is exposed to

25   any of her statements or interviews, et cetera, gives you

1  timelines for the destruction of certain videotapes, and the

2  protective order makes sure that you're following your

3  obligations under that, so you should throw one together and

4  send it up to me.

5         But I don't think you have the same complications

6  since you have a one-count indictment.  It shouldn't be too

7  difficult for us to take care of this quickly.

8         MS. WINSLOW:  That's correct.

9         MS. SAWYER:  Yes, your Honor.

10         THE COURT:  The *Silvern* instruction.

11         Any objection?

12         MS. WINSLOW:  No, your Honor.

13         THE COURT:  Okay.  Objection about sending me a

14  message?

15         MS. WINSLOW:  No objection.

16         THE COURT:  And then the verdict form instruction?

17         MS. WINSLOW:  To the extent that the -- no objection

18  to the verdict form instruction.  An objection to the verdict

19  form.

20         THE COURT:  Okay.  I haven't gotten there yet.

21         And then -- oh, this is actually the *Silvern*

22  instruction.  Excuse me.

23         MS. WINSLOW:  Yes, that's why I was confused.

24         THE COURT:  Oh, okay.  I wondered why you paused.

25         MS. WINSLOW:  Yes.

1          THE COURT:  Okay.  So you had no objection to the

2  previous one about their role as -- in deliberating.

3          And you also don't have an objection to the *Silvern*

4  instruction.

5          MS. WINSLOW:  That is correct, Judge.

6          THE COURT:  All right.  Thank you.

7          All right.  So do you want to flip the not guilty?  Is

8  that what you want to do?

9          MS. WINSLOW:  Yep.

10         THE COURT:  Okay.  I don't care.  I will do that.

11         MS. WINSLOW:  It is the default position.

12         THE COURT:  All right.  I'm going to require that the

13  government provide me with the updated jury instructions by

14  February 3rd.

15         And then I'd like to see all of you again on February

16  4th at 10:00 a.m. for a continuation of the final pretrial

17  conference where -- you will probably have a number of minute

18  orders giving you rulings on things as I work on them

19  throughout the next few days, but then we can address these

20  jury instructions, and we can also address whatever final

21  issues that we might have before the trial.  Okay?

22         All right.  Anything else from anyone on the trial?

23  Any questions?

24         MS. WINSLOW:  No.

25         THE COURT:  Okay.

1          MS. SAWYER:  I assume the Court would have said this,

2     but the Court sits on Fridays?

3          THE COURT:  I do sit, but I don't have a call on

4     Friday.  I don't have a motion call on Friday.  But I don't

5     have -- oh, you mean for the trial?

6          MS. SAWYER:  Yes, your Honor.

7          THE COURT:  Oh, yes.  Every day.  Yeah.  Which means

8     it's actually a longer trial day because you start at 9:00.

9          MS. WINSLOW:  That's fine.

10          There's only one other matter, and it's really just a

11     housekeeping matter.  I had motioned the motion to strike up

12     for tomorrow morning, because that was the Court's motion.  I

13     just want to make sure it's not on the calendar --

14          THE COURT:  It's not -- we won't -- will keep it off

15     the calendar.

16          That's the motion to strike the statement?

17          MS. WINSLOW:  The previous order based on the --

18          THE COURT:  My order on the suppression hearing.

19          MS. WINSLOW:  That's correct.

20          THE COURT:  Got it.  Okay.

21          MS. WINSLOW:  Just to make sure it doesn't show up on

22     the calendar.

23          THE COURT:  It doesn't -- you don't need to appear on

24     that.

25          Anything else?

1          MS. SAWYER:  No, your Honor.

2          And we'll provide the Court with Ms. Crayton's

3   statement that it has requested today.

4          THE COURT:  All right.  Great.  Thanks very much.

5   Have a good day.

6          MS. SAWYER:  Thank you, your Honor.

7          LAW CLERK:  All rise.  The court is in recess.

8      (Proceedings concluded at 11:30 a.m.)

9                   C E R T I F I C A T E

10      I certify that the foregoing is a correct transcript of the

11   record of proceedings in the above-entitled matter.

12

13

    _/s/ GAYLE A. McGUIGAN_____        _August 25, 2016_
14   Gayle A. McGuigan, CSR, RMR, CRR                  Date
    Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25