# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|                          |   |                            |
|--------------------------|---|----------------------------|
| UNITED STATES            | ) |                            |
|                          | ) | No. 13 CR 726              |
| v.                       | ) |                            |
|                          | ) | Judge Virginia M. Kendall  |
| DAJUAN KEY               | ) |                            |

## MEMORANDUM OPINION AND ORDER

On October 8, 2013, a special grand jury returned a one-count indictment against Defendant DaJuan Key, charging him with knowingly transporting a minor in interstate commerce with the intent that the minor engage in prostitution in violation of 18 U.S.C. § 2423(a). (Dkt. No. 16). On September 10, 2014, Key moved to suppress evidence acquired from warrantless searches of his motel room and rental car. (*See* Dkt. Nos. 47, 48). The Court held a suppression hearing to resolve these issues and entered an order denying Key's motion to suppress evidence recovered from his rental car and granting in part his motion to suppress evidence recovered from his motel room. (Dkt. No. 99). Specifically, the Court suppressed cellphones and a notebook recovered from the motel room and admitted prepaid credit cards, a computer tablet, and cash. (*See id.*)

The Government, recognizing its errors from the first hearing, in that it had failed to present evidence regarding the cell phones and notebook, moved this Court to reconsider its suppression of Key's cell phone and reopen the hearing for supplemental testimony and evidence. (Dkt. No. 107). Key, meanwhile, moved to suppress his post-arrest statements despite having missed the deadline for filing of pretrial motions by nearly a year. (Dkt. No. 104). On January 22, 2016, in the interest of justice, the Court exercised its discretion and granted both parties' requests to consider suppression issues that each had failed to raise and ordered a hearing

on both issues to be held on January 26, 2016. (Dkt. No. 117). Also on January 22, 2016, Key filed a motion to strike the Court's previous order on suppression in light of an alleged violation of the Government's *Brady* obligations. (Dkt. No. 118). On February 5, 2016, the Court denied Key's Motion to Strike based on the alleged *Brady* violation, *see* Dkt. No. 144; and, after careful consideration of the evidence presented at the second suppression hearing, the Court vacated its previous order suppressing Key's cellphone and granted Key's motion to suppress all of his post-arrest statements, *see* Dkt. No. 145.

As part of its order regarding the suppression issues, the Court found the testimony of Special Agent Carrie Landau inconsistent with other evidence presented by the Government, including video of Key and law enforcement in a holding cell area prior to Key making his post-arrest statement as well as video of his statement. The Government moved the Court to "clarify" its order, *see* Dkt. No. 149, which resulted in a post-trial credibility hearing at which the Court heard additional evidence that had not been presented at the second suppression hearing. After carefully reviewing the transcript of the first hearing on the Motion to Suppress, the second hearing on the Motion to Suppress, the videotape of the cell block area, the audiotape, and the transcript from the third hearing regarding the agent's credibility, the Court withdrew p. 14 (starting at line 4) to p. 26 of its opinion dated 2/5/16 [145]. (Dkt. No. 169).

Key, meanwhile, following a four-day jury trial, was convicted on the sole count of the Indictment on February 11, 2016. (*See* Dkt. No. 158). About a month later, Key—through counsel—filed a motion for acquittal under Federal Rule of Criminal Procedure 29(b) or, alternatively, a new trial under Federal Rule of Criminal Procedure 33(a), arguing that the Court erred in a number of its decisions regarding suppression, jury instructions, and other evidentiary matters. (*See* Dkt. No. 167). Key, *pro se*, then filed a supplemental motion for judgment of

acquittal [173], as well as a motion to reconsider the motion to suppress [174], and a motion for reconsideration of the motion to dismiss the indictment [171]—though he quickly withdrew the last motion. The Court held a status hearing on April 27, 2016. Key requested to proceed *pro se* and after the Court questioned Key, thoroughly advised him of his rights, and found that he knowingly and voluntarily waived his right to have an attorney, the Court allowed Key's second appointed defense counsel to withdraw and allowed Key to proceed *pro se* and informed him that he would not be entitled to a third appointed attorney. (Dkt. No. 181). The Court now considers the motion for acquittal or new trial filed by Key's prior counsel [167]; Key's *pro se* supplemental motion for judgment of acquittal [173]; and Key's *pro se* motion to reconsider the motion to suppress [174]. For the following reasons, all three of these motions are denied.

