```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    UNITED STATES OF AMERICA       )  Docket No. 13 CR 00726
                                     )
 4                   Plaintiff,      )  Chicago, Illinois
                                     )  November 9, 2016
 5              v.                   )  9:59 a.m.
                                     )
 6    DaJUAN KEY,                    )
                                     )
 7                   Defendant.      )
```

```
 8
                  TRANSCRIPT OF PROCEEDINGS - SENTENCING
 9              BEFORE THE HONORABLE VIRGINIA M. KENDALL
```

```
10
      APPEARANCES:
11
      For the Government:      UNITED STATES ATTORNEY'S OFFICE by
12                             MR. CHRISTOPHER PARENTE
                               Assistant United States Attorneys
13                             219 South Dearborn Street, 5th Floor
                               Chicago, Illinois 60604
14
      For the Defendant:      MR. DAJUAN KEY, PRO SE
15

16

17

18

19

20

21    Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                               Federal Official Court Reporter
22                             219 South Dearborn, Room 2318-A
                               Chicago, Illinois 60604
23                             (312) 435-6047
                               Gayle_McGuigan@ilnd.uscourts.gov
24

25
```

1        (Proceedings heard in open court:)

2              THE CLERK:  13 CR 726, Defendant 1, U.S. versus DaJuan

3    Key.

4              He does not have a copy of the memorandum.

5              THE COURT:  I can't hear you.

6              THE CLERK:  He did not get a copy of the memorandum

7    last night because he's incarcerated.

8              Do you want me to --

9              THE COURT:  Just hold on a second.

10        (Defendant enters courtroom.)

11              THE COURT:  All right.  Good morning.

12              MR. PARENTE:  Good morning, your Honor.  Chris Parente

13    for the United States.

14              THE COURT:  Good morning.

15              THE DEFENDANT:  Good morning, your Honor.

16              THE COURT:  Good morning.

17              THE DEFENDANT:  DaJuan Key, *pro se*.

18              THE COURT:  Okay.  Mr. Key, I issued an order last

19    night which was denying the last three of your *pro se* motions,

20    so I'm going to have my courtroom deputy hand it to you.  And

21    I'm going to give you a few minutes to read through it, because

22    that is something that has -- had to be entered before we go to

23    sentencing.  I'll just give you a few minutes to review it, and

24    we'll take like a ten-minute break before the sentencing, okay?

25              THE CLERK:  All rise.  Court is in recess.

1      (Recess taken from 10:00 a.m. to 10:15 a.m.)

2          THE COURT:  Okay.  We're going to begin the

3   sentencing, and I just want to walk you through, Mr. Key, the

4   process so that you know where -- what we're going to do.

5          The first thing we discuss is what you received as far

6   as materials, so we make sure you have all of the information.

7   And then I ask you whether you have factual changes to the PSR.

8   That is not the arguments regarding guideline calculations, but

9   just facts, that you say a fact should be different.  And then

10  we go to the guidelines and we talk about the guidelines and

11  enhancements, and then we each take turns.  Government puts its

12  position, and you give your position, and then I rule.  Then we

13  get that guideline calculation and -- so we all know where it

14  is.  And then I turn to what we call those 3553 factors, which

15  are the history and characteristics of the defendant and the

16  seriousness of the offense and need to promote respect for the

17  law.  That's the end.

18         Once we have the government give their position, you

19  give your position.  I ask if there's going to be any victim

20  statements or presentations of evidence in this whole process.

21  And we do that from the witness stand, if necessary, if it's

22  going to be testimony; if it's just a statement, it's not from

23  the witness stand, it's just here.

24         And when that's all done, then you have your right to

25  allocute, which is when you just say this is what I want you to

1    know about me, you can say whatever you want to say.  It's your

2    right to say whatever you want to say, and then I sentence.

3    Okay?

4            THE DEFENDANT:  All right.

5            THE COURT:  All right.

6            THE DEFENDANT:  I have one question --

7            THE COURT:  Sure.

8            THE DEFENDANT:  -- about the facts.

9            With the PSI, the facts, are you saying based on the

10   things that's inside the PSI --

11           THE COURT:  Yeah.

12           THE DEFENDANT:  -- that maybe like charges or

13   different things that they say I was arrested for or --

14           THE COURT:  Right.

15           THE DEFENDANT:  -- are we talking about those type of

16   things?

17           THE COURT:  Exactly.  So the facts are that the

18   probation officer might say, for example, on this day you did

19   this, and you say, no, on that day I did not do this.  That's a

20   fact dispute, and then you have to tell me, you know, your

21   basis for saying it's wrong.  Okay?

22           THE DEFENDANT:  Okay.

23           THE COURT:  All right.  Now, did you receive the

24   probation officer's report?

25           THE DEFENDANT:  Yes, I did.

1                THE COURT:  Okay.  And did you receive all of the

2      terms of supervised release that she presented within the

3      report?

4                THE DEFENDANT:  Yes.

5                THE COURT:  Okay.  Did you receive the government's

6      position paper regarding sentencing?

7                THE DEFENDANT:  No.

8                THE COURT:  Okay.  Let's see.  It is -- I'm looking at

9      document 223, November 4th.  Is that what you have?

10               MR. PARENTE:  Yes, your Honor.

11               THE COURT:  Okay.

12               MR. PARENTE:  I'm sorry, Judge, the original position

13     paper was 221 --

14               THE COURT:  Okay.

15               MR. PARENTE:  -- on 10-26.

16               THE COURT:  Okay.  Did you receive any of the

17     government's filings?

18               THE DEFENDANT:  No.

19               THE COURT:  Okay.  Let me get those for you, and we'll

20     let you read through those.

21               So someone go print off, please -- tell me the numbers

22     on the docket again.

23               MR. PARENTE:  221 and then 223.

24               THE COURT:  Okay.  221 and 223.

25               MR. PARENTE:  I can give him my copies here.

1      THE COURT:  That's very nice, and then he'll give you

2  another copy, okay?

3      So you go ahead and get started with those.

4      MR. PARENTE:  Judge, the only other thing is I was

5  handed a report by the marshal service.  I think there was

6  another assault at the prison yesterday involving Mr. Key.

7      THE COURT:  Okay.  Do you --

8      MR. PARENTE:  So Probation has a copy.  Would you

9  like --

10     THE COURT:  I would like a copy of that.  Did you give

11  him a copy of it?

12     MR. PARENTE:  Yeah, the marshals did.

13     THE COURT:  Oh, the marshals did.  Okay.  Thank you.

14     (Tendered.)

15     THE COURT:  And then if he didn't receive your

16  filings, he probably didn't receive your response to my request

17  yesterday.  Do you have a copy of that?  If not, I'll just

18  print one out.

19     MR. PARENTE:  I have a copy in my office, Judge.

20     THE COURT:  I'll get one right now.

21     So it's the print-out from yesterday, what he -- what

22  the government filed around 3:30 in response to my request for

23  support for the evidence that was turned over.  Okay?  And then

24  we'll give all of those to you.

25     Do you have a pen?

 1          THE DEFENDANT:  No, I don't.

 2          THE COURT:  Okay.  Is he allowed to have a pen while

 3   he's working here?

 4          COURT SECURITY OFFICER:  Sure.

 5          THE COURT:  How about a highlighter?  Would a

 6   highlighter help?

 7          THE DEFENDANT:  Pen would be all right.

 8          THE COURT:  Okay.  Let me give you a pen.  And make

 9   notes on it in case there's something that you want to argue

10   regarding their response -- so they responded to the objections

11   that you made, and then they responded to your position.

12          So I'm going to give you a few minutes to read that,

13   and then we'll -- you just let me know, we'll -- John, can you

14   let me know when he's ready?  Can you let me know when he's

15   ready?

16          COURT SECURITY OFFICER:  Yes.

17          THE COURT:  Okay.  Thanks.

18          THE CLERK:  All rise.  Court is in recess.

19      (Recess taken from 10:20 a.m. to 10:30 a.m.)

20          THE COURT:  We'll just wait for the prosecutor and my

21   probation officer to get back in.

22          THE DEFENDANT:  Excuse me, your Honor.

23          THE COURT:  Yes.

24          THE DEFENDANT:  I was wondering, my mother has some

25   evidence for me.  I was wondering could I get it from her?

1          THE COURT:  No, I don't think it can work that way.  I

2     don't know what the evidence is.  Is it papers?

3          THE DEFENDANT:  Yes, papers.

4          THE COURT:  Okay.  Do you want to hand it to the

5     marshal and see what it is, sir?  There's a security protocol,

6     so if it's just paper and you're fine with it.

7          (Pause in proceedings.)

8          THE COURT:  Are you going to use these?  Do you want

9     me to have them or do you want you to have them?

10          THE DEFENDANT:  You can keep them if you want.  Those

11     are ads that was posted after I was arrested.

12          THE COURT:  Okay.  Hold on, because the other side

13     isn't here, okay?

14          So the first thing we're going to need to do is when

15     we get to this point where you're arguing it, they need to see

16     it, okay?  Because we can't have one side seeing it and not the

17     other, okay?

18          THE DEFENDANT:  Okay.

19          (Probation Officer enters courtroom.)

20          (Cell Phone interruption of the proceedings.)

21          (Mr. Parente enters courtroom.)

22          MR. PARENTE:  I apologize, your Honor.

23          THE COURT:  Okay.  Are you all set?

24          MR. PARENTE:  Yes.

25          THE COURT:  Do you have the copies of the things that

1    you gave to Mr. Key?  Did you get them from my clerks?

2            MR. PARENTE:  Yes, your Honor.  Thank you.

3            THE COURT:  Okay.  He's had a chance to read through

4    those now, so just making sure that he had everything.

5            So we're going to turn to the probation officer's

6    report.  And first I want to thank you, Ms. Kieckhafer, because

7    this is probably the most thorough report I've ever received.

8    It clearly took a lot of time for you to do this work, and the

9    fact that you went into the underlying records was a tremendous

10   benefit for the Court, and I appreciate that, because it shows

11   in this very thorough report, so thank you for your work.

12           Now, let's go to the very first issue, which is the

13   issue of whether there's factual changes.

14           So from you, Mr. Parente, do you have anything

15   factually that you want to change in the report?

16           MR. PARENTE:  No, your Honor.

17           THE COURT:  Okay.  So now factually, Mr. Key, do you

18   have something that you want to change in the report?

19           THE DEFENDANT:  Yes.  It was -- it was several arrests

20   inside of the PSI that I wasn't actually arrested for.

21           THE COURT:  Okay.  You need to go -- this is how you

22   do it.  You turn to the page and you turn to the paragraph

23   number so that we can all discuss it.

24           THE DEFENDANT:  Page 19.

25           THE COURT:  Okay.  Okay.  So the April 26th, 2011

1    report?

2              THE DEFENDANT:  Yeah.

3              THE COURT:  So it's listed as an incident report, and

4    it was a report filed with the Milwaukee Police Department.  It

5    was dismissed and not prosecuted.

6              THE DEFENDANT:  Yeah, I wasn't -- I mean, what I'm

7    saying is I never actually was arrested or charged.  It wasn't

8    dismissed because it wasn't ever charged.

9              THE COURT:  It was an incident report.  So an incident

10   report, it wasn't -- it wasn't a charging report or an arrest

11   report.  It was an incident report involving you.  So the

12   information is there and it's not inaccurate that it wasn't --

13   it's not listed as a charge or an arrest.

14             THE DEFENDANT:  All right.  Page 15.

15             THE COURT:  Okay.  All right.

16             THE DEFENDANT:  46, 47.

17             THE COURT:  Okay.

18             THE DEFENDANT:  44.  I mean -- yeah, 44, 46, 47, I was

19   never arrested for either.

20             THE COURT:  Okay.  So let's start in chronological

21   order.

22             Number 44 is the August 10th, 2008 charge of operating

23   without carrying a license from Walworth County, Wisconsin.

24   The offender it says was arrested by an officer in

25   Walworth County.  You weren't represented.  And the results of

1    that were that there was no contest plea.

2    So let me ask the probation officer where -- what she

3    bases that arrest on.

4    PROBATION OFFICER:  Your Honor, I must have gotten

5    records from the -- the Wisconsin Circuit Court Access System.

6    THE COURT:  Okay.  All right.  So your position is

7    that you weren't arrested, but the Court records show that you

8    were arrested.

9    So why do you think you were not arrested?

10   THE DEFENDANT:  Because I was not arrested.  I got a

11   ticket from an officer for speeding.  And when I went to the

12   court, I paid a higher fine for operating without a license.

13   THE COURT:  Okay.

14   THE DEFENDANT:  I never got arrested, though.  I just

15   got ticketed.  It was a driving -- all these are driving

16   offenses that I never got arrested for.

17   THE COURT:  Okay.  Is it your opinion that an arrest

18   is when you're put into cuffs and brought into the police

19   station?

20   THE DEFENDANT:  Right.

21   THE COURT:  Okay.  All right.  So I'll add after the

22   line that says, "Defendant was arrested by an officer with the

23   Walworth County, Wisconsin Sheriff's Office," the statement

24   that "Defendant stated at the time of sentencing that he was

25   not arrested but merely received a ticket and paid the fine."

1              That is fine.  It is -- it makes no difference as far

2       as your criminal history calculation because it's zero points.

3              THE DEFENDANT:  All right.

4              THE COURT:  All right?  Go ahead.

5              THE DEFENDANT:  Also --

6              THE COURT:  Is that the same with 45?

7              THE DEFENDANT:  Yes, same with 45.

8              THE COURT:  So it's your position you were not

9       arrested but that you, again, paid a fine?

10             THE DEFENDANT:  Fine, ticket.

11             THE COURT:  Okay.  We'll add the same statement at the

12      end of your paragraph.  So it's just, "The defendant states at

13      the time of sentencing that it was not an arrest but that he

14      paid a fine on a ticket."

15             Again, that's zero points, and so it has no impact on

16      your criminal history.  Okay?