### I. The Record Contains Ample Evidence to Support the Jury's Verdict

A motion for judgment of acquittal challenges the sufficiency of the evidence against a defendant. *See* Fed. R. Crim. P. 29. Key faces "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to convict him on any of the charged counts. *See United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (citing *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014)). Once the Defendant is convicted, the Court reviews the evidence presented to the jury in the light most favorable to the Government and makes all reasonable inferences in the Government's favor. *See United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014) (citing *United States v. Larkins*, 83 F.3d 162, 165 (7th Cir. 1996)). The Court may overturn the jury's guilty verdict "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (quoting *United States v. Stevenson*, 680 F.3d 854, 855-56 (7th Cir. 2012)).

Key was convicted of knowingly transporting a minor across state lines with the intent that the minor engage in prostitution in violation of 18 U.S.C. § 2423(a). Though the briefs submitted by prior defense counsel and Key do not identify what they think was insufficient about the evidence presented by the Government at trial, prior counsel argued in her oral motion for acquittal following the close of the Government's case that the Government failed to prove the "specific intent on Mr. Key's part to have April engage in an act of prostitution after either trip from Wisconsin to Illinois." (Trial Tr. 447). Specifically, she submitted that there was no temporal proximity between Key's sending of a text message stating that he "need[ed] another girl" and his transportation of April from Wisconsin, nor was there evidence that Key mentioned prostitution to April prior to her arrival in Romeoville. (*See id*. at 450-51). Neither argument warrants overturning the jury's verdict.

The Government presented overwhelming evidence of Key's specific intent. The factual story was presented through the testimony of a minor victim named April and another young woman, Dache Crayton, who were both prostituted by Key. Crayton testified that on September 6, 2013, Key was looking on backpage.com "to see if he can get some girls over there." (*Id*. 225). Crayton stated that she saw Key looking on his computer tablet at an ad with a girl (later identified as April) from Wisconsin and that he spoke on the phone with that girl "a few times." (*Id*. 226-27). She further testified that Key went to pick the girl up from Wisconsin on September 8th or 9th and returned with her to Crayton's hotel room later that same day. (*Id*. 227-28). Key and April left Crayton's room about ten minutes later, though he subsequently returned to get lingerie and the computer tablet so that he could post April on backpage.com. (*Id*. 231-233). Crayton also testified that Key told her that April did not know she was going to be brought to Illinois from Wisconsin. (*Id*. 232).

The minor victim, April, testified similarly. She stated that around September 6, 2013, Key contacted her on her cellphone based on a backpage.com advertisement that had been posted of her. (*Id*. 123-24). According to April, backpage.com was for advertising sex in exchange for money and she did not receive calls from backpage.com that were not related to sex. (*Id*. 128). On September 8, 2013, Key requested a photo of April and she texted him one. (*Id*. 129-130). They discussed meeting and Key told April that he was in Chicago at the time. (*Id*. 130). Later that day, on September 8, 2013, Key went to meet April in Madison. (*Id*. 131-32). April was at a friend's house when Key arrived. (*Id*. 132).

At some point on the 8th, Key and April left April's friend's house together in his rental car. (*Id*. 133). Key told April that he was taking her to Milwaukee to pick-up his brother and sister and that he would take her home. (*Id*.) April only realized she was not going to Milwaukee when she saw the signs heading toward Chicago. (*Id*. 134). April had no money or way to get home to Madison. (*Id*. 134-35). The two eventually arrived at a Super 8 hotel in Romeoville, Illinois late on the night of September 8, 2013. (*Id*. 136-37; 215).

Once there, April testified that she told Key that she wanted him to take her home and that she was upset he had taken her there. (*Id*. 137). Key brought her into the motel to meet Crayton. (*Id*. 138). Crayton handed Key some money and told them that she "had someone coming to meet her;" Key and April left the room. (*Id*. 140). April further testified that Key told her that Crayton "did the same thing [she] did" (*i.e.*, posted advertisements on backpage.com to prostitute, according to April). (*Id*. 141). April told him that she wanted to go home and Key said that he would take her home the next day. (*Id*. 142). He told her that he had rented her a room. (Trial Tr. 143). April told him that she had not agreed to stay at the motel, though she eventually

agreed to stay in the room since she was in the middle of nowhere, had no money, and could not call anyone. (*Id*.)

Key and April entered the second motel room and Key said they were going to take some pictures to put on backpage.com. (*Id*. 143-44). Despite April's statements that she wanted Key to take her home, he insisted on the photographs. (*Id*. 145). Key told April to put on lingerie and he showed her how to pose; he then photographed her on his computer tablet. (*Id*. 145-46). Key told April that he used the name Lola for her in the backpage.com advertisement. (*Id*. 149).