17             THE DEFENDANT:  All right.

18             THE COURT:  And then what's the next one?

19             Are all of the ones regarding your --

20             THE DEFENDANT:  I have one on 41.

21             THE COURT:  Okay.  Let me go back.  Okay.

22             THE DEFENDANT:  They gave me 4 points for this.  But

23      they got a total of 18 months, which I served 10 months for

24      that, and it was -- there were two 9-month misdemeanors ran

25      consecutive, and they were both -- I served five months for

1    each count.  And I believe under 4A1.2(e), I believe, or (c),

2    they were over the 10-year time period, so I wouldn't be able

3    to get any criminal history points for this.

4              THE COURT:  Okay.  So that's actually a guideline

5    calculation argument.  We'll hold off on that for a moment.

6    Okay?  We'll stick with facts right now.  Okay?

7              What other facts do you want to change?

8              THE DEFENDANT:  Okay.  This fact of this case right

9    here.  So this is the arresting report, but at sentencing, as

10   you see, the charge was dropped down, so it was different

11   things that came into play at sentencing for the charge to get

12   dropped down to where it was at.  As far as the dangerous

13   weapon and the actual sex act, that was all dropped.

14             THE COURT:  So the -- I think the factual statement

15   correctly states that the offense was initially charged as a

16   felony; however, the defendant pled guilty to a misdemeanor.

17             THE DEFENDANT:  Right.

18             THE COURT:  And received a condition of probation,

19   et cetera.

20             So I think that is accurate.  That's consistent with

21   your statement.

22             THE DEFENDANT:  Okay.

23             THE COURT:  Okay.  We'll talk about the points that it

24   receives later.

25             THE DEFENDANT:  Okay.

1      THE COURT:  Okay?  All right.  Anything else?

2      THE DEFENDANT:  Pretty much with -- okay.  63.  I

3  don't know.  I can't really say this, but I talked to my mom,

4  and she said that she didn't say this, so I mean ...

5      THE COURT:  Is there something factually that you

6  think is wrong?

7      THE DEFENDANT:  Yeah, she says she didn't -- she

8  actually didn't make the statement saying she was unaware of

9  that.

10      THE COURT:  Okay.  So, Ms. Kieckhafer, did you

11  interview his mom?

12      PROBATION OFFICER:  I did, your Honor.

13      THE COURT:  And that was her statement to you at the

14  time.

15      PROBATION OFFICER:  Correct.

16      THE COURT:  Okay.  So that is what the probation

17  officer, as an officer of the Court, has reported that she

18  recorded -- not recorded in the sense of oral recording, like a

19  device, but rather what she wrote down.

20      THE DEFENDANT:  Right.

21      THE COURT:  And that is her statement to the Court.

22  And there's nothing but hearsay to object to that, so I'm not

23  going to change anything there.

24      I mean, she can make a statement at the time of

25  sentencing if she wants to the Court.

1          THE DEFENDANT:  All right.  I think 84.

2          THE COURT:  Okay.  Okay.  Factually, what do you think

3    is wrong?

4          THE DEFENDANT:  She said on March 4th, 2010 the

5    defendant was hospitalized after he took 70 to 80 tablets of

6    aspirin --

7          COURT REPORTER:  I'm sorry.  Repeat that, please.

8          THE COURT:  She said that the defendant was

9    hospitalized after he took 70 to 80 tablets of aspirin.

10         THE DEFENDANT:  And he left the hospital as completely

11   fine.

12         In fact, I had kidney -- I have severely damaged my

13   kidney.  So I'm not sure how --

14         THE COURT:  Okay.

15         THE DEFENDANT:  -- the records with that.

16         THE COURT:  Okay.  So is the statement that's in

17   quotes, Ms. Kieckhafer, is that something that was written in

18   the medical records?

19         PROBATION OFFICER:  That's correct, your Honor.

20         THE COURT:  Okay.  So then following that statement,

21   which was -- let's put in he was discharged on March 7th, 2016.

22   And then if you could please insert, "and the medical records

23   state that he stated he was, quote, completely fine, unquote."

24         And then if we could please add the sentence, "At the

25   time of sentencing, the defendant stated he has" -- what?  What

1    do you want to say?  What do you have?

2         THE DEFENDANT:  They said I had severe damage to my

3    kidney.

4         THE COURT:  "Severe damage to his kidneys."

5         But it has to come from "at the time of sentencing,

6    defendant stated that."  Okay?

7         Thank you.

8         So far, Mr. Parente, any objections to any of these

9    additions, sir?

10        MR. PARENTE:  No, your Honor.

11        THE COURT:  Okay.

12        THE DEFENDANT:  That's it.

13        THE COURT:  Okay.  All right.  So now that we have

14   looked at that factually, I'm going to adopt the report as

15   written.

16        And now we're going to turn to the sentencing

17   guidelines, as we must.

18        What I'm going to do is we're going to step through

19   each one.  And because you filed objections by simply citing to

20   a paragraph, you'll be able to argue to me now what your

21   objection is.  Okay?

22        THE DEFENDANT:  All right.

23        THE COURT:  All right.  So we turn to page 7 in the

24   report, okay?  Tell me when you're there.  Are you there?

25        THE DEFENDANT:  Yes.

1          THE COURT:  On page 7.

2          THE DEFENDANT:  Yes.

3          THE COURT:  Okay.  So it's the base offense level for

4     this guideline is -- the guideline is 2G1.3.  It applies to the

5     statute that you were found to be guilty of, which is 18

6     United States Code 2423(a).  It is for promoting a commercial

7     sex act or prohibited sexual conduct with a minor.  And the

8     base offense level is 28, according to the guideline

9     2G1.3(a)(3).

10         Do you disagree with that base offense level?

11         THE DEFENDANT:  No.

12         THE COURT:  Okay.  So the base offense level will be

13    28.

14         And then let's turn to the specific offense

15    characteristics.

16         The victim in this case was 15 years old at the time

17    of the offense, so accordingly you were given a 2-level

18    enhancement pursuant to guideline 2G1.3(b)(2)(B).

19         Do you have an objection to that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Okay.  Tell me your objection.

22         THE DEFENDANT:  First of all, I just read the

23    government's response to the defendant's sentencing memorandum.

24    And inside they sentencing memorandum, they stated several

25    cases.  Most cases which were stated by the government, none of

1    them are even closely identical to mine.

2          The reason I say the circumstances are different

3    because here in my case, it's a known fact that she represented

4    to me that she was 19 years of age.  With her representing this

5    to me, at that time, my state of mind was not that this was a

6    child or someone that was -- that I was ten years older or I

7    was unduly influenced.  So when I read through this, every case

8    that I see, it be the defendant misrepresenting the age or just

9    the unduly influence.  And as I go through case law after case

10   law, and as I have, there's not one case law that actually --

11   that the victim actually says that I told this person I was 19

12   years old and they used the unduly influence.

13         I think *Patterson* is much like my case, because with

14   *Patterson*, regardless of who posted the person on Backpage or

15   Craigslist, the person was posted on Craigslist and Backpage,

16   so regardless of who did it, it was still -- it was still an ad

17   posted of this individual.  So if he was going to get a charge

18   or the enhancement for that particular person, it would have

19   been regardless, because if anybody post her up and you unduly

20   influenced this person -- but the characteristics, too, your

21   Honor, because if you -- if you think about months back, April,

22   she represented even to the grand jury that she did not engage

23   in any prostitution acts prior to meeting me.  And only two

24   days before trial did they come out and say that she, in fact,

25   engaged in prostitution before meeting the defendant.

1          And if you look at the text messages I submitted to

2    you, it clearly shows that she had -- she was getting her own

3    money and she was doing her own thing and she -- she was -- she

4    been doing this before she even met me, by herself, I mean,

5    from what the text message, what I see in the text message.

6    And that's only a small percentage of the text messages,

7    because it's a way, way more text messages where it shows that

8    she was going back and forth to some of the same people, and

9    I'm --

10          THE COURT:  Let's focus on the issue of the specific

11    characteristic that she's a minor.

12          THE DEFENDANT:  All right.

13          THE COURT:  Okay?

14          THE DEFENDANT:  But, see, that's the whole thing.  I

15    didn't know she was a minor.  So even in the statute, I mean,

16    even in the transportation part of the -- I mean

17    characteristics, it says a minor, unduly influencing a minor.

18    So this -- this is state of mind that a person know that this

19    person is a minor.  You know?  And that's -- I mean, I --

20    people can argue that that's not -- but if you look at even the

21    statute of 2423(a) -- I mean (g), I believe it's an affirmative

22    defense to the -- to that -- to that statute that a person

23    reasonably believe that the person was 18 years of age that

24    they intended to engage in commercial sex acts with.

25          THE COURT:  Okay.  Mr. Parente, your response?

1          MR. PARENTE:  Thank you, Judge.

2          Judge, for this enhancement, I think it's important to

3     look at the circumstances of what happened here.

4          First, the guideline says if the defendant is more

5     than ten years older than the victim, then there's a rebuttable

6     presumption.

7          Whatever she said, the defendant claims -- whatever

8     she claimed her age was, it doesn't matter.  The fact is she

9     was a 15-year-old girl that he drove to Milwaukee to pick up,

10    and he did do that, and he was 28 at the time.  So that

11    applies.  The presumption applies.  There's now a rebuttable

12    presumption that undue influence was exercised here.

13         But more -- you don't need that, Judge, because if you

14    actually look at the circumstances here, you can see it.

15         Remember what April testified to at trial, Judge.  He

16    told her when he picked her up that they were going to

17    Milwaukee.  It wasn't until he got her in the car and then

18    started driving her to Chicago that she even realized what was

19    going on.

20         When she got here, you heard Dache Crayton testify she

21    didn't want to be there.  She stood in the corner.  She

22    repeatedly asked to go home.  He would not take her home.  He

23    took a 15-year-old child from her house in Wisconsin, without

24    telling her, drove her to Chicago, put her at a Super 8 Motel

25    and then gave her lingerie and started telling her he's going

1    to take her photo and he put her out on the internet.

2         The enhancement clearly applies here, Judge.  He

3    hasn't presented any evidence to rebut that presumption.  But

4    if you actually look at what we know, you see that it applies

5    here.  And you can look at the text messages that corroborate

6    she didn't want to be there, Judge, and she didn't know what

7    was happening.  The text messages she sent out to a friend

8    while she was on her way, unbeknownst to herself, to Chicago

9    were, "I might be in trouble, I'm scared, I'm scared, I just

10   want to go, I know I want to go back to Madison."

11        And remember how this case ends, Judge.  She finally

12   does, as a 15-year-old child, make that incredibly difficult

13   call, knowing the situation that she's in, and she calls home

14   and asks for help.

15        So the circumstances here support this enhancement

16   applying, not just because of the rebuttable presumption, but

17   the surrounding circumstances that show this is a man that took

18   a 15-year-old --

19        THE COURT:  Right, but does he have to know she's a

20   minor for this enhancement?  Minor is defined as an individual

21   who had not attained the age of 18 years, for one definition,

22   and an individual, whether fictitious or not, who law

23   enforcement officer represented as a participant, and then an

24   undercover officer.

25        So, Ms. Kieckhafer, is it necessary that he know that

1    she be -- that she's a minor?

2            PROBATION OFFICER:  No, it's not, your Honor.

3            THE COURT:  I mean, let's just look at the

4    enhancement, which is 2 -- it's 2G1.3 what?

5            MR. PARENTE:  Judge, 2G1.3(b)(2).

6            THE COURT:  (b)(2).

7            MR. PARENTE:  And then (B).  Capital B.

8            THE COURT:  If the offense involved the knowing

9    misrepresentation of a participant's identity to persuade --

10   okay.  Or if the offense -- or a participant otherwise unduly

11   influenced a minor to engage in prohibited sexual conduct.

12   Okay.

13           Without making a finding as to whether or not it's

14   necessary that he have knowledge, the facts of the case that

15   were presented to this jury show that he knew that she was a

16   minor based upon all of the circumstances of her desire to

17   contact her parent and to return home to her parent, which she

18   eventually did after the exercise of the criminal activity that

19   he engaged with her and got her into, and she was 15 years old.

20   There was evidence that she had -- that he had actually picked

21   her up and driven her, showing that she couldn't transport

22   herself down to where she was going.  And the discussions with

23   the other witness, Ms. Crayton, shows that there was knowledge

24   that she was a minor and that there had been activity involving

25   looking for girls who are participating.

1          So over objection, I'm giving the 2-level enhancement.

2          Let's turn to the next official offense character --

3    specific offense characteristic.  It is the use of the -- of

4    the computer or interactive computer service to persuade,

5    entice, coerce, or facilitate the travel or to entice,

6    encourage, offer, or solicit a person to engage in prohibited

7    sexual conduct.  Two levels have been added there, based upon

8    the fact that you met the -- you met the victim on Backpage,

9    that you took pictures of her, posted them to Backpage under a

10   pseudonym, and then had her pose in lingerie, and posted those

11   images on Backpage in order to receive phone calls from men for

12   sex, which she then engaged in, and that the tablet, therefore,

13   was used to entice the men to engage in sexual contact with

14   her.

15          I know you object to that, so give me your position.

16          THE DEFENDANT:  Yes, Judge.  I object to it.

17          I believe I use *United States versus Patterson*, but

18   even with the -- even in Subsection B where it's entice,

19   encourage, offer, or solicit a person to engage in sexual

20   conduct with a minor, these people know that this a minor.

21   Every -- every one of them, they know that this a minor.  Every

22   case that you can finally pick up on the computer, every last

23   one of them that use this, they know there's a minor.  Every

24   single case.  I haven't -- I haven't one -- seen one single

25   case that it was not a minor, that the person did not know that

1       this was a minor.  Not only that --

2               THE COURT:  So I think -- I think that the enhancement

3       is to -- is because you used the computer or an interactive

4       service to offer or solicit a person to engage in sexual

5       conduct with the minor.

6               So in order for you to argue any of these minor

7       specific offense characteristics, you have to say that the jury

8       verdict was wrong, because inherent in the statute that you

9       were convicted of, the jury found that you knowingly

10      transported an individual under the age of 18 to engage in

11      prostitution.