April began receiving calls once the ad was posted. (*Id*. 150). At first, she did not answer the calls; then, Key told her that she needed to start taking them and to tell people there was a hundred dollar special. (*Id*.) April took her first "client" from backpage.com the night she began taking the calls. (*Id*. 151-153). April and Crayton testified that April went on three "dates" and made about $300 during the days they were all together in Romeoville. (*Id*. 236-37). April also testified that Key bought her tampons and soft cups. (*Id*. 166-67). April said that she had never seen soft cups before and that Key told her that they were used "so you could have sex while you was on your period." (*Id*. 167).

In addition to this testimony, the Government provided corroborating evidence, including a text message sent on September 6, 2013 from Key's cellphone to a woman named Nikki that read, "I need you I got to many calls and only one girl," *see* Dkt. No. 167, 6-7; Ex. 44; printouts of the advertisements of April that were posted on backpage.com; text messages between Key and April as well as between April and friends from home; the email address that created the advertisements; motel records; a surveillance video of April and Key buying the soft cups at a drug store, and photographs of April extracted from the computer tablet all of which corroborated the testimony of April and Crayton. Viewing the evidence in the light most

favorable to the Government, there was more than enough evidence from which a reasonable jury could find that Key had the specific intent to transport April for the purpose that she engage in prostitution. Key was looking at advertisements on backpage.com to find other girls; went to Wisconsin to pick April up just days after conveying to both Crayton and Nikki that he was looking for other girls; and he brought April directly from Wisconsin to a motel in Romeoville where prostitution was taking place. Within hours of their arrival in Romeoville, Key had rented April a room; given her lingerie; shown her how to pose; taken pictures of her to post an advertisement of her on backpage.com; and in fact created an advertisement of her on backpage.com. April completed sex acts in exchange for money and provided all of that money directly to Key. Key, moreover, provided April all of her needs, including food, shelter, and tampons because she did not have any money to provide for herself. He also provided her with soft cups—which April testified she had never seen before—so that she could have sex while on her period.

Whether April and Crayton, the two witnesses that provided the bulk of the testimony regarding Key's specific intent, were truth-tellers was a determination to be made by the jury. *See United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008) ("It is up to the jury to weigh the evidence and determine the credibility of the witnesses; [courts do] not second-guess the jury's assessment of the evidence."); *see also Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("Rather, credibility questions are within the province of the trier of fact, in this case a jury."); *Hasham v. Ca. State Bd. of Equalization*, 200 F.3d 1035, 1047 (7th Cir. 2000) ("We will not second-guess a jury on credibility issues."). The jury credited their testimony or relied on the corroborating evidence to find Key guilty beyond a reasonable doubt. Key's motion for a judgment of acquittal is denied.

The Court also notes that Key, in his *pro se* Supplemental Motion for Judgment of Acquittal, also argues extensively that the Government "failed to prove that a state law was 'actually violated or that the defendant attempted or intended to bring about a violation of state law." (*See* Dkt. No. 173, 3-4). The Government did not, however, charge Key with the prong of Section 2423(a) related to a violation of state law. Section 2423(a) reads:

> A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2423(a). The Government charged the first prong of this Section, which relates to prostitution: not the second prong related to "any sexual activity for which any person can be charged with a criminal offense." "Prostitution" for purposes of the charged conduct is defined in the commentary of the Seventh Circuit Pattern Jury Instructions as "knowingly engaging in or offering to engage in a sexual act in exchange for money or other valuable consideration." *Pattern Criminal Jury Instructions of the Seventh Circuit* 2423(a) (2012). Key's arguments involving Illinois laws are irrelevant to the charged conduct and do not warrant a new trial or judgment of acquittal.

## II. A New Trial is Not Warranted Because The Court Did Not Err

Rule 33(a) of the Federal Rules of Criminal Procedure states that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." *See also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). Unlike in evaluating a motion for acquittal under Rule 29, the Court is not required to view the evidence in the light most favorable to the Government in ruling on a motion for a new trial under Rule 33. *United States v. Washington*, 184 F.3d 653,

657 (7th Cir. 1999); 58 Am. Jur. 2d New Trial § 391(2001). "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (" '[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.' ") (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989))), overruled on other grounds, 546 U.S. 12 (2005). Despite the more lenient standard, however, Rule 33 motions are disfavored and courts should generally only grant them in "the most extreme cases." *See United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998); *see also United States v. Kamel*, 965 F.2d 484, 490 n. 7 (7th Cir. 1992). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (citations omitted). Key and his prior counsel present a number of arguments in support of their motions seeking new trial; none of which has merit.