12              So the specific offense characteristic that you just

13      argued saying "I didn't know she was a minor, she posed as

14      someone else," is what was presented to the jury, and they

15      didn't find that to be the case.  Inherent in your conviction

16      is that you transported a minor for prostitution.

17              So any time the facts would show that you placed that

18      minor on the internet for services, I would have to be finding

19      that the jury verdict didn't exist to say that a minor wasn't

20      part of this.

21              THE DEFENDANT:  Okay.  Can I explain?

22              THE COURT:  Sure.

23              THE DEFENDANT:  Can I explain?

24              Okay.  First of all, the jury was given an instruction

25      that knowledge of age was not an issue, so it's not like the

1   jury had a determination on the age part because that wasn't --

2   that wasn't a requirement for them to find me guilty of.  That

3   wasn't a requirement.  Had it been a requirement under Illinois

4   state law for promoting juvenile prostitution, it would have

5   been an affirmative defense.  So if the jury heard the

6   testimony, then they would have been able to go on based on

7   that.

8           THE COURT:  You weren't charged under Illinois state

9   law --

10          THE DEFENDANT:  Illinois state law for promoting

11  juvenile prostitution --

12          THE COURT:  You weren't charged under Illinois state

13  law.  You were charged under Federal Mann Act.

14          THE DEFENDANT:  I understand why -- I don't

15  understand -- even the Federal Mann Act, the first subsection A

16  is transportation with the intent to engage in sexual

17  conduct -- sexual -- criminal sexual activity.

18          THE COURT:  Well, that's only one prong.

19          THE DEFENDANT:  No, I'm saying --

20          THE COURT:  It's "or to promote prostitution."

21          THE DEFENDANT:  I'm saying that's the first prong of

22  the statute.  It says, when you look under Subsection A, it's

23  criminal -- it's transporting a minor with the intent to engage

24  in criminal sexual activity.

25          THE COURT:  Or prostitution.  It's either/or.  It's

1    not an "and." It's "or." It's either one or the other.

2          This was in the motion that you filed to me for your

3    post-trial. You believe that there should have been an

4    instruction where the state statutes were provided, such as

5    promoting criminal prostitution with a minor, but that's -- the

6    statute is an either/or. There's two subsections. Either to

7    promote prostitution or. It's not one or the other.

8          Would you like me to read it?

9          THE DEFENDANT: Can I show you what I have, your

10   Honor?

11         THE COURT: Sure you can.

12         THE DEFENDANT: 2423. Transportation of a minor.

13   Subsection A. Transportation with the intent to engage in

14   criminal sexual activity. A person who knowingly transported

15   an individual who has not attained the age of 18 in interstate

16   or foreign commerce or in any commonwealth, territory, or

17   possession of the United States, with the intent that that

18   individual engage in prostitution or in any sexual activity

19   which any person can be charged with a criminal offense.

20         It started off with transportation with the intent to

21   engage in criminal sexual activity.

22         THE COURT: Right. And it says with the intent that

23   the individual engage in prostitution or in any sexual activity

24   for which any person can be charged with a criminal offense.

25         So if they had charged 2423(a), and it would have been

1   you transporting her from Wisconsin to Illinois, and you having

2   sex with her, then they would have had to show that sex with

3   this girl was a violation of Illinois law -- or Wisconsin

4   law -- actually, it wouldn't matter, because the travel would

5   have allowed both states -- but that's not what they charged.

6   They charged you with the intent that she engage in

7   prostitution.

8          THE DEFENDANT:  Can I ask a question?

9          Because the statute, from what I'm reading, it

10  criminalize criminal sexual activity, so they have to show --

11  they have to show criminal sexual activity.  That's what the

12  statute criminalize.

13         THE COURT:  Right, which is defined as either this

14  18-year-old, having her engage in prostitution, or in a sexual

15  activity for which any person can be charged.

16         So it was prostitution that they presented the

17  evidence.  It wasn't a state statute.  So they didn't have to

18  turn to violation of the state statute because it was -- they

19  just had to prove commercial sexual activity.

20         THE DEFENDANT:  But under commercial sexual activity,

21  knowledge is a -- knowledge of age is a requirement, if you

22  look at 1591.

23         THE COURT:  If you are in -- well, now you're in human

24  trafficking.

25         THE DEFENDANT:  Right.

1          THE COURT:  They didn't charge that.

2          THE DEFENDANT:  That's what I'm saying.

3          THE COURT:  They didn't charge that either.

4          THE DEFENDANT:  But you saying they -- I mean, I'm

5     just trying to understand, because if they charging commercial

6     sexual activity, then essentially they charging 1591.

7          THE COURT:  They didn't charge that.  That's not the

8     charge they presented to the grand jury.  You were charged with

9     one count of the Mann Act, the first count -- the first part of

10    the Mann Act.

11          And the standard jury instructions that were provided

12    to this jury --

13          THE DEFENDANT:  Well, I was going to move on to

14    Note -- Note One.

15          THE COURT:  So they were instructed that in order for

16    you to find the defendant guilty of this charge, the government

17    must prove each of the three following elements beyond a

18    reasonable doubt:

19          That the defendant knowingly transported the victim in

20    interstate commerce;

21          That the individual victim was less than 18 years of

22    age;

23          And that the defendant intended that that person

24    engage in prostitution, which, if it had occurred, any other

25    person identified would have committed the criminal offense

1    of -- then you should find the guilty -- the defendant -- oh,

2    that's the "not guilty" section.  Sorry.

3          So I don't -- the criminal jury instructions say

4    directly that the government does not have to prove that the

5    defendant believed or knew that the person was less than 18

6    years of age.

7          THE DEFENDANT:  I know.  That's my -- that's my point,

8    but --

9          THE COURT:  Okay.  So if that's your objection, that

10   objection can be your appeal objection, but it's the law.  It's

11   the law that was applied.  And since the jury concluded that

12   you did transport a minor in interstate commerce for purposes

13   of prostitution, the minor enhancement that was just given is

14   appropriate.

15         And now as far as the next enhancement, the only thing

16   you can argue then is that it didn't involve the use of a

17   computer or an interactive computer service, for whatever

18   reason.

19         So go ahead and argue that if you can.

20         THE DEFENDANT:  So note -- note -- the note on -- I

21   think it's the note -- I think Note 4 specifically says in

22   plain language addressed to a person who has -- who acts as

23   custody, care, or supervise or control of the minor, which

24   essentially mean a person knows he or she is dealing with a

25   minor, not only that, he knows -- the note also states that you

1    have to use the computer to communicate directly with the

2    minor, whether it's -- whether it's posting the ad up or

3    entice, encourage, and offer, soliciting a person to engage in

4    a prohibited sexual conduct.  Majority of the case law, any

5    person who does this are communicating directly with persons on

6    instant messages, e-mail.  They communicating with a person

7    with the use of computer.  It's the direct use of a computer.

8    And no one came -- directly used the computer to communicate

9    with anyone in my case.

10            THE COURT:  Okay.  Response?

11            MR. PARENTE:  Thank you, Judge.

12            Yes, Judge, the application note does clash with the

13   guideline.  But as this Court is aware, the *McMillan* case last

14   year cited in the government's response, which was 777 F.3d

15   444, addressed this issue, and it was the same set of facts in

16   which an individual similarly situated to the defendant used

17   Backpage to post these ads, and the Court found that despite

18   that application note, which does appear to clash with the

19   language of the guideline, that the law is when there's a note

20   that clashes with the guideline, you go with the guideline.

21            In here, there's -- the Court heard the evidence at

22   trial that the defendant clearly posted multiple Backpage ads.

23   You heard April herself testify that the defendant took her

24   photo and posted the ads.  You heard Dache testify that she

25   watched the defendant post these ads.  You saw the invoice

1    information from backpage.com, listing the user name as

2    swagamillie, which the defendant's nickname is amillie.  The

3    customer name was also his alias.  He had an address listed

4    that was very similar to his own address.  And, most

5    importantly, the invoice date on the account that he used on

6    Backpage was created well before he even met April, meaning

7    that he had been doing this repeatedly.  So the Court saw the

8    ads during trial of April posted.  It goes back to a Backpage

9    account created before she ever met the defendant, in his name,

10   at an address similar to his.  So the evidence was overwhelming

11   that he posted the Backpage ads.  And once you get to that

12   point, the *McMillan* case shows that the 2-point enhancement

13   does apply.

14            THE COURT:  And --

15            THE DEFENDANT:  Can --

16            THE COURT:  -- where is the cite for the *McMillan*

17   case?

18            MR. PARENTE:  It's on page -- I can give -- it's 777

19   F.3d 444, but it's also page 5 of the government's response to

20   this defendant's memorandum.

21            THE COURT:  Okay.  Go ahead.

22            THE DEFENDANT:  First of all, I believe that Dache did

23   not testify she seen me post any ads from April.  I believe

24   that was not -- that was not in the transcripts.

25            Next, the thing with the *McMillan* case is this:  It's

1   a difference between the *McMillan* case in which the Court

2   overlooked -- first and foremost, they're saying a person in

3   control, custody, or supervision or care.  So if this person is

4   in control, custody, supervision or care, they can communicate

5   directly with a person while soliciting them, encouraging and

6   enticing and offering.  They can do this because they in --

7   they in control of that person, so they would be able to

8   solicit a third party or second party to engage in a commercial

9   sex act with an individual with the use of a computer.  They

10  would -- they would actually be able to do that.  That's not --

11  that's not like you can't do that.  It's not a clash with the

12  note.  The interpretation was brung down from the -- if you

13  look at the *Patterson* case and you see the interpretation, the

14  note wasn't clashed.  It was the part that -- *McMillan* was

15  charged under 1591, he was charged with sex trafficking, a

16  whole different charge from mine.

17          THE COURT:  It is an analysis, however, of the

18  guideline application, which I'm looking at now.  And

19  regardless of whether it was a Mann Act charge or a sex

20  trafficking charge, what we do know is that the Seventh Circuit

21  last year held that, under really almost identical

22  circumstances, when a defendant had used the computer to,

23  quote, entice, encourage, offer, or solicit a person to engage

24  in prohibited sexual conduct with a minor, then -- where he

25  posted them on Craigslist, then it should apply.  And this was

1    the same exact guideline application that we're looking at.

2           So the charge doesn't matter if the activity is the

3    same, and the enhancement applies.

4           THE DEFENDANT:  Your Honor, can I say one thing?

5           THE COURT:  Sure you can.

6           THE DEFENDANT:  The thing about Craigslist is

7    different.

8           THE COURT:  Okay.

9           THE DEFENDANT:  Craigslist they communicate directly

10   on Craigslist with each other.

11          THE COURT:  Okay.

12          THE DEFENDANT:  They message each other back and

13   forth, so it's like an instant message thing.

14          THE COURT:  Okay.

15          THE DEFENDANT:  Backpage is not like that.  Backpage

16   is only a phone number.  You only post the ad.  It's different.

17   Craigslist actually -- you actually put it on there, and they

18   actually was communicating back and forth through Craigslist,

19   through the computer, through using a computer.  That's the

20   difference.

21          THE COURT:  So the idea here under Section B is to

22   entice, encourage, offer, or solicit a person to engage in

23   sexual conduct with a minor.

24          Evidence showed that you bought or presented the minor

25   with lingerie, posed the minor, took pictures of the minor, and

1   posted her to encourage, offer, or solicit her to engage in

2   sexual conduct with others, who then called in and did exactly

3   that.

4           So your objection is overruled.  And the 2-level

5   enhancement for the use of the computer or the computer service

6   to solicit others to engage in sex with a minor in this case

7   shall be applied.

8           So let's turn to the next specific offense

9   characteristic, which is the commercial sex act.  And you have

10   an objection to that.

11          This now is 2G1.3(b)(4)(B), and it says it applies if

12   it involved a commercial sex act.  And pursuant to the

13   application note, commercial sex act has the meaning that is

14   defined in the human trafficking statute.  And it means any sex

15   act on account of which anything of value is given to or

16   received in -- or received by any person.

17          What's your objection?

18          THE DEFENDANT:  I object.  It's unreliable evidence to

19   even prove that a sexual act occurred.  I mean, from -- from

20   five different testimonies -- I mean, three different

21   statements, several different testimony, I mean, in fact, if

22   I'm -- can remember correctly, Dache testified on

23   September 10th that she was in a Super 8 motel room all day and

24   April never did a commercial sex act inside that room.

25   April -- April testified that she did do two sexual acts on

1    that day.  So, I mean, there's testimony.  First she says she

2    never did any, then she says she did one, then she turned

3    around and said she did three, because the FBI told her that

4    Dache says she did three.  Now she did three.  Then she said

5    she didn't, and then she said she didn't do -- she have never

6    engage in sexual -- I mean, I don't believe that the testimony

7    is reliable.

8              THE COURT:  Okay.  Well, that's really a challenge to

9    the conviction, and it's a challenge to the sufficiency of the

10   evidence at trial, because the victim testified that she had

11   engaged in a commercial sex act.  You aided her in doing that

12   by posting her online, brought her over to the store to get her

13   the appropriate accouterments so that she could engage in sex

14   acts while she had her period, and that she provided cash to

15   you as a result.  That's my recollection of the evidence.

16             Mr. Parente, please make your position.

17             No, it's his position --

18             THE DEFENDANT:  All right.

19             THE COURT:  -- and then you can reply.

20             MR. PARENTE:  That's correct, Judge.  You did hear

21   testimony from the victim that there were three separate sex

22   acts performed.  A total of $300 was made that was turned over

23   to the defendant, corroborated by the other information that

24   your Honor just referenced, plus just looking at the big

25   picture, Judge, this is a defendant who is paying for these

1    hotel rooms, who drove to Milwaukee to pick this girl up, who

2    is giving her clothes, and he's posting these ads.  He's

3    clearly investing a lot of money in a 15-year-old girl he just

4    met.