### A. Jury Instruction Regarding Consent

Key argues that the Court erred in instructing the jury that April's consent to engage in prostitution was irrelevant because it was not a clarifying instruction for any defense presented by Key and therefore confused the jury. (*See* Dkt. No. 167, 1-2). At trial, the Court instructed the jury that:

> Whether or not April consented to being transported or to traveling in interstate commerce for the purpose of prostitution, or otherwise voluntarily participated, is irrelevant. The consent or voluntary participation of April to travel to engage in prostitution is not a defense to the charges.

In determining whether errors in the jury instructions warrant a new trial, the Court considers "whether, taken as a whole, they correctly and completely informed the jury of the applicable

law." *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). A new trial is only warranted where the instructions "misstate the law or fail to convey the relevant legal principles in full and when those shortcomings confuse or mislead the jury and prejudice the objecting litigant." *Id.* In determining whether the jury instructions adequately informed the jury of the applicable law, the Court must consider the instructions in their entirety rather than in isolation. *See Alcala v. Emhart Indus., Inc.*, 495 F.3d 360, 363 (7th Cir. 2007).

The instruction at issue is an accurate statement of the law. *See United States v. Jones*, 808 F.2d 561 (7th Cir. 1986); *see also United States v. Bennett*, 258 F. App'x 671, 683 (5th Cir. 2007) ("…consent is irrelevant to a conviction under § 2423(a). Indeed, the very purpose for enactment of the Mann Act was to address situations where the victim consented to the exploitation."). Indeed, Key agrees that consent is not a defense under the Mann Act, *see* Dkt. No. 167, 1; instead arguing that he never asserted consent as a defense and that any evidence regarding April's independence from him is a "far cry from asserting a non-existent defense that April consented to engage in prostitution." (*See* Dkt. No. 167, 2).

Key may not have expressly asserted consent as a defense, but April was subject to cross-examination regarding whether she willingly went on the trips to Romeoville from Wisconsin and whether she really did want to go home. Other portions of the cross-examination similarly explored her independence from Key and her control over her own decisions. For example, April testified under cross-examination that she took calls to arrange sex-for-money exchanges on her personal cellphone while in Romeoville; that Key never attempted to take her cell phone; that when a "client" would arrive at April's room, Key would leave; and that on an occasion where a client banged on the hotel room door and April instructed Key not to answer it, he did not answer it.

Key argues this evidence was elicited to demonstrate that it was not Key, but April who was in charge of her own actions. He insists that the instruction "could only serve to confuse the jury and undermine Mr. Key's position that April controlled her own behavior…" (*See* Dkt. No. 167, 2). This is a careful distinction that the Court advised Key during the jury instructions conference he was allowed to argue; however, the instruction regarding consent was still necessary to not confuse the jury about April's voluntariness. Rather than confuse or mislead the jury, this instruction provided clarity as to how the jury could properly consider this evidence that tended to illustrate April's independence. Key was not prejudiced by this clarification, especially in light of the other jury instructions—including the elements instruction. No error was made in instructing the jury regarding consent.

## B. Alleged *Brady* Violation

Next, Key argues that the Court should have suppressed evidence recovered from his motel room because the Government failed to disclose favorable grand jury testimony prior to the first suppression hearing in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). One of the issues considered at the first suppression hearing was whether Key consented to law enforcement's entry into his motel room. At the hearing, three law enforcement witnesses testified consistently that Key responded to their knock at the motel room door and voluntarily allowed them into the room. (Suppr. Tr. 120). Dache Crayton, who was with Key in the motel room at the time of the officers' entry, testified that the officers entered the room without knocking or being invited. (*Id*.) In granting the motion to suppress in part, admitting only the prepaid credit cards, cash, and tablet recovered from Key's motel room, the Court credited the officers' testimony regarding their entry into the room and found that the Key voluntarily consented to their entry.

After the Court issued its order on these preliminary suppression issues on December 30, 2015, the Government tendered a transcript of Dache Crayton's testimony before the Grand Jury from October 1, 2013 to the Defendant. (*See* Dkt. No. 118, 2-3). According to the transcript, Crayton testified before the Grand Jury that:

> After talking to Marie, I left the McDonald's and went back to our hotel room at the Super 8 where Amillie was waiting. We were each laying on one of the beds when the police arrived at the room. They placed Amillie under arrest and I went with another police officer.

(GJ Crayton, 15-16). The Defendant moved to strike the Court's suppression order, arguing that this withheld testimony was consistent with Crayton's testimony at the suppression hearing and could have been used as a prior consistent statement to rehabilitate her. (*See* Dkt. No. 118, 3).