5             THE COURT:  So go ahead and reply.

6             THE DEFENDANT:  I believe from the beginning, if

7    you -- if you go back to the evidence, and the evidence I even

8    submitted to you, the text message, even in her text message,

9    she said that I said I'll take her to the store and buy her

10   tampons.  Nothing about no soft cups.  I mean, and that's --

11   and you -- I think I presented the message to you.  So what I'm

12   saying is I never -- that was never my intentions to buy

13   anything like that.  I didn't even know anything about that,

14   so --

15            THE COURT:  Wait, isn't the video a video of you

16   making the purchase while she is there?

17            THE DEFENDANT:  I said -- yeah, I said -- but I

18   said --

19            THE COURT:  And the purchase and the receipt that

20   shows the purchase of soft cups --

21            THE DEFENDANT:  I'm not --

22            THE COURT:  -- and you on the video at the Walgreens

23   or whatever?

24            THE DEFENDANT:  I'm not disputing that, your Honor.

25            THE COURT:  I see.  So I don't understand then what

1    you were saying you didn't do.

2    THE DEFENDANT:  I said that it wasn't my intentions

3    to -- I told her to buy -- she said she wanted to buy tampons.

4    I took her to the store to buy tampons.  She picked those up --

5    THE COURT:  But then you bought her soft cups?

6    THE DEFENDANT:  She wanted them, so I -- I bought them

7    for her.

8    THE COURT:  I see.  Okay.  Okay.

9    Again, it's going to the weight of the evidence

10   presented to the jury, and you're challenging that.

11   As far as whether there was a commercial sex act,

12   there was evidence presented at this trial in the form of the

13   victim's testimony, which was corroborated by the video of the

14   purchase of the soft cups, which corroborates that you aided

15   her in getting those in order for her to continue to have

16   commercial sex acts.  She stated that she provided you with the

17   cash.  You had just met her and brought her to a hotel room

18   that you had rented yourself.  And Ms. Crayton's testimony was

19   that that was the purpose of having her there, and that was

20   Ms. Crayton's purpose there.  So there's sufficient evidence

21   for the jury to have found that this was for prostitution and

22   commercial sex acts occurred.

23   So over your objection, those two points will be

24   applied, which means that we're at a level 34.

25   There's no acceptance of responsibility because you

1    didn't plead or do so early.

2            We now turn to your criminal history, and we'll

3    address your concerns about the criminal history points.  So

4    let's go through each one.

5            And I'll start with the first one that has points is

6    the one that you were addressing.  Page 11, Mr. Parente, Number

7    41.  The arrest of April 5th, 2002 at the age of 17.  Charged

8    with first and second -- Counts 1 and 2, rather, charged with

9    fourth degree sexual assault.  Pled guilty to a misdemeanor and

10   received 9 months of jail, which was stayed, 3 years of pro --

11   for 3 years of probation.

12           Then in 2003 the probation was revoked, and 9 months

13   of jail on each count to run consecutive for a total of an

14   18-month jail time.

15           The probation officer has counted it as 4 criminal

16   history points.

17           And so let me hear your objection to why it should not

18   be counted.

19           THE DEFENDANT:  I think the Court --

20           THE COURT:  You mentioned to me first you thought it

21   was old.

22           THE DEFENDANT:  Oh, yes.

23           THE COURT:  That's the one you said you thought was --

24   went beyond the 10-year --

25           THE DEFENDANT:  Yes --

1          THE COURT:  -- period.

2          THE DEFENDANT:  -- it was.

3          THE COURT:  So that's your first argument.

4          THE DEFENDANT:  That's my --

5          THE COURT:  Is there more?

6          THE DEFENDANT:  My argument is *United States versus*

7     *Beckford*.

8          THE COURT:  Okay.  Right.

9          THE DEFENDANT:  In the *Beckford* court, March 2016*,*

10    *Beckford* the revocation occurred in 1997, which led the

11    probation officer to conclude that Beckford prison term was

12    imposed within 10 years of the commencement of this 1326

13    offense.  When Beckford re-entered the country in 2005, see

14    USGG 14A1.2(e), Subsection 2, the prison term was under 13

15    months.  However, the relevant date of the conviction is not

16    when the revocation occurred, but the time -- but the date of

17    the original sentence, which is 1994.

18          So basically, from with *Beckford*, in order for them to

19    give me points for this, I would have had to catch my case

20    before May 7th of 2013 or on May 7th, 2013.

21          In seeming that the case was -- I caught this case in

22    September of 2013, it would be out of the 10-year guideline

23    period for, and points would not be applicable.

24          THE COURT:  Okay.  So the argument, if I'm hearing you

25    correctly, is that the original sentence in 2003, which was for

1    a misdemeanor, would be outside of the scope of the 10-year

2    period, right?  That's your argument.

3              THE DEFENDANT:  Yes.

4              THE COURT:  And that the revocation sentence, even

5    though that is 18 months, is -- you don't look to that

6    revocation sentence, you look back to the original sentence,

7    which was 3 years of probation and 9 months of jail stayed.  Is

8    that correct?  Am I saying it correctly?

9              THE DEFENDANT:  No.

10             THE COURT:  Okay.  I'm sorry.  I thought that's what

11   you were saying.

12             THE DEFENDANT:  It was 9 months, each count.  It

13   wasn't 18 months.  It had --

14             THE COURT:  Okay.  So even if you looked at the

15   revocation sentence --

16             THE DEFENDANT:  It's two -- it's two different --

17             THE COURT:  It's 9 months, it's not -- it's not an

18   18-month sentence.

19             THE DEFENDANT:  It's 9 months apiece.

20             THE COURT:  Okay.  That's the argument.

21             So now the probation officer has relied on three

22   guidelines to reach the 4 points.

23             The first is that she's looking at 3 points for each

24   prior sentence of imprisonment exceeding one year and one

25   month.

1              And then 4A1.2(k), which is -- hang on -- which is a

2    revocation of probation, and it says in the case of a prior

3    revocation of probation, parole, or supervised release, add the

4    original term of imprisonment to any term of imprisonment

5    imposed upon revocation, and the resulting total is used to

6    compute the criminal history points for 4A1.1(a), (b), or (c).

7              So if I'm getting this right, Ms. Kieckhafer, what you

8    did is you looked at the original 9-month stayed and 1 year --

9    or 3 years' probation.  Once that was revoked, you added the

10   two subsequent 9 months to the 9-month stayed and 1-year

11   probation, so you're over a year of imprisonment.  Is that

12   correct?

13             PROBATION OFFICER:  That's correct, Judge.

14             THE COURT:  That's how you did it.  Okay.

15             And then we -- then she turned to 4A1.1(e), which is

16   adding a point for a prior sentence resulting from a conviction

17   of a crime of violence that did not receive any points under A,

18   B, or C above because it was treated as a single sentence.

19             And that is your position that the single sentence,

20   because it was the revocation and the original one, got 3

21   points, but it was a crime of violence, and it was combined, so

22   it should have been an extra point.

23             Is that my -- is that your position?

24             PROBATION OFFICER:  I'm sorry, your Honor.

25             THE DEFENDANT:  Me or --

1          THE COURT:  No, I'm talking to the probation officer.

2          PROBATION OFFICER:  I missed the question.  I'm sorry.

3          THE COURT:  So I'm now looking to your justification

4     for 4A1.1(e), which says to add the 1 point for each prior

5     sentence resulting from a conviction of a crime of violence

6     that did not receive any points under A, B, or C.

7          Now, in -- but in truth, are you giving him A points

8     for getting 3 points or -- no, you're going to K to get him the

9     points.  Is that what I'm reading?  I'm trying to understand

10    the last point.

11         PROBATION OFFICER:  So if you take -- I'm going to try

12    to explain it the best I can.

13         THE COURT:  Yeah, I know.

14         PROBATION OFFICER:  It's complicated.

15         THE COURT:  That's fine.

16         PROBATION OFFICER:  So if you take Count 1 alone, he

17    got 100 days jail, plus 9 months jail, so that would be more

18    than a year and a day.  That would total more than a year and a

19    day.

20         THE DEFENDANT:  No.

21         PROBATION OFFICER:  So that's how he gets --

22         THE DEFENDANT:  That ain't my --

23         THE COURT:  Hold on.  You're not -- it's not your

24    turn.  You're going to have your turn.

25         PROBATION OFFICER:  That's why it's 3 points for

1    4A1.1(a) and 4A1.2(k).

2         THE COURT:  I got that.  It's the last one.  It's the

3    (e) that I'm --

4         PROBATION OFFICER:  Okay.  So then I take that

5    separately, I take that second count separately, and he got a

6    total of 9 months on that, so because -- because he didn't need

7    that second count to count for those 3 points assigned to Count

8    1, and it's a crime of violence, you count that separately.

9         Does that help?

10        THE COURT:  Because it's an armed robbery.

11        PROBATION OFFICER:  Because it's a crime of violence.

12        THE COURT:  Got it.  Okay.  Okay.

13        THE DEFENDANT:  Can I explain something, your Honor?

14        THE COURT:  Yeah, go ahead.

15        THE DEFENDANT:  First of all, I had got 100 days

16   condition time.  The 100 days of condition time run within the

17   9 months, but the 9 months was -- the 9-month sentence was

18   stayed.  Both 9 months in my sentence were stayed.  The 100-day

19   sentence was -- ran within the 9 months.  So I go do -- I got a

20   halfway house for 9 months.  That mean for 100 days.  So I had

21   to do 75 days stay -- I mean 75 days as condition time.  But

22   the condition time was the actual -- within the actual

23   sentence, so the condition time counted within the 9-month

24   sentence.  And the 9-month sentence only did -- with the

25   total -- with the total jail time I did on this -- on both

1    charges were 10 months.  I did 10 months on both charges.

2              THE COURT:  Yeah.  So under the guideline calculation,

3    we're not looking to what you actually served.

4              THE DEFENDANT:  Right.

5              THE COURT:  We're looking to what you got.

6              THE DEFENDANT:  Right.

7              THE COURT:  So, first of all, my first point would be

8    it doesn't say that you received a conditional discharge.  Had

9    you received a conditional discharge, the revocation would have

10   then triggered the felony in the first place.

11             THE DEFENDANT:  That's what it did.

12             THE COURT:  Well, if it did, then that's a direct

13   calculation.

14             THE DEFENDANT:  But the revocation --

15             THE COURT:  If you received, as it states here that

16   the 9 months of jail was stayed and you were put on 3 years of

17   probation, but then you violated that probation and you were

18   revoked, and you received 9 months on Count 1 and 9 months on

19   Count 2, to run consecutive with each other, but you only

20   served 10 months total, then -- then this calculation is also

21   correct.

22             THE DEFENDANT:  But those are two different sentences.

23   Those are not one sentence.  That's two different sentences.

24             THE COURT:  Which is exactly why she's adding the

25   extra point, because because they're two different sentences,

1    one of the violent crime sentences is not getting any points,

2    and so she's adding under 4A1.1(e) that extra point.

3                 Am I correct on that?

4                 PROBATION OFFICER:  Correct, Judge.

5                 THE COURT:  Right.  That's my understanding.  All

6    right.

7                 THE DEFENDANT:  See, if you read -- if you read

8    *Beckford*, in *Beckford*, he was revocated in 1997.  In

9    *Beckford* -- in my -- in my case --

10                THE COURT:  Can you give me a cite on *Bedford*?

11                THE DEFENDANT:  It's just *United States versus*

12   *Beckford*, 2000 -- I mean, 2016 in March.

13                THE COURT:  Okay.  Is it B-E-D-F-O-R-D?

14                THE DEFENDANT:  No.  B-E-C-K-F-O-R-D.

15                THE COURT:  *Beckford*.  Okay.

16                THE DEFENDANT:  *Beckford*.

17                And I -- it was -- this is what -- this is what my

18   sentence was.  It was one -- one count on -- first count I

19   pleaded guilty to, I had 9 months' jail time stayed, 3 years'

20   probation.  Count 1 -- I did 100 days on Count 1 within a

21   9-month jail time.  That was stayed.  It was stayed, but within

22   that 9 months, I had 100 days to do out of that 9 months for

23   condition -- for a condition of my -- my supervision.  So after

24   I do -- after I do 5 months of that 9 months, regardless, both

25   of the sentences only received 9 months for both sentences.  So

1   both of the sentence were both under 13 months.  So if they

2   both under 13 months, it's inapplicable.  They can't count

3   them.

4           THE COURT:  I'm just going to read this case real

5   quickly, Mr. Parente, before I turn to you, okay?

6           MR. PARENTE:  Yes, Judge.

7       (Pause in proceedings.)

8           THE COURT:  Okay.  So just -- I don't know if you

9   have -- do you have *Beckford* with you?  I'll just read --

10          MR. PARENTE:  I don't.

11          THE COURT:  I'll read you the relevant portion.  And

12   for your record, it's 640 Fed. Appx. 558, and it's

13   Seventh Circuit, March 21, 2016.

14          "Counsel next advises that she reviewed the district

15   court's application of the sentencing guidelines and concluded

16   that the Court, quote, correctly adopted the calculations

17   proposed by the probation officer.  But one of those

18   calculations, the assessment of two criminal history points on

19   the 1994 drug conviction for which Beckford's probation was

20   revoked, was in error.  The revocation occurred in '97, which

21   led the probation officer to conclude that Beckford's prison

22   term was imposed within 10 years of the commencement of his

23   1326(a) offense," it's an illegal re-entry case, "when Beckford

24   re-entered in 2005.  The prison term was under 13 months,

25   however, so the relevant date for this conviction is not when

 1    the revocation occurred, but the date of the original sentence,

 2    which is 1994.  Thus the conviction should not have been

 3    counted towards his criminal history category under 4A1.1(b),"

 4    which is a different guideline than we're looking at.  "Still,

 5    an appellate challenge to this error would be frivolous because

 6    in his plea agreement Beckford expressly endorsed the Court's

 7    guideline calculation."

 8            So that's the analysis.

 9            So let me just go back and look at the dates again

10    based upon that.