In evaluating Key's Motion to Strike, the Court correctly found that no *Brady* violation occurred because: (1) the evidence was not "suppressed" for purposes of *Brady* because the same information contained in the grand jury transcript was provided to Key in the summary of an interview with Crayton prior to the first suppression hearing; (2) the statement was consistent with her testimony and therefore did not constitute *Brady* material; and (3) the evidence was not "material" because there was no reasonable probability that the suppression hearing would have turned out differently had Key been provided Crayton's grand jury testimony ahead of time. The Court found that all three officers' testified consistently regarding their entry into Key's motel room and the reports corroborated the same. Moreover, Crayton's grand jury testimony did not actually contradict the officers' version of events. There was substantial evidence undermining Crayton's testimony at the suppression hearing that the officers entered the room without consent and the Government's failure to disclose the grand jury testimony—though perhaps inappropriate—was not a *Brady* violation, did not undermine the confidence in the Court's order, and does not now warrant a new trial.

## C. Cross-Examination of Special Agent Carrie Landau

Next, Key claims that he should have been allowed to cross-examine Special Agent Carrie Landau on both the litigation pending against her in Indiana and her inconsistent testimony at the second suppression hearing in this case. Under Rule 608(b) of the Federal Rules of Evidence, "specific instances of the conduct of a witness, for the purposes of attacking or supporting the witness' character for truthfulness, … may …, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination."

On August 20, 2008, a complaint was filed in the Northern District of Illinois against, among many others, Agent Landau for a number of claims, including false arrest, failure to intervene, and conspiracy. *See Goodman, et al. v. United States, et al.*, Case No. 08-cv-04752 (N.D. Ill. filed Aug. 20, 2008). The action was transferred to Indiana on October 22, 2009 and the fourth amended complaint that was filed in 2011 remains pending with a motion for summary judgment that was filed on behalf of Agent Landau on January 16, 2015. *See Goodman, et al. v. United States, et al.*, Case No. 09-cv-00355-JTM, Dkt. No. 327 (N.D. Ind. filed Aug. 20, 2008). Key argues that "the allegations in *Goodman* pertain specifically to false prosecution and manipulation or fabrication of evidence" and are therefore "directly relevant to Agent Landau's truthfulness in conducting investigations." (*See* Dkt. No. 167, 5).

At the final pretrial conference on January 27, 2016, Key provided the Court a copy of the original *Goodman* Complaint that was filed in 2008. Neither party could inform the Court why the case was transferred or provide much detail whatsoever about the allegations or the litigation. The pending litigation did not include a finding of untruthfulness or lack of credibility and the allegations therein were therefore not relevant to Agent Landau's truthfulness or untruthfulness in this case. Moreover, even if the evidence were relevant, any slight probative

value it might have was substantially outweighed by the danger of unfair prejudice. (*See* Dkt. No. 125, 2) (citing *United States v. Seymour*, 472 F.3d 969, 970-71 (7th Cir. 2007) (affirming the exclusion of testifying officer's dishonesty in police report in an unrelated matter as irrelevant and substantially more prejudicial than probative)).

Although Key was not required to raise this issue to preserve it once the Court made its ruling at the first final pretrial conference, *see Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999), the Court notes that at the continuation of the final pretrial conference held on February 4, 2016, the Court asked whether the parties had any materials to supplement the *Goodman* objection and Key responded that the Court had already ruled the material was inadmissible and added, "we don't object to that. That's fine." (FPTC II Tr. 166). And, Key did not seek to admit the *Goodman* litigation during trial.

The bottom line, regardless of Key's objection or lack thereof, is that the Court did not err in refusing to admit the pendency of other litigation in the cross-examination of Agent Landau. Moreover, Key suffered no prejudice from the ruling because the mere pendency of other, unrelated litigation without any credibility findings or other related rulings was only minimally—if at all—probative of Agent Landau's credibility and was therefore unlikely to effect the jury's verdict.

The Court was also well-within its discretion in refusing to allow Key to cross-examine Agent Landau on its finding that her testimony was inconsistent with video presented at the suppression hearing. Under Rule 608(b), this Court had the discretion to allow Key's attorney to ask Agent Landau about this finding on cross-examination. *See, e.g., United States v. Dawson*, 434 F.3d 956, 958-59 (7th Cir. 2006). The Court also, however,

> has a responsibility not to allow cross-examination to get out of hand, confuse the jury, and prolong the trial unnecessarily. It would be one thing to ask a witness

whether a judge or jury had disbelieved his testimony in the past if a pattern of dishonest testimony by the witness could be shown, and quite another to ask such a question when the witness had testified frequently and been disbelieved in only one case or where it was unclear whether and why the witness's testimony had been rejected. It would be within the district judge's discretion to permit the question in the first case and to forbid it in the second.