11            What is the date of his arrest?

12            MR. PARENTE:  September -- the indictment is September

13    '13, Judge.

14            THE COURT:  Of?

15            MR. PARENTE:  September 2013.

16            THE COURT:  Oh, September 2013.  Thank you.

17            Okay.  So --

18            MR. PARENTE:  And the --

19            THE COURT:  So of course -- well, first of all, if

20    that were the case, it would certainly get points, because his

21    arrest was within -- within 10 years of the imposition of the

22    sentence that, you know, it has to be during the service of the

23    sentence, correct?

24            MR. PARENTE:  Right.  It would get points under either

25    the 10-year or the 15 --

1          THE COURT:  Yeah, exactly.  So it would count under

2     either the 10 or the -- 10-year scope or the 15-year scope.

3          But then as far as what number of points, he's arguing

4     that it -- so the point being is let's start at the very basic

5     beginning, which is that this sentence was imposed on May 7th

6     of 2003.  It did not end on May 7th in 2003.  You had 9 months

7     of jail time, which was stayed, and 3 years of probation.

8          So even -- so the probationary period would have ended

9     May 7th of 2006.  So not even looking at the revocation, the

10    fact that you were arrested in September of 2013, at least at a

11    bare minimum, 2 points have to be added for a misdemeanor

12    conviction -- is it 2 points for a misdemeanor conviction?

13         MR. PARENTE:  Anything over 60 days, Judge.

14         THE COURT:  Okay, right.

15         So you would have, at a bare minimum, 2 points because

16    it's within a 10-year period of time.

17         THE DEFENDANT:  May I speak, your Honor?

18         THE COURT:  You sure can.

19         THE DEFENDANT:  My original -- the date of my original

20    sentence is on May 7, 2003.

21         THE COURT:  That's correct.

22         THE DEFENDANT:  And that's the day it starts from.  It

23    start from not the day --

24         THE COURT:  It doesn't end, though.  It doesn't end.

25    You are serving a sentence the entire time.

1          So let's look to when you count -- the counting rule.

2          Maybe you can help me --

3          MR. PARENTE:  Judge, I think if you go to

4    4A1.2(k)(1) --

5          THE COURT:  Yes.

6          MR. PARENTE:  -- it says in the case of a revocation,

7    you then add the original term of imprisonment to the term

8    imposed upon revocation, which here would be 18 months.

9          THE COURT:  Right, so --

10          MR. PARENTE:  And then you go back to the --

11          THE COURT:  We're not even there yet.  That's where

12    she is.  I'm trying first and foremost to show him that it's

13    within the time frame.

14          MR. PARENTE:  Got it.

15          THE COURT:  And then we're going to go into the number

16    of points.

17          So it's within the time frame, so let's go back to the

18    most basic of the 4A1.1 calculations, which is how you -- what

19    the 15-year period is --

20          THE DEFENDANT:  I don't have a 15, it's a 10.

21          THE COURT:  It doesn't matter.  Either one.

22          THE DEFENDANT:  Because -- it's a difference because

23    the 15-year period of time goes from the time that your

24    sentence stop.  The 10-year period of time goes from the time

25    that your sentence began.  That's the difference.

1          THE COURT:  Where do you find that?

2          THE DEFENDANT:  It's in *United States versus Carroll*.

3   It's also in the -- the Seventh -- the circuit -- that other

4   case that the Seventh Circuit, *Beckford*, they cite it in

5   *Beckford*, *Arviso versus Mata*.  It's in all these cases.  I put

6   it in -- I also put it in *United States versus Arnold*,

7   *United States versus Carroll*, 1997 --

8          THE COURT:  No, see -- I'll look -- I mean, 4A1.1(d)

9   is very clear.  Even if we're looking at 2 points, which we're

10  not yet, but that they're added if you committed any part of

11  the instant offense -- listen -- while under any criminal

12  justice sentence, including probation, parole, supervised

13  release, imprisonment, work release.

14         You don't -- the clock doesn't start and stop on the

15  day you're sentenced.

16         If you commit the offense, which you did September

17  2013, and you were on probation --

18         THE DEFENDANT:  No, I wasn't.

19         THE COURT:  -- up until 2006, so we go back 10

20  years --

21         THE DEFENDANT:  I wasn't on probation.

22         THE COURT:  The probation is a 3-year period of

23  probation.

24         THE DEFENDANT:  My probation was revoked.  My

25  revocation -- my revocation stopped my probation.

1      THE COURT:  Okay.  So that -- all right.  If that's

2   where you want to head, that's where we're going to head.

3      So then we go to K, and K is exactly what Mr. Parente

4   was just arguing, which is that once you have the prior

5   revocation of probation, then we add the original term of

6   imprisonment to any term of imprisonment imposed upon

7   revocation.  We have 2 counts, 7 and 7, that were added to the

8   9 -- the 9 months in 2003, so then you have 14 and 9 and --

9      THE DEFENDANT:  14 and 9.  Excuse me?  14 and 9?

10   What?  I mean, your Honor, I only had two 9-month sentences.

11      THE COURT:  Right.  And I'm reading to you revocation

12   of probation, 4A1.2(k), in the case of a prior revocation of

13   probation, which is what you had --

14      THE DEFENDANT:  Right.

15      THE COURT:  -- add the original term of imprisonment,

16   which is what?

17      THE DEFENDANT:  If it's over 13 months.

18      THE COURT:  No.  Listen.  No.  Where are you getting

19   this qualification?  Add the original term of imprisonment to

20   any term of imprisonment imposed upon revocation.

21      THE DEFENDANT:  Now can I -- I'm trying to -- okay.

22   If you -- if you read the *Beckford* case, the *Beckford* case --

23      THE COURT:  I just read it.

24      THE DEFENDANT:  Okay.  Now, however, the relevant date

25   of the conviction is not when the revocation occurred, but the

1    date of the original sentence, which was 1994.  See USGG 1,

2    Subsection 4A1.2(k)(2)(C).  And it's saying that the

3    revocation -- the revocation has nothing to do with it if it's

4    under 13 months.  Only after 13 months can the time be added

5    towards the conviction, that the time starts with the

6    conviction, only after that time frame.  If it's not -- if it's

7    not over 13 months on the sentence, then they can't add it.

8    And both of my convictions were 9 months apiece.

9              THE COURT:  Okay.  Mr. Parente, your position?

10             MR. PARENTE:  Judge, again, I would go back to

11   4A1.2(k)(1), which says that you add it all together, which

12   then you're over the year and a -- the year and a month, and

13   you're in the 15-year window at that point, and it says the

14   resulting total is then used to compute criminal history points

15   under 4A.1(a), (b), or (c), which is where we go.

16             THE DEFENDANT:  So you adding up both of the

17   sentences, even though they're consecutive sentence, they're

18   different sentences?  You adding both conviction as one?

19             MR. PARENTE:  You add it to the original sentence of 9

20   months.

21             THE DEFENDANT:  No, I mean, but those are two

22   different convictions.

23             THE COURT:  That's exactly right.  Conviction for two

24   separate counts --

25             THE DEFENDANT:  But they both --

1          THE COURT:  So each conviction --

2          THE DEFENDANT:  -- right --

3          THE COURT:  -- received 9 months and, in fact, were

4    ordered to be consecutive to each other.

5          THE DEFENDANT:  Okay.  And I can -- and even if that's

6    so, if you look at the *Beckford* case, he was revocated three

7    years later.  He was revocated in 1997.

8          THE COURT:  Revoked.

9          THE DEFENDANT:  He was revoked -- revoked, revocated,

10   revoked -- in 1997.  So that was a whole three years later, and

11   the Court still concluded that the time -- that the time was

12   outside of the 10 years because it started from 1994.

13         THE COURT:  So when you look at the Subsection 2,

14   you -- (k)(2), you added up the numbers to get to -- that's why

15   2 is where you are with Subsection 1, right?

16         PROBATION OFFICER:  Yes, Judge.

17         And I would suggest looking -- let's look at

18   4A1.2(k)(2)(A).

19         THE COURT:  Right.

20         PROBATION OFFICER:  And that's where the timing kind

21   of comes in.

22         THE COURT:  Right.  Yeah.

23         So 2(k)(1) gives us the calculation that brings us to

24   adding them together.  And then in the case of an adult term of

25   imprisonment totaling more than one year and one month, it is

1    from the last release from incarceration.

2          That will be my ruling, over objection.  And so I'm

3    going to add the 4 points to your criminal history regarding

4    that.

5          We turn to --

6          THE DEFENDANT:  Excuse me, your Honor.

7          THE COURT:  Yes?

8          THE DEFENDANT:  Can I say one thing?

9          THE COURT:  Of course you can.

10         THE DEFENDANT:  I really don't want to participate in

11   the sentencing no more.  I really don't.  I don't want to

12   participate.  I mean, you can give me what you want to give me.

13   I don't want to -- I mean, I'm just here for no reason.  I

14   mean --

15         THE COURT:  I've given you every opportunity to make

16   your case.

17         THE DEFENDANT:  I understand.

18         THE COURT:  You're very articulate in your making it.

19   So it's your decision.

20         I will sentence you accordingly, but I'm going forward

21   with the calculations, and you're making your arguments and

22   preserving your record for appeal.

23         You don't like my rulings, but I'm -- I mean, you're

24   making your record, and you can tell the appellate court that

25   I'm wrong if you feel that's appropriate.  But if you don't

1    want to participate, I'll just go to sentencing.  It's up to

2    you.

3              THE DEFENDANT:  My motion still in for everything else

4    I made, because I don't want to waste the Court time no more.

5              THE COURT:  You've not wasted my time.  I've done a

6    lot of work on your case, as you can see.

7              Your motions have all been decided.

8              THE DEFENDANT:  Right.  I'm talking about my

9    sentencing motions and stuff like that, so my arguments are in

10   there, right?  So, I mean, if you want to move forward to the

11   sentencing, I'm --

12             THE COURT:  So do you have any more objections to the

13   criminal history category?

14             THE DEFENDANT:  I objected, every -- everything I

15   objected to so far was put into my sentencing memorandum.

16             THE COURT:  Okay.  So if you don't want to orally

17   argue any of those objections, we'll turn then to the

18   sentencing guideline calculation, which is that you are a level

19   34, and you are criminal history category IV, and your

20   sentencing guideline range is 210 to 262 months in jail.

21             We now turn to the 3553 factors.

22             And I'll hear first from Mr. Parente as to where you

23   would like to -- how you would like to proceed.

24             MR. PARENTE:  Thank you, your Honor.

25             Judge, as the Court said, the guideline range is 210

1    to 262.  The government is recommending a high-end sentence for

2    this defendant of 262 months, and that's based on the 3553(a)

3    factors that I'll now discuss.

4              First, it's the nature and circumstances of the

5    offense.

6              Your Honor has sat through this trial and heard what

7    this case was about and what the defendant did.  And primarily,

8    Judge, what that was is this is a man who traveled out of

9    state, drove 400 miles round-trip, picked up a 15-year-old girl

10   standing outside of her home, told her that they were going on

11   a trip to Milwaukee, which she lived in Madison, doesn't tell

12   her what's actually happening.  She figures it out as they

13   start driving towards Chicago.  He pulls into a Super 8 Motel,

14   brings her up to a hotel room where he has another girl, an

15   adult, working for him as a prostitute.  He knows this girl

16   doesn't want to be there.  You heard Ms. Crayton say she stood

17   in the corner.  Her arms were crossed.  She looked angry.  She

18   repeatedly asked to go home.  But when you get picked up

19   outside your house by a stranger, she -- at 15 you have no

20   money, she had no way to get out of there, and he knew that,

21   and he exploited that.  And that was his plan the entire time.

22   That's why he decided he would, in fact, drive from a Super 8

23   in Chicago all the way to Wisconsin and back in one night.

24   That's why he then decided to rent multiple hotel rooms, dress

25   up this 15-year-old girl as an adult woman and put her out on

1    the internet so that adult men could come in, have sex with

2    this woman -- this girl.  For what, Judge?  For him to get a

3    few hundred dollars.  That's what this case is about.  He

4    exploited a child for his own personal profit.  And it's

5    disgusting, it's obviously serious, and it's something that

6    this man did repeatedly, and it's consistent with his

7    background of being a violent sexual predator that we'll get to

8    shortly.

9            And if you look at his history and characteristics,

10   Judge, the next factor, again, I think it weighs heavily in

11   favor of a high-end sentence here of 262.

12           First, you heard a little bit about it wasn't just --

13   April wasn't the only girl.  There was another woman working

14   for him named Dache who the Court heard from, and you also

15   heard about a woman named Nikki.  And one of the exhibits that

16   the government sentencing memorandum shows what kind of man

17   this is.  The text to Nikki, who the government will proffer

18   had children, he texted her.  And this is from his phone:  I'm

19   going to make sure you never see your kids again.  That's on my

20   life.  Every living thing.  Again, that's on my life.  Every

21   living ounce in me to get -- so get my cash ready, Nikki.

22           I mean, to threaten one of these women, Judge, who are

23   working for him by going after her children in a text message

24   threat like that, that's who we're talking about here.  And

25   that's consistent with his past criminal history.  The Court

1    sees that this man has -- this is not his first crime of a

2    sexual nature.  He has a knife-point rape of a 21-year-old girl

3    in his background which he was sentenced for and obviously was

4    not able to be rehabilitated.

5            While he was on supervised release from his sentence,

6    he has sexual contact with a 15-year-old girl in a completely

7    separate case again while under supervised release from another

8    sentence.

9            This is an individual who cannot control himself.

10   This is an individual who is a predator to both women and small

11   children.  And it's an individual who continues to be sentenced

12   by courts and comes out and does the same thing.  And as the

13   Court will hear shortly, even does these things while he's in

14   jail.

15           And it's not just these sexual crimes, Judge.  He's

16   also a violent individual.  The Court sees that he has his

17   prior armed robbery where it's essentially a home invasion

18   robbery where the defendant goes in, physically punches and

19   beats up his victims, shoots a round out of the firearm that he

20   has into the dresser during the robbery.  This is a man who is

21   not just targeting children and women, he's also targeting

22   anyone who has something that he wants, and he's willing to use

23   firearms and physical violence to get it.