*See id.* at 959. In this case, the Court did not give the parties a clear credibility finding in its suppression order that would allow a clean 608(b) question such as, "didn't Judge Kendall find that you misrepresented the truth?" Second, if asked whether Agent Landau lied under oath, the Government represented to the Court that Agent Landau would respond in the negative; and, at that moment, the questioning under Rule 608(b) would stop. If the Agent answered affirmatively, then the Government would have sought to bring in individuals to say she was a truth teller and, as the Court explained on the record during trial, a mini trial would have ensued on this collateral issue regarding Agent Landau's truthfulness. (*See* Dkt. No. 189 at 279:8-280:12 (Court holding that "[b]ut then that is collateral and done, and anything pertaining to what she has to say, therefore, would be a mini trial on a collateral issue.").) This would have been both complicating and confusing to the jury.

In addition, it was not an outside Court or party that made the relevant finding regarding Agent Landau's credibility and truthfulness: it was this Court. And, because it was this Court— whom the jury is required to listen to and follow instructions from—the admission of that finding would have imported tremendous prejudice and improperly placed a 13th juror in the box. The admission of the statement could not be sanitized. The Court also notes that the finding Key argues should have been admitted has since been withdrawn by this Court and there is therefore no prejudice to Key. For these reasons, the Court did not err in refusing cross-examination of Agent Landau with this finding.

**D. Cross-Examination of April**

Next, Key argues he should have been allowed to cross-examine April regarding her prior use of backpage.com. (*See* Dkt. No. 167, 5-6). First and foremost, Key was expressly permitted to conduct such inquiry and did indeed do so. Prior to trial, the Court issued an order that prohibited questioning regarding April's sexual history, but provided that "[t]he Defendant will, however, be allowed to question the alleged victim AD regarding her use of backpage.com prior to meeting the Defendant. The Defendant was instructed to submit such questions to the Court before posing them at trial so that the Court may review the questions and ensure that they comport with the contours of this ruling." (*See* Dkt. No. 125, 1). The Court properly omitted any reference to April's sexual history under Rule 412(a) of the Federal Rules of Civil Procedure. (*See* Dkt. No. 125, 1) (*citing, e.g., United States v. Hitt*, 473 F.3d 146, 156–57 (5th Cir. 2006) (affirming application of Rule 412 to violation of Section 2423(a)); *United States v. Shamsud-Din*, No. 10 CR 927, 2011 WL 5118840, *2-3 (N.D. Ill. Oct. 27, 2011) (applying Rule 412 to alleged violation of Section 2423(a)). At the time of the pretrial conference when this ruling was made, the parties and the Court appeared to agree on the appropriate scope of questioning with respect to this issue. At trial, testimony was admitted that April did have a Madison posting on backpage.com; Key's counsel proposed questions regarding that posting; and, the jury heard questions regarding that posting and April's previous familiarity with backpage.com. For example, the following exchange took place on cross-examination between defense counsel and April:

Q. Before you met Amillie, you were familiar with backpage; is that right?

A. Yeah

Q. All right. And you knew that backpage was a website that advertised sex for money.

A. Yeah.

Q. And, in fact, you had -- you had had your picture posted on backpage; is that right?

A. Yes.

Q. And you had actually -- actually posted your own picture on backpage in Wisconsin, correct?

A. No.

Q. So -- but you were -- but you had -- but you were – you had been posted on backpage; is that right?

A. Yes.

Q. All right. And you knew that being posted up on backpage was a way to get money when you needed it.

A. Yes.

(Trial Tr. 180-81). Key now contends that he was "not allowed to question April about the details of how that [Madison] posting occurred and what level of knowledge April had of the process of posting on backpage.com." (*See* Dkt. No. 167, 6). On the contrary, April was asked whether she posted her own picture on backpage and she responded "No." There was no request to question April any further. The Court's order excluding references to April's sexual history, but allowing questions regarding her prior use of backpage.com was proper and the motion for new trial on this basis is denied.

### E. Admission of Text Message

The Court properly admitted Government Exhibit 44, a text message sent on September 6, 2013 from Key's cellphone to a woman named Nikki that read, "I need you I got to many calls and only one girl." (*See* Dkt. No. 167, 6-7; Ex. 44). Key insists the message was improper propensity evidence under Rule 404(b) of the Federal Rules of Evidence because—according to

Key—the "only reasonable interpretation of government Exhibit 44 is that Mr. Key was reaching out to Nikki, not April, because Mr. Key needed something from Nikki. Whether or not the content of the text message is construed as prostitution-related, it has no direct link to April and the defense was prohibited from asking about the recipient under the Court's 404(b) ruling without the door to all prior activities of Mr. Key." (*See* Dkt. No. 167, 7).