24           And most importantly, Judge, and I think the one that

25   the Court should pay special attention to is the multiple

1    incidents that he's committed while at the -- he's not even at

2    the MCC, Judge.  He's been kicked out of two federal

3    facilities.  And this is at a time when, if you are a person

4    who has a chance for rehabilitation, you're going to be on your

5    best behavior.  You know that a court is going to be sentencing

6    you soon.  You know that your behavior is under a microscope.

7    You're under lock and key 24/7.  And what do you do?  If you

8    can't control yourself, control your impulses in that scenario,

9    then society has no chance to be protected from you.  None.

10   That's with guards around, that's when you're locked down in

11   your cell, and he is still, Judge, there's multiple incidents,

12   including just yesterday, where he's attacking other prisoners

13   in fights.  And that's not even talking about the multiple

14   incidents of masturbation that he has in front of the guards,

15   and then the entire incident of the masturbation at the

16   deposition with the female attorney and the court reporter in

17   the room.

18           Again, it's just -- this is at a time when he knows

19   this court is looking at him, he knows this -- that was

20   post-verdict, Judge, the deposition one.  He knows that your

21   Honor is going to sentence him.  And he has sent the message

22   loud and clear that this is a man who will not change.  He will

23   continue to commit sexual crimes.  He will continue to commit

24   violent crimes.  Unfortunately, there's something wrong with

25   him, and hopefully he can get the help this time in prison that

1    he needs, but society is going to need to be protected for a

2    very, very long time from someone like this.

3          And finally, Judge, I'll just end with just

4    punishment, deterrence, and to protect the community, which I

5    think this is what this is about.

6          This is a man who has been in and out of prison

7    multiple times, and he continues to find new victims.  If only

8    he had gotten a longer sentence earlier or had somehow been

9    rehabilitated earlier, we could have at least protected April

10   from having this happen.  And I think what society needs now is

11   this defendant to be put away for a length of time where when

12   he comes out, it will be either a long enough time that he has

13   gotten the treatment he needs in prison and that he's at an age

14   where he is no longer able to attack women, children, or other

15   adults in a physical or sexually violent way.

16         THE COURT:  Do you have any victim statements?

17         MR. PARENTE:  I do, Judge.  I have a victim -- both

18   the victim and her mother are in the courtroom today.  They

19   thought it was important to be here, and they wanted to show

20   you that they were here.

21         The victim's mother has written a statement she would

22   like me to read to the Court, if that's okay.

23         THE COURT:  Okay.  That's fine.

24         MR. PARENTE:  (Reading:)

25         My name is D.P.  I am the mother of the victim April.

1    April's dad died ten years ago from a very violent and brutal

2    death.  I tried everything I could to make up for this tragedy

3    in her life.  I took both my daughters to counseling, and we

4    eventually moved in with my mother for financial and emotional

5    support.  I just wanted to make things better for April, but

6    instead I made things worse.  I took April away from her

7    friends.  I could tell that April felt isolated and alone.  I

8    know she felt like no one cared about her, and I felt that I

9    couldn't do anything right to help her.  I just wanted April to

10   have a normal life.  I wanted April to have friends.  I was

11   going to try to be a good mom, but I was struggling, too.

12            To this day, I remember dropping April off at her

13   friend's house.  Later on, April started sending me messages

14   saying that she loved me and that she would send me money.  I

15   didn't know what to think.  I tried to get ahold of her, but I

16   didn't know where she was.  All I knew was that she was gone,

17   and I felt hopeless.  I didn't know where to look for her, and

18   I didn't know if she would ever return.  At last my oldest

19   daughter received a phone call saying April was in trouble.  It

20   was then that I found out April was trying to come back home.

21            I immediately called the Romeoville Police Department

22   and told them where my daughter -- and told them where my

23   daughter was.  I had no idea what kind of trouble April was in,

24   and I just wanted her back.

25            I jumped in my car and headed straight to April, which

1    was a three-hour drive.  I was so nervous and made so many

2    wrong turns, it took me nine hours to get there.  I was

3    exhausted, but I was determined to get my daughter back home.

4         When I arrived at the police station, I learned that

5    April was being trafficked by the defendant.  I was in total

6    shock.  I just recall saying to myself over and over:  This

7    isn't real, this isn't real, this isn't real.  Unfortunately, I

8    now know that this is real.

9         The defendant took a 15-year-old child and pushed her

10   to be an adult.  April went from 15 years old to 21 years old,

11   with no in-between.  I never got a chance to raise my teenager.

12   I felt like that I had been robbed of this time with her.

13        April now drinks to calm her anxiety and has trouble

14   maintaining her emotions.

15        I've always felt that April grew up with a void in her

16   life.  That void is where her dad should have been, but,

17   instead, the defendant found a way to fill that void.  I wonder

18   how many other voids of underage girls he has also tried

19   filling.  I don't want any other young girl to go through what

20   April went through.

21        You took my daughter's life away from me.  You need

22   consequences, and your consequences are going to jail for

23   ruining my daughter's life.  All because you were too lazy to

24   get a job.  You destroyed my daughter's life, and it's not just

25   her life that you took.  It's mine, too, and everyone around

1   her.

2       (Reading concludes.)

3           Again, Judge, that was written by the victim's mother.

4           THE COURT:  Okay.  Anything else that you wanted to

5   present?

6           MR. PARENTE:  No, Judge.

7           THE COURT:  Okay.  So, Mr. Key, you have a right to

8   address the Court.  You can ask for any sentence you deem

9   appropriate.

10          Do you want to say anything at this time?

11          THE DEFENDANT:  Yes, I do.

12          THE COURT:  Okay.

13          THE DEFENDANT:  First of all, I want to -- I want to

14  really apologize for anybody that was affected by anything that

15  I did or any of my actions.  I apologize to my family, you

16  know.  Apologize to the Court.

17          I feel that a lot of the things that's been going on

18  in the court has been not a hundred percent and is -- and a lot

19  of things is inaccurate.

20          Had this been a case where it was -- that I was

21  charged with 2421 and I was charged with zero to ten, then I

22  wouldn't be sitting here today -- ten to life is different from

23  zero to ten -- because a person misrepresent who they are to

24  you.

25          A lot of the things from the struggles I go through

1  with my mental health and my situation is I try to find ways to

2  deal with my struggles and my -- my -- by going through DBT and

3  doing things that I should do, and I'm always set back by the

4  things that I'm trying to do.

5         The thing, too, is the Court probably looks at this

6  one way, but it's another way the Court should look at this.

7  In fact, I was reading the grand jury statements a while ago,

8  and the Court and the prosecutor try to make me seem as if I'm

9  just a super bad person.

10         Dache Crayton, she testified that I gave -- that she

11  made $4,500 with me.  She says she was with me, what, 20 days.

12  She stayed in a hotel every day, $100 a day.  She had her

13  own -- bought her own hair, $500, her nails, clothes.  She

14  didn't have anything.  She bought hair, food, clothes,

15  everything she wanted.  That's way more than $4,500 that she

16  spent on herself.  What did I get from it?  Nothing.  Nothing.

17  I can name to you, it's $2,000 to be in a hotel room for 20

18  days.  On top of her buying hair for herself, that's 4 or $500,

19  getting her hair done.  Her nails, her food, her cigarettes,

20  everything that she did, her clothes, her iPhones.  These are

21  all things, 4,500, that's $4,500 gone.  What did I get from

22  that?  Absolutely nothing.

23         I didn't -- I didn't tell April, "Hey, April, come on,

24  let's do this."  April said she was helping her mom.  She says

25  she was helping her mother.  I didn't tell her to do anything.

1    But that's -- those are the things the Court will never know

2    because people don't be honest and allowing things to really

3    come out like they should come out.

4            But I am here, I'm here where I'm at, and I can't

5    change it.  I just got to move forward from the past and

6    continue to go forth.

7            A lot of allegations I'm -- that the prosecutor bring

8    up, I fight every allegation that come my way, because if I'm

9    right, I'm right.  I have no problem admitting I'm wrong.  I

10   don't assault anyone.  Every fight I had, somebody hit me

11   first.  Every single fight.  That's just not me.  I don't go

12   around putting my hands on people.

13           Dache Crayton tell you I don't hit females, I don't

14   hit girls.  Nikki, I would never tell Nikki -- do anything to

15   Nikki kids.  I told Nikki -- I know the prosecutor got the rest

16   of the text messages.  I was going to tell her mother that she

17   was doing heroin.  That's what the text message was about.  And

18   after that, Nikki still text message me, telling me that she

19   didn't like Kayla and she didn't want to be around her, and she

20   was going to get me sent to jail, that I needed to stop talking

21   to her and things like that.  So don't make it seem as if

22   Nikki, like I was threaten Nikki or the kids, because, no, that

23   wasn't what I was doing.  I was telling her that I was going to

24   tell her mother that she was on drugs.  And I took Nikki her

25   stuff and so on.  So it's not like I was threatening -- I love

1    her kids.  Me and her kids, we went and seen her kids every

2    week, took them shopping, every week.  So don't say that I'm

3    threatening -- if you want to bring the text messages, bring

4    all the text messages, every single one of them, and don't

5    bring a piece of the text message to make it look as that I'm

6    trying to take kids or do something to the kids or anything of

7    that nature.

8         And, secondly, the charge in Wisconsin about the --

9    the case, the report, the incident report, it was

10   unsubstantiated.  I went to an administrative law judge

11   hearing, and the proof -- the burden of proof is more than --

12   more likely than less likely.  I presented five witnesses.  DNA

13   specialist.  This girl had three DNAs inside of her.  None of

14   them was mine.  Let's talk about that.

15        (Cell Phone interruption.)

16        THE DEFENDANT:  The DNAs that she had in her, none of

17   it was my DNA, in her panties, in her -- in her -- inside of

18   her.  And that's what I told the prosecutor, and that's what

19   the prosecutor talked to me about with the lawyer.  So they

20   knew what was going on, so they knew I ain't do this.  So

21   they -- that's why I wasn't charged with a crime.

22        But at the end of the day, I can just hope and pray

23   that everyone do better, and if -- if she had any problems, I

24   would hope that it's not me that caused her problems.  I would

25   hope that she would get over it and just, you know, be all she

1    can be, you know?

2            And that's it.

3            THE COURT:  Okay.  Anything else?  Anything else you

4    want me to address before I sentence you?

5            THE DEFENDANT:  No.

6            THE COURT:  Okay.  All right.  We start out with the

7    understanding that the sentencing guideline calculation is 210

8    to 262 months based upon a total offense level of 34 and a

9    criminal history category IV.

10           Although not before me, there is in the criminal

11   history category in the Court's opinion a basis for going

12   higher in the criminal history category and not lower as based

13   on the information of these arrests.  The -- but for the fact

14   that the 2017 [sic.] sexual assault conviction was pled down to

15   a misdemeanor, he would have been a career offender.  And based

16   upon the significant violent criminal history that supports a

17   career offender, this Court would have granted a variance or --

18   under the guidelines an upward departure saying that the

19   criminal history under-represented -- the category

20   under-represented the true nature of his criminal background.

21   I'm not granting that today.  What I'm doing is I'm using that

22   in my 3553 factors.  And what that should show is that

23   regardless of the criminal history calculation that we just

24   made, this Court would have gone higher in the criminal history

25   calculation based upon what I believe is an

1    under-representation of a significant history, which I'll go

2    through shortly.

3            So let's start with the crime itself, the nature and

4    circumstances of the crime.

5            The evidence was clear that the defendant

6    intentionally traveled out of state to collect this particular

7    minor because he needed a girl.  He needed a new girl to sell

8    for business.  The evidence supported that.  He was in the

9    business of selling humanity for sex.  He had done so before

10   with Ms. Crayton.  He had a history of being within these

11   hotels and clearly was in the business to continue to do so.

12   The victim repeatedly asked to go home.  She was out of state,

13   she was a minor, she did not have the ability to fend for

14   herself and, therefore, was abused by being placed in this

15   position.

16           The reality of this activity was clear to the Court

17   when Ms. Crayton first testified at the suppression hearing.

18   She is, what, maybe six feet from me on the witness stand; and

19   when asked about whether she was afraid of the defendant, she

20   was visibly shaking and terrified and she was afraid that he

21   would harm her.

22           The text messages that are presented, whether they're

23   all there or just singly there, no one can argue that someone

24   loves someone if they're saying words such as "make sure that

25   you get me my cash or you'll never see your kids again."  That

1    violent threat was a threat that clearly was conveyed, and it

2    was clear that Ms. Crayton was aware that that had been

3    conveyed and that that was one of the reasons why she was

4    shaking on the witness stand in this court.  Her credibility

5    was absolutely solid when she testified.  She described what

6    had occurred.  She described the incident with the minor victim

7    in this case and was very helpful to the Court in understanding

8    the analysis of the defendant's behavior for the charged

9    conduct.

10           So the circumstances of the case -- of the conviction,

11   although one count, show a behavior that was ongoing.  It was a

12   behavior that could have been charged at a greater degree.  It

13   wasn't.  It didn't need to be because it resulted in the

14   transportation of a minor in interstate commerce for the

15   purposes of prostitution, and that's a mandatory minimum of ten

16   years.  But the activity that was described shows conduct of

17   others and Ms. Crayton was another of the victims, although not

18   a minor under a 2423(a), certainly a trafficked victim as far

19   as sex trafficking is concerned, based upon the coercive

20   description that she described, so the nature and circumstances

21   of the offense show a much broader and more extensive conduct

22   by the defendant.