This text message was directly relevant to Key's specific intent to travel. The Government had the burden of demonstrating that Key had the specific intent to transport April for the purpose that she engages in prostitution. This text message was sent just two days before Key transported April from Wisconsin to Illinois for the first time; and, it was sent on the very same day that Key contacted April on her cellphone number from a backpage.com advertisement that had been posted of her. (Trial Tr. 123-24). The text message represents that Key is in the business of prostitution, which supports that he intended April to engage in prostitution. The text message does not, however, reference prior dates, times, or events of prostitution. It is direct evidence of his specific intent and was properly admitted. *See United States v. Ferrell*, 816 F.3d 433, 443 (7th Cir. 2015) ("Although *Gomez* clarifies how the district court should analyze Rule 404(b) evidence, it remains intact that Rule 404(b) does not apply to direct evidence of the crime charged.").

### F. Admission of Shah's Testimony

The Court also properly admitted the testimony of Anita Shah. During the direct examination of Romeoville Police Officer Dustin Legner at trial, the Court admitted a computer tablet seized from Key's motel room immediately following his arrest. (Trial Tr. 64-65). The Government later called Anita Shah, a forensic examiner with the Federal Bureau of Investigation's Regional Computer Forensics Laboratory ("RCFL"), to testify that Government

Exhibits 16-37 and 211 were images recovered from the tablet. Shah was not the forensic examiner that processed the tablet and downloaded its contents to a disk, but she did conduct a peer review of the examiner that completed that work and did in fact approve that work.

Under the Sixth Amendment's Confrontation Clause, "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." *See United States v. Maxwell*, 724 F.3d 724, 726 (7th Cir. 2013). This means that the Government may not introduce "forensic laboratory reports or affidavits reporting the results of forensic tests and use them as substantive evidence against a defendant unless the analyst who prepared or certified the report is offered as a live witness subject to cross-examination." *See id*. (citing *Bullcoming v. New Mexico*, ⸺ U.S. ⸺, 131 S. Ct. 2705, 2710 (2011)). "Raw data" from a lab test, however, are "not 'statements' in any way that violates the Confrontation Clause." *See id*. at 727.

In this case, the images Shah testified regarding were raw data pulled from the tablet and, as such, they were not testimonial and did not violate the Confrontation Clause. Shah was not testifying to where the images were recovered from within the tablet, but merely that these items are found in the raw collection of data from the tablet. Key argues that because the examiner that actually extracted the images from the tablet did not testify, he was unable to determine "what procedures were actually followed and how, and if, the images presented at trial were actually extracted from the tablet." (*See* Dkt. No. 167, 8). Concerns regarding the chain-of-custody foundation for the images go to the weight of the evidence rather than its admissibility and Key was properly permitted to cross-examine on that issue. *See United States v. Vitrano*, 747 F.3d 922, 925 (7th Cir. 2014) ("[A]ny gaps in the chain of custody go to the weight of the evidence, not its admissibility.").

### G. Motion to Reconsider the Suppression of Evidence

Key also moves this Court *pro se* to reconsider its orders from December 30, 2015 and February 5, 2016 refusing to suppress certain evidence recovered from his motel room on September 10, 2013.[1] (Dkt. No. 174). In its December 30th order, this Court suppressed the cellphones and notebook recovered from Key's motel room and admitted the prepaid credit cards, tablet, and cash. (*See* Dkt. No. 99, 11). In its February 5, 2013 order, the Court vacated the part of its order from December 30, 2015 suppressing Key's cell phone. (*See* Dkt. No. 145). Ultimately, therefore, the Court refused to suppress the prepaid credit cards, tablet, cash, and cell phone belonging to Key that were recovered in Key's motel room. Though titled and couched in language typical of a motion to reconsider, the Court will evaluate Key's motion as a motion for new trial under Rule 33 of the Federal Rules of Criminal Procedure. *See, e.g., Parke-Chapley Contr. Co. v. Cherrington*, 865 F.2d 907, 915 (7th Cir. 1989) ("[A]n appeal or motion for new trial, rather than a FRCP 60(b) motion, is the proper avenue to redress mistakes of law committed by the trial judge…").