23           The history and characteristics of the defendant, what

24   a troubling, troubling background and history.  As a young

25   person, there's a disputed issue as to whether or not at one

1    point he had been sexually abused as a seven-year-old.  That

2    was not presented the first time he was interviewed for

3    competency evaluation years ago and it came up later, so it's

4    in dispute.  However, what is clear and not in dispute is that

5    his parents were a couple that broke up, that the mother was

6    not available to be a role model based upon the fact that she

7    was not always there for him, and that she in many ways has

8    continually made statements that I think are enabling his

9    behavior, such as by saying that he's not a violent individual,

10   when there's a history of being convicted of armed robbery and

11   of sexual assault with a knife.  So I don't know how those

12   convictions can result in someone saying that there is no

13   violence in the background of this individual.

14          That being said, when we look to his mental health

15   background, it is all over the map, sometimes being described

16   as someone who is in need because he's cutting himself for

17   self-loathing, assumingly.  And, however, each of the efforts

18   that medical personnel have made to aid him in his mental

19   health situation he abuses, by abusing the medications in order

20   to overdose on the medications and many times by manipulating

21   the statements that have been presented to medical personnel.

22   And so even the efforts to aid him in his mental health

23   situation have fallen flat.

24          His criminal history is the most troubling.  And if we

25   start back at a young man's age, his criminal history includes

the one that we have discussed at great length regarding the number of points that he should have been given for it.  And in that instance, he used a knife to force -- to rape a woman, his senior, by the way, either 21 or 22 years old, when he was only 17 years old.  It was a violent rape where he, after the rape, exited the room and, again, in keeping with his character of coercion and force and threatening, at the age of 17, this is 14 years ago, held a knife to the victim's face and said, "Who you going to tell," to challenge her to be quiet and not release this information.

The Court in that case accepted a misdemeanor.  As I've mentioned, but for the fact that that was accepted, this would be a career offender, starting his criminal history with a significant violent act that should have received a much higher sentence in the Court's opinion.

Getting that gift from the court, however, did not have any impact on this 18-year-old, because he then violated his probation.  He was ordered to 100 days in the house of correction with release for work, and he ran from -- reflects that the revocation ran from August 11th until May 23rd, between 2003 and 2004, which brings us right up to a 2003 conviction.  So he's on probation while he is committing this armed robbery.  So straight out of getting this probationary sentence for this very violent act, we turn in to the armed robbery.

1          Now, rather than a knife, we have the defendant

2    pointing a gun at minors and adults.  The gun accidentally,

3    allegedly, going off during this robbery, which was clearly

4    one, again, to have force and threat and coercion and fear

5    within the individuals.  "Where's the money," with the gun

6    pointing at the victim, tearing a gold chain off of his neck.

7    Very violent, violent behavior at the age of 18.  He demanded

8    that the victims provide him with a number of different items.

9    This was not like a quick moment in time.  He then fled and hid

10   in an attic.  And the victims identified the various suspects,

11   and they recovered the .22 caliber gun from the attic where he

12   was arrested.  His statement upon the arrest is also consistent

13   with his usual statement of blaming his victims or degrading

14   them in some way.  He had robbed some Arabs on a previous

15   occasion he says and --

16          THE DEFENDANT:  That's not me, your Honor.

17          THE COURT:  Okay.  So this is Thomas saying he robbed

18   he --

19          THE DEFENDANT:  He the one -- he the one in the

20   sentencing, when I got sentenced, the judge found out that he

21   was the one who did all the stuff.  The Arabs didn't know how

22   to talk Spanish -- I mean talk English.  So when they did --

23   when they did all their analyst and they did the DNA and the

24   fingerprint analyst, they found his fingerprints on the gun,

25   his DNA on all the property, and the judge said that in the

1    other -- the other guy testified that it was him and the

2    other -- it was him and Andre who did all the stuff, and I was

3    driving the car, and so the judge gave me four years for party

4    to the crime for driving the car.  Andre told him I did it

5    because I drove the car and got -- somebody got the driver's

6    license, so he blamed it on me.  He went in there and blamed it

7    on me.  But when all the evidence showed in court, it was

8    showed that he was the one that did it, so they charged him

9    with the gun and they charged him with -- they gave him the

10   most time because they found out that he had lied.

11             THE COURT:  As I was saying, having an excuse for

12   everything when you were -- pled guilty and found guilty of

13   armed robbery with threat of force regarding your conviction.

14             And then there was a period of supervision.  Regarding

15   the revocation of the supervision, it was alleged that he had

16   sexual intercourse with a minor child on April 13th of 2011 and

17   had provided the minors with alcohol.

18             And regarding the second and third allegations, the

19   defendant, who was 26 years old at the time, did not dispute

20   that he had contact with the victim or that his semen was on

21   her shorts, but he denied getting her drunk or having any

22   sexual contact with her because the semen was on her shorts

23   because she sat on a spot where he had had sex with a friend

24   the day before.  The Court found that not credible and

25   inconsistent and determined that the semen stain on the shorts

1    was substantial evidence that sexual conduct -- contact with

2    her had resulted in ejaculation and that he had violated his

3    supervision as a result.  This is the supervision on the

4    robbery that, again, you have an excuse for, that it was

5    everybody else's fault and that's why you got the misdemeanor

6    regarding.

7            The court at that time stated you were clearly in need

8    of intensive treatment, addressing the sex offender issues and

9    cognitive thinking, and that you should be cooperative with the

10   sex offender treatment program, and you were ordered to see a

11   psychologist for an assessment, given to a halfway house for

12   your repeated drug use.  Now we're at 26 years old.  And

13   given -- and after that when he completed his ATR in the

14   Wisconsin Resource Center, he had resumed his drug use within

15   three months and was given a 45-day sanction for the drug use.

16   And had police contact in 2010 with a prostitute at a motel who

17   he claimed -- who had claimed that he was holding her against

18   his will and had a gun, not inconsistent with his previous

19   behavior in the charged convicted conduct that we just

20   described.  He was sanctioned for that and later -- ten days

21   later was driving without a valid license, providing alcohol to

22   minors, and sexually assaulting one of the minors.  The Court

23   revoked that supervision, and he was confined for three years

24   and seven days with credit served for various terms.  So we're

25   only at 26 years of age.

1    There's numerous arrests for operating on suspended

2  licenses, none of which resulted in any criminal history

3  computation.

4    So aside from the convictions and behavior that in the

5  Court's opinion shows a career offender type behavior, someone

6  whose behavior escalates and he uses weapons and coercion and

7  threats to, and sexual aggression, to maintain his victims,

8  then he's placed in custody, and the Court has been provided

9  with the various incident reports that came out of his federal

10  custody over the past few years.

11    He has a number of extensive conduct reports while

12  he's been in prison and, therefore -- some of these include

13  attempted coercion of correctional officers, force against

14  correctional officers, force against other detainees and

15  inmates, altercations with other detainees and inmates, and

16  then this behavior of masturbating in front of women,

17  correctional officers and others, while incarcerated, while

18  incarcerated and pending this sentence, showing a complete lack

19  of ability to control his behavior.

20    And what was really remarkable is to see the incident

21  report and read the deposition transcript of a civil attorney

22  on a civil case taking your deposition within a federal

23  facility in a locked interview room with you and a court

24  reporter and herself, two women and you, and masturbating in

25  front of her, so that she has to pound on the door to get out,

1    because you're masturbating in front of her in a civil case.

2    The behavior is completely out of bounds of normal behavior,

3    and it is extremely aggressive, and it's extremely violent.

4            Mental health treatment and incarceration has not

5    aided him.  Medications are abused.  The most recent report

6    from yesterday shows manipulation again in the altercation

7    report.

8            It wasn't simply that you engaged in a fight with

9    another inmate the night before you are to be sentenced by this

10   Court, but it was the way in which you maintained access to

11   him, by coming out for your tray and then acting as if you had

12   gone back into your cell, but hiding in the showers in wait for

13   that inmate to aggressively attack him in the back of the head.

14           This is behavior that is so out of bounds of normal

15   acceptable behavior within the community.

16           THE DEFENDANT:  That's a lie, your Honor.

17           THE COURT:  You will need to be incarcerated for all

18   of that criminal history that marks what is a violent person

19   who cannot rehabilitate, an aggressively sexual person who has

20   not been able to rehabilitate, and probably a mentally

21   unhealthy person who has not been able to respond to mental

22   health treatment as far as the history and characteristics of

23   the defendant.

24           As far as whether a sentence of this -- that I'm going

25   to impose will promote respect for the law, a sentence must be

1    imposed that represents, first, that it is impermissible to

2    sexually abuse minors and to sexually abuse the female gender,

3    and a sentence must be imposed to show that in the history of

4    your interaction with the judicial system, you had no respect

5    for any of the judicial system's orders, and a sentence must be

6    imposed to show that anyone who does something like this will

7    suffer a significant sentence.

8           Then as far as the needs for you, if I were looking at

9    a period of time of supervision, I would balance the period of

10   time for supervision.  I'm required, I believe, to give you

11   supervised release.  My position is that I'm going to give you

12   a higher sentence and less supervision because you have not

13   shown a regard for your ability to maintain a healthy lifestyle

14   within the facility.

15          I'm sentencing you to 262 months in jail -- in prison,

16   excuse me, followed by five years of supervised release.

17          Restitution is mandatory, and you shall pay

18   restitution in the amount of $3,000.  That restitution is based

19   upon the fact that the victim in this case has mental health

20   counseling needs.  I can only assume, based upon the letter of

21   her mother about the addiction issues that she's using in order

22   to cope with her victimization, that she needs to be given some

23   alcohol or drug treatment programs as well as counseling

24   programs, at a bare minimum of $100 per session for psychology,

25   3,000 is a minimum amount of restitution.

1          Did the government have another position regarding

2  restitution?

3          MR. PARENTE:  No, Judge, just that then we should make

4  it 3,300, which would incorporate the original $300.

5          THE COURT:  Okay.  3,300 it is.

6          There's a special assessment of $100.

7          Now we need to go through each and every one of the

8  proposed conditions of supervised release.  And they were given

9  to the defendant prior to sentencing, so he had a chance to

10  review them.

11          And the first ones are mandatory, and they include not

12  committing another federal, state, or local crime; and not

13  unlawfully possessing a controlled substance; and registering

14  with the Sex Offender Registration Notification Act;

15  cooperating in the collection of a DNA sample; and refraining

16  from the unlawful use of a controlled substance; and submitting

17  to one drug test within 15 days of release and at least two

18  thereafter, up to 104 per year.  Those are mandatory.  They're

19  also substantiated by the sex offense that has been the

20  conviction, the law that requires, especially in a sex offense

21  situation, that a DNA sample be used for collection, and his

22  history of abuse of drugs, which is documented within the

23  report.

24          Under the discretionary conditions, I know that you,

25  Ms. Kieckhafer, say make restitution to the victim of the

1    offense as a discretionary one.  It's actually mandatory, I

2    believe statutory condition here, and so I'm going to actually

3    include that as a mandatory condition, which will be the $3,300

4    for counseling, based upon the fact that the victim has been

5    psychologically harmed, and the mother has substantiated that

6    with her letter to the Court.

7            Seek and work conscientiously at lawful employment or

8    pursue a course of study that will equip him for employment.

9    Clearly, he needs to be working and not working illegally by

10   selling humanity for sex.

11           Secondly, refraining from engaging in the business of

12   bearing a reasonable relationship to the conduct constituting

13   the offense.  So I believe in this situation, because it was

14   commercial sex trade, to be clear at the sentencing, that he

15   must refrain from a business or occupation that is directly

16   related to this type of offense.  Would be, for example, a

17   massage parlor, a nude-dancing facility, any type of facility

18   where there is the sale of sexual or sensual, I'll even say,

19   activity which would then lead to him potentially getting back

20   into the behavior.

21           Refraining from meeting with Ms. Crayton and April.

22   This is not just meeting with.  It is refrain, you shall

23   refrain from communicating with any person that you know to be

24   engaged or plan to be engaged in criminal activity, and you

25   must not meet or communicate with Ms. Crayton and April based

1    upon your coercion of them.

2            You must refrain from the excessive use of alcohol,

3    which is defined as .08 percent blood alcohol concentration,

4    and refrain from the use of a narcotic drug or controlled

5    substance as defined in the Controlled Substances Act.  That's

6    because the report shows both have been abused in the criminal

7    activity and in the related conduct.

8            Refrain from possessing a firearm, destructive device,

9    or other dangerous weapon.  You have used both a knife and a

10   gun in the past in your criminal activity.  This is

11   appropriate.

12           Participate in a substance abuse treatment program,

13   which may include urine testing up to a maximum of 105 tests

14   per year, and a mental health treatment program, both abuse of

15   substances as documented, as well as a long history of mental

16   health problems.

17           Remain within the jurisdiction where you're being

18   supervised unless given permission by the Court or a probation

19   officer.  That is in order for us to maintain all of these

20   various treatment programs that I am imposing.

21           Report to a probation officer as directed by that

22   officer.

23           Permit the probation officer to visit at any

24   reasonable time at home, at work, at school, or at a community

25   location, or at any reasonable location specified by the

1    probation officer, and permit confiscation of any contraband

2    observed in plain view.  This is in order to maintain that you

3    are on the supervised release that you need to be on and

4    following the conditions, which include the conditions

5    regarding reporting and staying away from substance abuse.

6            Notify a probation officer within 72 hours of any

7    change in your residence, your employer, your workplace, absent

8    a constitutional or other legal privilege.

9            Notify a probation officer within 72 hours if arrested

10   or even questioned by law enforcement.

11           The next one, which is to submit to any time without a

12   warrant the search of his person by law enforcement having

13   reasonable suspicion, I'm not going to give.  I think it's too

14   broad, and he has a constitutional Fourth Amendment right.  So

15   if they have -- if law enforcement has reasonable suspicion,

16   they will -- they will follow that reasonable suspicion and

17   follow normal law enforcement, but I'm not going to pre, like

18   in the future, order him to submit without a warrant.

19           Comply with the following special conditions:

20           Participate in an approved job skill training program

21   within the first 60 days of placement on supervision.  Yes, he

22   needs to be working and maintaining a healthy lifestyle, not

23   selling others.

24           If unemployed after the first days of supervision, he

25   must perform at least 20 hours of community service per week

1    until he's gainfully employed, but that shall not exceed 500

2    hours.

3            He shall not incur credit charges or open additional

4    lines of credit without the approval of the probation officer

5    unless he is in compliance with the financial obligations that

6    I just imposed.

7            And he must provide the probation officer with

8    requested financial information during his supervised release

9    so that she can or he can determine whether or not he is in

10   compliance and has the ability to pay his financial

11   obligations.

12           He also must notify the Court of any material change

13   in his economic circumstances that might affect his ability to

14   pay restitution or special assessments.

15           And provide to the IRS and pay taxes as required by

16   the law if he is required by the law to pay taxes.

17           Participate in a sex offender treatment program.  This

18   program and provider will be determined by the probation

19   officer.  And you shall comply with all recommended treatment,

20   which may include psychological and physiological testing.

21           And you shall maintain the use of all of your

22   prescribed medications.

23           You shall comply with the requirements of the Computer

24   Internet Monitoring Program that has been established by the

25   United States probation officer.

1          You shall consent to the installation of monitoring

2     software on your computer, and that may restrict you in your

3     activity, and it also may record your history in order for the

4     Court, through the probation officer, to determine whether you

5     are violating the terms of your supervised release by, for

6     example, engaging in the same conduct that you were engaged in

7     that led to this conviction.

8          The cost of the monitoring shall be paid by the

9     defendant at a monthly contractual rate if he is financially

10    able to do so and only after he has paid his restitution to the

11    victim.

12         The defendant shall not possess any device with access

13    to an online computer at any location without discussing this

14    with his probation officer and getting prior approval.  And

15    this would include internet service regarding how he may be

16    using it at work or at home.  It needs to be approved by the

17    probation officer.  And if she or he feels that it's not an

18    appropriate access, that needs to be brought to the Court's

19    attention.

20         You shall not -- it says you shall not possess any

21    device that could be used for covert photography.  I think that

22    is too broad of a definition.  A cell phone could be used for

23    covert pornography -- or photography.  I'm not going to put

24    that in.  If there is a concern because of the monitoring,

25    we'll find out about it, and it will be brought to the Court's

1    attention.

2         The record shows an interest in minors, it shows

3    sexual activity towards minors in both charged and uncharged

4    conduct, so I am going to impose a condition that you shall not

5    view or possess child pornography.  And if the treatment

6    provider determines that exposure to other sexually stimulating

7    material that may be detrimental to the treatment process could

8    trigger that problem, then I'm going to require the probation

9    officer come to the Court and explain to the Court what is the

10   concern and whether new restrictions need to be placed.

11        So what that means is that any type of stimulating

12   material that is a concern of the probation officer's based

13   upon effective treatment in a sexual treatment program, they

14   should raise it with me so that we can assess it for First

15   Amendment issues and for overly burdensome issues.

16        The defendant shall not, without the approval of a

17   probation officer and treatment provider, engage in activities

18   that will put him in unsupervised private contact --

19   unsupervised private contact -- with persons under the age of

20   18 based upon his attraction to and assault and battery of

21   minors.

22        Therefore, this, again, if this is an issue regarding

23   whether there will be supervision or whether there will be any

24   type of private contact, the probation officer is required to

25   bring it to the Court's attention prior to the proposed

1    contact.

2           The defendant's employment shall be restricted to the

3    district and division where he resides or is being supervised,

4    and that is because all of these restrictions are in place for

5    those five years that he is going to be supervised.

6           He's not allowed to participate in any volunteer

7    activity that may cause him to come into direct contact in an

8    alleged volunteer way with children unless that is approved in

9    advance by the probation officer or the -- and/or the treatment

10   provider.

11          Upon request, the probation officer shall ask for

12   telephone bills or credit card statements, and that is both to

13   see whether he is paying his restitution and also whether he is

14   having contact with minors or accessing internet sites that he

15   should not be accessing.

16          He shall comply with all state and local laws

17   pertaining to his convicted sex offender status once he's

18   registered, depending on where he's living.

19          If this financial penalty that I'm imposing remains

20   unpaid at the beginning of the term of supervised release, the

21   defendant's monthly payment schedule shall be an amount that is

22   at least 10 percent of his net monthly income defined as income

23   net of reasonable expenses for basic food, shelter, utilities,

24   insurance, employment-related expenses.

25          And if the probation officer determines that he poses

1    a risk to another person, the probation officer may require

2    that you tell that person about the risk, and then you must

3    comply with that instruction.

4         I'm going to require that if the probation officer

5    determines that the defendant poses a risk to another, that the

6    probation officer also inform the Court that such a risk exists

7    so that the Court may make a determination as to whether other

8    conditions need to be imposed in order to protect that

9    individual from the defendant.

10        And, therefore, those are all of the conditions of

11   supervised release.

12        Mr. Key, do you object to any of them?

13        THE DEFENDANT:  I object to all of them.

14        THE COURT:  Okay.  You have to have a reason as to

15   why.

16        THE DEFENDANT:  First of all, as I put in my

17   sentencing memorandum, my case is based on -- it's a Tenth

18   Amendment violation in this case.  This case is based on

19   prostitution.  Prostitution is not a sexual offense in the

20   State of Illinois that cause a sexual registration.  Not one

21   prostitute has to registrate -- register for sex -- for

22   prostitution when they're found guilty of a prostitution act.

23   So me transporting someone to engage in prostitution that is

24   not considered a sexual act that requires registration in the

25   State of Illinois is a Tenth Amendment violation to the law.

1   It's giving Congress the power to go between the state lines

2   and regulate what states define as sexual offense that cause

3   registration.  And that's exactly what it's doing in this case.

4           So any of the -- any of the rules with sex offender

5   registration and any of those things, people have not brung

6   this to the courts' attention because the courts have not

7   looked deeply into these issues.  But I -- in my motion, I

8   think I was very clear with my motion about the way -- the way

9   it works.  Even if you found guilty of 2421, it's considered a

10  sex offense in the feds.  But the actual prostitute, because --

11  essentially what you saying is a cab driver can drive across

12  the state line with a prostitute, and he knows she's a

13  prostitute, and drop her off for fare, and be charged with a

14  sex offense and be looking at a 10-year -- a zero- to 10-year

15  sentence.  That's the unconstitutionality of the whole statute

16  itself.  Not only -- not only does it violate the Tenth

17  Amendment, it's also cruel and unusual punishment.  You

18  punishing me for someone else act.  I'm not being punished --

19  this act is not sex trafficking.  I'm not -- I'm not being

20  punished for coercion, force, fraud.  I'm being punished for

21  transporting an individual across the state line for them to

22  engage in prostitution.  And if their prostitution is a

23  misdemeanor, and I think Judge Posner said this in

24  *United States versus Taylor*, I think he was real clear on this

25  issue, he said for the federal government to take a state

misdemeanor and make it into a 10-to-life sentence goes beyond

the term of the sexual activity to which its requesting what

the government wants the Court to request and make it seem as

this is a crime of violence.  It could be a crime of violence

if violence occurred in the crime.  But as we sit -- as we sit

here right now, there's no reason I should have to register as

a sex offender based on the Illinois state laws, because even

in the Illinois state laws -- because, essentially, this is

what this is.  Prostitution is not illegal in the states -- in

the United States of America.  And even in Nevada, where the

counties have different counties that people prostitute, they

can't be charged with transporting a person in the state of

Nevada, in those states, where the feds, they can't charge them

with the transportation.  If that's the case, every ranch

that's in Nevada would get charged with 2422, coercion and

enticing a person to travel in interstate commerce with the

intent to engage in prostitution.  But since the act of

prostitution is illegal -- is legal in a state in those cities,

they're not able to charge them federally with these crimes.

So me being charged as a sex offender beats me.  I

don't understand, how could you possibly -- that's just like

Congress saying you regulate interstate commerce to go inside

of a state to steal.  You go inside of a state because you

drove interstate commerce and you went inside a state to smoke

some weed.  They're all misdemeanor offenses.  I think -- I'm

1    pretty sure that Congress doesn't have the police power to
2    enforce those constitutional -- constitutionalities and put a
3    registration on a state offense that's not considered an
4    offense that you register.
5         I mean, if we look at the significant case law that
6    has passed, *United States Mannava, United States versus Taylor*.
7    And the courts been really after about what they've been
8    deciding in these case laws what constitutes sexual activity
9    which people can be charged with a crime.  I could see if you
10   take a person -- because in Illinois, even promoting juvenile
11   prostitution, even soliciting a juvenile to prostitute, it's an
12   affirmative defense that the person reasonably believe --
13   believe that the person was 18 years of age.  So if these are
14   affirmative defenses and in states that constitute the crime,
15   because even if you look at 1952, the Traveling Act, the act of
16   prostitution is not criminal in the United States, so it got to
17   be the state to criminalize the prostitution act.  If the state
18   don't criminalize the prostitution act, you cannot be charged
19   with the act of prostitution.  When the federal government
20   decides to criminalize prostitution and make it a felony for a
21   person to prostitute -- now, if you get me wrong, if a person
22   molests someone, then yes, it -- in a state, that's a -- that's
23   probably a Class One felony, a Class X felony, and it's 6 to
24   30.  Then that's a registration within the -- within that
25   state.  But the prostitution act within that state is not a

1   registration act.  It's not nothing that requires registration

2   under the amendment.  And if you look back at this, this --

3   this statute, starting from 1986, when it was amended, they had

4   this purpose -- this purpose change in the statute.  And the

5   reason they changed the statute is because it had to be illegal

6   activity, because people was going over the state lines and

7   getting charged with immoral conduct, having sex with someone

8   else wife.  So that's why they made the statute to criminalize

9   illegal sexual activity.  Without the illegal sexual activity,

10  the statute does not criminalize itself.  Otherwise, you're

11  just being charged with a federal statute.  And that's what

12  Posner said.  And that's -- that's what I'm not waiving.

13  Because if they don't state a crime, I would have no problem

14  being charged with any of the crimes they want to charge me

15  with, because all the crimes they charged me with have

16  affirmative defenses to them.  And I think I can get over any

17  hurdle of any one of the affirmative defenses.  And I believe

18  this going to be a strong issue within the Seventh Circuit

19  Court of Appeal, and I think that they're really going to pay

20  real close attention because they really been waiting for this

21  to come up.  This is an issue that really the court has been

22  just patiently waiting for someone to bring up.  And I think by

23  this sex offender register, registration within the statute, I

24  think it caused the statute to be maybe revisited by Congress

25  to figure out what constitutes sex offender registration within

1    the statute.

2         THE COURT:  Okay.  The argument is noted then for your

3    appeal and that you object.

4         I am going to include the sex offender registration

5    because nowhere in the United States is it legal to have a

6    minor engage in prostitution, and that is what you were

7    convicted of.  As much as you would like to be convicted of a

8    different crime that you had affirmative defenses for, the jury

9    found that you had brought a minor to engage in prostitution,

10   and that's not legal anywhere in the United States.

11        Any other objections to your supervised release

12   conditions?

13        THE DEFENDANT:  No, your Honor.

14        I would ask, I would -- I would ask for the Court to

15   put on record for my notice of appeal and the transcripts --

16        THE COURT:  You need to file a notice of appeal with

17   the court above me.  It doesn't -- it doesn't matter what you

18   say to me.  You have a right to appeal this sentence.

19        THE DEFENDANT:  Right.

20        THE COURT:  You have to do it within 14 days of the

21   entry of the judgment and commitment -- conviction order, and

22   you have to do it upstairs.

23        THE DEFENDANT:  I have already.

24        THE COURT:  Okay.  You can't appeal before the

25   conviction comes down.  So having already, if -- don't think

1    that that did it.  You have to get the judgment and conviction

2    order and then file a notice of appeal on that.  Okay?

3              THE DEFENDANT:  So you saying I have to wait for the

4    judgment --

5              THE COURT:  The judgment and conviction order, which

6    will come out in a day or so, and then you appeal it.  You

7    can't appeal something until it's a final order, and it's not

8    final until the judgment and conviction order is entered.

9              THE DEFENDANT:  So when I enter my docket, I put down

10   it wasn't a final order either, but I still filed my docket, so

11   it should be within the next day the Court receives my

12   docketing statement, so I put the -- I did the same thing with

13   my appeal, because I knew I was getting sentenced, so I just

14   put the appeal in, and the Court would get it probably within

15   the next two days --

16             THE COURT:  All right.  It's a different court, so

17   you'll have to address it with them.  But you do have a right

18   to appeal, and you have to file a notice of appeal after the

19   judgment and conviction order.

20             THE DEFENDANT:  Sentencing transcripts?

21             THE COURT:  Sentencing transcripts, you can get those.

22   We'll -- I'll have the court reporter prepare them.  They will

23   be for whoever your lawyer is on appeal or if you're doing it

24   *pro se*.

25             Okay.  Mr. Parente, anything else that I have missed?

1          MR. PARENTE:  Judge, I don't know if we addressed a

2     fine.  Did the Court want to issue a fine?

3          THE COURT:  I did not impose a fine.

4          MR. PARENTE:  Nothing on supervised release.

5          THE COURT:  Okay.  Or on the sentence itself?

6          MR. PARENTE:  No, your Honor.

7          THE COURT:  Okay.  Ms. Kieckhafer, what have I

8     forgotten?  Anything?

9          PROBATION OFFICER:  Are you going to waive interest on

10    the restitution?

11         THE COURT:  Yes.

12         Okay.  Anything else?

13         MR. PARENTE:  No, your Honor.

14         PROBATION OFFICER:  No, your Honor.

15         THE COURT:  Okay.  All right.  That's the sentence of

16    the Court, and you do have a right to appeal it.

17         MR. PARENTE:  Thank you, your Honor.

18         THE CLERK:  All rise.  Court is in recess until

19    1:00 o'clock.

20        (Proceedings concluded at 12:46 p.m.)

21

22

23

24

25

1                        C E R T I F I C A T E

2          I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5
     _/s/ GAYLE A. McGUIGAN_____          _December 5, 2016_
6    Gayle A. McGuigan, CSR, RMR, CRR                 Date
     Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25