---

[1] Key also argues that the Court "has allowed the government 3 opportunities for motions to Reconsider without the showing of any of the elements to warrant such relief." (*See* Dkt. No. 174, 2-3). Key does not identify with any specificity what he is referring to and the Court cannot guess at which order he would like to challenge. As the Court explained in its oral ruling regarding Agent Landau, there were at that time "four examples to date of the way that the evidence presentation has caused complications that have led the government to seek to have me reconsider or reopen." (Trial Tr. 283). Key's throwaway argument regarding "opportunities for motions to Reconsider" is deemed waived. *See United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008) (Arguments that are inadequately developed or fail to cite substantive legal authority are waived "[b]ecause it is not the obligation of this Court to research and construct the legal arguments available to parties [.]"); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."). And, to the extent Key is challenging this Court's decision to reopen the suppression hearing, the challenge is without merit. (*See* Dkt. No. 117). This Court has broad discretion in deciding whether to reopen a suppression hearing for consideration of additional evidence. *See United States v. Ozuna*, 561 F.3d 728, 734 (7th Cir. 2009). And, because society has a strong interest in admitting all relevant evidence and a defendant is entitled to suppression only in cases of constitutional violations, the Government was not required to provide justification in seeking to reopen the suppression hearing. *See id.*; *see also United States v. Bayless*, 201 F.3d 116, 131 (2nd Cir. 2000) (opining that the Seventh Circuit has rejected "a rule requiring the government ... to proffer a justification for its failure to present the relevant evidence at the original suppression hearing"). There was no evidence that the Government was engaging in a deliberate strategy to proceed in a piecemeal fashion or otherwise waste judicial resources and the Court was within its discretion to reopen the suppression hearing.

First, Key argues that the Court erred in finding that he consented to the officers' entry into his room. (*See* Dkt. No. 174, 3-9). Key's insistence that there were minor factual discrepancies in the witnesses' testimony and that the Court made poor credibility findings of the witnesses at the first suppression hearing are belied by the record: Key consented to the officers' entry into his motel room by both his words and his actions. As stated in the Court's first suppression order,

> Legner and Truhlar testified that they asked Key if they could check the room and he advised that was "no problem, come on in." Masterson could not recall precisely what Key said, but she similarly stated that Key was very cooperative during their initial encounter at the door and—at the very least—moved out of the doorway to let the officers into the room. *See United States v. Taylor*, 549 F. App'x 562, 565 (7th Cir. 2013) (officers uncertainties regarding conversation about consent were "not fundamental inconsistencies or conflicts that invalidate the court's choice to believe the officers). There is no evidence that Key expressed any opposition to the officers' presence during this initial encounter. On the contrary, Key was pleasant, cooperative, and relaxed this initial exchange as testified to by the officers as well as Crayton. Key never asked the officers to leave and he never indicated that he did not want the officers in the room. Based on the totality of these circumstances, the Court finds that Key consented to the officers' entry into his motel room.

(*See* Dkt. No. 99, 6). According to Key's version of events, the police yelled to announce themselves and then walked into the motel room uninvited. That version of events was contradicted by the testimony of three officers and Crayton, all of which the Court credited over the claims in Key's affidavit. *See United States v. Scott*, 19 F.3d 1238, 1242 (7th Cir. 1994) ("The factfinder actually hearing the testimony of the witnesses is best situated to determine their credibility.").

Key also "brings to the court's attention of it's failure to rule on the illegal arrest and seizure of the defendant in his motel room." (*See* Dkt. No. 174, 9). This new argument challenging the lawfulness of his arrest is raised about six months after the initial suppression hearing, almost two months after the second suppression hearing, over a year after the deadline

for filing of pretrial motions, and over a month after Key was convicted by a jury. Motions to suppress are to be timely filed based on information reasonably available to a defendant. *See* Fed. R. Crim. P. 12(c); Fed. R. Crim. P. 12(b)(3) advisory committee's note to 2014 amendment. This new basis for suppression is, to say the least, untimely. This Court has discretion to hear an untimely motion upon a showing of good cause, *see* Fed. R. Crim. P. 12(c)(3), but Key has failed to demonstrate good cause for this delay. Every opportunity and benefit has been provided to Key with respect to the various suppression issues in this case. Key's argument that his arrest was illegal is waived. *See United States v. Kirkland*, 567 F.3d 316, 320-21 (7th Cir. 2009); *see also United States v. Moody*, 664 F.3d 164, 167–77 (7th Cir. 2011). Regardless, the officers had probable cause to arrest Key and that has never been challenged.The Court denies Key's motion for a new trial based on his challenges to the Court's suppression orders.

## CONCLUSION

For the reasons stated, the Court denies the motion for acquittal or new trial filed by Key's prior counsel [167]; Key's *pro se* supplemental motion for judgment of acquittal [173]; and Key's *pro se* motion to reconsider the motion to suppress [174].


Date: __10/21/2016__

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois